Nos. 2023-1634, -1635, -1704, -1705

# United States Court of Appeals
# for the Federal Circuit

---

**BANK OF AMERICA, N.A.,**
*Appellant*

**v.**

**NANT HOLDINGS IP, LLC,**
*Appellee*

---

Appeals from the United States Patent and Trademark Office
Patent Trial and Appeal Board, IPR2021-01081, -01304, -01332, -01333

---

## PRINCIPAL BRIEF FOR APPELLANT

---

EIMERIC REIG-PLESSIS
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111
(415) 591-6800

GEORGE C. LOMBARDI
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600

CLAIRE A. FUNDAKOWSKI
Winston & Strawn LLP
1901 L Street, NW
Washington, DC 20036
(202) 282-5000

DUSTIN J. EDWARDS
Winston & Strawn LLP
800 Capitol Street
Houston, TX 77002
(713) 651-2600

*Counsel for Appellant Bank of America, N.A.*

# CLAIM LANGUAGE

## U.S. Patent No. 7,881,529 (IPR2021-01081): Claim 1 (Appx245)

1. A system comprising:

a camera that captures an image;

a network-enabled device that conducts a data processing operation on at least a portion of the image to produce data, and sends the data to a service;

the service programmed to receive the data;

    identify an object within the image;

    distinguish an object present in the image from others using a database that stores data characteristics of target objects; associate the object with information; and

    return the information to the network-enabled device; and

the network-enabled device further programmed to present the information related to the object to a user.

## U.S. Patent No. 8,478,036 (IPR2021-01304): Claim 1 (Appx267)

1. A content provisioning system comprising:

a target database storing known targets of different types and recognition parameters associated with the known targets;

an identification platform coupled with the target database, and that:

    communicates with a mobile device capable of acquiring a digital representation of a scene containing at least a portion of a target;

    receives the digital representation from the mobile device; and

    recognizes the target as a known target from the target database based on comparing parameters derived from the digital representation to recognition parameters associated with the known targets; and

a content service coupled with the identification platform, and that:

    obtains content information related to the known target; and

    sends the content information to at least one of the identification platform and the mobile device.

# CLAIM LANGUAGE (continued)

## U.S. Patent No. 9,324,004 (IPR2021-01332): Claim 1 (Appx292)

1. A method for processing a video stream, comprising:

analyzing, via a mobile device, a scene represented by the video stream for at least one object;

deriving at least one characteristic of the video stream;

recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream;

providing an indication upon recognizing the at least one object as the target object; and

presenting to a user, via an address, content information associated with the target object.

## U.S. Patent No. 7,899,252 (IPR2021-01333): Claim 18 (Appx314)

18. A method for retrieving information from image processing, the method comprising:

providing a mobile device having a camera the mobile device configured to capture an image and configured to transmit data relating to the image an image processing platform;

configuring the image processing platform to receive the data relating to the image and to conduct image processing, including:

operating on the data relating to the image to determine if the image contains one or more recognizable symbols; and

decoding the recognizable symbols to extract symbol information by analyzing the recognizable symbols according to type;

providing access to a distal server configured to use a database to identify pertinent information associated with the recognizable symbols based on the symbol information; and

allowing the mobile device to receive the pertinent information over a network.

# CERTIFICATE OF INTEREST

Appellant's undersigned counsel certifies that the following infor-

mation is accurate and complete to the best of counsel's knowledge:

1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1): "The full name of every entity represented in the case by the counsel filing the certificate."

    Bank of America, N.A.

2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2): "For each entity, the name of every real party in interest, if that entity is not the real party in interest."

    Bank of America Corporation

    Bank of America Corporation is being identified as a real party in interest because Bank of America Corporation is a named defendant in the related district court proceeding and Bank of America, N.A. is an indirect wholly owned subsidiary of Bank of America Corporation.

3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3): "For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock."

    Berkshire Hathaway Inc.

    Bank of America, N.A. is a direct, wholly owned subsidiary of BAC North America Holding Company. BAC North America Holding Company is a direct, wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct, wholly owned subsidiary of Bank of America Corporation. Bank of America Corporation is a publicly held company whose shares are traded on the New York Stock Exchange and

has no parent corporation.  Based on the U.S. Securities and Exchange Commission Rules regarding beneficial ownership, Berkshire Hathaway Inc., 3555 Farnam Street, Omaha, Nebraska 68131, beneficially owns greater than 10% of Bank of America Corporation's outstanding common stock.

4.  **Legal Representatives.**  Fed. Cir. R. 47.4(a)(4): "The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court."

Michael A. Tomasulo

5.  **Related Cases.**  Fed. Cir. R. 47.4(a)(5): "An indication as to whether there are any related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5."

Yes: *Nantworks, LLC v. Bank of Am. Corp.*, No. 2:20-cv-07872-GW-PVC (C.D. Cal.).

6.  **Organizational Victims and Bankruptcy Cases.**  Fed. Cir. R. 47.4(a)(6): "All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases."

N/A

/s/ George C. Lombardi
GEORGE C. LOMBARDI
*Counsel for Appellant*

July 5, 2023

iv

# TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE ................................................................. i

CERTIFICATE OF INTEREST ............................................... iii

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY OF ABBREVIATIONS .......................................... x

STATEMENT OF RELATED CASES .................................... xi

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT .......................................... 9

STATEMENT OF ISSUES ....................................................... 9

STATEMENT OF THE CASE ................................................ 10

    A.   The challenged patents ................................... 10

    B.   The prior art ..................................................... 15

         1.   Ogasawara ............................................... 15

         2.   Bolle ......................................................... 18

    C.   Proceedings before the Board ........................ 23

         1.   The '529, '036, and '004 patents .......... 23

             a.   Bolle's tolerance for movement .......... 27

             b.   Integrating a mobile camera flash ...... 30

         2.   The '252 patent ....................................... 33

SUMMARY OF ARGUMENT ................................................ 38

STANDARD OF REVIEW ..................................................... 41

ARGUMENT .......................................................................... 43

# TABLE OF CONTENTS (continued)

**Page**

I.    The Board's findings upholding the challenged claims of the '529, '036, and '004 patents should be reversed or vacated............ 43

    A.    The Board erred in finding that Bolle's segmentation technique could not be used with a mobile device................ 44

        1.    The Board's factual finding that Bolle cannot tolerate 1 mm of movement is unsupported by any (let alone substantial) evidence.................................... 44

        2.    Combining Ogasawara and Bolle would have been obvious under controlling legal standards................... 49

    B.    The Board erred in finding that a skilled artisan could not have implemented a suitable camera flash. ................... 54

        1.    The Board legally erred by discounting the background knowledge of a skilled artisan. ................ 54

        2.    Mobile videophone flash and synchronization technology was undisputedly well known. .................. 58

II.    The Board's findings upholding the challenged claims of the '252 patent should be reversed or vacated. .................................... 62

CONCLUSION ....................................................................................... 69

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Erecting & Dismantling Co. v. Genesis
    Attachments, LLC,*
    825 F.3d 1373 (Fed. Cir. 2016) ........................................... 50

*Apple Inc. v. Andrea Elecs. Corp.,*
    949 F.3d 697 (Fed. Cir. 2020) ................... 26, 28, 29, 30, 31, 33, 35, 37

*Ariosa Diagnostics v. Verinata Health, Inc.,*
    805 F.3d 1359 (Fed. Cir. 2015) ........................................ 7, 55, 56, 57

*BASF Corp. v. Enthone, Inc.,*
    749 F. App'x 978 (Fed. Cir. 2018) ........................................ 46, 48, 60

*Belden Inc. v. Berk-Tek LLC,*
    805 F.3d 1064 (Fed. Cir. 2015) ........................................... 53

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) ........................................... 66

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ...................................................... 42

*Cook Grp. Inc. v. Bos. Sci. Scimed, Inc.,*
    809 F. App'x 990 (Fed. Cir. 2020) ....................................... 48

*E.I. du Pont De Nemours & Co. v. MacDermid Printing Sol.,*
    657 F. App'x 1004 (Fed. Cir. 2016) ................................... 50, 51

*Ericsson Inc. v. Intell. Ventures I LLC,*
    890 F.3d 1336 (Fed. Cir. 2018) ........................................... 42

*Ethicon LLC v. Intuitive Surgical, Inc.,*
    No. 2020-1528, 2021 WL 3716397
    (Fed. Cir. Aug. 23, 2021) .............................................. 49, 60

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
   64 F.3d 1553 (Fed. Cir. 1995) .................................................. 66, 67, 68

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................ 42, 45, 46

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
   983 F.3d 1334 (Fed. Cir. 2020) .......................................................... 61

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
   849 F.3d 1034 (Fed. Cir. 2017) .......................................................... 45

*Intel Corp. v. PACT XPP Schweiz AG*,
   61 F.4th 1373 (Fed. Cir. 2023)............................................... 6, 39, 50, 51

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021)........................................................ 53, 55

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) .......................................................... 41

*KEYnetik, Inc. v. Samsung Elecs. Co.*,
   No. 2022-1127, 2023 WL 2003932 (Fed. Cir. Feb. 15, 2023).............. 61

*Koninklijke Philips N.V. v. Google LLC*,
   948 F.3d 1330 (Fed. Cir. 2020) ...................................................... 56, 57

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ................................................. 3, 4, 5, 6, 51, 53, 61

*Par Pharm., Inc. v. TWI Pharms., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014) .......................................................... 50

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ............................................. 6, 7, 50, 51

*Q.I. Press Controls, B.V. v. Lee*,
   752 F.3d 1371 (Fed. Cir. 2014) ...................................................... 43, 44

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Randall Mfg. v. Rea,*
  733 F.3d 1355 (Fed. Cir. 2013) ................................................ 55, 56, 57

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.,*
  18 F.4th 1377 (Fed. Cir. 2021) ............................................... 42

*Therasense, Inc. v. Becton, Dickinson & Co.,*
  593 F.3d 1289 (Fed. Cir. 2010), *vacated on other grounds,*
  374 F. App'x 35 (Fed. Cir. 2010), *reinstated in relevant*
  *part,* 649 F.3d 1276 (Fed. Cir. 2011) .................................... 65

*Uber Techs., Inc. v. X One, Inc.,*
  957 F.3d 1334 (Fed. Cir. 2020) ..................................... 41, 46

*Yita LLC v. MacNeil IP LLC,*
  69 F.4th 1356 (Fed. Cir. 2023) ............................................ 58

## Statutes

28 U.S.C. § 1295(a)(4)(A) .................................................. 9

35 U.S.C. § 141(c) ........................................................... 9

35 U.S.C. § 142 ............................................................... 9

35 U.S.C. §§ 311-319 ....................................................... 9

35 U.S.C. § 316(e) ........................................................... 42

## Other Authorities

37 C.F.R. § 90.3(a)(1) ...................................................... 9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| '004 patent | U.S. Patent No. 9,324,004 (Appx268-294) |
| '036 patent | U.S. Patent No. 8,478,036 (Appx247-267) |
| '252 patent | U.S. Patent No. 7,899,252 (Appx295-314) |
| '529 patent | U.S. Patent No. 7,881,529 (Appx235-246) |
| Bajaj | Chandrajit Bajaj, Ph.D. (Nant's expert) |
| Board | Patent Trial and Appeal Board |
| Bolle | U.S. Patent No. 5,546,475 (Appx1477-1505) |
| CCD | charge-coupled device (e.g., CCD camera) |
| IPR | *inter partes* review |
| Nant | Appellee Nant Holdings IP, LLC |
| Ogasawara | U.S. Patent No. 6,512,919 (Appx1446-1476) |
| Parulski | U.S. Patent No. 6,122,526 (Appx2763-2774) |
| Rodriguez | Jeffrey J. Rodriguez, Ph.D. (Bank of America's expert) |

## STATEMENT OF RELATED CASES

Under Circuit Rule 47.5, Bank of America states as follows:

(a)    No previous appeal has been taken in this action.

(b)    The Court's decision in this action may directly affect parallel litigation in which the same patents-at-issue are asserted: *Nantworks, LLC v. Bank of Am. Corp.*, No. 2:20-cv-07872-GW-PVC (C.D. Cal.).

## INTRODUCTION

This appeal arises from *inter partes* reviews brought by Bank of America challenging four related patents owned by Nant Holdings IP, LLC. All four patents, which derive from the same parent application, relate to systems and methods for recognizing an object in an image and retrieving information about that object. As shown below, the Board legally and factually erred in upholding the challenged claims, and the Board's findings should be reversed or vacated.

***The '529, '036, and '004 patents.*** The first three patents relate to recognizing an object based solely on its visual appearance. For these patents, the only issue on appeal is whether it would have been obvious to combine two prior art references called Ogasawara and Bolle. The Board's finding that combining these references would not have been obvious was based on multiple legal errors—including overly stringent tests for motivation to combine and reasonable expectation of success and discounting the background knowledge of a skilled artisan—as well as factual findings that lack substantial evidence support. Under the proper legal framework and based on the undisputed record, a skilled artisan

would have been motivated to combine the teachings of Ogasawara and Bolle with a reasonable expectation of success.

Both Ogasawara and Bolle relate to the same field of endeavor as Nant's patents, namely "image processing" and "image recognition." *E.g.*, Appx12. Ogasawara describes using a mobile phone with a video camera to recognize items for sale in a store and then display information about them (e.g., their name or price). The only limitations relevant to this appeal that are not disclosed in Ogasawara relate to comparing the visual features of an object captured in an image to the features of known objects stored in a database to find a match. Those limitations are taught by Bolle, which describes a technique for (i) taking two images of an object, one with flash and one without; (ii) separating or "segmenting" the object from the background based on differences in brightness between the object and background; and (iii) comparing visual features of the segmented object to the features of reference images for known objects in a database to find a match. *See* Appx1477 (abstract).

Thus, a threshold question in the IPRs—and the only issue reached by the Board—was whether it would have been obvious to combine Ogasawara and Bolle. Bank of America showed that a skilled artisan

would have been motivated to improve the object-recognition capabilities of Ogasawara, which discloses "[a]dvanced pattern recognition software" for identifying objects, but only for objects with "a distinct or identifiable shape or other visually identifiable characteristic." Appx1472 (23:19-21). The Board even assumed that Bolle's segmentation technique would provide "better results" than Ogasawara's pattern recognition software. Appx44; Appx112; Appx191. Thus, under the Supreme Court's "expansive and flexible approach" to obviousness, where "any need or problem . . . can provide a reason for combining" the prior art, Bank of America presented a strong motivation to combine Bolle's object-recognition technique with Ogasawara's mobile device system. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415, 421 (2007).

The Board, however, upheld the challenged claims. For the '529 and '036 patents, the Board's decisions turned on a factual assumption that Bolle's segmentation technique requires taking two images of an object "without causing the scene as seen by the camera to move *even about one millimeter or less*," which the Board deemed incompatible with Ogasawara's mobile device. Appx43; Appx111-112 (emphasis added). According to the Board, a skilled artisan would not have "considered it

desirable (or feasible) for a consumer/shopper to have to hold a mobile device in space with such pixel-level precision." *Id.*

The problem is there is absolutely no evidence in the record that supports the Board's factual premise. The Board's only citation was attorney argument by Nant at the oral hearing, where Nant's counsel speculated that pixels on a mobile phone display "would be on the order of, *I don't know*, less than a millimeter *I'm guessing*," although he added "*there's nothing in the record* on that point." Appx4214 (47:1-7) (emphasis added); *see also* Appx31 n.11; Appx99 n.10.

Apart from relying on attorney speculation, the Board ignored extensive evidence that Bolle's segmentation technique *would* tolerate the movement of a mobile device, including admissions by Nant's expert that Bolle only needs to have "objects *almost* in the same place" across two images and that "[t]he objects don't have to be in the same position when you capture the images." Appx2873 (16:1-8) (emphasis added). As he conceded, the accuracy Bolle requires is "not right down to the precision of [a] pixel," and Bolle "has to take care of small errors" because it is "*impossible* to guarantee that you've got per-pixel accuracy in your alignment." Appx2873 (17:1-2); Appx2874 (18:18-25) (emphasis added).

The notion that Bolle's technique precludes any motion is also contrary to Bolle's explicit teaching that taking two images "in quick succession" (as in frames of a video) is a viable alternative to a "stationary" scene. Appx1498 (10:41-43). Yet the Board failed to find this teaching allows any movement in its decisions on the '529 and '036 patents.

By contrast, the Board's decision for the '004 patent expressly recognized that Bolle's "quick succession" embodiment contemplates "unintended small movements in certain circumstances" (Appx190), which contradicts the Board's findings for the '529 and '036 patents. Nevertheless, the Board still refused to find a motivation to combine because there is "no disclosure in Bolle of a mobile camera or a camera embodied in a mobile device." *Id*. The Board reasoned that, because Bolle's system operates at a grocery checkout counter instead of a mobile device, "[t]he application environment and context of Ogasawara and of Bolle are fundamentally opposite to each other." Appx191.

In refusing to combine Ogasawara and Bolle based on this difference in "application environment and context," the Board legally erred. Since it is clear that Bolle's segmentation technique can tolerate "unintended small movements" in at least "certain circumstances" (Appx190),

there is no reason it cannot be applied to Ogasawara's mobile device. Prior art teachings "may have obvious uses beyond their primary purposes," and the "person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420-21.

This Court has repeatedly held that "[t]he motivation-to-combine analysis is a flexible one," and it is "not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1379-80 (Fed. Cir. 2023) (citation omitted). Similarly, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success," even if it is "not a guarantee." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Regardless of whether Bolle's segmentation technique was the "best" option "guarantee[d]" to work for every user, its undisputed ability to tolerate some movement makes its combination with Ogasawara's mobile device at least a "suitable" option with a "reasonable probability of success."

Across all three decisions on the '529, '036, and '004 patents, the Board also committed legal error by discounting a skilled artisan's background knowledge of mobile camera flashes simply because the

information was allegedly "just known," not "*well* known."  Appx56; Appx123-124; Appx194 (emphasis added).  In the Board's view, prior art that is not "well known" can only be considered if it is part of a formal obviousness combination.  *Id.*  But this Court's case law makes clear that the Board may not "declin[e] to consider [prior art], even as evidence of the background understanding of skilled artisans as of [the priority date], simply because [it] had not been identified at the petition stage as one of the pieces of prior art defining a combination for obviousness."  *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015). For all these reasons, "the Board erred."  *Id.*

**The '252 patent.**  The fourth and final patent in this appeal differs from the other three in a critical respect.  The independent claim of the '252 patent challenged in Bank of America's petition (claim 18) does not require recognizing an object based solely on its visual appearance.  Instead, it merely requires recognizing and decoding a symbol, such as a barcode.  The '252 patent does not characterize this method as novel and instead admits that it is a "[t]raditional method[] for linking objects to digital information," which can be accomplished using "commercially available" technology.  Appx306 (3:10-16); Appx311 (13:56-61).

There is no need to combine any prior art to invalidate this claim. Bank of America's petition showed that Ogasawara anticipates it, and the only question on appeal is whether Ogasawara teaches separate steps for (i) "determin[ing] if the image contains one or more recognizable symbols"; and (ii) "decoding the recognizable symbols to extract symbol information by analyzing the recognizable symbols according to type." Appx213-214. There was no dispute that Ogasawara teaches the second step (the "analyzing limitation"), but the Board found that Ogasawara does not teach the first step (the "determining limitation").

The Board's finding lacks substantial evidence support because Ogasawara expressly discloses pattern-recognition software that "is coded to recognize either characters or patterns as appropriate to the application," including "'bar code' image data." Appx1471 (21:1-8). Moreover, Ogasawara makes clear that its software "enables a shopper to capture, *recognize <u>and</u> decode* captured images," where "recognize" and "decode" are described as separate steps. Appx1461 (1:20-21) (emphasis added). By conflating these separate functions and disregarding the teachings of Ogasawara as a whole, the Board erred.

8

For these and other reasons below, the Board's findings should be reversed, or at least vacated, and these proceedings should be remanded to determine whether the challenged claims are unpatentable in view of the prior art cited in Bank of America's IPR petitions.

## JURISDICTIONAL STATEMENT

These consolidated appeals arise from IPR proceedings under 35 U.S.C. §§ 311-319.  The Board entered final written decisions on January 9, 2023 (IPR2021-01081 and IPR2021-01332), February 1, 2023 (IPR2021-01304), and February 2, 2023 (IPR2021-01333).  Appx1-222. Bank of America filed timely notices appealing each decision.  Appx1121-1125; Appx4233-4237; Appx6217-6221; Appx10789-10794; 35 U.S.C. §§ 142, 319; 37 C.F.R. § 90.3(a)(1).  This Court consolidated the appeals on April 19, 2023.  ECF No. 12.  This Court has jurisdiction under 35 U.S.C. § 319, 35 U.S.C. § 141(c), and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

**I.**    As to the '529, '036, and '004 patents, whether the Board erred in finding that a skilled artisan would not have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success.

**II.**    As to the '252 patent, whether the Board erred in finding that Ogasawara does not teach the step of "operating on the data relating to

the image to determine if the image contains one or more recognizable symbols" (i.e., the "determining limitation").

## STATEMENT OF THE CASE

Bank of America appeals four final written decisions finding that the following claims were not shown to be unpatentable:

- **IPR2021-01081:** '529 patent claims 1, 2, 4, 7, 9, 18, and 20 (Appx1-68)

- **IPR2021-01304:** '036 patent claims 1, 10, 12, 13, and 15 (Appx69-136)

- **IPR2021-01332:** '004 patent claims 1-3, 6, and 18 (Appx137-206)

- **IPR2021-01333:** '252 patent claims 18, 26, 27, 29, and 31 (Appx207-222)

The four challenged patents, the key prior art references, and the proceedings before the Board are summarized below.

## A.    The challenged patents

The '529, '036, '004, and '252 patents claim priority to the same parent and provisional patent applications, the earliest of which was filed on November 6, 2000.  Appx235; Appx247; Appx268-269; Appx295.  The patents have similar specifications that each characterize the alleged invention as "provid[ing] technology and processes that can accommodate linking objects and images to information via a network such as the

Internet, which requires no modification to the linked object." Appx240 (2:10-13); Appx257 (3:26-29); Appx282 (3:39-42); Appx306 (3:7-10).

The patents describe "[t]raditional methods for linking objects to digital information" in the prior art as "applying a barcode" or otherwise "modifying the [image] or object so as to encode detectable information in it." Appx240 (2:13-19); Appx257 (3:29-35); Appx282 (3:42-48); Appx306 (3:10-16). The patents admit that technology which "detects and decodes symbols, such as barcodes or text, in [an] input image" was "commercially available" in the prior art. Appx262 (14:35-40); Appx287 (14:49-54); Appx311 (13:56-61).

Although traditional symbols may be used to assist the process, the patents repeatedly emphasize that "the invention" or "the present invention" provides a new way to identify an object in an image whereby an "object can be identified solely by its visual appearance," without marking or modifying the object with traditional symbols. Appx240 (1:25-28, 2:3-19, 2:28-36); Appx241 (3:4-6); Appx257 (3:29-35, 3:44-52, 4:20-22); Appx282 (3:42-48, 3:57-65, 4:33-35); Appx306 (3:10-16, 3:55-57).

Figures 1 and 2, which are identical in all four patents, show em-
bodiments of the alleged invention. Figure 2, reproduced below, "is an
idealized view of image capture." *E.g.*, Appx241 (3:49).



*FIG. 2*

Appx237; Appx250; Appx275; Appx298 (Fig. 2). The user (12) employs a
device (14) equipped with a camera, which may be a "CCD" (charge-cou-
pled device) camera, to capture a digital image (18) of an object (16),
which may either be processed on the device (14) and/or transmitted to a
server (20) for processing. Appx241 (4:28-55); Appx258 (5:23-49);
Appx283 (5:36-62); Appx309-310 (10:52-11:12).

Figure 1, reproduced below, is a flowchart of the processing that
occurs after a digital image has been captured:



**FIG. 1**

Appx236; Appx249; Appx274; Appx297 (Fig. 1).

At step 26 above, "a discriminator algorithm [ ] operates on the input data 18 and determines whether the input data contains recognizable symbols, such as barcodes." Appx241-242 (4:65-5:2); Appx258 (5:50-54); Appx283 (5:63-67); Appx310 (11:13-17). If so, the system uses the traditional prior art method of decoding the barcode or other symbol, as depicted on the right side of the flowchart above. Appx242 (5:2-3); Appx258 (5:54-55); Appx283 (5:67-6:1); Appx310 (11:17-18).

13

If no barcode or other symbol is detected, however, the system uses the allegedly inventive method of recognizing an object based on its visual appearance, as depicted on the left side of the flowchart above—i.e., the image is decomposed "into several different types of quantifiable salient parameters" (step 34), which allows the image to be matched to a known object stored in a database (step 36). Appx242 (5:3-25); Appx258 (5:55-6:10); Appx283 (6:1-24); Appx310 (11:19-42).

Once the best match for an object is determined, information about the object is retrieved from an address on the Internet (e.g., a uniform resource locator or "URL" address). Appx242 (5:27-32); Appx258 (6:10-15); Appx283 (6:23-28); Appx310 (11:42-47).

For the '529, '036, and '004 patents, claim 1 of each patent is the only independent claim among the claims that Bank of America challenged in its IPR petitions. Appx7-9; Appx75-76; Appx144-146. The Board construed these claims to require the allegedly inventive method of recognizing an object based on comparing its visual appearance to the appearance of objects stored in a database to find a match:

- Claim 1 of the '529 patent requires a service programmed to "distinguish an object present in the image from others *using a database that stores data characteristics of target objects to find a match*." Appx15 (emphasis added).

14

- Claim 1 of the '036 patent requires a platform that "recognizes the target as a known target *from the target database based on comparing* parameters derived from the digital representation to recognition *parameters associated with the known targets to find a match*." Appx82 (emphasis added).

- Claim 1 of the '004 patent requires "recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream by *comparing the at least one characteristic with characteristics of objects stored in a database to find a match*." Appx153 (emphasis added).

By contrast, for the '252 patent, the only independent claim that Bank of America challenged in its IPR petition, claim 18, recites the traditional method of using a barcode or other symbol, which includes two steps: "(i) operating on the data relating to the image to determine if the image contains one or more recognizable symbols; and (ii) decoding the recognizable symbols to extract symbol information by analyzing the recognizable symbols according to type." Appx209-211.

## B.    The prior art

### 1.    Ogasawara

The primary prior art reference that Bank of America relied on in all four IPR petitions is Ogasawara, a U.S. patent that describes "an electronic shopping system which utilizes a program downloadable wireless video phone as a purpose-type dedicated terminal which enable a shopper to capture, recognize and decode captured images." Appx1461 (1:16-21).

Similar to the CCD camera system described in the challenged patents, Ogasawara describes a handheld "wireless videophone 218 [that] suitably includes a . . . miniature, digital image capture device 236, such as a CCD camera system." Appx1468 (15:63-16:1). Once the CCD camera captures a digital image, Ogasawara's system uses the traditional method of recognizing and decoding barcodes in the image and/or a method of recognizing objects based on their visual appearance.

First, for the traditional method, Ogasawara teaches that its system can "capture, recognize and decode captured images." Appx1461 (1:20-21). For example, "[c]haracter or pattern recognition software translates [a] bar or icon code image into an appropriate item identifier." Appx1446 (abstract). Such "bar code data" or "other codes, indicia, text, icons, and the like may be scanned and recognized by modern character and pattern recognition application routines." Appx1470 (20:45-58). Ogasawara's system then "decodes the bar code image data to its corresponding numeric bar code data, by operating on the bar code image with pattern recognition software." Appx1471 (21:15-20). This software includes "character recognition and/or pattern recognition application routine[s]" that are "coded to recognize either characters or patterns as

16

appropriate to the application." Appx1471 (18:11-37, 21:1-5). Consistent with the specification, Ogasawara's claims recite steps for both (i) "recognizing" symbols in images and then (ii) "translating" them "into a numerical product identification." Appx1473 (25:59-63), (26:61-67).

Second, as an alternative to using symbols, Ogasawara teaches "[a]dvanced pattern recognition software . . . to capture merchandise information from items that are not identified by either a bar code or an alpha-numeric label." Appx1472 (23:12-16). "Advanced pattern recognition software allows a consumer to capture a videographic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software." Appx1472 (23:16-20).

This software, however, can only be used for objects "having a distinct or identifiable shape or other visually identifiable characteristic." Appx1472 (23:20-22). Moreover, as the Board recognized, Ogasawara "does not provide a specific and detailed description of the 'advanced pattern recognition software' with respect to how it works to recognize an item such as an apple without a bar code or an alpha-numeric label." Appx159. For example, Ogasawara does not perform segmentation and

does not explicitly describe whether its software uses a database to match known objects. Appx172-173.

After recognizing and decoding a traditional barcode and/or visually identifying on object with advanced pattern recognition, Ogasawara retrieves information over a network about the identified object, including "the item name, item price, and the like." Appx1471 (21:26-34).

### 2.    Bolle

Bolle is a U.S. patent titled "Produce Recognition System" that relates to "us[ing] image processing to recognize objects with a scene." Appx1477 (abstract). Bolle states that "[o]ne area where the prior art has failed to be effective is in produce check out" because "[a]ffixing . . . labels to fresh produce is disliked by customers and produce retailers/wholesalers." Appx1496 (5:14-18). Bolle's objective is to provide "an improved apparatus and method for recognizing objects such as produce." *Id.* (5:47-48).

Bolle's abstract explains how its improved system works by (i) taking two images of an object with different levels of illumination (e.g., with and without a flash); (ii) segmenting the object from the background by

comparing the two images; and (iii) comparing the visual features of the

segmented object image to stored reference images to find a match:

> The present system and apparatus uses image processing to
> recognize objects within a scene. The system includes an illu-
> mination source for illuminating the scene. By controlling the
> illumination source, an image processing system can take a
> first digitize[d] image of the scene with the object illuminated
> a higher level and a second digitized image with the object
> illuminated at a lower level. Using an algorithm, the object(s)
> image is segmented from a background image of the scene by
> a comparison of the two digitized images taken. *A processed
> image (that can be used to characterize features) of the object(s)
> is then compared to stored reference images. The object is rec-
> ognized when a match occurs.*

*Id.* (emphasis added). As in the challenged patents, Bolle repeatedly re-

fers to its compilation of "reference images" for matching objects as a "da-

tabase." Appx1500 (13:59-60); Appx1501 (15:29-30); Appx1503 (19:44-

45), (19:57-58).

As relevant to this appeal, the segmentation technique that is dis-

cussed in Bolle's abstract is depicted in Figure 3b, which shows how two

images of apples are taken with and without a flash:

19



Appx1480 (Fig. 3b); *see also* Appx1498 (9:5-20). By comparing images of the same scene with and without a flash, Bolle's system distinguishes and then segments the foreground object (e.g., apples) from the background based on differences in brightness within the two images:

> [A] check is performed on a pixel by pixel basis to determine if a pixel in the first image is brighter than the corresponding pixel in the second image by more than a value T. . . . [I]f the pixel in the first image pixel is brighter than its corresponding pixel in the second image by more than T, the algorithm . . . designates this pixel as corresponding to the object 131. Likewise, if the pixel comparison shows that the pixel in the first image is not brighter than its corresponding pixel in the second image by more than the value T, the algorithm 220 takes the branch 544 and designates this pixel as corresponding to the image 311 of physical background 312.

Appx1498 (10:59-11:4).

As in Ogasawara and the challenged patents, Bolle discloses that a "CCD camera" may be used to capture digital images. Appx1497 (7:22).

Like the camera in Ogasawara's mobile videophone, Bolle describes its CCD camera as "[a] video input device" and states that such devices "are well known." Appx1497 (7:25-26). Bolle also characterizes the "light sources" used to illuminate a scene as "well known." Appx1497 (7:17). For example, "a camera flash" may be used. Appx1498 (9:60).

Bolle also discloses a "light Control 450 [that] switches the light 110 on and off" to allow the camera to take images with and without a flash. Appx1498 (10:9-10). "The control may be a part of the light 110 as a timing device such as in a strobe" and "may be synchronized with the camera or the computer or both." Appx1498 (10:13-15). Bolle discloses that such "[l]ight switching controls [ ] are well known." Appx1498 (10:15-16).

To ensure that the foreground can be segmented from the background using two images, Bolle states that the images should be in "spatial registration," which "means that each numbered pixel in the first image corresponds to the same area of the scene (object(s) 131 and background 312) as the identically numbered pixel in the second image." Appx1498 (10:31-40). Bolle provides two options to ensure adequate spatial registration: "*either* [i] acquiring the first and second image *in quick*

*succession*, *or* [ii] by imaging a *stationary* object 131 against a *stationary* background 312." Appx1498 (10:41-43) (emphasis added).

Thus, maintaining a "stationary" scene is only one way to ensure spatial registration—another is to take the images "in quick succession." *Id*. As explained by Bank of America's expert, Dr. Rodriguez, "Bolle expressly teaches that taking the first and second scenes in quick succession ensures that the camera, object, and background are in the same relative position in both images." Appx2262-2263 ¶ 65; Appx4782-4783 ¶ 50; Appx9199-9200 ¶ 60 (Rodriguez).

Once the object in the two images has been segmented, Bolle uses an algorithm to determine and characterize features of the segmented object (e.g., by histogramming), which are then matched to characterized features of reference images. Appx1497 (8:12-37); Appx1500 (13:5-7); Appx1501 (15:50-65). To recognize the segmented object (i.e., the "target histogram"), Bolle does not require an exact match to an object in its database (i.e., a "reference histogram") but instead discloses an algorithm "to determine a distance measure [ ] between target histogram and reference histograms" and select "the best match of the target histogram" from

the options in the database.  Appx1501 (15:51-61); *see also* Appx9720 (95:5-12); Appx3397-3398 (70:23-71:1) (Rodriguez).

### C.    Proceedings before the Board

#### 1.    The '529, '036, and '004 patents

As relevant to this appeal, Bank of America's IPR petitions challenged claim 1 in each of the '529, '036, and '004 patents as obvious over the combined teachings of Ogasawara and Bolle.  Appx18; Appx86; Appx162.  For each patent, Bank of America relied on Ogasawara for all limitations of claim 1 except the limitations that relate to comparing visual features derived from the object to features of known objects stored in a database to find a match.  Bank of America argued that it was "unnecessary for purposes of this Petition to determine whether Ogasawara discloses" those limitations because they are explicitly taught by Bolle, which recognizes objects by matching them to reference images stored in a database.  Appx326-327; Appx3529-3530; Appx5629.  Thus, the central issue was whether it would have been obvious to combine Ogasawara and Bolle, which would meet all limitations in claim 1 of each patent.

Bank of America's petitions set forth a motivation to combine Ogasawara and Bolle: Although Ogasawara teaches pattern recognition software to identify objects based on their appearance, Ogasawara

suggests that its system cannot always identify an object that lacks "a distinct or identifiable shape or other visually identifiable characteristic." Appx327-328; Appx343-344; Appx3530-3531; Appx5630; Appx5646 (quoting Appx1472 (23:20-22)). A skilled artisan would have understood that Bolle "addresses this issue" with "segmentation technology in conjunction with its matching techniques" that use a database, which would improve Ogasawara's ability to recognize objects. Appx327-328; Appx344-346; Appx3530-3531, Appx3552-3554; Appx5630, Appx5647-5649. Thus, a skilled artisan would have been motivated to use Bolle's object-recognition technique—two-image segmentation followed by comparing objects to a database—in Ogasawara's mobile videophone. *Id.*

Bank of America also showed that a skilled artisan would have had a reasonable expectation of success by "using the hardware and techniques already described in each reference" to implement Bolle's object-recognition technique, including (i) the video input devices, such as a "CCD digital camera" that are described in both references; (ii) Bolle's "camera flash" as needed; and (iii) Ogasawara's system that has the processing capability to run multiple software programs, including

24

"advanced pattern recognition software." Appx347-349; Appx3555-3558; Appx5649-5652; *see also* Appx886; Appx3822; Appx5991-5993.

In instituting the IPRs, the Board initially accepted Bank of America's proposed motivation and reasonable expectation of success. *See* Appx27, Appx95, Appx146. In its final written decisions, however, the Board found that a skilled artisan would not have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success, and on that basis upheld all challenged claims. Appx27-28; Appx58-59; Appx96-97; Appx126; Appx147; Appx195-196.

Although the Board discussed several segmentation techniques in Bolle, the only one relevant to this appeal is the flash-based technique discussed above and shown in Bolle's Figure 3b. *See* Appx1480 (Fig. 3b); Appx1498 (10:59-11:4). Nant urged the Board to find that Bank of America had waived reliance on this technique, but the Board declined to find any waiver. Appx39; Appx107-108; Appx191 n.12. Bank of America's petitions cited Bolle's flash-based technique shown in Figure 3b, and Nant itself raised this Figure 3b technique in its patent owner responses.[1] *See*

---

[1] Although the Board found that Bank of America waived reliance on a different technique in Bolle based on single-image histogramming (e.g.,

Appx327-328;  Appx343-349;  Appx355-356;  Appx361-362;  Appx3530-3531; Appx3548-3551; Appx3553; Appx3557; Appx5629-5630; Appx5646-5652; Appx5657; Appx5663-5664; *see also* Appx800-802; Appx3871-3873; Appx5909-5911 (patent owner responses); *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) ("[A]ny ambiguity as to whether [the petitioner] raised a new argument on reply is eliminated when we consider whether [its] reply arguments are responsive to arguments raised in [the] Patent Owner Response.").

On the merits, the Board assumed that "Bolle's segmentation methods [would] yield better results in object feature recognition."  Appx44; Appx112; *accord* Appx191.  Nevertheless, the Board found that, for two reasons, a skilled artisan would not have "had a *rational* reason" to apply Bolle's flash-based segmentation technique in Figure 3b to Ogasawara's mobile videophone with a reasonable expectation of success.  Appx27; Appx87; Appx147.

---

Appx47), Bank of America is not appealing the Board's decisions on that technique.  Bank of America is also not appealing the Board's decisions as to Bolle's "Figure 3a" embodiment.  Rather, to focus the issues for the Court on appeal, Bank of America is only appealing the decisions as to Bolle's Figure 3b technique that uses flash-based segmentation.

### a.    Bolle's tolerance for movement

First, the Board found that Bolle's technique is limited to a "stationary" system (e.g., a checkout counter appliance in a grocery store) and is incompatible with Ogasawara's mobile device.  As discussed below, however, the Board's reasoning on this issue differed between its decisions on the '529 and '036 patent and its decision on the '004 patent.  *See* Appx41-44; Appx109-112; Appx189-193.

For the '529 and '036 patents, the Board found that Bolle's flash-based segmentation technique could only work if a user took two photographs "without causing the scene as seen by the camera to move *even about one millimeter or less* in any direction or orientation."  Appx43; Appx111-112 (emphasis added).  According to the Board, even this tiny amount of movement would prevent the two images from being "spatially registered" as required for segmentation.  Appx41-42; Appx110.  Based on this factual assumption, the Board found that a skilled artisan would not "have considered it desirable (or feasible) for a consumer/shopper to have to hold a mobile device in space with such pixel-level precision."  Appx43; Appx111-112.

The Board did not cite any evidence for its finding that Bolle cannot tolerate "one millimeter or less" of movement. *Id.* Instead, it cited statements by Nant's counsel at the oral hearing regarding the size of the pixels in Ogasawara's display. Appx31 n.11; Appx99 n.10. At the hearing, Nant's counsel said that "a typical phone from 2000 say has a three-inch, or four-inch screen," such that "[p]ixels on that phone would be on the order of, I don't know, less than a millimeter I'm guessing." Appx4214 (47:1-4). Nant's counsel admitted, however, that "there's nothing in the record on that point." Appx4214 (47:6-7).

Although the Board acknowledged Bolle's teaching that spatial registration can be ensured by taking images "in quick succession," it refused to find that this teaching allows any movement for purposes of obviousness. Appx37-44; Appx105-112. Only later in its opinions, while addressing an evidentiary motion, the Board acknowledged that "Bolle also describes taking pictures in quick succession to address the effects of some movement." Appx63; Appx131.

By contrast, the Board's decision for the '004 patent recognized in its obviousness analysis that Bolle's "quick succession" embodiment provides an alternative to maintaining a stationary scene. Appx190.

Although the Board found that this embodiment "is not for a moving camera," the Board recognized that it applies to "an object or a background that is not staying sufficiently still." Appx190. The Board took "official notice that apples, such as those shown in Bolle's Figures . . . , take some time to settle still after being placed on a flat support." *Id.* The Board did not explain why it would make any difference for purposes of Bolle's segmentation if the camera were moving as opposed to the object or the background. Regardless, the Board acknowledged that even "a stationary camera may still have unintended small movements in certain circumstances, such as when its structural support is not firm." *Id.* Moreover, as in the '529 and '036 decisions, the Board later agreed in deciding an evidentiary motion that "Bolle also describes taking pictures in quick succession to address the effects of some movement." Appx200.

Despite recognizing that Bolle's technique could tolerate "unintended small movements," the Board nevertheless concluded that a skilled artisan "would see Bolle's system as fundamentally different from and not usable in Ogasawara's videophone which is a mobile device handheld by a retail shopper." Appx190-191. The Board found it dispositive that "the camera disclosed in Bolle is stationary" (i.e., is described as part

of a grocery checkout counter) and there is "no disclosure in Bolle of a mobile camera or a camera embodied in a mobile device," leading the Board to conclude that "[t]he application environment and context of Ogasawara and of Bolle are fundamentally opposite to each other" and thus cannot be combined. *Id.*

### b. Integrating a mobile camera flash

Second, apart from finding that Ogasawara's mobile device could not be combined with Bolle's "stationary" camera, the Board found that a skilled artisan would not have had a reasonable expectation of success in using a camera flash with Ogasawara's mobile device, as required by Bolle's flash-based segmentation technique. *See* Appx56-58; Appx123-125; Appx193-195.

Even though Bank of America relied on the "camera flash" in Bolle that was already part of its obviousness combination (Appx57; Appx124; Appx194; Appx1498 (9:60)), the Board focused on a background reference called "Parulski" that Bank of America cited in its reply and expert declaration as evidence that mobile devices with a camera flash were known in the prior art. Appx55-56; Appx123; Appx193. The Board then discounted this background knowledge because Bank of America's expert

opined that mobile devices with flash were "known" but did not explicitly say that they were "well known." *Id.* Although he never denied that mobile devices with flash were well known, the Board found that characterizing them as "known" was insufficient for purposes of obviousness. According to the Board, unless Bank of America could prove that "flash functionality was so well known for videophones in 2000 that that was basic knowledge or fundamental skill to one with ordinary skill in the art," Bank of America needed "to include a pertinent reference" like Parulski in its obviousness combination for this knowledge to be considered. Appx56; Appx124; Appx194.

The Board also found that, even if known camera flashes were considered, Bank of America had "not shown the existence, prior to the critical date, of an integrated flash that can be programmed" to be "automatically synchronized to turn on and off at the appropriate time"—i.e., such that images with and without flash can be taken "in quick succession." Appx57; Appx125; Appx195. The Board found it was unclear whether the camera flash in Parulski—a so-called "flip-up flash"—could be used in this manner because it is "possible" that the flash turns on depending on "when it is flipped up" or that it takes time to charge "before the flash

can function." Appx57-58; Appx125; Appx195. The Board did not cite any evidence for these "possib[ilities]." Nor did it analyze Bolle's teaching that "a timing device such as in a strobe" that ensures the flash is "synchronized with the camera" is "well known." Appx1498 (10:9-16).

For the '529 and '004 patents (but not the '036 patent), the Board also found it insufficient that "mobile phones with camera flash functionality were known" because Ogasawara's device is a *video*phone, and "[a] flash usable for taking a video is not the same as a flash usable for a still image, given that substantially more pictures or frames have to be taken within a short period of time to form a video." Appx56; Appx193-194. The Board did not cite any evidence for this statement or explain why it should matter. Nor did the Board address the admission by Nant's expert at deposition that the prior art's "mobile phones that had cameras included flash functionality so that it could be filming in the wild anywhere." Appx2802 (108:17-23).

*    *    *

For the two reasons discussed above—Bolle's "stationary" device and the need to use a flash with Ogasawara's mobile device—the Board found that a skilled artisan would not have been motivated to combine

Ogasawara and Bolle with a reasonable expectation of success. Appx58-60; Appx126; Appx196-197. On that basis, the Board concluded that the challenged claims would not have been obvious. *Id*. The Board did not reach the parties' arguments as to whether the combined teachings of the prior art meet all limitations of the challenged claims. The Board also did not reach Bank of America's arguments for the '529 and '004 patents that a skilled artisan would have combined an additional reference, either to meet the limitation of a dependent claim or for an alternative obviousness ground. *See* Appx59-60; Appx196-197. Because the Board did not reach these arguments, they are not at issue in this appeal.

### 2.   The '252 patent

The only independent claim of the '252 patent challenged in Bank of America's petition is claim 18. Appx209. Unlike the claims of the '529, '036, and '004 patents, this claim does not relate to recognizing objects based on their visual appearance. Instead, it relates to "detect[ing] and decod[ing] symbols, such as barcodes or text," which the '252 patent admits is a "commercially available" technology. Appx311 (13:56-61); *see also* Appx306 (3:10-16). Specifically, claim 18 includes two steps that were the focus of the proceedings before the Board:

1) "operating on the data relating to the image to *determine* if the image contains one or more recognizable symbols" (which the Board called the "determining limitation"); and

2) "decoding the recognizable symbols to extract symbol information by *analyzing* the recognizable symbols according to type" (which the Board called the "analyzing limitation").

Appx213-214. Bank of America relied on Ogasawara as an anticipatory reference that teaches all limitations of claim 18, including both the determining and analyzing limitations. Appx9968-9974.

In its preliminary response opposing institution of the IPR, Nant did not dispute that Ogasawara discloses the analyzing limitation. Nant argued only that Ogasawara does not disclose the determining limitation. Appx10055-10058. Specifically, Nant asserted that Ogasawara does not "determine *if* the image contains recognizable symbols" before decoding them but instead relies on "the user which informs the system whether or not the image contains recognizable symbols such as a barcode." Appx10056 (citing Appx1471 (21:12-20)).

In its institution decision, the Board rejected this argument and found that Bank of America's petition "presents a strong case that the challenged claims are unpatentable" because the "evidence shows that Ogasawara discloses 'operating on the data relating to the image to determine if the image contains one or more recognizable symbols,' which

34

is the only limitation that Patent Owner disputes at this stage of the proceeding." Appx10084. Contrary to Nant's argument, the Board initially found that "Ogasawara does not require a user to inform the program that the image contains a recognizable symbol." Appx10089. The Board quoted the following passage from Ogasawara:

> If character and/or pattern recognition software was downloaded to the system as part of the program, *the customer need only inform the system that the image is ready for processing by pressing a pre-defined key* on the system's keyboard. Those skilled in the art will appreciate that *various other codes, indicia, text, icons, and the like may be scanned and recognized* by modern character and pattern recognition application routines.

Appx10089 (quoting Appx1470 (20:51-58)). The Board then explained: "In other words, Ogasawara discloses that a user only needs to inform the program that an image is ready for proceeding, and then the program recognizes any symbols in the image." *Id.*

After institution, even though the Board had rejected its only argument for claim 18, Nant repeated it almost verbatim. Nant's only new evidentiary support was a declaration from its expert, Dr. Bajaj, but his declaration simply mirrored Nant's attorney argument from its preliminary response. For example, the argument in Nant's preliminary response that the Board rejected was as follows:

Instead, Ogasawara expressly states that it is the user which informs the system whether or not the image contains recognizable symbols such as a barcode.  Specifically, Ogasawara discloses a "pre-defined bar code read key, on the system's keyboard," which when "depressed," causes the purchase transaction program to "capture[] the bar code image taken by the digital camera" and "decodes the bar code image with pattern recognition software."  Ex. 1005 at 21:12-20.  In other words, Ogasawara discloses that it is the user which tells the system whether or not the captured image includes a barcode.

Appx10056-10057.  Dr. Bajaj repeated the same argument using nearly identical language, with the only changes underlined below:

Instead, <u>a person of ordinary skill in the art reading Ogasawara would have noted that</u> Ogasawara expressly states that it is the user which informs the system whether or not the image contains recognizable symbols such as a barcode.  Specifically, Ogasawara discloses a "pre-defined bar code read key, on the system's keyboard," which when "depressed," causes the purchase transaction program to "capture[] the bar code image taken by the digital camera" and "decodes the bar code image with pattern recognition software."  Ex. 1005 <u>(Ogasawara)</u> at 21:12-20.  <u>Hence, a person of ordinary skill in the art would have recognized that, in</u> Ogasawara, the user <u>interacts with the purchase transaction program, indicating</u> whether or not the captured image includes a barcode.

Appx11709-11710 ¶ 45 (underlining added).

Even though Nant submitted no other new evidence during the IPR to contradict the Board's findings in its institution decision, the Board reached the exact opposite conclusion in its final written decision.  This

time, the Board agreed with Nant that Ogasawara does not teach the determining limitation because, instead, "the user of its device verifies that an image contains an entire symbol when capturing the image and before transmitting the image data to the computing platform." Appx217. The Board concluded that, "[a]s a result, when Ogasawara's computing platform receives the image data, it simply invokes recognition software to analyze the image data," without determining whether the image contains recognizable symbols. *Id.*

The Board acknowledged that Ogasawara teaches discrete steps to "capture, *recognize <u>and</u> decode* captured images" (Appx1461 (1:16-21) (emphasis added)) but nevertheless found that "Ogasawara uses both terms—recognize and decode—to describe analyzing image data to extract information" rather than separate functions. Appx218. The Board thus found that "the term 'recognize' does *not* show that Ogasawara discloses the determining limitation of claim 18." *Id.*

Based on this finding, the Board concluded that Ogasawara does not anticipate claim 18 of the '252 patent, and it rejected Bank of America's arguments regarding the other challenged claims (which depend from claim 18) on the same basis. Appx218-219.

## SUMMARY OF ARGUMENT

**I.**    As to the '529, '036, and '004 patents, the Board erred in finding that a skilled artisan would not have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success.

**I.A.**    The Board's decisions for the '529 and '036 patents turned on an explicit finding that Bolle's segmentation technique cannot tolerate even a single millimeter of movement.  But no evidence—let alone substantial evidence—supports that finding, which was based solely on a "guess[]" by Nant's counsel, who admitted "there's nothing in the record on that point."  Appx4214 (47:1-7).  In fact, the record overwhelmingly contradicts the Board's finding, including Bolle's explicit teaching that taking images "in quick succession" is a suitable alternative to maintaining a "stationary" scene.  Appx1498 (10:41-43).  Nant and its expert admitted that Bolle tolerates some movement, and the Board's decision for the '004 patent similarly acknowledged that Bolle's "quick succession" embodiment allows for "unintended small movements."  Appx190.  Moreover, Bank of America's expert showed in unrebutted testimony that even some misaligned pixels would not prevent Bolle's technique from finding

a best match to recognize objects. *See* Appx9719-9720 (94:24-95:12); Appx9723-9724 (98:25-99:6); Appx3397-3398 (70:23-71:1).

Because it is undisputed that Bolle's segmentation technique tolerates at least some movement, it would have been obvious to apply that technique to Ogasawara's mobile device under this Court's legal standards, which do not require "that a combination is the *best* option, only that it be a *suitable* option." *Intel*, 61 F.4th at 1379-80. In finding otherwise and upholding the challenged claims of the '529, '036, and '004 patents on that basis, the Board legally erred.

**I.B.** The Board also committed legal error by finding that it could not consider a skilled artisan's knowledge of camera flashes in mobile devices unless such information was not "just known" in the prior art, but "*well* known." Appx56; Appx123-124; Appx194 (emphasis added). According to the Board, prior art that is "known" but not "well known" can only be considered if it is part of a formal obviousness combination. *Id.* Yet this Court has repeatedly rejected attempts to disregard the background knowledge of skilled artisans, which must always be considered even if it is not part of an obviousness combination.

Regardless, even under the Board's heightened legal standard, its findings are unsupported by substantial evidence because Bolle explicitly teaches that (i) the flash, (ii) video camera, and (iii) synchronization for its segmentation technique are not only known, but "well known." Appx1497 (7:6-26); Appx1498 (10:13-15). No evidence contradicts these teachings. Thus, a skilled artisan would have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success.

**II.** As to the '252 patent, the Board erred in finding that Ogasawara does not teach the step of determining whether an image contains recognizable symbols. Ogasawara clearly teaches this step by disclosing "character and/or pattern recognition software" that is expressly "coded to recognize either characters or patterns as appropriate to the application." Appx1470 (20:51-59); Appx1471 (21:4-5).

While there is no dispute that Ogasawara's pattern-recognition software can decode symbols in images, the Board nevertheless found that Ogasawara cannot recognize whether an image contains such symbols in the first place. Ogasawara contradicts this finding and makes clear that it can both "recognize *and* decode captured images," which are different steps. Appx1461 (1:20-21) (emphasis added). Ogasawara's

40

claims follow the same two-step approach, with separate functions for "recognizing" symbols and then "translating" them into an object identifier. Appx1473 (25:59-63), (26:61-67). By conflating these functions and finding that Ogasawara performs only one of them, the Board erred by rendering Ogasawara's disclosures superfluous. Thus, Ogasawara teaches the determining limitation and anticipates claim 18.

## STANDARD OF REVIEW

This Court "review[s] the Board's factual findings for substantial evidence and . . . legal conclusions de novo." *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1337 (Fed. Cir. 2020) (quotation omitted). The "ultimate determination on obviousness is a legal determination that [the Court] review[s] de novo, although [the Court] review[s] any underlying factual findings for substantial evidence." *Id.*

The presence or absence of a motivation to combine the prior art and a reasonable expectation of success are questions of fact. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). "Whether the Board applied the correct standard in assessing" these requirements, however, "is a question of law that [this Court]

review[s] de novo." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1380-81 (Fed. Cir. 2021).

"Anticipation is a question of fact" and is therefore "reviewed for support by substantial evidence." *Ericsson Inc. v. Intell. Ventures I LLC*, 890 F.3d 1336, 1338 (Fed. Cir. 2018). "To contradict a reference, an unsupported opinion is not substantial evidence." *Id.*

"[T]he 'substantial evidence' standard asks whether a reasonable fact finder could have arrived at the agency's decision, and is considered to be a less deferential review standard than 'arbitrary, capricious.'" *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "is more than a mere scintilla." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This Court's "'substantial evidence' review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.*

"In an *inter partes* review," the standard of proving "unpatentability [is] by a preponderance of the evidence." 35 U.S.C. § 316(e). This "standard of proof . . . is substantially lower than in a civil case and there is no

presumption of validity." *Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1379 (Fed. Cir. 2014).

## ARGUMENT

**I.    The Board's findings upholding the challenged claims of the '529, '036, and '004 patents should be reversed or vacated.**

There is no dispute that Ogasawara and Bolle both disclose object recognition techniques for CCD camera devices, and the Board expressly assumed that Bolle's segmentation technique would provide "better results" than Ogasawara's pattern recognition software.  Appx44; Appx112; Appx191.  The only issues on which the Board disagreed with Bank of America relate to the technical feasibility of combining Ogasawara and Bolle.  The Board found that (i) Bolle's technique for segmenting images of objects is limited to the "stationary" device described in Bolle and thus cannot be applied to Ogasawara's mobile device; and (ii) a skilled artisan could not have integrated a suitable camera flash into Ogasawara's mobile device.  The Board's findings on both issues are unsupported by substantial evidence under this Court's controlling legal standards and should therefore be reversed, or at least vacated.

### A.     The Board erred in finding that Bolle's segmentation technique could not be used with a mobile device.

As shown below, the Board's findings for the '529 and '036 patents were premised on a critical factual assumption that has no evidentiary basis.  Once this error is corrected, the Board's findings across all three decisions on the '529, '036, and '004 patents cannot stand because the undisputed record is sufficient to show a motivation and reasonable expectation of success under this Court's legal standards.

### 1.     The Board's factual finding that Bolle cannot tolerate 1 mm of movement is unsupported by any (let alone substantial) evidence.

In its decisions on the '529 and '036 patents, the Board concluded that Bolle's segmentation technique could not be applied to Ogasawara's mobile device because "a consumer/shopper [would] have to hold a mobile device in space with such pixel-level precision . . . without causing the scene as seen by the camera to move *even about one millimeter or less* in any direction or orientation."  Appx43; Appx111-112 (emphasis added). Based on this factual premise, the Board found that a skilled artisan would not have been motivated, with a reasonable expectation of success, to apply Bolle's segmentation technique to Ogasawara's mobile device. *Id.*; Appx55; Appx123.

The Board's factual premise, however, lacks any evidentiary support in the record.  For its "one millimeter (or less)" finding, the Board relied solely on attorney argument by Nant's counsel at the oral hearing about the size of Ogasawara's display.  Appx31 n.11; Appx99 n.10.  But "[a]ttorney argument is not evidence," *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017), and Nant's counsel made clear he was only "guessing" that the pixels on Ogasawara's display are "less than a millimeter," since "there's nothing in the record on that point."  Appx4214 (47:3-7).  Nor did he explain the connection, if any, between the size of the pixels on the display and the amount of movement tolerated by the image sensor.  Thus, there is *no* evidence that supports the Board's factual premise, let alone *substantial* evidence—i.e., "such relevant evidence as a reasonable mind might accept as adequate," which must be "more than a mere scintilla."  *Gartside*, 203 F.3d at 1312.

Apart from being unsupported by any evidence, the Board's factual premise is contradicted by affirmative evidence that Bolle's technique *does* tolerate movement.  Bolle itself teaches that "[p]roper registration [for segmentation] can be ensured by [i] *either* acquiring the first and second image *in quick succession*, *or* [ii] by imaging a *stationary* object 131

against a *stationary* background 312."   Appx1498 (10:41-43) (emphasis added).   Thus, Bolle makes clear that remaining "stationary" is only *one* way to ensure proper registration, which can also be accomplished by taking both images "in quick succession" to mitigate the effects of any movement.   *Id.*; Appx2262-2263 ¶ 65 (Rodriguez).

In its decision for the '004 patent—but not for the '529 and '036 patents—the Board acknowledged that Bolle's "quick succession" embodiment allows for some movement.   Appx190.   For example, the Board recognized that this embodiment allows Bolle to maintain proper registration between images even when "an object or a background [ ] is not staying sufficiently still."   *Id.*   And while the Board insisted that Bolle teaches a "stationary camera," it acknowledged that even Bolle's "stationary camera *may still have unintended small movements in certain circumstances.*"   *Id.* (emphasis added).   This explicit finding that Bolle tolerates "unintended small movements" confirms that the Board erred in its decisions on the '529 and '036 patents, which found the opposite on the same record.   *See BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978, 985 (Fed. Cir. 2018) (vacating nonobviousness decision where "[t]he PTAB acted

arbitrarily and capriciously by failing to provide a reasoned explanation for reaching an inconsistent finding" in two different IPRs).

Moreover, in all three decisions, the Board acknowledged while addressing a motion to exclude evidence that "Bolle also describes taking pictures in quick succession *to address the effects of some movement*." Appx63; Appx130; Appx200 (emphasis added). Yet the Board failed to address this undisputed fact in its analysis of motivation or reasonable expectation of success, which contradicts the notion that Bolle cannot tolerate even a single millimeter of movement.

The Board also failed to address admissions by Nant about Bolle's ability to tolerate movement. Notably, Nant's patent owner responses did not deny that Bolle tolerates *any* movement but merely stated that "the camera cannot be moved *significantly* between the two photographs," meaning that Bolle must tolerate *some* movement. Appx802-803; Appx3873-3874; Appx5911-5912 (emphasis added). Likewise, Nant's expert admitted that (i) Bolle only requires objects to be "*almost in the same place*" across two images; (ii) Bolle's required alignment is "not right down to the precision of the pixel"; and (iii) Bolle "has to take care of small errors" because it would be "*impossible* to guarantee that

47

you've got per-pixel accuracy in your alignment." Appx2873 (16:1-8, 17:1-2); Appx2874 (18:18-25) (emphasis added).

In failing to address these admissions by Nant and its expert, the Board erred. *See Cook Grp. Inc. v. Bos. Sci. Scimed, Inc.*, 809 F. App'x 990, 999-1000 (Fed. Cir. 2020) ("The Board erred in refusing to consider [patent owner's] admission when it was weighing the evidence supporting each side's understanding of [the prior art]."); *BASF*, 749 F. App'x at 985 (Board erred in ignoring "conflicting deposition testimony from [patentee]'s expert that appears to support [petitioner]'s position").

Similarly, the Board erred by failing to consider unrebutted testimony by Bank of America's expert that Bolle's technique can visually recognize objects *even if* some pixels are misaligned because its algorithm is "very robust" and "does not require a perfect match." Appx9719-9720 (94:24-95:1). As he explained, "Bolle describes a specific algorithm that does a comparison with a database of stored images and computes a distance metric" to "pick[] the one that has the closest match rather than requiring an exact match." Appx9720 (95:5-12); *see also* Appx3397-3398 (70:23-71:1); Appx1501 (15:50-16:21). Thus, as Dr. Rodriguez showed, the "alignment [between two images] doesn't have to be precise because

48

of the nature of Bolle's algorithm, [which] provides a very robust matching process so that the pixels in the two images . . . don't have to match up exactly the same." Appx9723-9724 (98:25-99:6). "As there was no evidence disputing this expert testimony, the Board erred by not addressing it." *Ethicon LLC v. Intuitive Surgical, Inc.*, No. 2020-1528, 2021 WL 3716397, at *7 (Fed. Cir. Aug. 23, 2021) (reversing Board's decision of nonobviousness).

In sum, the Board's factual finding for the '529 and '036 patents that Bolle requires pixel-level precision that cannot tolerate even a single millimeter of movement lacks any evidentiary basis in the record and is contradicted by (i) Bolle itself, (ii) the Board's own findings on the same record for the '004 patent; (iii) admissions by Nant and its expert; and (iv) unrebutted testimony by Bank of America's expert.

### 2.    Combining Ogasawara and Bolle would have been obvious under controlling legal standards.

Once it becomes clear that Bolle's segmentation technique tolerates at least *some* movement—as Nant and its expert admitted, and as the Board expressly recognized for the '004 patent—it becomes equally clear that the Board's findings of no motivation to combine and no reasonable expectation of success across all three decisions are erroneous.

49

As to motivation to combine, this Court's precedent makes clear that the "analysis is a flexible one," and it is "not necessary to show that a combination is the *best* option, only that it be a *suitable* option." *Intel*, 61 F.4th at 1379-80 (citation omitted). Moreover, "the legally proper question is whether [Bolle's segmentation technique] would be a suitable option in *some* respects, not necessarily in *every* respect." *E.I. du Pont De Nemours & Co. v. MacDermid Printing Sol.*, 657 F. App'x 1004, 1014 (Fed. Cir. 2016). Indeed, "[a] given course of action often has simultaneous advantages and disadvantages," but "this does not necessarily obviate motivation to combine." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016).

Similarly, as to reasonable expectation of success, controlling "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364. Thus, "only a reasonable expectation of success, not a guarantee, is needed." *Id.*; *see also Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014) ("The reasonable expectation of success requirement for obviousness does not necessitate an absolute certainty for success.").

Given the undisputed fact that Bolle's technique tolerates "unintended small movements in certain circumstances" (Appx190), it was at least "a suitable option in *some* respects" to improve Ogasawara's mobile device system (*E.I. du Pont*, 657 F. App'x at 1014) and achieve the database-matching limitations of the '529, '036, and '004 patents with "a reasonable probability of success" (*Pfizer*, 480 F.3d at 1364).

Indeed, the Board assumed Bolle's technique would have provided "better results" than Ogasawara's pattern recognition software (Appx44; Appx112; Appx191), which is generally limited to objects "having a distinct or identifiable shape or other visually identifiable characteristic" Appx1472 (23:19-21). The Board did not make any findings that applying Bolle's object-recognition algorithm to Ogasawara's mobile device would have been beyond the skill of an ordinary artisan. That is all this Court's precedent requires. *See, e.g.*, *Intel*, 61 F.4th at 1379-81 ("It's enough for [petitioner] to show that there was a known problem . . . in the art, that [a prior art technique] helped address that issue, and that combining the teachings of [a first] and [second reference] wasn't beyond the skill of an ordinary artisan. Nothing more is required to show a motivation to combine under *KSR*.").

Accordingly, the Board's findings of no motivation and no reasonable expectation of success with respect to Bolle's tolerance for movement should be reversed. For the '529 and '036 patents, as discussed above, the Board's findings were premised on a factual assumption that lacks substantial evidence support. Once that error is corrected, there is no basis in those decisions to uphold the Board's findings.

As to the '004 patent, while the Board correctly recognized that Bolle's "quick succession" embodiment allows two images to be spatially registered even when the camera experiences "small movements," the Board legally erred by refusing to combine the references because there is "no disclosure in Bolle of a mobile camera or a camera embodied in a mobile device." Appx190. Based on Bolle's exemplary embodiment of a grocery checkout counter, the Board reasoned that a skilled artisan "would see Bolle's system as fundamentally different from and not usable in Ogasawara's videophone which is a mobile device" and that the overall "application environment and context of Ogasawara and of Bolle are fundamentally opposite to each other." Appx190-191.

That analysis was legally flawed. Because the Board's own findings confirm that Bolle's segmentation technique tolerates some movement

(Appx190; Appx172), whether "Bolle's system" is a mobile device like Ogasawara's videophone (Appx190) is legally irrelevant. Under *KSR*, the teachings in prior art references "may have obvious uses beyond their primary purposes," and the "person of ordinary skill is also a person of ordinary creativity, not an automaton." 550 U.S. at 420-21. By narrowly focusing on whether Bolle describes the same mobile device as Ogasawara instead of whether a skilled artisan could successfully apply Bolle's segmentation technique to such a device, the Board "violate[d] the principle that a reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (quotation omitted).

Because the Board applied an incorrect legal standard, its findings of no motivation or reasonable expectation of success lack substantial evidence support and should be reversed or vacated. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797 (Fed. Cir. 2021) (reversing nonobviousness decision where, "[u]nder applicable legal principles, none of the Board's reasons are supported by substantial evidence.").

**B.    The Board erred in finding that a skilled artisan could not have implemented a suitable camera flash.**

In addition to finding that a skilled artisan would not have combined Bolle's "stationary" technology with Ogasawara's mobile device, the Board found that a skilled artisan would not have had a reasonable expectation of success in implementing a camera flash in the combined system to take two images of the same scene—one with flash and one without—for purposes of Bolle's flash-based segmentation technique. *See* Appx55-58; Appx123-126; Appx193-196.

As discussed below, this finding turned on the Board's erroneous legal conclusion that it could not consider a skilled artisan's knowledge of mobile camera flashes unless that knowledge was not "just known," but "well known." Under the correct legal standard—and even under the Board's erroneously heightened standard—the undisputed evidence shows that a skilled artisan would have reasonably expected success in implementing a flash "synchronized with the camera," which Bolle explicitly describes as "well known." Appx1498 (10:14-16).

**1.    The Board legally erred by discounting the background knowledge of a skilled artisan.**

The Board legally erred in discounting undisputed evidence that mobile devices with a camera flash were in the prior art. The Board

discounted Bank of America's expert testimony, which was corroborated by the Parulski reference, because he testified that mobile phones with flash "were *known* by 2000" but did not expressly specify that they were "*well known* by 2000." Appx56; Appx123-124; Appx194 (emphasis added). In the Board's view, "[t]he difference is not insignificant, because if such flash functionality was just known, a reference showing that may be formally required as a portion of the alleged ground of unpatentability, e.g., Ogasawara, Bolle, and Parulski[,] [b]ut Parulski is not in the specific ground of unpatentability asserted by Petitioner." *Id*. The Board thus found that expert testimony about Parulski or other known camera flashes could not be considered unless Bank of America proved that "flash functionality was *so well known* for videophones in 2000 that that was *basic* knowledge or *fundamental* skill to one with ordinary skill in the art without need to include a pertinent reference in the alleged ground of unpatentability." *Id*. (emphasis added).

That was legal error under this Court's precedent, which makes clear that background references (e.g., Parulski) and the knowledge of a skilled artisan must be considered, even if they are not part of a petitioner's obviousness combination. *See Ariosa*, 805 F.3d at 1365; *Randall*

55

*Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013); *see also Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1338 (Fed. Cir. 2020).

In *Ariosa*, this Court rejected analogous reasoning by the Board, which "declin[ed] to consider [a reference], even as evidence of the background understanding of skilled artisans as of [the priority date], simply because [it] had not been identified at the petition stage as one of the pieces of prior art defining a combination for obviousness." 805 F.3d at 1365. This Court held: "If that is what the Board meant, the Board erred" because background prior "[a]rt can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness." *Id.*

Similarly, in *Randall*, "the Board did not consider the background references [the petitioner] had cited as evidence of the knowledge of one of skill in the art." 733 F.3d at 1361. Again, this Court rejected that approach: "By narrowly focusing" on prior art references in a formal obviousness combination "and ignoring the additional record evidence [ ] cited to demonstrate the knowledge and perspective of one of ordinary skill in the art, the Board failed to account for critical background information that could easily explain why an ordinarily skilled artisan would

have been motivated to combine or modify the cited references to arrive at the claimed inventions." *Id*. at 1362.

Moreover, in *Philips*, this Court rejected an argument that the Board should disregard a skilled artisan's "general knowledge" beyond the references in an obviousness combination. 948 F.3d at 1337. As this Court held: "Although the prior art that can be considered in inter partes reviews is limited to patents and printed publications, it does not follow that we ignore the skilled artisan's knowledge when determining whether it would have been obvious to modify the prior art . . . . Regardless of the tribunal, the inquiry into whether any 'differences' between the invention and the prior art would have rendered the invention obvious to a skilled artisan necessarily depends on such artisan's knowledge." *Id*. The Court thus upheld a petitioner's reliance "on expert evidence, which was corroborated by [background art]," to show what was "within the general knowledge of a skilled artisan." *Id*. at 1338.

*Ariosa*, *Randall*, and *Philips* are instructive and confirm that the Board legally erred by discounting Bank of America's expert testimony and background art as evidence of a skilled artisan's knowledge. None of these decisions limit the use of background references or expert

testimony to information that is "well known." Nor did the Board cite any legal authority for its arbitrary distinction between information that is merely "known" and that which is "well known." By imposing on Bank of America the additional burden of proving that flash functionality was "so well known" that it was "basic" or "fundamental," the Board legally erred. Appx56; Appx123-124; Appx194. *Cf. Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1364 (Fed. Cir. 2023) (reversing nonobviousness decision where Board required prior art feature to be "*well* known" rather than merely "known" to defeat nexus for purposes of objective indicia).

### 2. Mobile videophone flash and synchronization technology was undisputedly well known.

Regardless, the undisputed evidence satisfies even the Board's erroneously heightened legal standard—and is more than enough under the correct standard to find a reasonable expectation of success.

Bolle itself, which is part of Bank of America's obviousness combination with Ogasawara, discloses appropriate light sources for its segmentation technique and teaches that "such light sources are *well known*." Appx1497 (7:6-17) (emphasis added). Bolle describes a "camera flash" as an example of a light source. Appx1498 (9:60). "Video input devices" that can be used with this technique, including a "CCD camera,"

58

also "are *well known*." Appx1497 (7:18-26) (emphasis added). "Light switching controls," which "may be synchronized with the camera" to switch the light on and off, again "are *well known*." Appx1498 (10:9-16) (emphasis added). Thus, every aspect of the camera flash required by Bolle is not only taught by Bolle but described as "well known."

Whether Bolle or Parulski specifically describe a camera flash that is integrated into a videophone like Ogasawara's is immaterial. In its decisions for the '529 and '004 patents, the Board deemed this important because "[a] flash usable for taking a video is not the same as a flash usable for a still image, given that substantially more pictures or frames have to be taken within a short period of time to form a video." Appx56; Appx193-194. But the Board did not explain why this difference would make it any more difficult for a skilled artisan to use a known camera flash with Bolle's segmentation technique. Again, Bolle's "well known" flash and light-switching technique applies to "[*v*]*ideo* input devices," including a "CCD camera" (Appx1497 (7:18-26) (emphasis added)), which is the same type of video camera in Ogasawara (Appx1468 (15:67)).

In any event, Nant's expert, Dr. Bajaj, admitted that a skilled arti-

san would have known that mobile devices in the prior art had "flash

functionality" for "filming"—i.e., an integrated video camera flash:

> I think from my experience and knowledge in that of a
> POSITA as well at that time, you know, *the mobile phones
> that had cameras included flash functionality so that it could
> be filming in the wild anywhere.* So, yeah, I think a POSITA
> would have been aware of such cameras and phones as well.

Appx2802 (108:18-23) (emphasis added). Thus, contrary to the Board's

findings, it is undisputed that mobile videophones with integrated flash

were known in the art. By failing to consider this undisputed knowledge,

the Board erred, and its finding that mobile videophones with flash were

unknown lacks substantial evidence support. *See Ethicon*, 2021 WL

3716397, at *7 (reversing nonobviousness decision where "the Board

erred by not addressing" expert testimony); *BASF*, 749 F. App'x at 985

(vacating where Board ignored "deposition testimony from [patentee]'s

expert that appears to support [petitioner]'s position").

For the same reasons, the Board erred in concluding that Bank of

America had "not shown the existence, prior to the critical date, of an

integrated flash that can be programmed" to be "automatically synchro-

nized to turn on and off at the appropriate time"—i.e., so that images can

be taken "in quick succession" with and without flash.  Appx57; Appx125; Appx195.  Again, contrary to the Board's finding, Bolle itself teaches that "[l]ight switching controls" that "may be synchronized with the camera" to turn the flash on and off when capturing different images were "well known" in the prior art.  Appx1498 (10:9-16).

Nor is there any basis to doubt a skilled artisan's ability to program Ogasawara's mobile device to implement Bolle's "well known" synchronization.  "A person of ordinary skill is also a person of ordinary creativity, not an automaton," so this Court "can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 421, 418.  The mere fact that "combining prior art references would require some alteration of the apparatuses disclosed in the prior art" or "that it would take some creativity to carry out the combination does not defeat a finding of obviousness." *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020) (quotation omitted).  For example, "[n]ormally, once the function to be performed by software has been identified, writing code to achieve that function is within the skill of the art." *KEYnetik, Inc. v. Samsung Elecs. Co.*, No. 2022-1127, 2023 WL 2003932, at *2 (Fed. Cir. Feb. 15, 2023).

Accordingly, to the extent the Board required Bank of America to articulate in detail how a skilled artisan would have programmed flash-synchronizing software for Ogasawara's device that the prior art explicitly describes as "well known" (Appx1498 (10:9-16)), the Board erred by ignoring the ordinary skill and creativity of a skilled artisan.

\*    \*    \*

Once the Board's errors regarding (i) Bolle's tolerance for movement and (ii) the ability to implement a camera flash are corrected, the Board's findings that a skilled artisan would not have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success cannot stand under this Court's controlling legal standards.

Thus, the Board's findings of no motivation and no reasonable expectation of success should be reversed, or at a minimum vacated, and its decisions on the '529, '036, and '004 patents should be remanded to determine whether the prior art combinations in Bank of America's petitions teach all limitations of the challenged claims.

## II.   The Board's findings upholding the challenged claims of the '252 patent should be reversed or vacated.

Unlike its decisions on the '529, '036, and '004 patents, the Board's decision on the '252 patent does not turn on whether a skilled artisan

would have combined Ogasawara and Bolle.  Rather, the only issue is whether Ogasawara teaches the limitation in claim 18 that requires "operating on the data relating to the image to *determine* if the image contains one or more recognizable symbols," which the Board called the "determining limitation."  Appx213.  Because Ogasawara plainly discloses this limitation, the Board's conclusion that Ogasawara does not anticipate claim 18 is unsupported by substantial evidence.

Ogasawara explicitly discloses that "a purchaser may use the wireless videophone, in particular the digital camera, to select various items which the consumer desires to purchase . . . . by capturing an image of an item's UPC bar code data, or the like, within the image field of the digital camera."  Appx1470 (20:42-47).  By invoking "character and/or pattern recognition software" that is downloaded to Ogasawara's system, "the customer need only inform the system that the image is ready for processing by pressing a pre-defined key on the system's keyboard," and any barcodes or "other codes, indicia, text, icons, and the like may be scanned and recognized by modern character and pattern recognition application routines."  Appx1470 (20:51-58).  Ogasawara makes clear that this software "is coded to *recognize* either characters or patterns as appropriate

to the application." Appx1471 (21:4-5) (emphasis added); *see also* Appx11065-11067 ¶ 93; Appx11310-11312 ¶¶ 33-35 (Rodriguez).

As a matter of basic logic, to "recognize" barcodes or other symbols in an image, Ogasawara must determine that the image contains such recognizable symbols. And Ogasawara explains that this initial step of "recognizing" that an image contains a symbol occurs separately from the subsequent step of actually decoding the symbol. Indeed, Ogasawara is directed to a system that "enables a shopper to capture, *recognize* <u>*and*</u> *decode* captured images," where "recognize" and "decode" are listed as separate steps for processing an image. Appx1461 (1:20-21) (emphasis added); *see also* Appx11310-11312 ¶ 35 (Rodriguez).

Ogasawara's claims, which are part of its disclosure, are consistent with this two-step approach and further confirm that Ogasawara separately teaches both (i) determining whether an image contains any recognizable symbols (which Ogasawara's claims refer to as "*recognizing*"); and then (ii) decoding those symbols once they have been recognized (which Ogasawara's claims refer to as "*translating*"):

> 12. The electronic shopping system according to claim 5, the wireless videophone further including pattern recognition software, the pattern recognition software *recognizing the*

> *item indicia <u>and</u> translating the item indicia* into a corresponding desired product identification.
>
> 22. The program downloadable wireless videophone according to claim 21, wherein the acquired visual image is an item specific pattern image representing a desired item for processing by a pattern recognition software, the pattern recognition software *recognizing said pattern <u>and</u> translating said pattern into an alpha-numeric character string* corresponding to the item.

Appx1473 (25:59-63), (26:61-67) (emphasis added); *see also* Appx1446 (abstract) ("[c]haracter or pattern recognition software translates [a] bar or icon code image into an appropriate item identifier"); Appx1471 (21:17-26) (explaining that "the program *decodes* the bar code image data *to its corresponding numeric bar code data*," which corresponds to the translation step in the claims above (emphasis added)); *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1295 (Fed. Cir. 2010), *vacated on other grounds*, 374 F. App'x 35 (Fed. Cir. 2010), *reinstated in relevant part*, 649 F.3d 1276, 1296 (Fed. Cir. 2011) ("The claims of a prior art patent are part of its disclosure.") (invalidating asserted claims as obvious in view of claims in a prior art patent).

The Board acknowledged that Ogasawara refers to steps that "*recognize <u>and</u> decode* captured images," yet it nevertheless concluded that "Ogasawara uses both terms—recognize and decode—to describe

analyzing image data to extract information." Appx218. That cannot be a correct reading of Ogasawara because it fails to consider the reference as a whole and would render language throughout its disclosure superfluous, including in both the specification and in the claims. *Cf. Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim"—no claim language is "merely superfluous"); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) ("We must give meaning to all the words in [the] claims.").

The Board cited two passages in Ogasawara, but neither one supports its conclusion. First, the Board quoted a statement that recognition software may be used "to either *decode* the bar code videographic data or to perform pattern *recognition* functions on a[n] icon-like patter[n]." Appx218 (quoting Appx1469 (18:32-37) (alteration in original). Second, the Board quoted a statement that "the program *decodes* the bar code image data . . . by operating on the bar code image with pattern *recognition* software." *Id.* (quoting Appx1471 (21:17-20)).

Neither statement provides any evidence that "recognizing" and "decoding" in Ogasawara are the same function. In both statements, only

"decode[s]" is used as a verb, and the fact that the same "pattern recognition software" both recognizes and decodes symbols is not surprising and is fully consistent with the rest of Ogasawara, which makes clear that "*the pattern recognition software recogniz*[*es*] the item indicia *and translat*[*es*] the item indicia into a corresponding desired product identification." Appx1473 (25:59-63) (emphasis added).

Equally unsupported is the Board's finding that only "the user of [Ogasawara's] device verifies that an image contains an entire symbol when capturing the image and before transmitting the image data to the computing platform." Appx217. For support, the Board cited a statement in Ogasawara that "[w]hile the consumer is scanning a particular bar code with the digital camera, . . . the consumer can visually verify that the entire image has been captured." *Id.* (quoting Appx1470 (20:47-51)). But this plainly does not mean that only the user can determine whether an image contains recognizable symbols; it states only that the user verifies that an entire *image* has been captured. *Id.* (quotation omitted). Nor is there any inconsistency between a user verifying that a symbol is included within a captured image and the system determining whether the image contains such a symbol.

The other statements cited by the Board are no different. *See id.* (citing Appx1470 (20:41-47) ("Such selection is made by capturing an image of an item's UPC bar code data, or the like, within the image field of the digital camera."); Appx1471 (22:10-13) ("[A]ll that is required is that the bar code data fall within the visual image field of the system's digital camera"); Appx1471 (22:59-63) (it is sufficient to "merely plac[e] the information within the visual image field of the system's digital camera")). These statements all make the self-evident point that the symbol should be in the image for the system to recognize it, but they provide no evidence (let alone substantial evidence) that the system is unable to determine whether the image includes such symbols.

Accordingly, substantial evidence does not support the Board's finding that Ogasawara fails to teach the step of "operating on the data relating to the image to determine if the image contains one or more recognizable symbols." The Board thus erred in concluding that Ogasawara does not anticipate claim 18 of the '252 patent. And because the Board treated its finding on claim 18 as dispositive for all other challenged claims, the Board erred in upholding those claims too.

## CONCLUSION

As to the '529, '036, and 004 patents, the Board's findings that a skilled artisan would not have been motivated to combine Ogasawara and Bolle with a reasonable expectation of success should be reversed, or at least vacated.  Likewise, as to the '252 patent, the Board's finding that Ogasawara does not teach the determining limitation should be reversed, or at least vacated.  All four proceedings should be remanded for the Board to determine whether the challenged claims are unpatentable over the prior art cited in Bank of America's IPR petitions.

Respectfully submitted,

/s/ George C. Lombardi

| | |
|---|---|
| EIMERIC REIG-PLESSIS | GEORGE C. LOMBARDI |
| Winston & Strawn LLP | Winston & Strawn LLP |
| 101 California Street | 35 W. Wacker Drive |
| San Francisco, CA 94111 | Chicago, IL 60601 |
| (415) 591-6800 | (312) 558-5600 |
| ereigplessis@winston.com | glombard@winston.com |
| | |
| CLAIRE A. FUNDAKOWSKI | DUSTIN J. EDWARDS |
| Winston & Strawn LLP | Winston & Strawn LLP |
| 1901 L Street, NW | 800 Capitol Street |
| Washington, DC 20036 | Houston, TX 77002 |
| (202) 282-5000 | (713) 651-2600 |
| cfundakowski@winston.com | dedwards@winston.com |

*Counsel for Appellant Bank of America, N.A.*

July 5, 2023

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

IPR2021-01081: Final Written Decision .................................... Appx1-68

IPR2021-01304: Final Written Decision ................................ Appx69-136

IPR2021-01332: Final Written Decision .............................. Appx137-206

IPR2021-01333: Final Written Decision .............................. Appx207-222

U.S. Patent No. 7,881,529 ................................................... Appx235-246

U.S. Patent No. 8,478,036 ................................................... Appx247-267

U.S. Patent No. 9,324,004 ................................................... Appx268-294

U.S. Patent No. 7,899,252 ................................................... Appx295-314

Trials@uspto.gov                                          Paper 46
571-272-7822                                    Entered: January 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BANK OF AMERICA, N.A.,
Petitioner,

v.

NANT HOLDINGS IP, LLC,
Patent Owner.

_____

IPR2021-01081
Patent 7,881,529 B2

_____

Before JAMESON LEE, THOMAS L. GIANNETTI, and
STEPHEN E. BELISLE, *Administrative Patent Judges*.

BELISLE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude Evidence
*37 C.F.R. § 42.64(c)*

IPR2021-01081
Patent 7,881,529 B2

## I.    INTRODUCTION

Bank of America, N.A. ("Petitioner") filed a Petition (Paper 9,
"Pet.")[1] requesting an *inter partes* review of claims 1, 2, 4, 7, 9, 18, and 20
("Challenged Claims") of U.S. Patent No. 7,881,529 B2 (Ex. 1001,
"the '529 patent").  Nant Holdings IP, LLC ("Patent Owner") filed a
Preliminary Response to the Petition (Paper 10, "Prelim. Resp."; *see*
Paper 4, 2).  In addition, with prior authorization from the Board, the parties
filed supplemental briefing concerning the Preliminary Response.  Paper 13
("Reply"); Paper 14 ("Sur-Reply").  We instituted an *inter partes* review of
claims 1, 2, 4, 7, 9, 18, and 20 of the '529 patent on all grounds of
unpatentability alleged in the Petition.  Paper 15 ("Institution Decision" or
"Dec.").

After institution, Patent Owner filed a Response.  Paper 24
("PO Resp.").  Petitioner filed a Reply.  Paper 31 ("Pet. Reply").  Patent
Owner filed a Sur-Reply.  Paper 39 ("PO Sur-Reply").  Petitioner also filed a
Motion to Exclude Evidence, in which Petitioner moves to exclude some or
all of paragraphs 27–32, 34–47, 49, 51–58, 60, 64, 65, and 67 of the
Supplemental Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2006), Patent
Owner's expert.  Paper 40 ("Mot. Excl.").  Patent Owner filed an Opposition
to Petitioner's Motion to Exclude Evidence (Paper 41), and Petitioner filed a
Reply[2] to Patent Owner's Opposition to Petitioner's Motion to Exclude

---

[1] Petitioner filed a Petition (Paper 2) and a corrected Petition (Paper 9).
We reference the corrected Petition filed on September 16, 2021.

[2] Petitioner filed a Reply to Patent Owner's Opposition to Petitioner's
Motion to Exclude Evidence (Paper 42) and a corrected Reply (Paper 43).
We reference the corrected Reply filed on October 6, 2022.

Appx2

IPR2021-01081
Patent 7,881,529 B2

Evidence (Paper 43). We held a hearing on October 12, 2022, which was consolidated with the hearing in IPR2021-01332, and a transcript of the consolidated hearing appears in the record. Paper 45 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. Under the applicable evidentiary standard, Petitioner has the burden to prove unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2022). "Preponderance of the evidence means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *United States v. C.H. Robinson Co.*, 760 F.3d 1376, 1383 (Fed. Cir. 2014) (internal quotations omitted). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons discussed below, we determine Petitioner has not established by a preponderance of the evidence that any of claims 1, 2, 4, 7, 9, 18, and 20 of the '529 patent is unpatentable.

## II.   BACKGROUND

### A.   *Related Matters*

The parties indicate that the '529 patent, along with seven other patents, are involved in one U.S. district court action, namely, *NantWorks, LLC and Nant Holdings IP, LLC v. Bank of America Corporation and Bank of America, N.A.*, No. 2:20-cv-07872 (C.D. Cal.) ("District Court Case"). Pet. 68; Paper 4, 2. Petitioner also states, "All of the patents claim priority to Provisional Application Nos. 60/246,295 and 60/317,521. There appears to be no pending application that claims priority to those two applications." Pet. 69.

3

IPR2021-01081
Patent 7,881,529 B2

The following *inter partes* review proceedings involve patents related to the '529 patent: IPR2021-01080 (US 8,463,030 B2), IPR2021-01304 (US 8,478,036 B2), IPR2021-01332 (US 9,324,004 B2), IPR2022-01333 (US 7,899,252 B2), IPR2021-01388 (US 8,520,897 B2), and IPR2021-01389 (US 9,031,278 B2).

B.   *The '529 Patent*

The '529 patent is titled "Data Capture and Identification System and Process," issued February 1, 2011, from U.S. Patent Application No. 12/505,714, filed July 20, 2009, and claims priority through a series of continuing applications to U.S. Provisional Patent Applications Nos. 60/317,521, filed September 5, 2001, and 60/246,295, filed November 6, 2000.  Ex. 1001, codes (10), (21), (22), (45), (54), (60), (63).

The '529 patent describes "[t]raditional methods" for linking objects to digital information that involve applying a barcode, a radio or optical transceiver or transmitter, or some other means of identification to the object, as well as modifying the image or object so as to encode detectable information.  Ex. 1001, 2:13–19.  However, according to the '529 patent, "[t]here is a need to identify an object that has been digitally captured from a database of images without requiring modification or disfiguring of the object."  *Id.* at 1:32–34.  The '529 patent states that it responds to this need by describing "a system and process for identifying digitally captured images without requiring modification to the object."  *Id.* at 3:4–6.  But notwithstanding this additional capability, the '529 patent explicitly discloses that "*the present invention also can detect, decode, and identify images and objects based on traditional symbols* which may appear on the

4

IPR2021-01081
Patent 7,881,529 B2

object, such as alphanumeric characters, *barcodes*, or 2-dimensional matrix codes." *Id.* at 2:32–36 (emphases added).

Figures 1 and 2 of the '529 patent, reproduced below, collectively illustrate an embodiment of the patent. The following description refers to both figures.



Figure 1 depicts a block diagram top-level algorithm flowchart.

Ex. 1001, 3:47–48, Fig. 1.

5

IPR2021-01081
Patent 7,881,529 B2



FIGURE 2

Figure 2 depicts an idealized view of data capture.
Ex. 1001, 3:49, Fig. 2.

According to the '529 patent, for data capture 10, user 12 utilizes a
computer, mobile telephone, personal digital assistant, or other similar
device 14 equipped with a data sensor (such as a CCD or CMOS digital
camera). Ex. 1001, 4:28–31. User 12 aligns the sensor of data capture
device 14 with object 16 of interest. *Id.* at 4:31–32. The linking process is
then initiated, and device 14 captures digital data 18 of the scene at which it
is pointed. *Id.* at 4:32–38. Data 18 is represented as three separate 2-D
matrices of pixels, corresponding to the raw RGB (Red, Green, Blue)
representation of the input image. *Id.* at 4:38–41. Data 18 is subsequently
transferred to data/server 20. *Id.* at 4:46–55.

Data type determination 26 is accomplished with a discriminator
algorithm which operates on input data 18 and determines whether the input
data contains recognizable symbols, such as barcodes, matrix codes, or
alphanumeric characters. Ex. 1001, 4:65–5:2. If such symbols are found,
data 18 is sent to decode symbol process 28. *Id.* at 5:2–3. In decode symbol

6

IPR2021-01081
Patent 7,881,529 B2

process 28, data 18 is analyzed to determine the location, size, and nature of the symbols. *Id.* at 5:13–18. The symbols are analyzed according to their type, and their content information is extracted. *Id.*

Data 18 may also or alternatively contain an object of interest, and may therefore also or alternatively be sent to the object data branch of the process flow. Ex. 1001, 5:3–7. In input data decomposition process 34, a "decomposition" of a high-resolution input data into several different types of quantifiable salient parameters is performed. *Id.* at 5:19–22. According to the '529 patent, this allows for multiple independent convergent search processes of the database to occur in parallel in database matching 36, which "greatly improves data *match* speed and *match* robustness." *Id.* at 5:22–25 (emphases added).

### C. *Illustrative Claim*

The '529 patent includes twenty-seven claims, of which claims 1, 2, 4, 7, 9, 18, and 20 are challenged. Claim 1 is the challenged independent claim. Claim 1 is illustrative and reproduced below.

1. A system comprising:

a camera that captures an image;

a network-enabled device that conducts a data processing operation on at least a portion of the image to produce data, and sends the data to a service;

the service programmed to receive the data; identify an object within the image;

distinguish an object present in the image from others using a database that stores data characteristics of target objects; associate the object with information; and

return the information to the network-enabled device; and

the network-enabled device further programmed to present the information related to the object to a user.

7

IPR2021-01081
Patent 7,881,529 B2

Ex. 1001, 11:55–12:2.

### D.    Evidence of Record

Petitioner relies on the following patent evidence.

| Name | Document | Exhibit |
|---|---|---|
| Ogasawara | 6,512,919 B2 | 1005 |
| Bolle | 5,546,475 | 1006 |

Pet. 7.

Petitioner also relies on the following non-patent literature evidence.

| Name | Non-Patent Literature Title | Author | Exhibit |
|---|---|---|---|
| O'Gorman[3] | *Executive Briefing: Document Image Analysis*, IEEE Computer Society (1997) | L. O'Gorman and R. Kasturi | 1007 |

Pet. 7.

Petitioner also relies upon the Declaration of Jeffrey J. Rodriguez, Ph.D. (Ex. 1003) and the Declaration of Dr. Rodriguez in support of Petitioner's Reply (Ex. 1050).

Patent Owner relies upon the Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2001) and the Supplemental Declaration of Dr. Bajaj (Ex. 2006).

### E.    Asserted Challenges to Patentability

We instituted *inter partes* review of claims 1, 2, 4, 7, 9, 18, and 20 of the '529 patent on the following grounds asserted by Petitioner.

---

[3] Petitioner submits "[O'Gorman] was publicly accessible on or shortly after May 6, 1997." Ex. 1019 ¶ 62 (Declaration of Sylvia D. Hall-Ellis, Ph.D.); *see* Pet. 55 (citing Ex. 1019 ¶¶ 55–64).

8

IPR2021-01081
Patent 7,881,529 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4, 7, 9, 18 | 103[4] | Ogasawara, Bolle |
| 20 | 103 | Ogasawara, Bolle, O'Gorman |

Pet. 7.

## III.  PATENTABILITY

### A.    Applicable Law

Petitioner challenges the patentability of claims 1, 2, 4, 7, 9, 18, and 20 of the '529 patent on grounds that the claims would have been obvious under 35 U.S.C. § 103 in light of various references, namely, Ogasawara, Bolle, and O'Gorman.  To prevail in its challenges to the patentability of the claims, Petitioner must establish unpatentability by a preponderance of the evidence.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show *with particularity* why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")) (emphasis added).  This burden never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

---

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103.  Because the '529 patent was filed before March 16, 2013, the effective date of the relevant amendment, the pre-AIA version of § 103 applies.

Appx9

IPR2021-01081
Patent 7,881,529 B2

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when of record, objective evidence of obviousness or non-obviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Secondary considerations may include the following: "commercial success, long felt but unsolved needs, failure of others, etc."[5] *Id.* The totality of the evidence submitted may show that the challenged claims would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *see Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018) ("An obviousness determination requires finding that [an ordinarily skilled artisan] would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so.").

---

[5] Patent Owner did not present any evidence or arguments directed to secondary considerations during this proceeding.

IPR2021-01081
Patent 7,881,529 B2

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *Id.* at 415. Whether a patent claiming a combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To reach this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.* "To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). "Whether the prior art discloses a claim limitation, whether a skilled artisan would have been motivated to modify or combine teachings in the prior art, and whether she would have had a reasonable expectation of success in doing so are questions of fact." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

11

IPR2021-01081
Patent 7,881,529 B2

### B.  Level of Ordinary Skill in the Art

Petitioner contends that a person of ordinary skill in the art, at the time
of the invention of the '529 patent:

> would have had a range of knowledge roughly equivalent to the
> knowledge and/or training of a person holding the degree of
> Bachelor of Science in Electrical Engineering, Computer
> Science, Computer Engineering, or equivalent, and one to two
> years of experience working with image processing, image
> recognition, or a related field. . . . Individuals with additional
> education or additional practical experience could still be of
> ordinary skill in the art if that additional aspect compensates for
> a deficit in the other aspect of the requirements stated above.

Pet. 20–21 (citing Ex. 1003 ¶¶ 51–52).

Patent Owner does not present an alternative definition of the skilled
artisan, and does not dispute Petitioner's definition thereof.  *See* PO
Resp. 16–17 ("For purposes of this IPR, Patent Owner does not contend that
an alternative level of ordinary skill in the art should be applied.").

In determining the level of ordinary skill in the art, various factors
may be considered, including the "type of problems encountered in the art;
prior art solutions to those problems; rapidity with which innovations are
made; sophistication of the technology; and educational level of active
workers in the field."  *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995)
(citation omitted).  The level of ordinary skill in the art also is reflected by
the prior art of record.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed.
Cir. 2001).

Considering the subject matter of the '529 patent, the background
technical field, the prior art, and Petitioner's unopposed proposed definition
of the skilled artisan, (a) we apply the level of skill set forth above, which
also is consistent with the testimony of Dr. Rodriguez (Ex. 1003 ¶¶ 51–52);

12

IPR2021-01081
Patent 7,881,529 B2

and (b) we determine this would have provided a sufficient level of skill in light of the technology at issue in the '529 patent and the asserted prior art.

Regardless, neither party argues that the outcome of this case would differ based on our adoption of any particular definition of the level of ordinary skill in the art.

C.   *Claim Construction*

We construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

In this context, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (There is "a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

13

IPR2021-01081
Patent 7,881,529 B2

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner asserts that the parties "have offered competing constructions for a few terms in the asserted claims of the '529 patent" in the District Court Case. Pet. 28. Petitioner argues "the prior art invalidates the challenged claims under any reasonable construction of the terms, and claim construction is therefore unnecessary for purposes of this Petition." Pet. 28. Patent Owner submits proposed constructions for certain limitations, but otherwise contends it applies the "plain and ordinary meaning" for limitations in this proceeding. PO Resp. 17–24.

### 1. Distinguishing Objects Limitation

In the pre-institution phase, the parties disputed the meaning of the limitation "distinguish an object present in the image from others using a database that stores data characteristics of target objects," as recited in independent claim 1. *See* Dec. 15–19. Hereinafter, this limitation is referred to as the "Distinguishing Objects Limitation."

After filing of the Petition and Preliminary Response, the district court in the District Court Case entered a *Markman* order construing the Distinguishing Objects Limitation, among others. *See* Ex. 1041, 16–18, 21–22. Specifically, the court construed the Distinguishing Objects Limitation to mean "distinguish an object present in the image from others

14

Appx14

IPR2021-01081
Patent 7,881,529 B2

using a database that stores data characteristics of target objects *to find a match*." Ex. 1041, 21–22 (emphasis added). As explained in our Institution Decision (Dec. 15–19), we have reviewed the district court's reasoning, as well as the '529 patent and other evidence of record before us, and agree that for reasons given by the district court the Distinguishing Objects Limitation should be given the same construction as determined by the district court. Neither party since has urged (or persuaded) us to revise this construction. Based on the complete record before us, we continue to construe the Distinguishing Objects Limitation to mean "distinguish an object present in the image from others using a database that stores data characteristics of target objects to find a match." *See* Dec. 15–19; Ex. 1041, 21–22. Both parties adopt this construction for purposes of their post-institution arguments in this case. *See* PO Resp. 17 ("Patent Owner and its expert apply this claim construction in their analysis in the remainder of this IPR, but do not necessarily agree it is correct."); *see generally* Pet. Reply (arguing "matching" as per this construction); Pet. (same).

2.   *"an image"*

Independent claim 1 recites the limitation "an image." Ex. 1001, 11:56. Patent Owner asserts:

> Claim 1 of the '529 patent specifies "a camera that captures ***an image***." Ex. 1001 ('529 patent) at cl. 1 (emphasis added). Subsequent claim limitations refer to "***the image***," the antecedent basis of which is "***an image***" that has been captured by the camera. *E.g., id.* ("conducts a data processing operation on at least a portion of ***the image***," "identify an object within ***the image***," "distinguish an object present in ***the image***").

> These terms should be construed to refer to the same, single image. Ex. 2006 (Supplemental Declaration of Chandrajit Bajaj, Ph.D.) ("Bajaj") ¶ 17. Because "the" is a singular

15

IPR2021-01081
Patent 7,881,529 B2

> modifier, its usage to qualify "the image" therefore limits that
> image to being a single image. *Id.* ¶ 18 [other citations omitted].

PO Resp. 18.

Petitioner does not propose a construction for "an image" or "the
image." Instead, Petitioner states:

> Ogasawara combined with Bolle teaches "captur[ing] an image,"
> "processing . . . the image," and "identify[ing]" and
> "distinguish[ing]" an object in "the image" both under the terms'
> plain-and-ordinary meaning and under PO's proposed
> construction that the claimed "image" refers to the "same, single
> image." POR, 18, 21, 58; Ex. 1050, ¶¶26–48.

Pet. Reply 9. Petitioner does not identify specifically what it contends is the
plain and ordinary meaning of "an image" or "the image." Petitioner does,
however, explain why it believes the prior art still satisfies Patent Owner's
proposed construction for "an image" and "the image." According to
Petitioner, analyzing one image, a single image, does not preclude
involvement in the analysis of information from a second image. Pet.
Reply 9–16. Thus, in Petitioner's view, "an image" and "the image" are met
even under Patent Owner's proposed construction.

In its Sur-Reply, Patent Owner clarifies that, under Patent Owner's
proposed construction, "the processing, identifying, and distinguishing steps
must occur on a *single* image; the claims exclude processing that occurs
across multiple images." PO Sur-Reply 25. This dispute between the
parties requires resolution. For reasons discussed below, we disagree with
Patent Owner.

Patent Owner is correct that the antecedent basis in claim 1 for
"the image" is the earlier recited "an image." Patent Owner is incorrect,
however, in characterizing "the" as a singular modifier. The definite article

IPR2021-01081
Patent 7,881,529 B2

"the" can be used to modify something plural, e.g., "the images."  Although in claim 1, "the" is used to modify an "image," that does not help the Patent Owner, because nothing in the claim excludes the involvement of additional images while one "image" is analyzed.  Patent Owner points to nothing in claim 1 which restricts the analyzing to "only" one image or "no more" than one image, and we see none.

Further, claim 1 uses the non-limiting phrase "comprising," which creates a presumption that the claim is not limited to only those elements expressly recited in the claim.  *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).  We recognize that the only embodiment described in the specification of the '529 patent analyzes only a single image, but we are not required to construe the claim as limited to just that embodiment.  *Innova/Pro Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1121–22 (Fed. Cir. 2004).  Such a construction is neither encouraged nor presumed.  *Id.*  Additionally, Patent Owner points to no expressions of disavowal either in the prosecution history or in the specification of the '529 patent with regard to "an image" in which the patent applicant disavows, with clarity, claim scope covering analysis of more than one image.

For the foregoing reasons, we disagree with Patent Owner, and we determine that analyzing "an image" as recited in claim 1 does not preclude involvement of an additional image or images in the analysis.

### 3.  *Other Limitations*

In its Response, Patent Owner submits constructions for certain other limitations in claim 1, namely (1) "a computer remote to the network enabled device"; and (2) "a network-enabled device."  PO Resp. 17, 22–24.

17

IPR2021-01081
Patent 7,881,529 B2

Based upon our consideration of the complete record before us, we conclude that it is unnecessary to interpret expressly any of these limitations for purposes of rendering our final decision in this case. *See Nidec*, 868 F.3d at 1017.

    D.   *Alleged Obviousness of Claims 1, 2, 4, 7, 9, and 18 over the Combination of Ogasawara and Bolle*

Petitioner contends claims 1, 2, 4, 7, 9, and 18 are unpatentable under 35 U.S.C. § 103 as obvious over the combination of Ogasawara (Ex. 1005) and Bolle (Ex. 1006).[6]  Pet. 28–54; Pet. Reply 8–30.  Patent Owner opposes Petitioner's contentions.  PO Resp. 26–62; PO Sur-Reply 4–30.  For the reasons expressed below, and based on the complete record before us, we determine Petitioner has not proven that an ordinarily skilled artisan (1) would have had a rational reason to combine the teachings of Ogasawara and Bolle to achieve the recited inventions of claims 1, 2, 4, 7, 9, and 18; and (2) would have had a reasonable expectation of success in doing so. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1, 2, 4, 7, 9, and 18 would have been obvious

---

[6] In our Institution Decision, we stated, "[a]lthough Petitioner has alleged that Ogasawara discloses every limitation of claim 1, Petitioner also has provided for contingencies in case Ogasawara does not disclose certain limitations of claim 1 and teachings from Bolle are needed to be combined with teachings from Ogasawara to render claim 1 obvious."  Dec. 20 (citing Pet. 34–41).  During the oral hearing, Petitioner conceded that this ground (i.e., Ground 1 in the Petition) is directed only to obviousness over *the combination of* Ogasawara and Bolle.  Tr. 65:15–66:17; *see* Pet. 7 (identifying Ground 1 as based on obviousness over "Ogasawara and Bolle").  Thus, in this Final Written Decision, we need not and do not address whether any of the Challenged Claims is anticipated by or rendered obvious solely over Ogasawara.

18

IPR2021-01081
Patent 7,881,529 B2

over the combination of Ogasawara and Bolle.  We turn first to an overview
of Ogasawara and Bolle.

> *1.   Overview of Ogasawara (Ex. 1005)*

Ogasawara relates generally to "an electronic shopping system which
utilizes a program downloadable wireless video phone as a purpose-type
dedicated terminal which enables a shopper to capture, recognize and decode
captured images." Ex. 1005, 1:16–21; *see id.* at code (57).  In Ogasawara,
an integral digital camera is attached to the wireless telephone to facilitate
the selection of items to be purchased and is controlled to function as a bar
code or product icon image capture device. *Id.* at code (57).  Character or
pattern recognition software translates the bar or icon code image into an
appropriate item identifier. *Id.*

Figure 1 of Ogasawara is reproduced below.

*FIG. 1*



19

IPR2021-01081
Patent 7,881,529 B2

> Figure 1 depicts a schematic overview of an electronic
> shopping system.

Ex. 1005, 4:9–10, Fig. 1.

Figure 1 of Ogasawara shows an electronic system comprising store server 10 in communication with a commercial telephone network 14. Ex. 1005, 4:66–5:2. Commercial telephone network 14 facilitates a connection of store server 10 to wireless telephone 18. *Id.* at 5:10–11. Optionally, external bar code scanner 20 communicates with the wireless telephone 18 via wire connection 19. *Id.* at 5:31–32. Alternatively, a built-in bar code scanner 25 and/or a built-in IC card reader/writer 27 are formed integrally with the wireless telephone 18. *Id.* at 5:36–38. In a store, a bar code on a purchased item 33 is scanned by bar code scanner 20 attached to a wireless telephone 18. Catalog 21 of the items which can be purchased contains a bar code 22 for each such item, and preferably also contains descriptive text 13 and a picture 15 of each item. *Id.* at 5:40–43.

Figure 10 of Ogasawara is reproduced below.

*FIG. 10*



Appx20

IPR2021-01081
Patent 7,881,529 B2

> Figure 10 depicts a block diagram of an electronic shopping
> system having a wireless videophone.

Ex. 1005, 4:34–36, Fig. 10.  Figure 10 illustrates wireless videophone 218 used in combination with store or remote server 210.  *Id.* at 15:55–56. Wireless videophone 218 includes miniature digital image capture device 236, such as a CCD camera system.  *Id.* at 15:63–16:1. Digital camera 236 includes processing circuitry that translates the visual image acquired by the camera's lens into digital signals suitable for processing by microprocessor 238 into a form that can be transmitted by functional electronic section 240.  *Id.* at 16:7–12.

As described by Ogasawara, since digital camera 236 can be provided to the wireless videophone 218 in place of a bar code scanner, the tailored purchase transaction program may additionally include character recognition and/or pattern recognition software, as well as bar code decode software. This would allow the wireless videophone to function in a manner similar to the wireless telephone and bar code scanner embodiment illustrated in Figure 1. Ex. 1005, 18:15–22.

Ogasawara also discloses that advanced pattern recognition software is able to enhance the performance of the wireless videophone by offering the capability to capture merchandise information from items that are not identified by either a bar code or an alpha-numeric label.  Ex. 1005, 23:11– 15.  According to Ogasawara, advanced pattern recognition software allows a consumer to capture a videographic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software.  *Id.* at 23:16–19.  "This capability is useful for any merchandise item *having a distinct or identifiable shape or other visually identifiable characteristic.*

21

IPR2021-01081
Patent 7,881,529 B2

Such pattern recognition is accomplished within the wireless videophone, by specialized downloaded software." *Id.* at 23:19–23 (emphasis added).

We further discuss below the disclosure of Ogasawara in connection with the parties' arguments.

>    2.    *Overview of Bolle (Ex. 1006)*

Bolle relates generally to "recognizing (i.e., identifying, classifying, grading, and verifying) objects using computerized optical scanning devices," and "a trainable system and method relating to recognizing bulk items using image processing." Ex. 1006, 1:6–10; *see id.* at code (57). In Bolle, an image processing system takes digitized images of a scene. *Id.* at code (57). Using an algorithm, an object image is segmented[7] from a background image. *Id.* The object image is then processed and compared to stored reference images. *Id.* The object is recognized when a match occurs. *Id.*

---

[7] "Segmenting (also called figure/ground separation) is separating a scene image into separate object and background images. Segmenting refers to identifying those image pixels that are contained in the image of the object versus those that belong to the image of the background." Ex. 1006, 2:3–7.

22

IPR2021-01081
Patent 7,881,529 B2

Figure 4 of Bolle is reproduced below.



**FIG. 4**

Figure 4 depicts a block diagram of an apparatus for
segmenting images and recognizing an object in images.

Ex. 1006, 6:30–32, Fig. 4.  Figure 4 shows a block diagram of system 400

for imaging scenes, segmenting object images 130 from their background

image 311 of a physical background 312, and recognizing object(s) 131. *Id.*

at 9:21–25.  System 400 comprises opening 403 to allow object 131 to be

imaged by camera 120 and illuminated by light 110. *Id.* at 9:39–43.  The

system further includes a segmenting algorithm for segmenting an image of

23

IPR2021-01081
Patent 7,881,529 B2

object 131 from an image of the scene. *Id.* at 10:17–19. After the image is segmented, computer 140 performs a computation to determine features of the target object. *Id.* at 12:58–62. Further, computer 140, via algorithm 200, compares normalized characteristics of the target object 131 to one or more normalized referenced object characteristics. *Id.* at 13:61–63.

Bolle further describes comparison/matching of the target characterization to the reference characterizations that is performed according to one or more matching algorithms, such as a nearest neighbor classification. Ex. 1006, 15:50–67.

We further discuss below the disclosure of Bolle in connection with the parties' arguments.

3. *Alleged Reasons to Combine Teachings of Ogasawara and Bolle*

a) *Independent Claim 1*

Petitioner contends the combined teachings of Ogasawara and Bolle render obvious the invention of independent claim 1. Pet. 28–43; Pet. Reply 8–30. This implicates the fundamental issue of whether the ordinarily skilled artisan would have had a *rational* reason to combine such teachings in the first place. *See KSR*, 550 U.S. at 418 (To support the legal conclusion of obviousness, "there must be some articulated reasoning with some rational underpinning" for combining elements in the manner claimed.); *Regents of Univ. of Cal.*, 903 F.3d at 1291. The parties dispute, *inter alia*, whether Petitioner has proven that the skilled artisan would have had such a rational reason. Pet. 21–27; PO Resp. 31–56; Pet. Reply 8–30; PO Sur-Reply 4–25; Tr. 10:8–10 ("[T]he main crux, the dispute between the parties,

IPR2021-01081
Patent 7,881,529 B2

deals with motivation to combine."). We find this issue dispositive in this case as to all Challenged Claims, as discussed below.

In considering the parties' arguments on this issue, we are mindful that even if one of ordinary skill in the art were to understand that two references *could be* combined, this would not itself imply a motivation or reason to combine the references. *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987 993–94 (Fed. Cir. 2017); *see also Belden Inc. v. Berk–Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention."); *InTouch Techs., Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

In this case, Petitioner argues, *inter alia*, (1) Ogasawara teaches most limitations in claim 1 and discloses using "[a]dvanced pattern recognition software" to recognize objects in images under certain conditions, but lacks teachings concerning identifying an object in an image where the "object's shape or other visual characteristic may not be distinct or identifiable due to the distractions from the rest of the image," which Petitioner submits is required by claim 1 (Pet. 21–22, 24 ("Ogasawara [ ] does not segment the object from the background and thus cannot perceive the object's distinct or identifiable shape or other visually identifiable characteristic."); Ex. 1005, 23:11–30; *see, e.g.*, Pet. 21–43; Pet. Reply 8–30); (2) Bolle fills that void by teaching "segmenting an object from its background in a captured image and then distinguishing it from others by matching characteristics of the segmented object to reference characteristics stored in a database" (Pet. 22; *see, e.g.*, *id.* at 6 (relying on "the use of Bolle's image segmentation and

IPR2021-01081
Patent 7,881,529 B2

database matching techniques, in Ogasawara's system"), 21–43;

Pet. Reply 8–30); and (3) the skilled artisan would have combined these

teachings from Ogasawara and Bolle "to achieve a system that could more

accurately discern the shape or other visual characteristics of an object in an

image to be able to identify that object and distinguish it from others"

(Pet. 21; *see, e.g.*, *id.* at 21–43; Pet. Reply 8–30).

Patent Owner argues, *inter alia*, (1) the only image segmentation

techniques disclosed in Bolle require the use of *two* different images where

"the first and second images are in *spatial registration*[8]," which requires

"precise pixel-to-pixel correspondence between the two spatially-aligned

images" (PO Resp. 46–47; Ex. 1006, 10:31–34 (emphasis added); *see, e.g.*,

PO Resp. 36 ("Bolle's system always requires taking *two* photographs of a

target object, under very specific conditions."), 35, 37–45; PO Sur-

Reply 4–25); (2) Ogasawara teaches a retail consumer using a *mobile* (e.g.,

hand-held) device to take a *single* image of an object for purposes of

identifying the object via a bar code or similar marking on the object (*see,

e.g.*, PO Resp. 31–35); and (3) for "multiple reasons" (PO Resp. 46), the

---

[8] Bolle describes "spatial registration" as follows:

> Suppose each pixel is numbered starting in the upper left corner
> of the image then proceeding across the first line then down to
> the second line in the manner of reading a book. Registration
> means that each numbered pixel in the first image corresponds to
> the same area of the scene (object(s) 131 and background 312)
> as the identically numbered pixel in the second image. Proper
> registration can be ensured by either acquiring the first and
> second image in quick succession, or by imaging a stationary
> object 131 against a stationary background 312.

Ex. 1006, 10:34–44.

IPR2021-01081
Patent 7,881,529 B2

skilled artisan would *not* have had a rational reason to apply Bolle's "two-image" segmentation techniques requiring precise spatial registration between the two images to Ogasawara's "one-image" method performed by consumers holding mobile devices in their hands (PO Resp. 46–56; *see, e.g.*, PO Resp. 49 ("Bolle's repeated emphasis on the necessity for taking two photographs from a stationary platform before any object could be recognized is a fundamentally different approach from Ogasawara's, which only uses a single photograph of a target object, taken from a non-stationary wireless videophone.").

In our Institution Decision, we preliminarily found "Petitioner's cited evidence provides sufficient rational reasons for purposes of institution to combine Ogasawara and Bolle." Dec. 31–32; *see id.* at 36, 38. However, on further review of the Petition and further consideration of the parties' briefing on this issue and the relevant case law, and based on the complete record before us, we now conclude otherwise. *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1340 (Fed. Cir. 2020) ("There is nothing inherently inconsistent about the Board instituting IPR on obviousness grounds and then ultimately finding that the petitioner did not provide preponderant evidence that the challenged claim was obvious."); *In re Magnum Oil Tools*, 829 F.3d at 1376 ("[T]he decision to institute and the final written decision are 'two very different analyses,' and each applies a 'qualitatively different standard.'" (quoting *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016))).

In particular, we determine that Petitioner has not proven, by a preponderance of the evidence, that the ordinarily skilled artisan would have had a *rational* reason to combine the relevant teachings of Ogasawara and

Appx27

IPR2021-01081
Patent 7,881,529 B2

Bolle to render obvious the invention of independent claim 1. This issue is substantially disputed between the parties (*see* Pet. 21–27; PO Resp. 31–56; Pet. Reply 8–30; PO Sur-Reply 4–25), with Petitioner also seeking to exclude nearly all of the testimony of Patent Owner's expert, Dr. Bajaj, on this issue (Mot. Excl.), and with Patent Owner arguing that Petitioner's Reply "improperly raises new theories for the first time" on this issue (PO Sur-Reply 4–10). Nonetheless, the burden of proving a rational reason (or motivation) to combine such teachings *is on Petitioner* and never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378; *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348–49 (Fed. Cir. 2021) ("[I]t was, at all times, [petitioner's] burden to show that the claims would have been obvious."). To this end, interspersed across its Petition and Reply, Petitioner submits what we have categorized as four arguments in support of its contention that the skilled artisan allegedly would have combined the relevant teachings of Ogasawara and Bolle to achieve the invention of claim 1. We find these four arguments unpersuasive, and that Petitioner's alleged evidence in support thereof fails to meet its evidentiary burden, as discussed below.

> *(1)   Bolle's Teachings Based on its Figure 3a Embodiment*

In most instances, *the Petition* relies only generally on Bolle's use of "image segmentation technology" in arguing that the skilled artisan would have been motivated to combine such "image segmentation technology" with Ogasawara's teachings to achieve the invention of claim 1.[9] Although

---

[9] *See, e.g.*, Pet. 23 ("Bolle uses image segmentation technology in conjunction with object recognition techniques and a database that stores

28

IPR2021-01081
Patent 7,881,529 B2

not presented especially clearly in the Petition,[10] we understand Petitioner to argue that the skilled artisan would have turned to Bolle's specific "image segmentation" teaching of comparing two spatially registered images of a scene, one with and the other without an object present, as depicted in Figure 3*a*, reproduced below. *See* Pet. 26–27 ("Furthermore, 'carefully controlled lighting conditions' *are not required* for Bolle. Indeed, Bolle provides for segmentation of an object in an image *by comparing images of a scene with and without the object present*." (emphases added) (citing Ex. 1006, 8:45–9:4 (discussing Fig. 3*a*), Fig. 3*a*), 23 ("[T]he object(s) image is novelly segmented from a background image of the scene by a comparison of the two digitized images taken." (quoting Ex. 1006, 6:1–6)); *see also* PO Sur-Reply 5 ("The grounds all relied on the same embodiment of Bolle—its Figure 3a embodiment."), 7 ("The Petition cited Bolle's general description of background segmentation but only relied on Bolle's Figure 3a embodiment.").

---

reference characteristics of target objects to match characteristics of the object in the captured image with characteristics of a target object."), 33 ("Bolle also discloses identifying an object within the image (e.g., by segmenting an object from the background . . . ."), 34 ("Bolle teaches using 'an algorithm' whereby 'the object(s) image is novelly segmented from a background image of the scene by a comparison of the two digitized images taken.'"); *see generally* Pet. 18–43.

[10] *See* 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim").

IPR2021-01081
Patent 7,881,529 B2

## FIG. 3a



Figure 3*a* depicts segmenting a scene into an object image and a background image.

Ex. 1006, 6:27–28, Fig. 3*a*. Bolle's Figure 3*a* shows two scenes, and along with its related description, teaches:

> The first imaged scene 310, shows an image of a background 311 without any other objects present in the field of view of camera 120. The second imaged scene 320 includes both an image of the scene background 311 and an image 130 of one or more objects 131. Here the pixels of the imaged object 130 replace pixels in the background image 311 in those areas of the scene image 320 where object 131 is present. Hence, it is an image of background 311 with instances of objects 131 present in the scene.

> A comparison of the scenes 310 and 320, *preferably on a pixel by pixel basis*, allows the object image 130 to be segmented (separated out) from the background image 311 of the scene. If for *a given pixel* in the 320 image, the brightness is different from (e.g., more then) the image brightness of *said pixel* in 310, this pixel belongs to object image 130. If for *a given pixel* in the image 320, the brightness is equal to *same pixel* in 310, this pixel belongs to background image 311.

30

IPR2021-01081
Patent 7,881,529 B2

Ex. 1006, 8:53–9:4 (emphases added). In other words, Bolle teaches segmenting an object image from a background image using a first image of a scene without an object present and a second image of the scene with the object present, *but doing so without moving the imaging device even about a single pixel value[11] of distance while capturing those two separate images*.

Despite calling out image segmentation teachings relating to Bolle's Figure 3*a* embodiment, Petitioner offers no specific reason, let alone a rational one stated with particularity, for *why* the skilled artisan would have turned specifically to Bolle's "image segmentation" teaching of comparing two spatially registered images of a scene, one with and the other without an object present, as depicted in Figure 3*a*. Instead, Petitioner takes Bolle's teachings concerning Figure 3*a out of context*, and argues only generally that the skilled artisan allegedly would have been motivated to use Bolle's "image segmentation" (generically) with Ogasawara to achieve the invention of claim 1. *See, e.g.*, Pet. 21 (Petitioner arguing generally that combining Ogasawara and Bolle would have "achieve[d] a system that could more

---

[11] Although Petitioner offers no evidence as to the size of a "pixel," based on Ogasawara's description of a "LCD display having a resolution of, for example, 320x240 pels [i.e., pixels]," we understand a pixel at least in the context of Ogasawara and Bolle to have a size of the order of magnitude of about one millimeter (or less). *See* Ex. 1005, 16:40–42; *see also Bank of America, N.A. v. Nant Holdings IP, LLC*, IPR2021-01304, Paper 41 at 45:22–46:14 (PTAB Dec. 8, 2022) (same parties as here: "Counsel [for Patent Owner], do you have an understanding of what the size of a pixel is? . . . [T]here is very little evidence on measurements, petitioner has not put in any evidence on this point. Ogasawara does explain, this is at [column 16], lines 40 through 45 . . . . I don't recall if Ogasawara explains how big the screen is, but we're talking year 2000, we're not talking giant screens. He says that the screen is 320 by 240 pixels, that by my math is 76800 pixels on a tiny screen. That's the level of identity that Bolle is requiring.").

IPR2021-01081
Patent 7,881,529 B2

accurately discern the shape or other visual characteristics of an object in an image to be able to identify that object and distinguish it from others." (citing Ex. 1003 ¶¶ 98–110)); Pet. 24 (Petitioner arguing "Bolle would predictably enhance the performance of the Ogasawara system," and the teachings of the references themselves "provide [the skilled artisan] with a strong motivation to combine Ogasawara and Bolle." (citing Ex. 1003 ¶¶ 103–104)); Pet. 24 (Petitioner arguing "both references are in the same field and address the same issue in the same context—using image processing systems to identify products, such as produce, for purchase during shopping." (citing Ex. 1003 ¶ 104)); *see generally* Pet. 21–27.

Patent Owner argues, *inter alia*, "a retail customer would not be able to take the necessary photographs to segment an object from the background using Bolle's [Figure 3*a*] techniques," because "Bolle requires precise pixel-to-pixel correspondence between the two spatially-aligned images in a non-mobile environment, which would be hard—if not impossible—for a retail customer to do," particularly where customers must physically or manually insert or remove objects from scenes between the time of taking the two images using mobile devices held in their hands. PO Resp. 46 (citing Ex. 1006, 10:31–35, 10:53–55; Ex. 2006 ¶¶ 27–29); *see id.* at 35–56. After Patent Owner highlighted this issue (PO Resp. 31–56), Petitioner responded by characterizing its arguments and evidence, directed on their face to reasons or motivations to combine the teachings of Ogasawara with Bolle's teaching of image segmentation related to Figure 3*a*, as *also* being directed to other of Bolle's image segmentation teachings (discussed below). Pet. Reply 8–30; *see* PO Sur-Reply 5 ("Petitioner now recasts its Petition argument, focusing on three alternative Bolle embodiments that are

32

IPR2021-01081
Patent 7,881,529 B2

fundamentally different than the Figure 3a embodiment."); 7 ("The Petition
cited Bolle's general description of background segmentation but only relied
on Bolle's Figure 3a embodiment.  Having been shown that Ogasawara
cannot be combined with this embodiment, Petitioner newly relies on
Bolle's Figure 3b embodiment *and* capturing images in quick succession.").

We find Petitioner's arguments and evidence here ignore the critical
context of Bolle requiring that the two images being used to perform image
segmentation be in spatial, pixel-to-pixel registration, despite an object being
moved into or out of a scene between the taking of those two images.  *See
Bausch & Lomb, Inc. v. Barnes-Hind/Hyrocurve, Inc.*, 796 F.2d 443, 448
(Fed. Cir. 1986) ("It is impermissible within the framework of section 103 to
pick and choose from any one reference only so much of it as will support a
given position to the exclusion of other parts necessary to the full
appreciation of what such reference fairly suggests to one skilled in the
art.").  Petitioner alleges Patent Owner provides no support "for the claim
that a user cannot hold Ogasawara's videophone sufficiently stationary while
capturing multiple images."  Ex. 1050 ¶ 64.  To the contrary, Patent Owner's
expert, Dr. Bajaj, testifies:

> Performing this pixel-accurate spatial registration from
> two independently-acquired images taken by a shopping
> customer on their phone is non-trivial and is prone to be
> erroneous.  All spatial registration errors between the two images
> are carried over and causatively yield much greater error using
> the pixel-wise segmentation algorithm 220 of Bolle.
>
> The resulting segmentation errors in the separation of the
> pixels belonging to the object from the pixels belonging to
> background image causes greater and cascadic error in the object
> recognition phase of Bolle's method of extracting and
> normalizing separated object histogram characteristics and

IPR2021-01081
Patent 7,881,529 B2

> comparing to one or more stored normalized reference characterizations.

Ex. 2006 ¶¶ 28–29; *see* PO Sur-Reply 10–11. Patent Owner also submits that "[t]he difficulty of an average customer to take two pixel-perfect images using a mobile phone is also *self-apparent*." PO Sur-Reply 11 (emphasis added).

Regardless, it is Petitioner's burden to evidence sufficiently that the ordinarily skilled artisan would have understood that such a user could have held Ogasawara's videophone sufficiently stationary while capturing multiple images as required by Bolle's Figure *3a* embodiment—Petitioner has not done so. More importantly, it is Petitioner's burden here to evidence sufficiently and with particularity *why* the ordinarily skilled artisan, *but for hindsight* and in the time frame of the year 2000 (about *seven years before* introduction of the first "iPhone" by Apple Inc. [12]), would have combined (a) Ogasawara's system where, for example, shoppers use mobile devices (e.g., handheld mobile phones) to capture single images of objects and to have those objects recognized as such by pattern recognition software, with (b) Bolle's image segmentation technique of Figure *3a*, where such shoppers would have had to hold their mobile phones with near perfect stability and positioning in space all while taking one image of a scene without an object of interest therein, then physically placing the object within the scene (presumably not using the hand holding the phone), and then taking a second image of the scene with the object present. For the reasons discussed above,

---

[12] *See* Apple Reinvents the Phone With iPhone, https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (accessed Dec. 21, 2022).

IPR2021-01081
Patent 7,881,529 B2

we agree with Patent Owner that Petitioner fails to meet its burden here.
Indeed, we find it incredible (i.e., not credible) that the ordinarily skilled
artisan at the relevant time would have considered it desirable (or feasible)
for a consumer/shopper to have to hold a mobile device in space with such
pixel-level precision (e.g., without causing the scene as seen by the camera
to move even about one millimeter or less in any direction or orientation).
We find this proposed combination of teachings to simply not make sense
based on the record before us and the relevant time frame.

> (2) *Bolle's Teachings Based on its Figure 3b*
> *Embodiment and "Quick Succession"*

In its Reply, Petitioner argues the skilled artisan would have been
motivated to combine Bolle's alternative "image segmentation" teaching of
comparing two spatially registered images of a scene, one taken with a flash
and the other without a flash, as depicted in Bolle's Figure 3*b*, with
Ogasawara's teachings to achieve the invention of claim 1.  Pet.
Reply 10–12.  Petitioner argues the skilled artisan "would have been
motivated to combine Ogasawara and Bolle to achieve a system that could
more accurately discern the shape or other visual characteristics of an object
in an image to be able to identify that object and distinguish it from others."
Pet. 21 (citing Ex. 1003 ¶¶ 98–110); *see id.* at 21–25.

35

IPR2021-01081
Patent 7,881,529 B2

Figure 3*b* of Bolle is reproduced below.



Figure 3*b* depicts segmenting a scene into an object image and
a background image.

Ex. 1006, 6:27–28, Fig. 3*b*.

Bolle's Figure 3*b* shows two images of a scene with a background and
one or more objects, and along with its related description, teaches:

> Image 330 in FIG. 3*b* is an image of a scene (including
> objects 131 and a background 311) with light source 110 off.
> That is, the scene image 330 consist of an image of
> background 311 illuminated by ambient light. Also in the scene
> image 330 are the object images 135 obscuring the background.
> Because the light source 110 is off, object images 135 appear
> dark in scene image 330 because they are not illuminated by the
> light source 110.

> Image 340 in FIG. 3*b* is an image of the scene with light
> source 110 on. In this case, the light source 110 illuminates
> objects 132 in field of view of camera with an amount of light
> greater than ambient light. This results in the object images 130
> being brighter (than in 330) in scene image 340.

Ex. 1006, 9:5–20. Bolle further teaches in connection with Figure 3*b* and
Figure 5 (not shown here) that the object, background, and image input
device "should be at the *same position* in both step 510 and 520 [i.e., the

36

IPR2021-01081
Patent 7,881,529 B2

steps of acquiring the first/dark image and second/light image] to assure that the first and second images are in *spatial registration*." *Id.* at 10:31–34 (emphases added). Bolle also teaches in connection with Figure 3*b* and Figure 5 that "[p]roper registration can be ensured by either acquiring the first and second image in *quick succession*, or by imaging a *stationary object* 131 against a *stationary background* 312." *Id.* at 10:41–43 (emphases added).

Petitioner argues "Bolle expressly teaches that taking the first and second images in *quick succession* ensures that the camera, object, and background are in the same relative position in both images." Pet. Reply 20 (citing Ex. 1006, 10:31–44) (emphasis added). Petitioner argues, "[b]y capturing images in *quick succession*, any relative movement is insignificant, and thus, the images will be sufficiently aligned for segmenting the object from the background." *Id.* at 21 (emphasis added). Petitioner also argues "flash functionality in CCD cameras integrated in mobile phones was well-known at the time of the invention," and that the skilled artisan "would therefore understand that the camera in Ogasawara's videophone would include a synchronized camera flash to illuminate the object for Bolle's segmentation." *Id.* at 28–29. Petitioner argues "Bolle explains that a camera flash or 'strobe' 'may be synchronized with the camera' capturing the two images," and that "[t]hese teachings combined with Ogasawara's videophone would motivate [the skilled artisan] to use the combined system to take two pictures (with flash and without) in 'quick succession.'" *Id.* at 22 (citing Ex. 1006, 10:8–16, 7:18–65, 9:59–60; Ex. 1050 ¶ 69); *see id.* at 28–29 (discussing illumination).

37

Appx37

IPR2021-01081
Patent 7,881,529 B2

Patent Owner complains that Petitioner's reliance on teachings of Bolle's Figure 3*b* embodiment and related disclosure to support an alleged motivation to combine Ogasawara and Bolle constitute a new obviousness theory presented for the first time on reply.   PO Sur-Reply 5–6 ("Petitioner modifies its grounds by combining Ogasawara with 'Bolle's Figure 3b [segmentation] embodiment,' where the images are captured in 'quick succession' and synced to a camera's flash, such that the first image is taken without a flash, and the second image is taken with a flash."), 4 ("Petitioner presents . . . entirely new obviousness theories based on previously-uncited Bolle embodiments.").   As the Federal Circuit stresses:

> It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify with particularity the evidence that supports the grounds for the challenge to each claim. . . . [T]he expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute."

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1286–87 (Fed. Cir. 2017) (quoting *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016), which quotes, in part, 35 U.S.C. § 312(a)(3) (The Petition must identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim.")).   But the Federal Circuit also has cautioned that any ambiguity as to whether a reply constitutes a new argument is eliminated when the reply is a legitimate reply to arguments introduced in a patent owner's response or the Board's institution determination.  *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706–07 (Fed. Cir. 2020) (citing *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018)); *see*

38

IPR2021-01081
Patent 7,881,529 B2

*Everstar Merch. Co. v. Willis Elec. Co.*, No. 2021-1882, 2022 WL 1089909,
at *4 (Fed. Cir. Apr. 12, 2022).

During oral hearing, Petitioner's counsel could not identify
specifically *in the Petition* any actual discussion of Figure 3b, let alone any
discussion of taking images in "quick succession" with changing
illumination (with flash/without flash), but for identifying a few *citations* in
the Petition, where the cited material also included (or perhaps happened to
include) reference to Figure 3b.  *See, e.g.*, Tr. 7:21–9:25.  We likewise find
no such arguments presented with particularity concerning Figure 3b and
"quick succession" in the Petition.  The Petition itself explicitly notes that
"Bolle provides for segmentation of an object in an image *by comparing
images of a scene with and without the object present*" (Pet. 26–27
(emphasis added)), which implicates only Bolle's Figure 3a embodiment,
and effectively dismisses Bolle's Figure 3b embodiment involving specific,
controlled lighting requirements by stating, "'carefully controlled lighting
conditions' *are not required* for Bolle" (Pet. 26–27 (emphasis added)).
We agree with Patent Owner that Petitioner's arguments in its Reply
concerning Bolle's Figure 3b embodiment and "quick succession" constitute
arguments offered for the first time on reply.  However, because Patent
Owner discussed Bolle's Figure 3b embodiment in its Response (PO
Resp. 39, 41–45), and because our decision does not turn on whether
Petitioner's arguments here are new and improper, we need not and do not
decide this procedural issue and instead turn to the merits.

Patent Owner argues Bolle's Figure 3b embodiment, like the
Figure 3a embodiment, requires that "the two images must be pixel-
accurate, spatially aligned or registered views—i.e., the camera cannot be

IPR2021-01081
Patent 7,881,529 B2

moved significantly between the two photographs," and "[t]hus, a stationary camera is ***required*** to capture the necessary segmentation images." PO Resp. 43–44. Patent Owner argues "Ogasawara never describes a cell phone as containing a flash or any other light source, which would have prevented using Bolle's second, illumination-based segmentation approach," and that "[t]his would have [led] a skilled artisan away from combining Ogasawara and Bolle to yield the challenged claims." PO Resp. 48; *see id.* at 58 ("There is no description in Ogasawara of even taking more than one photograph per target item, much less any disclosure of how the mobile phone could be used to take the required two photographs under specific illumination conditions."). According to Patent Owner:

> Petitioner argues on Reply for the first time that "flash functionality in CCD cameras integrated in mobile phones was well-known." Reply 29 (citing EX1050 ¶¶95-96). It raises this argument because Bolle's Figure 3b (Petitioner's new combination) requires a flash, and, as PO had pointed out, neither Ogasawara or Bolle disclose an integrated flash. POR 48.

> Petitioner relies on Dr. Rodriguez's 78-page declaration, which in turn relies on an entirely new reference, EX1062, U.S. Patent No. 6,122,526 ("Parulski"). EX1050 ¶96. The Petition did not disclose any obviousness theory involving Ogasawara's mobile videophone having an integrated flash. While the Petition asserted that "Bolle teaches that a . . . camera flash will suffice if a lighting source is preferred" (Pet. 26-27 (citing EX1006 7:3-17 (Fig. 1), 9:59-60), Bolle's only disclosure of a "camera flash" is not integrated into a mobile device but is instead a discrete "light source 110" that is preferably specific types of external flash tubes. EX1006 7:14-17; Fig. 1. The Petition did not disclose the Reply's new theory of integrating a flash into Ogasawara's videophone, and certainly did not disclose Parulski. Reply 28-29. Petitioner's arguments should therefore be given no weight.

PO Sur-Reply 8–9.

40

IPR2021-01081
Patent 7,881,529 B2

In response to Petitioner's arguments about capturing first and second images in "quick succession," Patent Owner argues that "Bolle explains that pictures may be taken in 'quick succession' when the *object* or *background* are not stationary, and otherwise expressly states that the camera 'should be at the same position.'" PO Sur-Reply 16 (citing Ex. 1006, 10:31–44 (discussed above); Ex. 2007, 44:24–45:16 (Petitioner's expert, Dr. Rodriguez, agreeing that "[t]he camera seems to be stationary."); Ex. 2010, 55:18–56:5 (Dr. Rodriguez testifying that Bolle's "camera is in a fixed position," such as "putting a camera on a tripod."). Patent Owner argues "Bolle's teaching of capturing images in 'quick succession' is a solution for a *stationary* or *fixed-position* camera," and "Ogasawara's mobile videophone is incompatible with this system." PO Sur-Reply 16–17. Patent Owner argues "Bolle expressly discloses in both its Figure 3a and 3b embodiments use of an enclosure where the desired object is placed on 'a support 405' to 'ensure[] the object is of fixed and repeatable distance 407 from camera 120,'" and that "[t]his is because the segmentation process uses a precise pixel-by-pixel comparison of two images." PO Sur-Reply 17.

We agree with Patent Owner that Bolle teaches using a *stationary* imaging device (camera) to obtain two images for purposes of segmentation via Bolle's Figure 3*a* and 3*b* embodiments, and that Ogasawara teaches using a *mobile* device to obtain a single image for purposes of pattern recognition. Bolle itself explicitly states that the object, background, *and image input device* "should be at the *same position*" when acquiring the first/dark image and second/light image, and that the two images must be *spatially registered* (explained above). Ex. 1006, 10:31–44; *see id.* at 9:48–51 ("By placing the object 131 on the surface 405, the distance 407

41

IPR2021-01081
Patent 7,881,529 B2

between camera 120 and object 131 remains fixed thus providing the means for repeatable imaging.").

We credit Dr. Bajaj's (Patent Owner's expert) testimony that Bolle requires a stationary camera and spatially registered images for purposes of segmentation via Bolle's Figure 3*a* and 3*b* embodiments, which we find to be well-aligned with Bolle's disclosure and the complete record before us. *See, e.g.*, Ex. 2006 ¶ 38. We find Dr. Bajaj's testimony on this issue much more credible than Dr. Rodriguez's (Petitioner's expert) testimony to the contrary, which we find to be misaligned at best with Bolle's explicit disclosures discussed above. *See, e.g.*, Ex. 1050 ¶ 66 (Dr. Rodriguez testifying that Bolle's Figure 4 shows a stationary camera, but Bolle allegedly is not limited to using a stationary camera; and that Bolle's segmentation techniques do not require "exact alignment," merely "approximate[]" alignment of images, without explaining how or why the skilled artisan would have interpreted Bolle in that way); Ex. 2007, 97:22–99:6 (testifying on re-direct to the same); *see also Skky, Inc. v. MindGeek, S.A.R.L.*, 859 F.3d 1014, 1022 (Fed. Cir. 2017) (the Board is "not required to credit [a party's] expert evidence simply because [the party] offered it"); *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("This court's opinions have repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review."); *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).

We find Petitioner's arguments and evidence here ignore the critical context of Bolle requiring that the two images being used to perform image segmentation be in spatial, pixel-to-pixel registration, despite needing to take

42

Appx42

IPR2021-01081
Patent 7,881,529 B2

the two images under separate and different lighting conditions (e.g., with flash and without flash). Again, it is Petitioner's burden to evidence sufficiently that the ordinarily skilled artisan would have understood that a user could have held Ogasawara's videophone sufficiently stationary while capturing multiple images as required by Bolle's Figure *3b* embodiment— Petitioner has not done so. And again, it is Petitioner's burden here to evidence sufficiently and with particularity *why* the ordinarily skilled artisan, *but for hindsight* and in the time frame of the year 2000, would have combined (a) Ogasawara's system where, for example, shoppers use *mobile* devices (e.g., handheld mobile phones) to capture single images of objects and to have those objects recognized as such by pattern recognition software, with (b) Bolle's *stationary* image segmentation technique of Figure 3*b*, where such shoppers would have had to hold their mobile phones with near perfect stability and positioning in space all while taking one image of a scene with a flash and then taking another image of that same scene without a flash. For the reasons discussed above, we agree with Patent Owner that Petitioner fails to meet its burden here. *See* PO Sur-Reply 6, 13–16.

Indeed, we find no credible explanation in the record before us for *why* the ordinarily skilled artisan would have considered it desirable (or feasible) for a consumer/shopper to have to hold a mobile device in space with such pixel-level precision (e.g., without causing the scene as seen by the camera to move even about one millimeter or less in any direction or orientation), or otherwise would have considered it desirable to combine Bolle's stationary, two-image segmentation method of Figure 3*b* with Ogasawara's mobile, one-image object recognition system. We find this

43

IPR2021-01081
Patent 7,881,529 B2

proposed combination of teachings to simply not make sense based on the
record before us and the relevant time frame, even assuming that Bolle's
segmentation methods yield better results in object feature recognition, as
Petitioner asserts (Pet. 21–25).[13]

### (3) Bolle's Teachings Based on Figure 14, "Histogramming," and Claim 32

In its Reply, Petitioner argues the skilled artisan would have been
motivated to combine Bolle's "image segmentation" teaching of
"histogramming," as discussed in connection with Bolle's Figure 14, with
Ogasawara's teachings to achieve the invention of claim 1.  Pet.
Reply 14–15.

---

[13] To the extent Petitioner intends its "quick succession" arguments also to
apply to Bolle's Figure 3a embodiment (*see supra* Section III.D.3.a.1),
we likewise are unpersuaded.  We agree with Patent Owner that "Petitioner
provides no evidence that pixel-perfect images with and without the object
could be captured in 'quick succession' using a mobile phone," and that
"Bolle's teaching of 'quick succession' is only disclosed in the context of
the Figure 3b embodiment."  PO Sur-Reply 11–12 (citing Ex. 1006,
10:20–43; Ex. 2010, 67:9–20, 69:19–23).

44

IPR2021-01081
Patent 7,881,529 B2

Figure 14 of Bolle is reproduced below.



**FIG. 14**

Figure 14 depicts *an already segmented object*
having two distinct regions that can be further
segmented relative to each other.

Ex. 1006, 6:54–57, Fig. 14.

Petitioner argues Bolle "teaches segmenting an object in an image

*without comparing corresponding pixels of the object in two images*." Pet.

Reply 14–15 (emphasis added). Specifically, Petitioner asserts:

> Figure 14 [of Bolle] . . . discloses segmenting a "first object
> region" (e.g., leaves 1410) from a "second object region" (e.g.,
> grapes 1420). . . . [Ex. 1006], 19:16–27 ("The object image 130
> [sic 1430] is segmented along its first object region 1410 and its
> second 1420 object region . . . by using a segmentation
> algorithm. A preferred algorithm is the use of an area normalized

45

IPR2021-01081
Patent 7,881,529 B2

> Hue histogram for detecting if there are two or more distinct
> peaks."). *This algorithm would separate a scene image into
> separate object and background images just as it separates
> object regions*. Ex. 1050, ¶¶ 22–24, 39–44.

*Id.* (emphasis added).  In that connection, Petitioner contends that Bolle's
claim 32 recites "segmenting [a] target object image from the background
image of the scene" without requiring comparing two images.  *Id.* at 15.
According to Petitioner, claim 32 of Bolle confirms that "[Bolle's]
segmentation embodiments are not limited to comparing two images."  *Id.*

Petitioner's reliance on Bolle's claim 32 is misplaced.  Even if the
scope of claim 32 is broad and covers segmentation of an object from the
background by analyzing only one scene, this is not a disclosure of any
algorithm to segment an object from the background by analyzing only one
scene.  Indeed, we agree with Patent Owner's assessment of Petitioner's
"claim 32" argument:

> [Bolle's] specification does not disclose any background
> segmentation algorithms that use only a single image . . . .
> [T]he Figure 14 segmentation algorithm [discussed above and
> further below] is not a background segmentation algorithm.
> The background segmentation algorithms disclosed in Bolle both
> use two images.  There is therefore no single-image background
> segmentation teaching in Bolle to combine with Ogasawara.

PO Sur-Reply 21.

As noted above, a petition must identify "with particularity . . . the
evidence that supports the grounds for the challenge to each claim."
35 U.S.C. § 312(a)(3).  With regard to Bolle's Figure 14 embodiment,
Petitioner did not, in the Petition, identify or refer to Figure 14 as an
algorithm to segment an object from the background in a scene.  *See* PO Sur-
Reply 6 ("Petitioner modifies its grounds [as originally set forth in the

IPR2021-01081
Patent 7,881,529 B2

Petition] by combining Ogasawara with Bolle's segmentation algorithm depicted in Figure 14 used for segmenting an object into two sub-objects *after* background segmentation."), 20 ("Petitioner also raises new arguments that Ogasawara could be combined with segmentation algorithms that only use one image.").  Petitioner also identifies no disclosure in Bolle which describes the algorithm associated with Figure 14 as segmenting an object from the background in a scene.  *See id.* at 20 ("Petitioner argues that '[t]his algorithm would separate a scene image into separate object and background images just as it separates object regions,' but provides no explanation for why this is true.").  To the contrary, in arguing in the Petition that Bolle teaches certain limitations in claim 1, Petitioner relies on Bolle's two-image segmentation process.  *See* Pet. 34 ("Bolle teaches using 'an algorithm' whereby "the object(s) image is novelly segmented from a background image of the scene *by a comparison of the two digitized images taken*.'" (emphasis added)).

It is belated for Petitioner to raise this new contention, for the first time in its Reply, that Bolle discloses a Figure 14 embodiment which segments an object from the background in a scene using a single image.  The argument is not entitled to consideration.  If Petitioner wanted to make that argument, Petitioner should have presented the argument in the Petition to provide Patent Owner reasonable notice of the argument.  *See* 37 C.F.R. §42.104(b)(4) ("The petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon."); 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition, patent owner preliminary response, or patent owner response."); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324,

IPR2021-01081
Patent 7,881,529 B2

1330–31 (Fed. Cir. 2019); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016).

Regardless, even if we were to consider the belated argument, we agree with Patent Owner that Bolle's Figure 14 embodiment does not teach segmenting an object from the background in a scene, but only further segmenting an object already previously segmented from the background in a scene into two sub-portions. *See* PO Sur-Reply 20–21 (Bolle's Figure 14 embodiment does not reflect "a background segmentation algorithm. Instead, it is an algorithm for segmenting an object ***after*** background segmentation."). Bolle clearly discloses "segmented object image 130 has two distinct regions, i.e., the leaves 1410 and the grapes 1420." Ex. 1006, 19:18–20. Bolle also discloses "object image 130 is segmented 220 from the background 311." *Id.* at 17:1–2. Petitioner's expert, Dr. Rodriguez, acknowledges that object image 130 is already segmented from the background. Ex. 1050 ¶ 40 ("FIG. 14 shows an image 1405 where segmented object image 130 has two distinct regions, i.e., the leaves 1410 and the grapes 1420."); *id.* ¶ 42 ("The grapes and the leaves are part of a 'segmented object image 130' that was previously (prior to Figure 14) segmented from the original background.").

We recognize that Dr. Rodriguez also testifies that "[t]his segmentation algorithm [separating the leaves and the grapes] would separate a scene image into separate object and background images just as it separates object regions." *Id.* ¶ 41. In its Reply, Petitioner asserts the same. Pet. Reply 15 (citing Ex. 1050 ¶¶ 22–24, 39–44). But we agree with Patent Owner that Petitioner "provides no explanation for why this is true." Further, to the extent Petitioner is asserting that it would have been obvious

48

IPR2021-01081
Patent 7,881,529 B2

to the ordinarily skilled artisan to adapt Bolle's algorithm of Figure 14 for use in segmenting an object from the background image in a scene, that is a new argument first presented in the Reply and is not entitled to consideration.

In sum, we find no credible explanation in the record before us for *why* the ordinarily skilled artisan would have considered it desirable (or feasible) to combine Bolle's Figure 14 embodiment with Ogasawara's teachings to achieve the invention recited in claim 1. We find this proposed combination of teachings to simply not make sense based on the record before us and the relevant time frame.

### (4) *Bolle's Teachings of "Segmentation" Generally*

In its Reply, Petitioner argues the skilled artisan would have been motivated to combine Bolle's "segmentation process," generally, with Ogasawara's teachings to achieve the invention of claim 1. Pet. Reply 20. Similarly, during the oral hearing, Petitioner's counsel characterized the Petition as "focus[ing] on the benefits of segmentation as a whole, and not only on certain embodiments," and argued "we're not relying on Figure A, Figure B, single image segmentation," instead "[w]e're relying on the motivation -- our motivation relies on the benefits of segmentation, [as] a whole -- such as providing for increased accuracy." Tr. 8:15–19; *see id.* at 9:1–4 ("The motivation to combine *does not depend on any specific segmentation embodiment* as any of those methods in Bolle provide the benefits that a person of ordinary skill in the art would see for the combination." (emphasis added)). To the extent that this is true, it only further fuels our view that the Petition does not set forth sufficiently, let

49

Appx49

IPR2021-01081
Patent 7,881,529 B2

alone with particularity, *why* the ordinarily skilled artisan would have had a *rational* reason to combine *specific* teachings of Ogasawara and Bolle to achieve the invention of claim 1.

Petitioner's argument here also contradicts its entire basis for reaching to Bolle in the first place, namely, that Ogasawara's mere mention of "[a]dvanced pattern recognition software" to recognize objects in images under certain conditions, without more, is insufficient to teach the invention recited in claim 1. *See* Pet. 21–22, 24. Petitioner's reliance on Bolle's teaching of "segmentation" generally, without relying on teachings of a particular segmentation technique, adds little to nothing to Ogasawara. Regardless, for the same reasons we do not find Bolle's specific "image segmentation" teachings to support a rational reason to combine Ogasawara and Bolle (*see supra* Sections III.D.3.a.1–a.3), *a fortiori*, we do not find Bolle's generalized "image segmentation" teachings to do so either.

### (5) Conclusion

For the reasons expressed above, and based on the complete record before us, we conclude Petitioner has not proven that an ordinarily skilled artisan would have had a rational reason to combine the teachings of Ogasawara and Bolle to achieve the recited invention of claim 1. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that independent claim 1 would have been obvious over the combination of Ogasawara and Bolle.

### b) Dependent Claims 2, 4, 7, 9, and 18

Petitioner submits the same arguments and evidence concerning alleged reasons to combine the teachings of Ogasawara and Bolle for dependent claims 2, 4, 7, 9, and 18 as for independent claim 1. *See*

IPR2021-01081
Patent 7,881,529 B2

Pet. 21–27. Petitioner's evidentiary showing for dependent claims 2, 4, 7, 9, and 18 (*see* Pet. 21–27, 43–54) does not remedy the deficiencies in its evidentiary showing for independent claim 1. *See supra* Section III.D.3.a. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that any of dependent claims 2, 4, 7, 9, and 18 would have been obvious over the combination of Ogasawara and Bolle.

### 4.   *Alleged Reasonable Expectation of Success in Combining the Relevant Teachings of Ogasawara and Bolle*

Petitioner's contention that the combined teachings of Ogasawara and Bolle render obvious the inventions of claim 1, 2, 4, 7, 9, and 18 (Pet. 28–54) also implicates the fundamental issue of whether the ordinarily skilled artisan would have had a reasonable expectation of success in combining such teachings. The parties dispute, *inter alia*, whether Petitioner has proven that the skilled artisan would have had such a reasonable expectation of success. Pet. 6, 25–27; PO Resp. 56–58; PO Sur-Reply 16–19. We find this issue also dispositive in this case as to all Challenged Claims, as discussed below.

"An obviousness determination requires finding that [an ordinarily skilled artisan] would have been motivated to combine or modify the teachings in the prior art <u>and</u> *would have had a reasonable expectation of success in doing so.*" *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018) (emphasis added); *see also OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382–85 (Fed. Cir. 2019); *Samsung Elecs. Co., Ltd. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1380–83 (Fed. Cir. 2019). "'[A] reasonable expectation of success, not absolute predictability' supports a conclusion of obviousness." *Yamanouchi Pharm. Co. v. Danbury*

51

IPR2021-01081
Patent 7,881,529 B2

*Pharmacal, Inc.*, 231 F.3d 1339, 1343 (Fed. Cir. 2000); *see Intel Corp. v. Alacritech, Inc.*, 817 F. App'x 1014, 1016–17 (Fed. Cir. 2020).  "The reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention."  *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021).  "Whether the prior art discloses a claim limitation, whether a skilled artisan would have been motivated to modify or combine teachings in the prior art, *and whether she would have had a reasonable expectation of success in doing so are questions of fact.*" *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (emphasis added).

In our Institution Decision, we preliminarily found "Petitioner's cited evidence provides sufficient rational reasons for purposes of institution to combine Ogasawara and Bolle *with a reasonable expectation of success*." Dec. 38 (emphasis added).  However, on further review of the Petition and further consideration of the parties' briefing on this issue and the relevant case law, and based on the complete record before us, we now conclude otherwise.  *See Fanduel*, 966 F.3d at 1340; *Magnum Oil Tools*, 829 F.3d at 1376.  In particular, even if Petitioner were found to have proven a rational reason to combine the relevant teachings of Ogasawara and Bolle, we determine that Petitioner has not proven, by a preponderance of the evidence, that the ordinarily skilled artisan would have had a reasonable expectation of success in doing so (i.e., in implementing Bolle's segmentation methods on Ogasawara's videophone).

Petitioner argues the skilled artisan "would have had a reasonable expectation of success combining Bolle's image segmentation and matching techniques with Ogasawara's system." Pet. 25.  Petitioner argues the skilled

52

IPR2021-01081
Patent 7,881,529 B2

artisan "could have combined Bolle's image segmentation and matching techniques with Ogasawara's system using the hardware and techniques already described in each reference, and each system would perform the same in the combined system," and "would have recognized that using Bolle's image segmentation and matching techniques with Ogasawara's system would be nothing more than combining prior art elements according to known methods to yield predictable results, or the application of known techniques to improve a known device to yield predictable results." Pet. 25 (citing Ex. 1003 ¶ 106); *see* Pet. 6, 26–27 ("[The skilled artisan] would have thus recognized that Bolle's algorithmic methods of image segmentation and matching are compatible with Ogasawara's system.").

Patent Owner contends "Petitioner's articulated reasoning for a reasonable expectation of success is boilerplate and conclusory." PO Resp. 56. Patent Owner argues the skilled artisan would not have had a *reasonable* expectation of success "because an untrained shopping customer using Ogasawara's mobile phone would not have been able to take the precise dual images required by Bolle's system." *Id.* at 57–58 (discussing Bolle's Figure 3*a* and 3*b* embodiments); *see* PO Sur-Reply 16–19.

As for Bolle's Figure 3*a* embodiment, Patent Owner argues:

> Bolle's first segmentation technique requires two still photographs [ ] without any pixel variation in the background. Considering first the segmentation technique where one image is of a background without the target object, and the other image is the same exact background with the target object, a shopping customer would not be able to take the two required photographs with their phone. Bajaj ¶ 56. For example, they would not be able to reliably situate themselves to take the necessary photograph from the same perspective, distance, etc.

53

IPR2021-01081
Patent 7,881,529 B2

PO Resp. 57. For these reasons, and also for reasons discussed above in Section III.D.3.a.1 and below, we agree with Patent Owner, and find Petitioner has not proven that the ordinarily skilled artisan at the relevant time would have considered it feasible for a consumer/shopper to have to hold a mobile device in space and take two, spatially registered images of scene while that consumer moved an object into or out of the scene between the taking of those two images.

Petitioner does not adequately explain how such activity could have been performed without causing substantial misalignment that undermines the spatial registration requirement of Bolle. Petitioner does refer to Bolle's description of taking the two pictures in "quick succession," Pet. Reply 20, but (1) the "quick succession" description of Bolle relates to Bolle's Figure 3*b* embodiment which does not involve moving an object into or out of a background (Ex. 1006, 10:24–43), and (2) Petitioner does not explain how holding Ogasawara's videophone still gets easier for the shopper if the shopper has to move an object either into or out of a scene *even quicker*.

As for Bolle's Figure 3*b* embodiment, and also as discussed above in Section III.D.3.a.2, Patent Owner argues "Bolle's teaching of capturing images in 'quick succession' is a solution for a ***stationary*** or ***fixed-position*** camera," and "Ogasawara's mobile videophone is incompatible with this system." PO Sur-Reply 16–17; *see* PO Resp. 35–58. Patent Owner argues "Petitioner also does not establish that Ogasawara's videophone was capable of capturing images in quick succession," and "[a]s Dr. Rodriguez admitted, Bolle does not explain how its teaching of 'quick succession' is performed." PO Sur-Reply 17; *see id.* at 17–18 ("[T]he Reply also does not describe how Ogasawara's videophone could take images in quick succession."). Patent

IPR2021-01081
Patent 7,881,529 B2

Owner argues "Petitioner's new combination also requires 'Ogasawara's videophone [to] include a synchronized camera flash to illuminate the object for Bolle's segmentation,'" but "Petitioner provides no evidence that integrating a flip-up flash, such as the one disclosed in Parulski,[14] would have integrated with Ogasawara's videophone and still meet Bolle's segmentation requirements." *Id.* at 18–19 (quoting Pet. Reply 29).  Patent Owner argues Petitioner is silent as to how Parulski adds anything to support Petitioner's reasonable expectation of success argument:

> Petitioner . . . does not, for example, establish that Parulski's flash meets Bolle's requirement that lighting be "nonmonochromatic and of a constant frequency distribution" or that it is "infrared" or "ultra violet." EX1006 7:7–14.  Nor does Petitioner provide any evidence that Parulski's flash is similar to the exemplary flashes described by Bolle. *Id.* 7:14–17.  Thus, Petitioner's revised combination fails to establish that Bolle's system could be successfully combined with Ogasawara, and is thus inadequate.

*Id.* at 19.  For these reasons, and also for reasons discussed above in Section III.D.3.a.2 and below, we agree with Patent Owner, and find Petitioner has not proven that the ordinarily skilled artisan at the relevant time would have considered it feasible for a consumer/shopper to have to hold a mobile device in space and take two, spatially registered images of scene, one with the camera flash on and another with the camera flash off (both with the object in the background).

Petitioner's expert, Dr. Rodriguez, testifies that "mobile phones with camera flash functionality were known by 2000," and Dr. Rodriguez

---

[14] Parulski discloses "flip-out flash unit 24 that protects the lens 22 when the camera module 10 is not in use." Ex. 1062, 3:16–17.

55

IPR2021-01081
Patent 7,881,529 B2

identifies Parulski (Ex. 1062) as describing such a mobile phone with an integrated flip-up flash unit.  Ex. 1050 ¶ 96.  There are at least two infirmities with respect to this testimony as applied to the issue of implementing the segmentation method of Bolle's Figure 3*b* embodiment in Ogasawara's videophone.

First, Petitioner's proposed combination makes use of Ogasawara's *videophone*.  *See* Pet. 29 (relying on "video phone").  A flash usable for taking a video is not the same as a flash usable for a still image, given that substantially more pictures or frames have to be taken within a short period of time to form a video.  Dr. Rodriguez does not testify that *videophones* with camera flash functionality were known by 2000.  Second, Dr. Rodriguez simply states that mobile phones with camera functionality "were known by 2000," not "well known by 2000."  The difference is not insignificant, because if such a camera flash was just known, a reference showing that may be formally required as a portion of the alleged ground of unpatentability, e.g., Ogasawara, Bolle, and Parulski.  But Parulski is not in the specific ground of unpatentability asserted by Petitioner.  If a feature was "well known" to one with ordinary skill in the art, Parulski need not be named in the alleged ground of unpatentability and can still be relied on by Petitioner to show basic knowledge or fundamental skill that would have been possessed by one with ordinary skill in the art.  Dr. Rodriguez's testimony does not persuade us that a flash functionality was so well known for videophones in 2000 that that was basic knowledge or fundamental skill to one with ordinary skill in the art without need to include a pertinent reference in the alleged ground of unpatentability.  We note further that even Parulski itself does not show a videophone.  On this record, Petitioner has

Appx56

IPR2021-01081
Patent 7,881,529 B2

not shown any videophone with an early enough date that operates with an integrated flash for taking a video.

In addition, Petitioner asserts:

> For illumination-based segmentation, Bolle further teaches using a camera flash or "strobe" to illuminate an object and synchronizing the timing of the strobe with the camera. Bolle, 9:59–60 (CCD digital camera includes "a camera flash"), 10:9–16 ("The control may be a part of the light 110 as a timing device such as in a strobe. The control may be synchronized with the camera.... [and was] well known."); Ex. 1050, ¶97. [The skilled artisan] would therefore understand that the camera in Ogasawara's videophone would include a synchronized camera flash to illuminate the object for Bolle's segmentation. *Id.*, ¶98.

Pet. Reply 29. Thus, assuming that Ogasawara's videophone is modified to include flash functionality for taking a video, Petitioner urges that a retail shopper could have held Ogasawara's videophone sufficiently still to take two frames while the flash is automatically synchronized to turn on and off at the appropriate time.

Petitioner, however, has not shown the existence, prior to the critical date, of an integrated flash that can be programmed in this manner, even assuming that the processing circuitry of Ogasawara is sufficiently sophisticated to be so programmed. Specifically, Petitioner has not shown that Parulski's flip-up flash can be turned on and off so quickly that it can be controlled on a frame by frame basis with respect to multiple images (or video) taken. For Bolle's Figure 3*b* segmentation method, light from a flash cannot take time to emit and to cease but essentially must be instantly on and off to be programmable on a "quick succession" or per frame basis. Petitioner has not shown that Parulski's flip-up flash is of that type. It is possible that Parulski's flash is turned on when it is flipped up, and is turned

57

IPR2021-01081
Patent 7,881,529 B2

off when it is flipped down. It also is possible that when charging is needed, Parulski's flash starts charging after it has been flipped up and the user has to wait some time before the flash can function. Such characteristics would be incompatible with the segmentation method of Bolle's Figure 3*b* embodiment performed with flash programmable on a per frame basis. Regardless, the burden of proving a reasonable expectation of success to combine the relevant teachings of Ogasawara and Bolle *is on Petitioner* and never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378; *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348–49 (Fed. Cir. 2021) ("[I]t was, at all times, [petitioner's] burden to show that the claims would have been obvious, including that a skilled artisan would have had a reasonable expectation of success in achieving the claimed invention."). We find Petitioner's alleged evidence fails to do so.

For the reasons expressed above, and based on the complete record before us, we conclude that Petitioner has not sufficiently evidenced a reasonable expectation of success in modifying Ogasawara to implement Bolle's image segmentation techniques to achieve the recited inventions of claims 1, 2, 4, 7, 9, and 18. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1, 2, 4, 7, 9, and 18 would have been obvious over the combination of Ogasawara and Bolle.

### 5.   *Summary*

For the reasons expressed above, and based on the complete record before us, we conclude that Petitioner has not sufficiently evidenced that an ordinarily skilled artisan would have had (1) a rational reason to combine the teachings of Ogasawara and Bolle to achieve the recited inventions of

58

IPR2021-01081
Patent 7,881,529 B2

claims 1, 2, 4, 7, 9, and 18; and (2) a reasonable expectation of success in modifying Ogasawara to implement Bolle's image segmentation techniques to achieve the recited inventions of claims 1, 2, 4, 7, 9, and 18. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1, 2, 4, 7, 9, and 18 would have been obvious over the combination of Ogasawara and Bolle.

> E.    *Alleged Obviousness of Claim 20 over the Combination of Ogasawara, Bolle, and O'Gorman*

Independent claim 1 recites, in part, "a network-enabled device that conducts a *data processing operation* on at least a portion of the image to produce data." Ex. 1001, 11:57–59 (emphasis added). Dependent claim 20, which depends directly from claim 1, recites: "The system of claim 1 wherein the data processing operation is selected from the group consisting of contrast enhancement, noise removal, and de-blurring." *Id.* at 12:65–67.

Petitioner does not apply O'Gorman in a manner that eliminates the need to combine the teachings of Ogasawara and Bolle to implement Bolle's image segmentation methods on Ogasawara's mobile videophone. Pet. 55–61. For example, Petitioner relies on O'Gorman for teaching "a data processing operation to remove noise from an image, explaining that noise removal during preprocessing was achieved by methods such as erosion, dilation, and filtering." Pet. 61.

Accordingly, the deficiencies discussed above in Section III.D for the ground of unpatentability based on Ogasawara and Bolle apply equally to the ground of unpatentability based on Ogasawara, Bolle, and O'Gorman. For the same reasons discussed above in Section III.D, Petitioner has not

59

IPR2021-01081
Patent 7,881,529 B2

demonstrated by a preponderance of the evidence that claim 20 would have been obvious over the combination of Ogasawara, Bolle, and O'Gorman.

## IV.  PETITIONER'S MOTION TO EXCLUDE EVIDENCE

Petitioner moves to exclude some or all of paragraphs 27–32, 34–47, 49, 51–58, 60, 64, 65, and 67 of the Supplemental Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2006), Patent Owner's expert, as well as the images contained in paragraphs 41–44.  Mot. Excl. 1–12.

### A.  *Allegation of Testimony being Conclusory*

On the basis of statements being conclusory or opinions lacking supporting facts or data, Petitioner seeks to exclude all of paragraphs 30–32, 34, 38–47, 55–58, and 67, and parts of paragraphs 27–29, 35–37, 49, 51–54, 60, 64, and 65 of Dr. Bajaj's Supplemental Declaration.  Mot. Excl. 4–5. Petitioner does not specifically address the content of each paragraph, but discusses only what it asserts to be exemplary.  *Id.* at 5–8.  Specifically, Petitioner provides three examples.  *Id.*

As a first example, Petitioner asserts: "Dr. Bajaj testifies in Paragraph 37 of Exhibit 2006 that 'a person of ordinary skill in the art would have known that a wireless videophone available in the late-1990s would have significantly less processing power than any of the hardware discussed in Bolle.' Ex. 2006, ¶ 37.  Dr. Bajaj, however, provides no facts or data to support this bald assertion." Mot. Excl. 5.  We disagree that Dr. Bajaj has to show more.  As an expert in the field, Dr. Bajaj can testify as to his opinion regarding the state of the art at a certain time period, without need of specific underlying material.  The subject is not one for which Dr. Bajaj needs to run an experiment to observe the results.  In the absence of supporting material, the testimony may be challenged as lacking sufficient credibility, but the

60

IPR2021-01081
Patent 7,881,529 B2

testimony is not inadmissible.   In any event, as discussed above, our decision

assumes that Ogasawara's videophone has processing circuitry just as

powerful as Bolle's computer.   The testimony did not result in any detriment

to Petitioner.

As a second example, Petitioner asserts: "Dr. Bajaj testifies in

Paragraphs 28, 30, 34–36, 38–39, 56–58, and 60 of Exhibit 2006 that two

images are *required* by Bolle for segmentation.   Again, this opinion is

conclusory without any supporting facts or data."  Mot. Excl. 5.

We disagree that there is no support for Dr. Bajaj's testimony.  Bolle's

disclosure describing the Figure 3*a* and Figure 3*b* embodiments provide

such support.  *See* Ex. 1006, Figs. 3*a*, 3*b* (and related disclosure).

Petitioner further asserts:

> Dr. Bajaj contradicts this opinion in his deposition.  He
> acknowledges in his deposition that Bolle's segmentation
> methods (that require comparing two images) are "preferred"
> methods (Ex. 1063, 66:15–67:20) and admits that segmentation
> without comparing two-images was known at the time of the
> invention (*id.*, 68:15–25).  He also acknowledges that motivation
> to combine considers a prior art reference as a whole (*id.*,
> 33:11–22), yet he admits that he did not consider parts of Bolle
> that indicate Bolle's segmentation methods are not limited to
> comparing two images, such as claim 32 (*id.*, 98:6–99:14,
> 100:2–11).

Mot. Excl. 6.  The arguments are misplaced.  That single image

segmentation methods were known at that time is an entirely separate

question from what segmentation methods are disclosed by Bolle.   Here,

we are not persuaded that claim 32 discloses a single image segmentation

method.  *See supra* Section III.D.3.a.3.  Further, that claim 32 of Bolle may

be read to cover segmentation methods not requiring two images does not

necessarily mean Bolle discloses a segmentation method not requiring two

IPR2021-01081
Patent 7,881,529 B2

images. Similarly, Bolle characterizing his disclosed embodiments as preferred does not mean Bolle discloses other segmentation methods. We find no contradiction. Even if there is any contradiction, that merely affects credibility of Dr. Bajaj's testimony and is not a basis for excluding that testimony.

Petitioner further asserts:

> Similarly, Dr. Bajaj's deposition testimony contradicts his unsupported assertions that Ogasawara is a "bar-code based system." Ex. 2006, ¶¶ 49–53. He testifies in his deposition that Ogasawara discloses character and pattern recognition software. Ex. 1063, 40:10–23, 42:4–13, 43:14–44:18, 46:3–47:16. He also testifies that a POSITA would have been aware of the character and pattern recognition software routines disclosed in Ogasawara. *Id.*, 51:1–23, 61:16–62:4.

Mot. Excl. 6. We disagree that there is no support for Dr. Bajaj's testimony such that the testimony should be excluded. That there is conflicting evidence, even overwhelming conflicting evidence, does not mean the testimony is inadmissible. Further, our determination herein that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle does not rely, in any part, on Dr. Bajaj's testimony that Ogasawara is a "bar-code based system."

As the third example, Petitioner asserts:

> Dr. Bajaj provides no basis for his opinion that Bolle's system is limited to a stationary system (Ex. 2006, ¶¶ 37–39, 60), which is based on the unsupported conclusion that two images are *required* for Bolle's segmentation (*id.*, ¶¶ 38–39) and the unsupported conclusion that a user could not stabilize Ogasawara's mobile videophone to take two images for Bolle's two-image segmentation methods (*id.*, ¶¶ 28–29, 39, 60). Beyond failing to consider Bolle's other segmentation methods, as discussed above, Dr. Bajaj ignores Bolle's disclosure that, as an alternative to a stationary system, spatial registration "can be

62

IPR2021-01081
Patent 7,881,529 B2

> ensured by [] acquiring the first and second image in quick
> succession." Ex. 1006, 10:41–43.

Mot. Excl. 6–7. We disagree that there is no basis for Dr. Bajaj's opinion
that Bolle's system is limited to a stationary system. There is support in
Figures 1 and 4 of Bolle, and also in Bolle's description of spatial
registration for taking a first and a second image (Ex. 1006, 10:31–44).
We also disagree that Dr. Bajaj's conclusion that "a user could not stabilize
Ogasawara's mobile videophone to take two images for Bolle's two-image
segmentation methods" is without evidentiary support. Bolle's description
of spatial registration constitutes such support. That Bolle also describes
taking pictures in quick succession to address the effects of some movement
goes to the weight of the evidence and is not a basis to exclude Dr. Bajaj's
testimony.

### B. *Allegation of Irrelevance*

Petitioner asserts that paragraphs 40–47 of Dr. Bajaj's Supplemental
Declaration (Ex. 2006) should be excluded because they focus on symbols,
e.g., barcodes, which "(i) did not form the bases of the instituted grounds,
and (ii) is contrary to [the] district court's claim constructions adopted by the
Board." Mot. Excl. 8. Petitioner explains that opinions regarding
Ogasawara's symbols and barcodes "have no bearing on the prior art
combinations in this IPR (which are specifically for items without symbols)
or the Challenged Claims (which have not been construed to include
symbols)." *Id.* at 9. According to Petitioner, an expert's testimony that has
no bearing on the issues in the case and ignores the tribunal's claim
construction is irrelevant. *Id.*

63

IPR2021-01081
Patent 7,881,529 B2

The testimony regarding Ogasawara's barcodes may be misplaced but is not irrelevant to Patent Owner's theory of lack of a rational reason to combine references. Patent Owner, in its presentation, is free to emphasize the symbol or bar code aspect of Ogasawara more than it does the non-symbol aspect of Ogasawara. In any event, our determination that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle does not in any way rely on Patent Owner's emphasizing Ogasawara's symbol or barcode disclosures over Ogasawara's disclosure of recognizing visual characteristics of an object. The same is true for our determination that Petitioner does not sufficiently evidence a reasonable expectation of success in implementing a system according to the combined teachings. Petitioner is concerned that we would be confused by the discussion pertaining to Ogasawara's bar codes. We are not.

C. *The Images*

Petitioner makes numerous contentions regarding the images reflected in paragraphs 41–44 of Exhibit 2006. Mot. Excl. 10–12. Petitioner asserts that the images supposedly are representations of bar codes and data matrices printed on various surfaces. *Id.* at 10. Petitioner asserts that the images are evidence without foundation because "[n]either Patent Owner nor Dr. Bajaj have identified any details regarding the origin of the images or the method and circumstances under which they were produced." *Id.*

Petitioner also asserts that the images appear to be "manipulated or annotated, including markings/etchings on the objects and manipulating light," and that "Dr. Bajaj provides no basis or explanation for the manipulations or annotations." Mot. Excl. 10–11. For that reason, Petitioner asserts the images are unreliable and should be excluded. *Id.*

64

IPR2021-01081
Patent 7,881,529 B2

at 11.  Petitioner further asserts that the images lack authentication and thus Patent Owner has not demonstrated that they are what they are purported to be.  *Id.*

Petitioner further asserts that the images should be excluded because they ("including the original,  copy, and any other evidence") "have not been produced to prove the content."  Mot. Excl. 12 (citing Fed. R. Evid. 1001–1007).  Petitioner asserts that "Patent Owner has provided no explanation as to why it did not submit supporting evidence for these images along with its Patent Owner's Response." *Id.*

All of the above-noted contentions are misplaced.  The images themselves constitute the opinion of Dr. Bajaj on what some printed bar codes and data matrices on surfaces may look like under certain conditions.  They are not items of evidence, separate from the opinion, submitted to prove anything, and they are not purported by Dr. Bajaj to have a specific source or origin.  Even if they are assumed as evidence relied on by Dr. Bajaj, the facts or data relied on by an expert to form an opinion need not be admissible for the opinion to be admitted.  Fed. R. Evid. 703.

In any event, our determination that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle and a reasonable expectation of success in doing so does not in any way rely on these images in paragraph 41–44 of Dr. Bajaj's Supplemental Declaration.

### D.    Allegation of Hearsay

Petitioner further asserts that paragraphs 41–47 "should be excluded as containing, referencing, and relying upon out of court statements purporting to describe the sources of these images, which are hearsay under Fed. R. Evid. 801 and 802 for which Patent Owner has shown no exception."

IPR2021-01081
Patent 7,881,529 B2

Mot. Excl. 12.  The assertion is too vague.  Petitioner does not specifically identify any such statement and we see none. [15]  Further, as discussed above in Section IV.C, the facts or data relied on by an expert to form an opinion need not be admissible for the opinion to be admitted.  Fed. R. Evid. 703.

In any event, we have not relied on these images in determining that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle and a reasonable expectation of success in doing so.

### E.   Alleged Demonstratives

Petitioner asserts that the images "should be excluded to the extent they are intended as demonstratives."  Mot. Excl. 12.  The assertion is without merit, because Dr. Bajaj's Supplemental Declaration (Ex. 2006), including all contents thereof, is not a demonstrative exhibit and has not been submitted by Patent Owner as a demonstrative exhibit.  Patent Owner's demonstrative exhibit was submitted as Exhibit 2012.  As discussed above in Section IV.C, the images are the opinion of Dr. Bajaj on what some bar codes and data matrices may look like under certain conditions.

### F.   Conclusion

Petitioner's Motion to Exclude Evidence is *denied*.

## V.   CONCLUSION

As set forth in the following table, Petitioner has not proven, by a preponderance of the evidence, that any of the Challenged Claims are unpatentable:

---

[15] The assertion also conflicts with the contention of Petitioner, that "[n]either Patent Owner nor Dr. Bajaj have identified any details regarding the origin of the images."  Mot. Excl. 10.

IPR2021-01081
Patent 7,881,529 B2

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 7, 9, 18 | 103 | Ogasawara, Bolle | | 1, 2, 4, 7, 9, 18 |
| 20 | 103 | Ogasawara, Bolle, O'Gorman | | 20 |
| **Overall Outcome** | | | | 1, 2, 4, 7, 9, 18, 20 |

## VI.  ORDER

Upon consideration of the record, it is:

ORDERED that claims 1, 2, 4, 7, 9, 18, and 20 of U.S. Patent No. 7,881,529 B2 have not been shown, by a preponderance of the evidence, to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence (Paper 40) is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

67

IPR2021-01081
Patent 7,881,529 B2

FOR PETITIONER:

Dustin J. Edwards
Michael A. Tomasulo
WINSTON & STRAWN LLP
dedwares@winston.com
mtomasulo@winston.com

FOR PATENT OWNER:

James Glass
Todd Briggs
QUINN EMANUEL URQUHART & SULLIVAN, LLP
nantworksvboa@quinnemanuel.com
jimglass@quinnemanuel.com
toddbriggs@quinnemanuel.com

68

Trials@uspto.gov                                          Paper 42
571-272-7822                                    Entered: February 1, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BANK OF AMERICA, N.A.,
Petitioner,

v.

NANT HOLDINGS IP, LLC,
Patent Owner.

_____

IPR2021-01304
Patent 8,478,036 B2

_____

Before JAMESON LEE, THOMAS L. GIANNETTI, and
STEPHEN E. BELISLE, *Administrative Patent Judges*.

BELISLE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude Evidence
*37 C.F.R. § 42.64(c)*

## I.    INTRODUCTION

Bank of America, N.A. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1, 10, 12, 13, and 15 ("Challenged Claims") of U.S. Patent No. 8,478,036 B2 (Ex. 1001, "the '036 patent").  Nant Holdings IP, LLC ("Patent Owner") filed a Preliminary Response to the Petition (Paper 6, "Prelim. Resp."; *see* Paper 4, 2).  In addition, with prior authorization from the Board, the parties filed supplemental briefing concerning the Preliminary Response.  Paper 7 ("Reply"); Paper 8 ("Sur-Reply").  We instituted an *inter partes* review of claims 1, 10, 12, 13, and 15 of the '036 patent on all grounds of unpatentability alleged in the Petition.  Paper 10 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response.  Paper 25[1] ("PO Resp.").  Petitioner filed a Reply.  Paper 24 ("Pet. Reply").  Patent Owner filed a Sur-Reply.  Paper 30 ("PO Sur-Reply").  Petitioner also filed a Motion to Exclude Evidence, in which Petitioner moves to exclude some or all of paragraphs 22–27, 29–42, 44, 46–49, 51–53, and 55 of the Supplemental Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2007), Patent Owner's expert.  Paper 34 ("Mot. Excl.").  Patent Owner filed an Opposition to Petitioner's Motion to Exclude Evidence (Paper 35), and Petitioner filed a Reply to Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence (Paper 36).  We held a hearing on November 10, 2022, and a

---

[1] Patent Owner filed a Response (Paper 16 (expunged)) and a corrected Response (Paper 25).  We reference the corrected Response filed on August 11, 2022.

IPR2021-01304
Patent 8,478,036 B2

transcript of the consolidated hearing appears in the record. Paper 41
("Tr.").

> We have jurisdiction under 35 U.S.C. § 6. Under the applicable
evidentiary standard, Petitioner has the burden to prove unpatentability by a
preponderance of the evidence. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R.
§ 42.1(d) (2022). "Preponderance of the evidence means the greater weight
of evidence, evidence which is more convincing than the evidence which is
offered in opposition to it." *United States v. C.H. Robinson Co.*,
760 F.3d 1376, 1383 (Fed. Cir. 2014) (internal quotations omitted). This
Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and
37 C.F.R. § 42.73.

> For the reasons discussed below, we determine Petitioner has not
established by a preponderance of the evidence that any of claims 1, 10, 12,
13, and 15 of the '036 patent is unpatentable.

## II.    BACKGROUND

### A.    *Related Matters*

> The parties indicate that the '036 patent, along with seven other
patents, are involved in one U.S. district court action, namely, *NantWorks,
LLC and Nant Holdings IP, LLC v. Bank of America Corporation and Bank
of America, N.A.*, No. 2:20-cv-07872 (C.D. Cal.) ("District Court Case").
Pet. 64; Paper 4, 2. Petitioner also states, "All of the patents claim priority
to Provisional Application Nos. 60/246,295 and 60/317,521. There appears
to be no pending application that claims priority to those two applications."
Pet. 65.

> The following *inter partes* review proceedings involve patents related
to the '036 patent: IPR2021-01080 (US 8,463,030 B2), IPR2021-01081

3

Appx71

IPR2021-01304
Patent 8,478,036 B2

(US 7,881,529 B2), IPR2021-01332 (US 9,324,004 B2), IPR2021-01333
(US 7,899,252 B2), IPR2021-01388 (US 8,520,897 B2), and IPR2021-
01389 (US 9,031,278 B2).

### B.    The '036 Patent

The '036 patent is titled "Image Capture and Identification System
and Process," and issued on July 2, 2013, from U.S. Patent Application
No. 13/410,577, filed March 2, 2012, and claims priority through a series of
continuing applications to U.S. Provisional Patent Applications
Nos. 60/317,521, filed September 5, 2001, and 60/246,295, filed
November 6, 2000. Ex. 1001, codes (10), (21), (22), (45), (54), (60).

The '036 patent describes "[t]raditional methods" for linking objects
to digital information that involve applying a barcode, a radio or optical
transceiver or transmitter, or some other means of identification to the
object, as well as modifying the image or object so as to encode detectable
information. Ex. 1001, 3:29–35. However, according to the '036 patent,
"[t]here is a need to determine the position and orientation of known objects
based only on imagery of the objects," "without modification or
disfigurement of the object, [and] without the need for any marks, symbols,
codes, barcodes, or characters on the object." *Id.* at 1:36–51. The '036
patent states that it responds to this need by describing "a system and
process for identifying digitally captured images without requiring
modification to the object." *Id.* at 4:20–22. But notwithstanding this
additional capability, the '036 patent explicitly discloses that "*the present
invention also can detect, decode, and identify images and objects based on
traditional symbols* which may appear on the object, such as alphanumeric

4

IPR2021-01304
Patent 8,478,036 B2

characters, *barcodes*, or 2-dimensional matrix codes." *Id.* at 3:44–52 (emphases added).

Figures 1 and 2 of the '036 patent, reproduced below, collectively illustrate an embodiment of the patent. The following description refers to both figures.



Figure 1 depicts a block diagram top-level algorithm flowchart.

Ex. 1001, 4:37–38, Fig. 1.

5

IPR2021-01304
Patent 8,478,036 B2



FIG. 2

Figure 2 depicts an idealized view of image capture.
Ex. 1001, 4:39, Fig. 2.

According to the '036 patent, for image capture 10, user 12 utilizes a computer, mobile telephone, personal digital assistant, or other similar device 14 equipped with an image sensor (such as a CCD or CMOS digital camera). Ex. 1001, 5:23–26. User 12 aligns the sensor of image capture device 14 with object 16 of interest. *Id.* at 5:26–27. The linking process is then initiated, and device 14 captures digital image 18 of the scene at which it is pointed. *Id.* at 5:27–33. Image 18 is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. *Id.* at 5:33–39. Image 18 is subsequently transferred to image processor/server 20. *Id.* at 5:41–49.

Image type determination 26 is accomplished with a discriminator algorithm which operates on input image 18 and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters. Ex. 1001, 5:50–54. If such symbols are found, image 18 is sent to decode symbol process 28. *Id.* at 5:54–55. In decode

6

IPR2021-01304
Patent 8,478,036 B2

symbol process 28, image 18 is analyzed to determine the location, size, and nature of the symbols. *Id.* at 5:66–67. The symbols are analyzed according to their type, and their content information is extracted. *Id.* at 5:67–6:3.

Image 18 may also or alternatively contain an object of interest, and may therefore also or alternatively be sent to the object image branch of the process flow. Ex. 1001, 5:55–65. In input image decomposition process 34, a "decomposition" of a high-resolution input image into several different types of quantifiable salient parameters is performed. *Id.* at 6:4–15. According to the '036 patent, this allows for multiple independent convergent search processes of the database to occur in parallel in database matching 36, which "greatly improves image *match* speed and *match* robustness." *Id.* at 6:7–10 (emphases added).

C.  *Illustrative Claim*

The '036 patent includes nineteen claims, of which claims 1, 10, 12, 13, and 15 are challenged. Independent claim 1 is illustrative and reproduced below.

> 1.  A content provisioning system comprising:
> a target database storing known targets of different types and recognition parameters associated with the known targets;
> an identification platform coupled with the target database, and that:
> > communicates with a mobile device capable of acquiring a digital representation of a scene containing at least a portion of a target;
> > receives the digital representation from the mobile device; and
> > recognizes the target as a known target from the target database based on comparing parameters derived from the digital representation to recognition parameters associated with the known targets; and

7

IPR2021-01304
Patent 8,478,036 B2

> a content service coupled with the identification platform, and
>> that:
>>> obtains content information related to the known target; and
>>> sends the content information to at least one of the identification platform and the mobile device.

Ex. 1001, 24:2–22.

### D.  Evidence of Record

Petitioner relies on the following patent evidence.

| Name | Document | Exhibit |
|---|---|---|
| Ogasawara | 6,512,919 B2 | 1005 |
| Bolle | 5,546,475 | 1006 |

Pet. 8.

Petitioner also relies upon the Declaration of Jeffrey J. Rodriguez, Ph.D. (Ex. 1003) and the Declaration of Dr. Rodriguez in support of Petitioner's Reply (Ex. 1050).

Patent Owner relies upon the Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2001) and the Supplemental Declaration of Dr. Bajaj (Ex. 2007).

### E.  Asserted Challenge to Patentability

We instituted *inter partes* review of claims 1, 10, 12, 13, and 15 of the '036 patent on the following ground asserted by Petitioner.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 10, 12, 13, 15 | 103[2] | Ogasawara, Bolle |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103.  Because the '036 patent was filed before March 16, 2013, the effective date of the relevant amendment, the pre-AIA version of § 103 applies.

8

Appx76

IPR2021-01304
Patent 8,478,036 B2

Pet. 8.

## III. PATENTABILITY

### A. *Applicable Law*

Petitioner challenges the patentability of claims 1, 10, 12, 13, and 15 of the '036 patent on the sole ground that the claims would have been obvious under 35 U.S.C. § 103 in light of the combination of Ogasawara and Bolle. To prevail in its challenges to the patentability of the claims, Petitioner must establish unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show *with particularity* why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")) (emphasis added). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art;

IPR2021-01304
Patent 8,478,036 B2

(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) when of record, objective evidence of
obviousness or non-obviousness, i.e., secondary considerations. *Graham v.
John Deere Co.*, 383 U.S. 1, 17–18 (1966). Secondary considerations may
include the following: "commercial success, long felt but unsolved needs,
failure of others, etc."[3] *Id.* The totality of the evidence submitted may show
that the challenged claims would not have been obvious to one of ordinary
skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).
When evaluating a combination of teachings, we must also "determine
whether there was an apparent reason to combine the known elements in the
fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re
Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *see Regents of Univ. of Cal. v.
Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018) ("An obviousness
determination requires finding that [an ordinarily skilled artisan] would have
been motivated to combine or modify the teachings in the prior art and
would have had a reasonable expectation of success in doing so.").

　　　The Supreme Court has made clear that we apply "an expansive and
flexible approach" to the question of obviousness. *Id.* at 415. Whether a
patent claiming a combination of prior art elements would have been
obvious is determined by whether the improvement is more than the
predictable use of prior art elements according to their established functions.
*Id.* at 417. To reach this conclusion, however, requires more than a mere
showing that the prior art includes separate references covering each
separate limitation in a claim under examination. *Unigene Labs., Inc. v.*

―――――――――――――――
[3] Patent Owner did not present any evidence or arguments directed to
secondary considerations during this proceeding.

IPR2021-01304
Patent 8,478,036 B2

*Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.* "To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). "Whether the prior art discloses a claim limitation, whether a skilled artisan would have been motivated to modify or combine teachings in the prior art, and whether she would have had a reasonable expectation of success in doing so are questions of fact." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### B.   *Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art, at the time of the invention of the '036 patent:

> would have had a range of knowledge roughly equivalent to the knowledge and/or training of a person holding the degree of Bachelor of Science in Electrical Engineering, Computer Science, Computer Engineering, or equivalent, and one to two years of experience working with image processing, image recognition, or a related field. . . . Individuals with additional education or additional practical experience could still be of ordinary skill in the art if that additional aspect compensates for a deficit in the other aspect of the requirements stated above.

Pet. 27 (citing Ex. 1003 ¶¶ 46–47).

11

IPR2021-01304
Patent 8,478,036 B2

Patent Owner does not present an alternative definition of the skilled artisan, and does not dispute Petitioner's definition. *See* PO Resp. 17 ("For purposes of this IPR, Patent Owner does not contend that an alternative level of ordinary skill in the art should be applied.").

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citation omitted). The level of ordinary skill in the art also is reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Considering the subject matter of the '036 patent, the background technical field, the prior art, and Petitioner's unopposed proposed definition of the skilled artisan, we apply the level of skill set forth above, which also is consistent with the testimony of Dr. Rodriguez (Ex. 1003 ¶¶ 46–47).

Regardless, neither party argues that the outcome of this case would differ based on our adoption of any particular definition of the level of ordinary skill in the art.

## C.   *Claim Construction*

We construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R.

12

IPR2021-01304
Patent 8,478,036 B2

§ 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

In this context, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (There is "a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner asserts that the parties have "offered competing constructions for two terms in the Challenged Claims before the district court." Pet. 34. Petitioner argues "the prior art invalidates the Challenged Claims under any reasonable construction of the terms, and claim

IPR2021-01304
Patent 8,478,036 B2

construction is therefore unnecessary [for purposes of this Petition]."
Pet. 34. Patent Owner submits proposed constructions for certain
limitations, but otherwise contends it applies the "plain and ordinary
meaning" for limitations in this proceeding. PO Resp. 17–23.

### 1. *Recognizes Limitation*

In the pre-institution phase, the parties disputed the meaning of the
limitation "recognizes the target as a known target from the target database
based on comparing parameters derived from the digital representation to
recognition parameters associated with the known targets," as recited in
independent claim 1. *See* Dec. 17–19. Hereinafter, this limitation is referred
to as the "Recognizes Limitation."

After filing of the Petition and Preliminary Response, the district court
in the District Court Case entered a *Markman* order construing the
Recognizes Limitation, among others. *See* Ex. 2006, 16–18, 21–22.[4]
Specifically, the court construed the Recognizes Limitation to mean
"recognizes the target as a known target from the target database based on
comparing parameters derived from the digital representation to recognition
parameters associated with the known targets *to find a match*." Ex. 2006,
21–22 (emphasis added). As explained in our Institution Decision
(Dec. 17–19), we have reviewed the district court's reasoning, as well as the
'036 patent and other evidence of record before us, and agree that for
reasons given by the district court, the Recognizes Limitation should be
given the same construction as determined by the district court. Neither

_____

[4] Unless otherwise specified, citations to exhibits use the page numbers
assigned by the parties, not the original page numbers.

14

IPR2021-01304
Patent 8,478,036 B2

party since has urged (or persuaded) us to revise this construction. Based on the complete record before us, we continue to construe the Recognizes Limitation to mean "recognizes the target as a known target from the target database based on comparing parameters derived from the digital representation to recognition parameters associated with the known targets to find a match." *See* Dec. 17–19; Ex. 2006, 21–22. Both parties adopt this construction for purposes of their post-institution arguments in this case. *See* PO Resp. 18–19 ("Patent Owner and its expert apply this claim construction in their analysis in the remainder of this IPR, but do not necessarily agree it is correct."); *see generally* Pet. Reply (arguing "matching" as per this construction); Pet. (same).

### 2. *"a digital representation"*

Independent claim 1 recites the limitation "a digital representation." Ex. 1001, 24:9. Patent Owner asserts:

> Claim 1 of the '036 patent specifies "a digital representation of a scene containing at least a portion of a target." Ex. 1001 ('036 patent) at cl. 1. Subsequent claim limitations refer to "*the digital representation*," the antecedent basis of which is "*a digital representation* of a scene containing at least a portion of a target." *E.g.*, *id.* ("receives *the digital representation* from the mobile device" and "comparing parameters derived from *the digital representation* to recognition parameters associated with the known targets").
>
> These terms should be construed to refer to the same, single digital representation, such as a single image or a single video stream. Ex. 2007 (Supplemental Declaration of Chandrajit Bajaj, Ph.D.) ("Bajaj") ¶ 16. Because "the" is a singular modifier, its usage to qualify "the digital representation" therefore limits that digital representation to being a single digital representation. *Id.* ¶ 17 [other citations omitted].

PO Resp. 19.

IPR2021-01304
Patent 8,478,036 B2

Petitioner does not propose a construction for "a digital representation" or "the digital representation." Instead, Petitioner states:

> Ogasawara combined with Bolle teaches "acquiring a digital representation of a scene," "receiv[ing] the digital representation," and "recogniz[ing] the target as a known target . . . based on . . . the digital representation" (Ex. 1001, 24:8–15), both under the terms' plain and ordinary meaning and under PO's proposed construction that the claimed "digital representation" refers to the "same, single digital representation." POR, 19, 23, 57–58.

Pet. Reply 3. Petitioner does not identify specifically what it contends is the plain and ordinary meaning of "a digital representation" or "the digital representation." Petitioner does, however, explain why it believes the prior art still satisfies Patent Owner's proposed construction for "a digital representation" and "the digital representation." According to Petitioner, analyzing one digital representation, a single digital representation, does not preclude involvement in the analysis of information from a second digital representation. Pet. Reply 3–10. Thus, in Petitioner's view, "a digital representation" and "the digital representation" are met even under Patent Owner's proposed construction.

In its Sur-Reply, Patent Owner clarifies that, under Patent Owner's proposed construction, "the receiving, acquiring and recognizing steps must occur on a *single* digital representation (*i.e.* an image); the claims exclude processing that occurs across multiple images." PO Sur-Reply 25. This dispute between the parties requires resolution. For reasons discussed below, we disagree with Patent Owner.

Patent Owner is correct that the antecedent basis in claim 1 for "the digital representation" is the earlier recited "a digital representation." Patent Owner is incorrect, however, in characterizing "the" as a singular

16

IPR2021-01304
Patent 8,478,036 B2

modifier. The definite article "the" can be used to modify something plural, e.g., "the digital representations." Although in claim 1, "the" is used to modify a "digital representation," that does not help the Patent Owner, because nothing in the claim excludes the involvement of additional digital representations while one "digital representation" is analyzed. Patent Owner points to nothing in claim 1 which restricts the analyzing to "only" one digital representation or "no more" than one digital representation, and we see none.

Further, claim 1 uses the non-limiting phrase "comprising," which creates a presumption that the claim is not limited to only those elements expressly recited in the claim. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). We recognize that the only embodiment described in the specification of the '036 patent analyzes only a single digital representation, but we are not required to construe the claim as limited to just that embodiment. *Innova/Pre Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1121–22 (Fed. Cir. 2004). Such a construction is neither encouraged nor presumed. *Id.* Additionally, Patent Owner points to no expressions of disavowal either in the prosecution history or in the specification of the '036 patent with regard to "a digital representation" in which the patent applicant disavows, with clarity, claim scope covering analysis of more than one digital representation.

For the foregoing reasons, we disagree with Patent Owner, and we determine that analyzing "a digital representation" as recited in claim 1 does not preclude involvement of an additional digital representation or digital representations in the analysis.

17

IPR2021-01304
Patent 8,478,036 B2

### 3. Other Limitations

In its Response, Patent Owner submits constructions for certain other limitations, namely (1) "printed media" as recited in claim 10; and (2) "a remote computer" as recited in claim 15. PO Resp. 18. Based upon our consideration of the complete record before us, we conclude that it is unnecessary to interpret expressly any of these limitations for purposes of rendering our final decision in this case. *See Nidec*, 868 F.3d at 1017.

### D. Alleged Obviousness of Claims 1, 10, 12, 13, and 15 over the Combination of Ogasawara and Bolle

Petitioner contends claims 1, 10, 12, 13, and 15 are unpatentable under 35 U.S.C. § 103 as obvious over the combination of Ogasawara (Ex. 1005) and Bolle (Ex. 1006).[5] Pet. 14–57; Pet. Reply 1–22. Patent

---

[5] In our Institution Decision, we stated, "[a]lthough Petitioner has alleged that Ogasawara discloses every limitation of claim 1, Petitioner also has provided for contingencies in case Ogasawara does not disclose certain limitations of claim 1 and teachings from Bolle are needed to be combined with teachings from Ogasawara to render claim 1 obvious." Dec. 19–20 (citing Pet. 41–47). We also found that "Petitioner explicitly identifies Ground 1 as based on obviousness over the combination of Ogasawara and Bolle," and that "in identifying its only ground for unpatentability in this case, Petitioner identifies neither anticipation by Ogasawara nor obviousness based on Ogasawara alone as such grounds." Dec. 20. Given that Petitioner's subsequent arguments in this proceeding do not address anticipation by or obviousness solely over Ogasawara, and taking that in light of the Petition's identification of its sole challenge to patentability as "[o]bvious[ness] over Ogasawara and Bolle," we again find on the complete record before us that Petitioner's "Ground 1" is directed only to obviousness over *the combination of* Ogasawara and Bolle. *See* Pet. 8; Reply 1 ("Ogasawara, however, *is not a standalone § 103 reference*; it is *combined* with Bolle in *the only ground* of the Petition. Thus, Patent Owner's enablement argument fails because it does not address the stated grounds of invalidity, let alone the prior art as a whole, e.g., *Ogasawara and Bolle*."

IPR2021-01304
Patent 8,478,036 B2

Owner opposes Petitioner's contentions. PO Resp. 25–60; PO Sur-
Reply 10–28. For the reasons expressed below, and based on the complete
record before us, we determine Petitioner has not proven that an ordinarily
skilled artisan (1) would have had a rational reason to combine the teachings
of Ogasawara and Bolle to achieve the recited inventions of claims 1, 10, 12,
13, and 15; and (2) would have had a reasonable expectation of success in
doing so. Thus, we determine that Petitioner has not demonstrated by a
preponderance of the evidence that claims 1, 10, 12, 13, and 15 would have
been obvious over the combination of Ogasawara and Bolle. We turn first to
an overview of Ogasawara and Bolle.

### 1. *Overview of Ogasawara (Ex. 1005)*

Ogasawara relates generally to "an electronic shopping system which
utilizes a program downloadable wireless video phone as a purpose-type
dedicated terminal which enables a shopper to capture, recognize and decode
captured images." Ex. 1005, 1:16–21; *see id.* at code (57). In Ogasawara,
an integral digital camera is attached to the wireless telephone to facilitate
the selection of items to be purchased and is controlled to function as a bar
code or product icon image capture device. *Id.* at code (57). Character or
pattern recognition software translates the bar or icon code image into an
appropriate item identifier. *Id.*

---

(emphases added)); Tr. 6:22–24 (Petitioner's counsel: "The first thing is that
the asserted grounds of unpatentability are based on the combination of
Ogasawara, and Bolle as the panel knows."); *see also* 35 U.S.C. § 312(a)(3).
Regardless, for the same reasons given in our Institution Decision,
we disagree that Ogasawara alone would have rendered any of the
Challenged Claims unpatentable. Dec. 27–28, 34–35.

19

Appx87

IPR2021-01304
Patent 8,478,036 B2

Figure 1 of Ogasawara is reproduced below.

## FIG. 1



Figure 1 depicts a schematic overview of an electronic
shopping system.

Ex. 1005, 4:9–10, Fig. 1.

Figure 1 of Ogasawara shows an electronic system comprising store
server 10 in communication with a commercial telephone network 14.
Ex. 1005, 4:66–5:2. Commercial telephone network 14 facilitates a
connection of store server 10 to wireless telephone 18. *Id.* at 5:10–11.
Optionally, external bar code scanner 20 communicates with the wireless
telephone 18 via wire connection 19. *Id.* at 5:31–32. Alternatively, a built-
in bar code scanner 25 and/or a built-in IC card reader/writer 27 are formed
integrally with the wireless telephone 18. *Id.* at 5:36–38. In a store, a bar
code on a purchased item 33 is scanned by bar code scanner 20 attached to a

20

Appx88

IPR2021-01304
Patent 8,478,036 B2

wireless telephone 18. Catalog 21 of the items which can be purchased
contains a bar code 22 for each such item, and preferably also contains
descriptive text 13 and a picture 15 of each item. *Id.* at 5:40–43.

Figure 10 of Ogasawara is reproduced below.

*FIG. 10*



Figure 10 depicts a block diagram of an electronic shopping
system having a wireless videophone.

Ex. 1005, 4:34–36, Fig. 10. Figure 10 illustrates wireless videophone 218
used in combination with store or remote server 210. *Id.* at 15:55–56.
Wireless videophone 218 includes miniature digital image capture
device 236, such as a CCD camera system. *Id.* at 15:63–16:1.
Digital camera 236 includes processing circuitry that translates the visual
image acquired by the camera's lens into digital signals suitable for
processing by microprocessor 238 into a form that can be transmitted by
functional electronic section 240. *Id.* at 16:7–12.

As described by Ogasawara, since digital camera 236 can be provided
to the wireless videophone 218 in place of a bar code scanner, the tailored
purchase transaction program may additionally include character recognition

21

IPR2021-01304
Patent 8,478,036 B2

and/or pattern recognition software, as well as bar code decode software. This would allow the wireless videophone to function in a manner similar to the wireless telephone and bar code scanner embodiment illustrated in Figure 1. Ex. 1005, 18:15–22.

Ogasawara also discloses that advanced pattern recognition software is able to enhance the performance of the wireless videophone by offering the capability to capture merchandise information from items that are not identified by either a bar code or an alpha-numeric label. Ex. 1005, 23:11–15. According to Ogasawara, advanced pattern recognition software allows a consumer to capture a videographic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software. *Id.* at 23:16–19. "This capability is useful for any merchandise item *having a distinct or identifiable shape or other visually identifiable characteristic. Such pattern recognition is accomplished within the wireless videophone, by specialized downloaded software." Id.* at 23:19–23 (emphasis added).

We further discuss below the disclosure of Ogasawara in connection with the parties' arguments.

## 2.    *Overview of Bolle (Ex. 1006)*

Bolle relates generally to "recognizing (i.e., identifying, classifying, grading, and verifying) objects using computerized optical scanning devices," and "a trainable system and method relating to recognizing bulk items using image processing." Ex. 1006, 1:6–10; *see id.* at code (57). In Bolle, an image processing system takes digitized images of a scene. *Id.* at code (57). Using an algorithm, an object image is segmented[6] from a

---

[6] "Segmenting (also called figure/ground separation) is separating a scene image into separate object and background images. Segmenting refers to

IPR2021-01304
Patent 8,478,036 B2

background image. *Id.* The object image is then processed and compared to stored reference images. *Id.* The object is recognized when a match occurs. *Id.*

Figure 4 of Bolle is reproduced below.



Figure 4 depicts a block diagram of an apparatus for segmenting images and recognizing an object in images.

---

identifying those image pixels that are contained in the image of the object versus those that belong to the image of the background." Ex. 1006, 2:3–7.

23

IPR2021-01304
Patent 8,478,036 B2

Ex. 1006, 6:30–32, Fig. 4. Figure 4 shows a block diagram of system 400 for imaging scenes, segmenting object images 130 from their background image 311 of a physical background 312, and recognizing object(s) 131. *Id.* at 9:21–25. System 400 comprises opening 403 to allow object 131 to be imaged by camera 120 and illuminated by light 110. *Id.* at 9:39–43. The system further includes a segmenting algorithm for segmenting an image of object 131 from an image of the scene. *Id.* at 10:17–19. After the image is segmented, computer 140 performs a computation to determine features of the target object. *Id.* at 12:58–62. Further, computer 140, via algorithm 200, compares normalized characteristics of the target object 131 to one or more normalized referenced object characteristics. *Id.* at 13:61–63.

Bolle further describes comparison/matching of the target characterization to the reference characterizations that is performed according to one or more matching algorithms, such as a nearest neighbor classification. Ex. 1006, 15:50–67.

We further discuss below the disclosure of Bolle in connection with the parties' arguments.

### 3. *Alleged Reasons to Combine Teachings of Ogasawara and Bolle*

#### a) *Independent Claim 1*

Petitioner contends the combined teachings of Ogasawara and Bolle render obvious the invention of independent claim 1. Pet. 27–57; Pet. Reply 1–22. This implicates the fundamental issue of whether the ordinarily skilled artisan would have had a *rational* reason to combine such teachings in the first place. *See KSR*, 550 U.S. at 418 (To support the legal conclusion of obviousness, "there must be some articulated reasoning with some

24

IPR2021-01304
Patent 8,478,036 B2

rational underpinning" for combining elements in the manner claimed.);
*Regents of Univ. of Cal.*, 903 F.3d at 1291. The parties dispute, *inter alia*,
whether Petitioner has proven that the skilled artisan would have had such a
rational reason. Pet. 27–57; PO Resp. 25–60; Pet. Reply 1–22; PO Sur-
Reply 10–28; Tr. 7:18–20 (Petitioner's counsel: "I'd like to address patent
owner's three main reasons why there is no motivation, and tell you why
they're wrong."). We find this issue dispositive in this case as to all
Challenged Claims, as discussed below.

In considering the parties' arguments on this issue, we are mindful
that even if one of ordinary skill in the art were to understand that two
references *could be* combined, this would not itself imply a motivation or
reason to combine the references. *Personal Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 993–94 (Fed. Cir. 2017); *see also Belden Inc. v. Berk–Tek
LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns
whether a skilled artisan not only *could have made* but *would have been
motivated to make* the combinations or modifications of prior art to arrive at
the claimed invention."); *InTouch Techs., Inc. v. VGO Communications,
Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

In this case, Petitioner argues, *inter alia*:

(1) Ogasawara teaches most limitations in claim 1 and discloses using
"[a]dvanced pattern recognition software" to recognize targets in digital
representations of scenes (e.g., images) under certain conditions, but lacks
teachings concerning recognizing a target in an image where the "target's
shape or other visual characteristic may not be distinct or identifiable due to
the distractions from the rest of the image," which Petitioner submits is
required by claim 1 (Pet. 28, 30 ("Ogasawara [ ] does not segment the target

25

IPR2021-01304
Patent 8,478,036 B2

from the background and thus cannot perceive the target's distinct or identifiable shape or other visually identifiable characteristic."); Ex. 1005, 23:11–30; *see, e.g.*, Pet. 27–50; Pet. Reply 11–22; Tr. 7:1–7 (Petitioner's counsel: "Ogasawara advanced pattern recognition does not segment the object from the background, and again, that's where Bolle comes into play."));

(2) Bolle fills that void by teaching "segmenting a target from its background in a digital representation of a scene and matching parameters derived from the segmented target to recognition parameters of known targets stored in a target database" (Pet. 27; *see, e.g.*, *id.* at 7 (relying on "the use of Bolle's image segmentation and database matching techniques, in Ogasawara's system"), 27–50; Pet. Reply 11–22); and

(3) the skilled artisan would have combined these teachings from Ogasawara and Bolle "to achieve a system that could more accurately discern the shape or other visual characteristics of a target in an image to be able to identify that target" (Pet. 27; *see, e.g.*, *id.* at 27–50; Pet. Reply 11–22).

Patent Owner responds, *inter alia*:

(1) the only image segmentation techniques disclosed in Bolle require the use of *two* different images where "the first and second images are in *spatial registration*[7]," which requires "precise pixel-to-pixel correspondence

---

[7] Bolle describes "spatial registration" as follows:

Suppose each pixel is numbered starting in the upper left corner of the image then proceeding across the first line then down to the second line in the manner of reading a book. Registration means that each numbered pixel in the first image corresponds to the same area of the scene (object(s) 131 and background 312)

26

IPR2021-01304
Patent 8,478,036 B2

between the two spatially-aligned images" (PO Resp. 42–43 (quoting Ex. 1006, 10:31–34 (emphasis added)), 45; *see, e.g.*, PO Resp. 36 ("Bolle's system always requires taking *two* photographs of a target object, under very specific conditions."), 35, 37–44; PO Sur-Reply 10–28);

(2) Ogasawara teaches a retail consumer using a *mobile* (e.g., hand-held) device to take a *single* image of an object for purposes of identifying the object via a bar code or similar marking on the object (*see, e.g.*, PO Resp. 30–34); and

(3) for "multiple reasons" (PO Resp. 45), the skilled artisan would *not* have had a rational reason to apply Bolle's "two-image" segmentation techniques requiring precise spatial registration between the two images to Ogasawara's "one-image" method performed by consumers holding mobile devices in their hands (PO Resp. 45–55; *see, e.g.*, PO Resp. 48 ("Bolle's repeated emphasis on the necessity for taking two photographs from a stationary platform before any object could be recognized is a fundamentally different approach from Ogasawara's, which only uses a single photograph of a target object, taken from a non-stationary wireless videophone.")).

In our Institution Decision, we preliminarily found "Petitioner's cited evidence provides sufficient rational reasons for purposes of institution to combine Ogasawara and Bolle." Dec. 39; *see id.* at 33, 37–38. However, on further review of the Petition and further consideration of the parties'

---

as the identically numbered pixel in the second image. Proper registration can be ensured by either acquiring the first and second image in quick succession, or by imaging a stationary object 131 against a stationary background 312.

Ex. 1006, 10:34–44.

27

IPR2021-01304
Patent 8,478,036 B2

briefing on this issue and the relevant case law, and based on the complete record before us, we now conclude otherwise. *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1340 (Fed. Cir. 2020) ("There is nothing inherently inconsistent about the Board instituting IPR on obviousness grounds and then ultimately finding that the petitioner did not provide preponderant evidence that the challenged claim was obvious."); *In re Magnum Oil Tools*, 829 F.3d at 1376 ("[T]he decision to institute and the final written decision are 'two very different analyses,' and each applies a 'qualitatively different standard.'" (quoting *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016))).

In particular, we determine that Petitioner has not proven, by a preponderance of the evidence, that the ordinarily skilled artisan would have had a *rational* reason to combine the relevant teachings of Ogasawara and Bolle to render obvious the invention of independent claim 1. This issue is substantially disputed between the parties (*see* Pet. 27–57; PO Resp. 25–60; Pet. Reply 1–22; PO Sur-Reply 10–28), with Petitioner also seeking to exclude nearly all of the testimony of Patent Owner's expert, Dr. Bajaj, on this issue (Mot. Excl.), and with Patent Owner arguing that Petitioner's Reply "improperly raises new theories for the first time" on this issue (PO Sur-Reply 4–10). Nonetheless, the burden of proving a rational reason (or motivation) to combine such teachings *is on Petitioner* and never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378; *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348–49 (Fed. Cir. 2021) ("[I]t was, at all times, [petitioner's] burden to show that the claims would have been obvious."). To this end, interspersed across its Petition and Reply, Petitioner submits what we have categorized as four arguments in

28

IPR2021-01304
Patent 8,478,036 B2

support of its contention that the skilled artisan allegedly would have combined the relevant teachings of Ogasawara and Bolle to achieve the invention of claim 1. We find these four arguments unpersuasive, and that Petitioner's alleged evidence in support thereof fails to meet its evidentiary burden, as discussed below.

### (1) Bolle's Teachings Based on its Figure 3a Embodiment

In most instances, *the Petition* relies only generally on Bolle's use of "image segmentation technology" in arguing that the skilled artisan would have been motivated to combine such "image segmentation technology" with Ogasawara's teachings to achieve the invention of claim 1.[8] Although not presented especially clearly in the Petition,[9] we understand Petitioner to argue that the skilled artisan would have turned to Bolle's specific "image segmentation" teaching of comparing two spatially registered images of a scene, one with and the other without an object present, as depicted in Figure 3a, reproduced below. *See* Pet. 33 ("Furthermore, 'carefully controlled lighting conditions' *are not required* for Bolle. Indeed, Bolle

---

[8] *See, e.g.*, Pet. 29 ("Bolle uses image segmentation technology in conjunction with object recognition techniques and a target database that stores known targets of different types and associated recognition parameters to match parameters derived from the segmented target to those of known targets stored in the target database."), 7 (referencing "Bolle's image segmentation and database matching techniques"), 46 ("Bolle teaches 'an algorithm' whereby 'the object(s) image is novelly segmented from a background image of the scene by a comparison of the two digitized images taken.'"); *see generally* Pet. 14–57.

[9] *See* 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim").

29

IPR2021-01304
Patent 8,478,036 B2

provides for segmentation of a target in an image *by comparing images of a scene with and without the target present*." (emphases added) (citing Ex. 1006, 8:45–9:4 (discussing Fig. 3*a*), Fig. 3*a*), 46 ("[T]he object(s) image is novelly segmented from a background image of the scene by a comparison of the two digitized images taken." (quoting Ex. 1006, 6:1–6)); *see also* PO Sur-Reply 5 ("The grounds all relied on the same embodiment of Bolle—its Figure 3a embodiment."), 7 ("The Petition cited Bolle's general description of background segmentation but only relied on Bolle's Figure 3a embodiment.").



## FIG. 3a

Figure 3*a* depicts segmenting a scene into an object image and
a background image.

Ex. 1006, 6:27–28, Fig. 3*a*. Bolle's Figure 3*a* shows two scenes, and along with its related description, teaches:

The first imaged scene 310, shows an image of a background 311 without any other objects present in the field of view of camera 120. The second imaged scene 320 includes both an image of the scene background 311 and an image 130 of one or more objects 131. Here the pixels of the imaged object 130

30

IPR2021-01304
Patent 8,478,036 B2

> replace pixels in the background image 311 in those areas of the
> scene image 320 where object 131 is present. Hence, it is an
> image of background 311 with instances of objects 131 present
> in the scene.
>
> A comparison of the scenes 310 and 320, *preferably on a
> pixel by pixel basis*, allows the object image 130 to be segmented
> (separated out) from the background image 311 of the scene.
> If for *a given pixel* in the 320 image, the brightness is different
> from (e.g., more then) the image brightness of *said pixel* in 310,
> this pixel belongs to object image 130. If for *a given pixel* in the
> image 320, the brightness is equal to *same pixel* in 310, this pixel
> belongs to background image 311.

Ex. 1006, 8:53–9:4 (emphases added). In other words, Bolle teaches

segmenting an object image from a background image using a first image of

a scene without an object present and a second image of the scene with the

object present, *but doing so without moving the imaging device even about a

single pixel value[10] of distance while capturing those two separate images.*

Despite calling out image segmentation teachings relating to Bolle's

Figure 3*a* embodiment, Petitioner offers no specific reason, let alone a

rational one stated with particularity, for *why* the skilled artisan would have

---

[10] Although Petitioner offers no evidence as to the size of a "pixel," based on
Ogasawara's description of a "LCD display having a resolution of, for
example, 320x240 pels [i.e., pixels]," we understand a pixel at least in the
context of Ogasawara and Bolle to have a size of the order of magnitude of
about one millimeter (or less). *See* Ex. 1005, 16:40–42; Tr. 45:22–46:14
("Counsel [for Patent Owner], do you have an understanding of what the
size of a pixel is? . . . [T]here is very little evidence on measurements,
petitioner has not put in any evidence on this point. Ogasawara does
explain, this is at [column 16], lines 40 through 45 . . . . I don't recall if
Ogasawara explains how big the screen is, but we're talking year 2000,
we're not talking giant screens. He says that the screen is 320 by 240 pixels,
that by my math is 76800 pixels on a tiny screen. That's the level of identity
that Bolle is requiring.").

IPR2021-01304
Patent 8,478,036 B2

turned specifically to Bolle's "image segmentation" teaching of comparing two spatially registered images of a scene, one with and the other without an object present, as depicted in Figure 3*a*.  Instead, Petitioner takes Bolle's teachings concerning Figure 3*a out of context*, and argues only generally that the skilled artisan allegedly would have been motivated to use Bolle's "image segmentation" (generically) with Ogasawara to achieve the invention of claim 1.  *See, e.g.*, Pet. 27 (Petitioner arguing generally that combining Ogasawara and Bolle would have "achieve[d] a system that could more accurately discern the shape or other visual characteristics of a target in an image to be able to identify that target." (citing Ex. 1003 ¶ 92)); Pet. 30 (Petitioner arguing "Bolle would predictably enhance the performance of the Ogasawara system," and the teachings of the references themselves "provide [the skilled artisan] with a strong motivation to combine Ogasawara and Bolle." (citing Ex. 1003 ¶¶ 97–98)); Pet. 24 (Petitioner arguing "both references are in the same field and address the same issue in the same context—using image processing systems to identify products, such as produce, for purchase during shopping." (citing Ex. 1003 ¶ 98)); *see generally* Pet. 27–34.

Patent Owner argues, *inter alia*, "a retail customer would not be able to take the necessary photographs to segment a target from the background using Bolle's [Figure 3*a*] techniques," because "Bolle requires precise pixel-to-pixel correspondence between the two spatially-aligned images in a non-mobile environment, which would be hard—if not impossible—for a retail customer to do," particularly where customers must physically or manually insert or remove objects from scenes between the time of taking the two images using mobile devices held in their hands.  PO Resp. 45 (citing

32

Appx100

IPR2021-01304
Patent 8,478,036 B2

Ex. 1006, 10:31–35, 10:53–55; Ex. 2006 ¶¶ 22–24); *see id.* at 35–55. After Patent Owner highlighted this issue (PO Resp. 1–3, 30–55), Petitioner responded by characterizing its arguments and evidence, directed on their face to reasons or motivations to combine the teachings of Ogasawara with Bolle's teaching of image segmentation related to Figure 3*a*, as *also* being directed to other of Bolle's image segmentation teachings (discussed below). Pet. Reply 10–22; *see* PO Sur-Reply 5 ("Petitioner now recasts its Petition argument, focusing on three alternative Bolle embodiments that are fundamentally different than the Figure 3a embodiment."); 7 ("The Petition cited Bolle's general description of background segmentation but only relied on Bolle's Figure 3a embodiment. Having been shown that Ogasawara cannot be combined with this embodiment, Petitioner newly relies on Bolle's Figure 3b embodiment *and* capturing images in quick succession.").

We find Petitioner's arguments and evidence here ignore the critical context of Bolle requiring that the two images being used to perform image segmentation be in spatial, pixel-to-pixel registration, despite an object being moved into or out of a scene between the taking of those two images. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hyrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art."). Petitioner alleges Patent Owner provides no support "for the claim that a user cannot hold Ogasawara's videophone sufficiently stationary while capturing multiple images." Ex. 1050 ¶ 49. To the contrary, Patent Owner's expert, Dr. Bajaj, testifies:

33

IPR2021-01304
Patent 8,478,036 B2

> Performing this pixel-accurate spatial registration from two independently-acquired images taken by a shopping customer on their phone is non-trivial and is prone to be erroneous. All spatial registration errors between the two images are carried over and causatively yield much greater error using the pixel-wise segmentation algorithm 220 of Bolle.

> The resulting segmentation errors in the separation of the pixels belonging to the object from the pixels belonging to background image causes greater and cascadic error in the object recognition phase of Bolle's method of extracting and normalizing separated object histogram characteristics and comparing to one or more stored normalized reference characterizations.

Ex. 2007 ¶¶ 23–24; *see* PO Sur-Reply 11. Patent Owner also submits that "[t]he difficulty of an average customer to take two pixel-perfect images using a mobile phone is also *self-apparent*." PO Sur-Reply 11 (emphasis added).

Regardless, it is Petitioner's burden to evidence sufficiently that the ordinarily skilled artisan would have understood that such a user could have held Ogasawara's videophone sufficiently stationary while capturing multiple images as required by Bolle's Figure *3a* embodiment—Petitioner has not done so. More importantly, it is Petitioner's burden here to evidence sufficiently and with particularity *why* the ordinarily skilled artisan, *but for hindsight* and in the time frame of the year 2000 (about *seven years before* introduction of the first "iPhone" by Apple Inc.[11]), would have combined (a) Ogasawara's system where, for example, shoppers use mobile devices (e.g., handheld mobile phones) to capture single images of objects and to

---

[11] *See* Apple Reinvents the Phone With iPhone, https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (accessed Dec. 21, 2022).

34

Appx102

IPR2021-01304
Patent 8,478,036 B2

have those objects recognized as such by pattern recognition software, with (b) Bolle's image segmentation technique of Figure 3*a*, where such shoppers would have had to hold their mobile phones with near perfect stability and positioning in space all while taking one image of a scene without an object of interest therein, then physically placing the object within the scene (presumably not using the hand holding the phone), and then taking a second image of the scene with the object present. For the reasons discussed above, we agree with Patent Owner that Petitioner fails to meet its burden here. Indeed, we find it incredible (i.e., not credible) that the ordinarily skilled artisan at the relevant time would have considered it desirable (or feasible) for a consumer/shopper to have to hold a mobile device in space with such pixel-level precision (e.g., without causing the scene as seen by the camera to move even about one millimeter or less in any direction or orientation). We find this proposed combination of teachings to simply not make sense based on the record before us and the relevant time frame.

*(2) Bolle's Teachings Based on its Figure 3b*
*Embodiment and "Quick Succession"*

In its Reply, Petitioner argues the skilled artisan would have been motivated to combine Bolle's alternative "image segmentation" teaching of comparing two spatially registered images of a scene, one taken with a flash and the other without a flash, as depicted in Bolle's Figure 3*b*, with Ogasawara's teachings to achieve the invention of claim 1. *See, e.g.*, Pet. Reply 2–14, 20–21. Petitioner argues the skilled artisan "would have been motivated to combine Ogasawara and Bolle to achieve a system that could more accurately discern the shape or other visual characteristics of a target

Appx103

IPR2021-01304
Patent 8,478,036 B2

in an image to be able to identify that target." Pet. 27 (citing Ex. 1003 ¶ 92);
*see id.* at 27–34.

Figure 3*b* of Bolle is reproduced below.



Figure 3*b* depicts segmenting a scene into an object image and
a background image.

Ex. 1006, 6:27–28, Fig. 3*b*.

Bolle's Figure 3*b* shows two images of a scene with a background and
one or more objects, and along with its related description, teaches:

> Image 330 in FIG. 3*b* is an image of a scene (including
> objects 131 and a background 311) with light source 110 off.
> That is, the scene image 330 consist of an image of
> background 311 illuminated by ambient light. Also in the scene
> image 330 are the object images 135 obscuring the background.
> Because the light source 110 is off, object images 135 appear
> dark in scene image 330 because they are not illuminated by the
> light source 110.

> Image 340 in FIG. 3*b* is an image of the scene with light
> source 110 on. In this case, the light source 110 illuminates
> objects 132 in field of view of camera with an amount of light
> greater than ambient light. This results in the object images 130
> being brighter (than in 330) in scene image 340.

36

IPR2021-01304
Patent 8,478,036 B2

Ex. 1006, 9:5–20. Bolle further teaches in connection with Figure *3b* and Figure 5 (not shown here) that the object, background, and image input device "should be at the *same position* in both step 510 and 520 [i.e., the steps of acquiring the first/dark image and second/light image] to assure that the first and second images are in *spatial registration*." *Id.* at 10:31–34 (emphases added). Bolle also teaches in connection with Figure *3b* and Figure 5 that "[p]roper registration can be ensured by either acquiring the first and second image in *quick succession*, or by imaging a *stationary object* 131 against a *stationary background* 312." *Id.* at 10:41–43 (emphases added).

Petitioner argues "Bolle[] express[ly] teach[es] that taking the first and second digital representations in *quick succession* ensures that the camera, object, and background are in the same relative position in both digital representations." Pet. Reply 12 (citing Ex. 1006, 10:31–44) (emphasis added). Petitioner argues, "[b]y capturing digital representations in *quick succession*, any relative movement is insignificant, and thus, the images will be sufficiently aligned for segmenting the target from the background." *Id.* (emphasis added). Petitioner also argues "flash functionality in CCD cameras integrated in mobile phones was well known at the time of the invention," and that the skilled artisan "would therefore understand that the camera in Ogasawara's videophone would include a synchronized camera flash to illuminate the target for image segmentation." *Id.* at 21. Petitioner argues "Bolle explains that a camera flash or 'strobe' 'may be synchronized with the camera' capturing the two images," and that "[w]hen this teaching is combined with the teaching of capturing images in 'quick succession' and incorporated into Ogasawara's videophone, [the

37

IPR2021-01304
Patent 8,478,036 B2

skilled artisan] would have been motivated to have the resultant combination take two pictures in 'quick succession.'" *Id.* at 13–14 (citing Ex. 1006, 10:8–16, 7:18–65, 9:59–60; Ex. 1050 ¶ 54); *see id.* at 20–21 (discussing illumination).

Patent Owner complains that Petitioner's reliance on teachings of Bolle's Figure 3*b* embodiment and related disclosure to support an alleged motivation to combine Ogasawara and Bolle constitute a new obviousness theory presented for the first time on reply. *See* PO Sur-Reply 5–6 ("Petitioner modifies its grounds by combining Ogasawara with 'Bolle's Figure 3b [segmentation] embodiment,' where the images are captured in 'quick succession' and synced to a camera's flash, such that the first image is taken without a flash, and the second image is taken with a flash."), 4 ("Petitioner presents . . . entirely new obviousness theories based on previously-uncited Bolle embodiments."), 4–8. As the Federal Circuit stresses:

> It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify with particularity the evidence that supports the grounds for the challenge to each claim. . . . [T]he expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute."

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1286–87 (Fed. Cir. 2017) (quoting *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016), which quotes, in part, 35 U.S.C. § 312(a)(3) (The Petition must identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim.")). But the Federal Circuit also has cautioned that any ambiguity as to whether a reply constitutes a new argument is eliminated

38

IPR2021-01304
Patent 8,478,036 B2

when the reply is a legitimate reply to arguments introduced in a patent owner's response or the Board's institution determination. *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706–07 (Fed. Cir. 2020) (citing *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018)); *see Everstar Merch. Co. v. Willis Elec. Co.*, No. 2021-1882, 2022 WL 1089909, at *4 (Fed. Cir. Apr. 12, 2022).

During oral hearing, Petitioner's counsel could not identify specifically *in the Petition* any actual discussion of Figure 3*b*, let alone any discussion of taking images in "quick succession" with changing illumination (with flash/without flash), but for identifying a few *citations* in the Petition, where the cited material also included (or perhaps happened to include) reference to Figure 3*b*. *See, e.g.*, Tr. 12:3–17:1. We likewise find no such arguments presented with particularity concerning Figure 3*b* and "quick succession" in the Petition. The Petition itself explicitly notes that "Bolle provides for segmentation of a target in an image *by comparing images of a scene with and without the target present*" (Pet. 33 (emphasis added)), which implicates only Bolle's Figure 3*a* embodiment, and effectively dismisses Bolle's Figure 3*b* embodiment involving specific, controlled lighting requirements by stating, "'carefully controlled lighting conditions' *are not required* for Bolle" (Pet. 33 (emphasis added)). We agree with Patent Owner that Petitioner's arguments in its Reply concerning Bolle's Figure 3*b* embodiment and "quick succession" constitute arguments offered for the first time on reply. However, because Patent Owner discussed Bolle's Figure 3*b* embodiment in its Response (PO Resp. 40–44), and because our decision does not turn on whether

39

Appx107

IPR2021-01304
Patent 8,478,036 B2

Petitioner's arguments here are new and improper, we need not and do not decide this procedural issue and instead turn to the merits.

Patent Owner argues Bolle's Figure 3*b* embodiment, like the Figure 3*a* embodiment, requires that "the two images must be pixel-accurate, spatially aligned or registered views—*i.e.*, the camera cannot be moved significantly between the two photographs," and "[t]hus, a stationary camera is **required** to capture the necessary segmentation images." PO Resp. 42–43. Patent Owner argues "Ogasawara never describes a cell phone as containing a flash or any other light source, which would have prevented using Bolle's second, illumination-based segmentation approach," and that "[t]his would have [led] a skilled artisan away from combining Ogasawara and Bolle to yield the challenged claims." PO Resp. 47; *see id.* at 57 ("There is no description in Ogasawara of even taking more than one photograph per target item, much less any disclosure of how the mobile phone could be used to take the required two photographs under specific illumination conditions."). According to Patent Owner:

> Petitioner argues on Reply for the first time that "flash functionality in CCD cameras integrated in mobile phones was well-known." Reply 21 (citing EX1050 ¶80). It raises this argument because Bolle's Figure 3b (Petitioner's new combination) requires a flash, and, as PO had pointed out, neither Ogasawara or Bolle disclose an integrated flash. POR 48.
>
> Petitioner relies on an entirely new reference, EX1062, U.S. Patent No. 6,122,526 ("Parulski"). Reply 21; *see also* EX1050 ¶81. The Petition did not disclose any obviousness theory involving Ogasawara's mobile videophone having an integrated flash. While the Petition asserted that "Bolle teaches that a . . . camera flash will suffice if a lighting source is preferred" (Pet. 33 (citing EX1006 7:3–17 (Fig. 1), 9:59-60), Bolle's only disclosure of a "camera flash" is not integrated into a mobile device but is instead a discrete "light source 110" that is preferably specific

40

IPR2021-01304
Patent 8,478,036 B2

> types of external flash tubes. EX1006 7:14–17; Fig. 1. The
> Petition did not disclose the Reply's new theory of integrating a
> flash into Ogasawara's videophone, and certainly did not
> disclose Parulski. Reply 20-21. Petitioner's arguments should
> therefore be given no weight.

PO Sur-Reply 8–9.

In response to Petitioner's arguments about capturing first and second images in "quick succession," Patent Owner argues that "Bolle explains that pictures may be taken in 'quick succession' when the **object** or **background** are not stationary, and otherwise expressly states that the camera 'should be at the same position.'" PO Sur-Reply 16 (citing Ex. 1006, 10:31–44 (discussed above); Ex. 2008, 44:24–45:16 (Petitioner's expert, Dr. Rodriguez, agreeing that "[t]he camera seems to be stationary."); Ex. 2010, 55:18–56:5 (Dr. Rodriguez testifying that Bolle's "camera is in a fixed position," such as "putting a camera on a tripod.")). Patent Owner argues "Bolle's teaching of capturing images in 'quick succession' is a solution for a **stationary** or **fixed-position** camera," and "Ogasawara's mobile videophone is incompatible with this system." PO Sur-Reply 16–17. Patent Owner argues "Bolle expressly discloses in both its Figure 3a and 3b embodiments use of an enclosure where the desired object is placed on 'a support 405' to 'ensure[] the object is of fixed and repeatable distance 407 from camera 120,'" and that "[t]his is because the segmentation process uses a precise pixel-by-pixel comparison of two images." PO Sur-Reply 17.

We agree with Patent Owner that Bolle teaches using a *stationary* imaging device (camera) to obtain two images for purposes of segmentation via Bolle's Figure 3*a* and 3*b* embodiments, and that Ogasawara teaches using a *mobile* device to obtain a single image for purposes of pattern recognition. Bolle itself explicitly states that the object, background, *and*

41

IPR2021-01304
Patent 8,478,036 B2

*image input device* "should be at the *same position*" when acquiring the first/dark image and second/light image, and that the two images must be *spatially registered* (explained above). Ex. 1006, 10:31–44; *see id.* at 9:48–51 ("By placing the object 131 on the surface 405, the distance 407 between camera 120 and object 131 remains fixed thus providing the means for repeatable imaging.").

 We credit Dr. Bajaj's (Patent Owner's expert) testimony that Bolle requires a stationary camera and spatially registered images for purposes of segmentation via Bolle's Figure 3*a* and 3*b* embodiments, which we find to be well-aligned with Bolle's disclosure and the complete record before us. *See, e.g.*, Ex. 2007 ¶ 33. We find Dr. Bajaj's testimony on this issue much more credible than Dr. Rodriguez's (Petitioner's expert) testimony to the contrary, which we find to be misaligned at best with Bolle's explicit disclosures discussed above. *See, e.g.*, Ex. 1050 ¶ 51 (Dr. Rodriguez testifying that Bolle's Figure 4 shows a stationary camera, but Bolle allegedly is not limited to using a stationary camera; and that Bolle's segmentation techniques do not require "exact alignment," merely "approximate[]" alignment of images, without explaining how or why the skilled artisan would have interpreted Bolle in that way); Ex. 2008, 97:22–99:6 (testifying on re-direct to the same); *see also Skky, Inc. v. MindGeek, S.A.R.L.*, 859 F.3d 1014, 1022 (Fed. Cir. 2017) (the Board is "not required to credit [a party's] expert evidence simply because [the party] offered it"); *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("This court's opinions have repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on

42

IPR2021-01304
Patent 8,478,036 B2

substantial evidence review."); *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).

We find Petitioner's arguments and evidence here ignore the critical context of Bolle requiring that the two images being used to perform image segmentation be in spatial, pixel-to-pixel registration, despite needing to take the two images under separate and different lighting conditions (e.g., with flash and without flash). Again, it is Petitioner's burden to evidence sufficiently that the ordinarily skilled artisan would have understood that a user could have held Ogasawara's videophone sufficiently stationary while capturing multiple images as required by Bolle's Figure *3b* embodiment— Petitioner has not done so. And again, it is Petitioner's burden here to evidence sufficiently and with particularity *why* the ordinarily skilled artisan, *but for hindsight* and in the time frame of the year 2000, would have combined (a) Ogasawara's system where, for example, shoppers use *mobile* devices (e.g., handheld mobile phones) to capture single images of objects and to have those objects recognized as such by pattern recognition software, with (b) Bolle's *stationary* image segmentation technique of Figure 3*b*, where such shoppers would have had to hold their mobile phones with near perfect stability and positioning in space all while taking one image of a scene with a flash and then taking another image of that same scene without a flash. For the reasons discussed above, we agree with Patent Owner that Petitioner fails to meet its burden here. *See* PO Sur-Reply 12–16.

Indeed, we find no credible explanation in the record before us for *why* the ordinarily skilled artisan would have considered it desirable (or feasible) for a consumer/shopper to have to hold a mobile device in space

43

IPR2021-01304
Patent 8,478,036 B2

with such pixel-level precision (e.g., without causing the scene as seen by the camera to move even about one millimeter or less in any direction or orientation), or otherwise would have considered it desirable to combine Bolle's stationary, two-image segmentation method of Figure 3*b* with Ogasawara's mobile, one-image object recognition system. We find this proposed combination of teachings to simply not make sense based on the record before us and the relevant time frame, even assuming that Bolle's segmentation methods yield better results in object feature recognition, as Petitioner asserts (Pet. 27–34).[12]

> (3) *Bolle's Teachings Based on Figure 14, "Histogramming," and Claim 32*

In its Reply, Petitioner argues the skilled artisan would have been motivated to combine Bolle's "image segmentation" teaching of "histogramming," as discussed in connection with Bolle's Figure 14, with Ogasawara's teachings to achieve the invention of claim 1. Pet. Reply 9–10.

---

[12] To the extent Petitioner intends its "quick succession" arguments also to apply to Bolle's Figure 3*a* embodiment (*see supra* Section III.D.3.a.1), we likewise are unpersuaded. We agree with Patent Owner that "Petitioner provides no evidence that pixel-perfect images with and without the object could be captured in 'quick succession' using a mobile phone," and that "Bolle's teaching of 'quick succession' is only disclosed in the context of the Figure 3b embodiment." PO Sur-Reply 11–12 (citing Ex. 1006, 10:20–43; Ex. 2010, 67:9–20, 69:19–23).

IPR2021-01304
Patent 8,478,036 B2

Figure 14 of Bolle is reproduced below.



FIG. 14

Figure 14 depicts *an already segmented object*
having two distinct regions that can be further
segmented relative to each other.

Ex. 1006, 6:54–57, Fig. 14.

Petitioner argues Bolle "teaches segmenting a target in a digital

representation *without comparing corresponding pixels of the target in two*

*digital representations*." Pet. Reply 9–10 (emphasis added). Specifically,

Petitioner asserts:

> Figure 14 [of Bolle] . . . discloses segmenting a "first object
> region" (e.g., leaves 1410) from a "second object region" (e.g,
> grapes 1420). . . . Ex. 1006, 19:16–27 ("The object image 130
> [sic: 1430] is segmented along its first object region 1410 and its
> second 1420 object region . . . by using a segmentation

45

IPR2021-01304
Patent 8,478,036 B2

> algorithm. A preferred algorithm is the use of an area normalized Hue histogram for detecting if there are two or more distinct peaks."). *This type of segmentation algorithm would separate a scene image into separate target and background images just as it separates target regions.* Ex. 1050, ¶¶ 38–45.

*Id.* (emphasis added). In that connection, Petitioner contends that Bolle's claim 32 recites "segmenting [a] target object image from the background image of the scene" without comparing two digital representations. *Id.* at 10. According to Petitioner, claim 32 of Bolle confirms that "[Bolle's] segmentation embodiments are not limited to comparing two digital representations." *Id.*

Petitioner's reliance on Bolle's claim 32 is misplaced. Even if the scope of claim 32 is broad and covers segmentation of a target from the background by analyzing only one digital representation, this is not a disclosure of any algorithm to segment a target from the background by analyzing only one digital representation. Indeed, we agree with Patent Owner's assessment of Petitioner's "claim 32" argument:

> [Bolle's] specification does not disclose any background segmentation algorithms that use only a single image. . . . [T]he Figure 14 segmentation algorithm [discussed above and further below] is not a background segmentation algorithm. The background segmentation algorithms disclosed in Bolle both use two images. There is therefore no single-image background segmentation teaching in Bolle to combine with Ogasawara.

PO Sur-Reply 21.

As noted above, a petition must identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3). With regard to Bolle's Figure 14 embodiment, Petitioner did not, in the Petition, identify or refer to Figure 14 as an algorithm to segment an object from the background in a scene. *See* PO Sur-

46

Reply 6 ("Petitioner modifies its grounds [as originally set forth in the Petition] by combining Ogasawara with Bolle's segmentation algorithm depicted in Figure 14 used for segmenting an object into two sub-objects *after* background segmentation."), 20 ("Petitioner also raises new arguments that Ogasawara could be combined with segmentation algorithms that only use one image."). Petitioner also identifies no disclosure in Bolle which describes the algorithm associated with Figure 14 as segmenting a target from the background in a digital representation. *See id.* at 20 ("Petitioner argues that '[t]his algorithm would separate a scene image into separate object and background images just as it separates object regions,' but provides no explanation for why this is true."). To the contrary, in arguing in the Petition that Bolle teaches certain limitations in claim 1, Petitioner relies on Bolle's two-image segmentation process. *See* Pet. 46 ("Bolle teaches 'an algorithm' whereby 'the object(s) image is novelly segmented from a background image of the scene *by a comparison of the two digitized images taken*.'" (emphasis added)).

It is belated for Petitioner to raise this new contention, for the first time in its Reply, that Bolle discloses a Figure 14 embodiment which segments an object from the background in a scene using a single image. The argument is not entitled to consideration. If Petitioner wanted to make that argument, Petitioner should have presented the argument in the Petition to provide Patent Owner reasonable notice of the argument. *See* 37 C.F.R. §42.104(b)(4) ("The petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon."); 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition, patent owner preliminary response, or patent

47

IPR2021-01304
Patent 8,478,036 B2

owner response."); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330–31 (Fed. Cir. 2019); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016).

Regardless, even if we were to consider the belated argument, we agree with Patent Owner that Bolle's Figure 14 embodiment does not teach segmenting a target from the background in a digital representation, but only further segmenting a target already previously segmented from the background in a digital representation into two sub-portions. *See* PO Sur-Reply 20–21 (Bolle's Figure 14 embodiment does not reflect "a background segmentation algorithm. Instead, it is an algorithm for segmenting an object *after* background segmentation."). Bolle clearly discloses "segmented object image 130 has two distinct regions, i.e., the leaves 1410 and the grapes 1420." Ex. 1006, 19:18–20. Bolle also discloses "object image 130 is segmented 220 from the background 311." *Id.* at 17:1–2. Petitioner's expert, Dr. Rodriguez, acknowledges that object image 130 is already segmented from the background. Ex. 1050 ¶ 38 ("FIG. 14 shows an image 1405 where segmented object image 130 has two distinct regions, i.e., the leaves 1410 and the grapes 1420."); *id.* ¶ 42 ("The grapes and the leaves are part of a 'segmented object image 130' that was previously (prior to Figure 14) segmented from the original background.").

We recognize that Dr. Rodriguez also testifies that "[t]his segmentation algorithm [separating the leaves and the grapes] would separate a scene image into separate target and background images just as it separates target regions." Ex. 1050 ¶ 39. In its Reply, Petitioner asserts the same. Pet. Reply 9 (citing Ex. 1050 ¶¶ 38–45). But we agree with Patent Owner that Petitioner "provides no explanation for why this is true." PO

48

IPR2021-01304
Patent 8,478,036 B2

Sur-Reply 20. Further, to the extent Petitioner is asserting that it would have been obvious to the ordinarily skilled artisan to adapt Bolle's algorithm of Figure 14 for use in segmenting a target from the background image in a digital representation, that is a new argument first presented in the Reply and is not entitled to consideration.

In sum, we find no credible explanation in the record before us for *why* the ordinarily skilled artisan would have considered it desirable (or feasible) to combine Bolle's Figure 14 embodiment with Ogasawara's teachings to achieve the invention recited in claim 1. We find this proposed combination of teachings to simply not make sense based on the record before us and the relevant time frame.

### (4) *Bolle's Teachings of "Segmentation" Generally*

In its Reply, Petitioner argues the skilled artisan would have been motivated to combine Bolle's "segmentation process," generally, with Ogasawara's teachings to achieve the invention of claim 1. *See, e.g.*, Pet. Reply 2, 11. Similarly, during the oral hearing, Petitioner's counsel characterized the Petition's discussion of motivation to combine Ogasawara and Bolle as "based on the benefits of segmentation as a whole, and Bolle teaches that multiple segmentation methods are part of its segmentation algorithm." Tr. 7:8–10. To the extent that this is true, it only further fuels our view that the Petition does not set forth sufficiently, let alone with particularity, *why* the ordinarily skilled artisan would have had a *rational* reason to combine *specific* teachings of Ogasawara and Bolle to achieve the invention of claim 1.

49

Appx117

IPR2021-01304
Patent 8,478,036 B2

Petitioner's argument here also contradicts its entire basis for reaching to Bolle in the first place, namely, that Ogasawara's mere mention of "[a]dvanced pattern recognition software" to recognize objects in images under certain conditions, without more, is insufficient to teach the invention recited in claim 1. *See* Pet. 28, 30. Petitioner's reliance on Bolle's teaching of "segmentation" generally, without relying on teachings of a particular segmentation technique, adds little to nothing to Ogasawara. Regardless, for the same reasons we do not find Bolle's specific "image segmentation" teachings to support a rational reason to combine Ogasawara and Bolle (*see supra* Sections III.D.3.a.1–a.3), *a fortiori*, we do not find Bolle's generalized "image segmentation" teachings to do so either.

*(5)   Conclusion*

For the reasons expressed above, and based on the complete record before us, we conclude Petitioner has not proven that an ordinarily skilled artisan would have had a rational reason to combine the teachings of Ogasawara and Bolle to achieve the recited invention of claim 1. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that independent claim 1 would have been obvious over the combination of Ogasawara and Bolle.

*b)   Dependent Claims 10, 12, 13, and 15*

Petitioner submits the same arguments and evidence concerning alleged reasons to combine the teachings of Ogasawara and Bolle for dependent claims 10, 12, 13, and 15 as for independent claim 1. *See* Pet. 27–34, 50–57. Petitioner's evidentiary showing for dependent claims 10, 12, 13, and 15 (*see* Pet. 27–34, 50–57) does not remedy the deficiencies in its evidentiary showing for independent claim 1. *See supra* Section

50

IPR2021-01304
Patent 8,478,036 B2

III.D.3.a. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that any of dependent cl claims 10, 12, 13, and 15 would have been obvious over the combination of Ogasawara and Bolle.

> **4.    *Alleged Reasonable Expectation of Success in Combining the Relevant Teachings of Ogasawara and Bolle***

Petitioner's contention that the combined teachings of Ogasawara and Bolle render obvious the inventions of claims 1, 10, 12, 13, and 15 (Pet. 27–57) also implicates the fundamental issue of whether the ordinarily skilled artisan would have had a reasonable expectation of success in combining such teachings.  The parties dispute, *inter alia*, whether Petitioner has proven that the skilled artisan would have had such a reasonable expectation of success.  Pet. 7, 31–34; PO Resp. 55–57; PO Sur-Reply 16–19.  We find this issue also dispositive in this case as to all Challenged Claims, as discussed below.

"An obviousness determination requires finding that [an ordinarily skilled artisan] would have been motivated to combine or modify the teachings in the prior art <u>and</u> *would have had a reasonable expectation of success in doing so*." *Regents of Univ. of Cal.*, 903 F.3d at 1291 (emphasis added); *see also OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382–85 (Fed. Cir. 2019); *Samsung Elecs. Co., Ltd. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1380–83 (Fed. Cir. 2019).  "'[A] reasonable expectation of success, not absolute predictability' supports a conclusion of obviousness." *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1343 (Fed. Cir. 2000); *see Intel Corp. v. Alacritech, Inc.*, 817 F. App'x 1014, 1016–17 (Fed. Cir. 2020).  "The reasonable-expectation-of-success analysis

51

IPR2021-01304
Patent 8,478,036 B2

must be tied to the scope of the claimed invention." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021). "Whether the prior art discloses a claim limitation, whether a skilled artisan would have been motivated to modify or combine teachings in the prior art, *and whether she would have had a reasonable expectation of success in doing so are questions of fact*." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (emphasis added).

In our Institution Decision, we preliminarily found "Petitioner's cited evidence provides sufficient rational reasons for purposes of institution to combine Ogasawara and Bolle *with a reasonable expectation of success*." Dec. 39 (emphasis added). However, on further review of the Petition and further consideration of the parties' briefing on this issue and the relevant case law, and based on the complete record before us, we now conclude otherwise. *See Fanduel*, 966 F.3d at 1340; *Magnum Oil Tools*, 829 F.3d at 1376. In particular, even if Petitioner were found to have proven a rational reason to combine the relevant teachings of Ogasawara and Bolle, we determine that Petitioner has not proven, by a preponderance of the evidence, that the ordinarily skilled artisan would have had a reasonable expectation of success in doing so (i.e., in implementing Bolle's segmentation methods on Ogasawara's videophone).

Petitioner argues the skilled artisan "would have had a reasonable expectation of success combining Bolle's image segmentation and matching techniques with Ogasawara's system." Pet. 31. Petitioner argues the skilled artisan "would have combined Bolle's image segmentation and matching techniques with Ogasawara's system using the hardware and techniques already described in each reference, and each system would perform the

IPR2021-01304
Patent 8,478,036 B2

same in the combined system," and "would have recognized that using Bolle's image segmentation and matching techniques with Ogasawara's system would be nothing more than combining prior art elements according to known methods to yield predictable results or the application of known techniques to improve a known device to yield predictable results." Pet. 31–32 (citing Ex. 1003 ¶ 100); *see* Pet. 33 ("[The skilled artisan] would have thus recognized that Bolle's algorithmic methods of image segmentation and matching are compatible with Ogasawara's system.").

Patent Owner contends "Petitioner's articulated reasoning for a reasonable expectation of success is boilerplate and conclusory." PO Resp. 55. Patent Owner argues the skilled artisan would not have had a *reasonable* expectation of success "because an untrained shopping customer using Ogasawara's mobile phone would not have been able to take the precise dual images required by Bolle's system." *Id.* at 56–57 (discussing Bolle's Figure 3*a* and 3*b* embodiments); *see* PO Sur-Reply 16–19.

As for Bolle's Figure 3*a* embodiment, Patent Owner argues:

> Bolle's first segmentation technique requires two still photographs [ ] without any pixel variation in the background. Considering first the segmentation technique where one image is of a background without the target object, and the other image is the same exact background with the target object, a shopping customer would not be able to take the two required photographs with their phone. Bajaj ¶ 51. For example, they would not be able to reliably situate themselves to take the necessary photograph from the same perspective, distance, etc.

PO Resp. 56. For these reasons, and also for reasons discussed above in Section III.D.3.a.1 and below, we agree with Patent Owner, and find Petitioner has not proven that the ordinarily skilled artisan at the relevant time would have considered it feasible for a consumer/shopper to have to

IPR2021-01304
Patent 8,478,036 B2

hold a mobile device in space and take two, spatially registered images of
scene while that consumer moved a target object into or out of the scene
between the taking of those two images.

Petitioner does not adequately explain how such activity could have
been performed without causing substantial misalignment that undermines
the spatial registration requirement of Bolle. Petitioner does refer to Bolle's
description of taking the two pictures in "quick succession," Pet. Reply 2, 6,
12–14, but (1) the "quick succession" description of Bolle relates to Bolle's
Figure 3*b* embodiment which does not involve moving an object into or out
of a background (Ex. 1006, 10:24–43), and (2) Petitioner does not explain
how holding Ogasawara's videophone still gets easier for the shopper if the
shopper has to move an object either into or out of a scene *even quicker*.

As for Bolle's Figure 3*b* embodiment, and also as discussed above in
Section III.D.3.a.2, Patent Owner argues "Bolle's teaching of capturing
images in 'quick succession' is a solution for a ***stationary*** or ***fixed-position***
camera," and "Ogasawara's mobile videophone is incompatible with this
system." PO Sur-Reply 16–17; *see* PO Resp. 25–58. Patent Owner argues
"Petitioner also does not establish that Ogasawara's videophone was capable
of capturing images in quick succession," and "[a]s Dr. Rodriguez admitted,
Bolle does not explain how its teaching of 'quick succession' is performed."
PO Sur-Reply 17; *see id.* at 17–18 ("[T]he Reply also does not describe how
Ogasawara's videophone could take images in quick succession."). Patent
Owner argues "Petitioner's new combination also requires 'Ogasawara's
videophone [to] include a synchronized camera flash to illuminate the object
for Bolle's segmentation,'" but "Petitioner provides no evidence that

54

Appx122

IPR2021-01304
Patent 8,478,036 B2

integrating a flip-up flash, such as the one disclosed in Parulski,[13] would have integrated with Ogasawara's videophone and still meet Bolle's segmentation requirements." *Id.* at 18–19 (quoting Pet. Reply 21). Patent Owner argues Petitioner is silent as to how Parulski adds anything to support Petitioner's reasonable expectation of success argument:

> Petitioner . . . does not, for example, establish that Parulski's flash meets Bolle's requirement that lighting be "nonmonochromatic and of a constant frequency distribution" or that it is "infrared" or "ultra violet." EX1006 7:7-14. Nor does Petitioner provide any evidence that Parulski's flash is similar to the exemplary flashes described by Bolle. *Id.* 7:14-17. Thus, Petitioner's revised combination fails to establish that Bolle's system could be successfully combined with Ogasawara, and is thus inadequate.

*Id.* at 19. For these reasons, and also for reasons discussed above in Section III.D.3.a.2 and below, we agree with Patent Owner, and find Petitioner has not proven that the ordinarily skilled artisan at the relevant time would have considered it feasible for a consumer/shopper to have to hold a mobile device in space and take two, spatially registered images of scene, one with the camera flash on and another with the camera flash off (both with the object in the background).

Petitioner's expert, Dr. Rodriguez, testifies that "videophones with flash functionality were known by 2000," and Dr. Rodriguez identifies Parulski (Ex. 1062) as describing such a mobile phone with an integrated flip-up flash unit. Ex. 1050 ¶ 81. But Dr. Rodriguez simply states that videophones with flash functionality "were known by 2000," not "well

---

[13] Parulski discloses "flip-out flash unit 24 that protects the lens 22 when the camera module 10 is not in use." Ex. 1062, 3:16–17.

IPR2021-01304
Patent 8,478,036 B2

known by 2000." *Id.* The difference is not insignificant, because if such flash functionality was just known, a reference showing that may be formally required as a portion of the alleged ground of unpatentability, e.g., Ogasawara, Bolle, and Parulski. But Parulski is not in the specific ground of unpatentability asserted by Petitioner. If a feature was "well known" to one with ordinary skill in the art, Parulski need not be named in the alleged ground of unpatentability and can still be relied on by Petitioner to show basic knowledge or fundamental skill that would have been possessed by one with ordinary skill in the art. Dr. Rodriguez's testimony does not persuade us that a flash functionality was so well known for videophones in 2000 that that was basic knowledge or fundamental skill to one with ordinary skill in the art without need to include a pertinent reference in the alleged ground of unpatentability. We note further that even Parulski itself does not show a videophone. On this record, Petitioner has not shown any videophone with an early enough date that operates with an integrated flash for taking a video.

> In addition, Petitioner asserts:

> For illumination-based segmentation, Bolle further teaches using a camera flash or "strobe" to illuminate an object and synchronizing the timing of the strobe with the camera. Ex. 1006, 9:59–60 (CCD digital camera includes "a camera flash"), 10:9–16 ("The control may be a part of the light 110 as a timing device such as in a strobe. The control may be synchronized with the camera … [and was] well known."). [The skilled artisan] would therefore understand that the camera in Ogasawara's videophone would include a synchronized camera flash to illuminate the target for image segmentation. Ex. 1050, ¶¶ 80–83.

Pet. Reply 21. Thus, assuming that Ogasawara's videophone is modified to include flash functionality for taking a video, Petitioner urges that a retail

56

IPR2021-01304
Patent 8,478,036 B2

shopper could have held Ogasawara's videophone sufficiently still to take two frames while the flash is automatically synchronized to turn on and off at the appropriate time.

Petitioner, however, has not shown the existence, prior to the critical date, of an integrated flash that can be programmed in this manner, even assuming that the processing circuitry of Ogasawara is sufficiently sophisticated to be so programmed. Specifically, Petitioner has not shown that Parulski's flip-up flash can be turned on and off so quickly that it can be controlled on a frame by frame basis with respect to multiple images (or video) taken. For Bolle's Figure 3*b* segmentation method, light from a flash cannot take time to emit and to cease but essentially must be instantly on and off to be programmable on a "quick succession" or per frame basis. Petitioner has not shown that Parulski's flip-up flash is of that type. It is possible that Parulski's flash is turned on when it is flipped up, and is turned off when it is flipped down. It also is possible that when charging is needed, Parulski's flash starts charging after it has been flipped up and the user has to wait some time before the flash can function. Such characteristics would be incompatible with the segmentation method of Bolle's Figure 3*b* embodiment performed with flash programmable on a per frame basis. Regardless, the burden of proving a reasonable expectation of success to combine the relevant teachings of Ogasawara and Bolle *is on Petitioner* and never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378; *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348–49 (Fed. Cir. 2021) ("[I]t was, at all times, [petitioner's] burden to show that the claims would have been obvious, including that a skilled artisan would have had a

IPR2021-01304
Patent 8,478,036 B2

reasonable expectation of success in achieving the claimed invention."). We find Petitioner's alleged evidence fails to do so.

For the reasons expressed above, and based on the complete record before us, we conclude that Petitioner has not sufficiently evidenced a reasonable expectation of success in modifying Ogasawara to implement Bolle's image segmentation techniques to achieve the recited inventions of claims 1, 10, 12, 13, and 15. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1, 10, 12, 13, and 15 would have been obvious over the combination of Ogasawara and Bolle.

### 5. *Summary*

For the reasons expressed above, and based on the complete record before us, we conclude that Petitioner has not sufficiently evidenced that an ordinarily skilled artisan would have had (1) a rational reason to combine the teachings of Ogasawara and Bolle to achieve the recited inventions of claims 1, 10, 12, 13, and 15; and (2) a reasonable expectation of success in modifying Ogasawara to implement Bolle's image segmentation techniques to achieve the recited inventions of claims 1, 10, 12, 13, and 15. Thus, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1, 10, 12, 13, and 15 would have been obvious over the combination of Ogasawara and Bolle.

## IV. PETITIONER'S MOTION TO EXCLUDE EVIDENCE

Petitioner moves to exclude some or all of paragraphs 22–27, 29–42, 44, 46–49, 51–53, and 55 of the Supplemental Declaration of Chandrajit Bajaj, Ph.D. (Ex. 2007), Patent Owner's expert, as well as the images contained in paragraphs 36–39. Mot. Excl. 1–15.

IPR2021-01304
Patent 8,478,036 B2

### A. Allegation of Testimony being Conclusory

On the basis of statements being conclusory or opinions lacking supporting facts or data, Petitioner seeks to exclude all of paragraphs 25–27, 29, 33–42, and 51–53, and parts of paragraphs 22–24, 30–32, 44, 46–49, and 55 of Dr. Bajaj's Supplemental Declaration. Mot. Excl. 4–5. Petitioner does not specifically address the content of each paragraph, but discusses only what it asserts to be exemplary. *Id.* at 5–10. Specifically, Petitioner provides four examples. *Id.*

As a first example, Petitioner asserts: "Dr. Bajaj testifies in Paragraph 32 of Exhibit 2007 that 'a person of ordinary skill in the art would have known that a wireless videophone available in the late-1990s would have significantly less processing power than any of the hardware discussed in Bolle.' Ex. 2007, ¶ 32. Dr. Bajaj, however, provides no facts or data to support this bald assertion.'" Mot. Excl. 5. We disagree that Dr. Bajaj has to show more. As an expert in the field, Dr. Bajaj can testify as to his opinion regarding the state of the art at a certain time period, without need of specific underlying material. The subject is not one for which Dr. Bajaj needs to run an experiment to observe the results. In the absence of supporting material, the testimony may be challenged as lacking sufficient credibility, but the testimony is not inadmissible. In any event, as discussed above, our decision assumes that Ogasawara's videophone has processing circuitry just as powerful as Bolle's computer. The testimony did not result in any detriment to Petitioner.

As a second example, Petitioner asserts: "Dr. Bajaj testifies in Paragraphs 23, 25, 29–31, 33–34, 51–53, and 55 of Exhibit 2007 that two images are *required* by Bolle for segmentation. Again, this opinion is

IPR2021-01304
Patent 8,478,036 B2

conclusory without any supporting facts or data." Mot. Excl. 5.

We disagree that there is no support for Dr. Bajaj's testimony. Bolle's

disclosure describing the Figure 3*a* and Figure 3*b* embodiments provide

such support. *See* Ex. 1006, Figs. 3*a*, 3*b* (and related disclosure).

> Petitioner further asserts:
>
> Claim 32 of Bolle, for example, discloses segmentation methods contemplated by Bolle that do not require two images. Ex. 1006, 24:15–42. Dr. Bajaj himself acknowledges that Bolle's segmentation methods (that require comparing two images) are merely "preferred" methods (Ex. 1063, 66:15–67:20) and admits that segmentation without comparing two images was known at the time of the invention (*id.*, 68:15–25). Yet, Dr. Bajaj did not consider Claim 32 in his analysis. Ex. 1063, 68:15–25, 98:6–99:14, 100:2–11.

Mot. Excl. 6; *see id.* at 6–7. The arguments are misplaced. That single

image segmentation methods were known at that time is an entirely separate

question from what segmentation methods are disclosed by Bolle. Here,

we are not persuaded that claim 32 discloses a single image segmentation

method. *See supra* Section III.D.3.a.3. Further, that claim 32 of Bolle may

be read to cover segmentation methods not requiring two images does not

necessarily mean Bolle discloses a segmentation method not requiring two

images. Similarly, Bolle characterizing his disclosed embodiments as

preferred does not mean Bolle discloses other segmentation methods.

We find no contradiction. Even if there is any contradiction, that merely

affects credibility of Dr. Bajaj's testimony and is not a basis for excluding

that testimony.

> Petitioner further asserts:
>
> Similarly, Dr. Bajaj's deposition testimony contradicts his unsupported and irrelevant assertions that Ogasawara is only a "bar-code based system." Ex. 2007, ¶¶ 44, 46–48. He testifies

Appx128

IPR2021-01304
Patent 8,478,036 B2

> in his deposition that Ogasawara discloses character and pattern
> recognition software. Ex. 1063, 40:10–23, 42:4–13, 43:14–
> 44:18, 46:3–47:16. He also testifies that a [skilled artisan] would
> have been aware of the character and pattern recognition
> software routines disclosed in Ogasawara. *Id.*, 51:1–23, 61:16–
> 62:4.

Mot. Excl. 7. We disagree that there is no support for Dr. Bajaj's testimony
such that the testimony should be excluded. That there is conflicting
evidence, even overwhelming conflicting evidence, does not mean the
testimony is inadmissible. Further, our determination herein that Petitioner
does not sufficiently evidence a rational reason to combine Ogasawara and
Bolle does not rely, in any part, on Dr. Bajaj's testimony that Ogasawara is a
"bar-code based system."

> As the third example, Petitioner asserts:

>> Dr. Bajaj provides no basis for his opinion that Bolle's
>> system is limited to a stationary system (Ex. 2007, ¶¶ 32–34, 55),
>> which is based on the unsupported conclusion that two images
>> are *required* for Bolle's segmentation (*id.*, ¶¶ 33–34) and the
>> unsupported conclusion that a user could not stabilize
>> Ogasawara's mobile videophone to take two images for Bolle's
>> two-image segmentation methods (*id.*, ¶¶ 23–24, 34, 55).
>> Beyond failing to consider Bolle's other segmentation methods,
>> as discussed above, Dr. Bajaj ignores Bolle's disclosure that, as
>> an alternative to a stationary system, spatial registration "can be
>> ensured by [] acquiring the first and second image in quick
>> succession." Ex. 1006, 10:41–43.

Mot. Excl. 7–8. We disagree that there is no basis for Dr. Bajaj's opinion
that Bolle's system is limited to a stationary system. There is support in
Figures 1 and 4 of Bolle, and also in Bolle's description of spatial
registration for taking a first and a second image (Ex. 1006, 10:31–44).
We also disagree that Dr. Bajaj's conclusion that "a user could not stabilize
Ogasawara's mobile videophone to take two images for Bolle's two-image

61

IPR2021-01304
Patent 8,478,036 B2

segmentation methods" is without evidentiary support. Bolle's description of spatial registration constitutes such support. That Bolle also describes taking pictures in quick succession to address the effects of some movement goes to the weight of the evidence and is not a basis to exclude Dr. Bajaj's testimony.

> As a fourth example, Petitioner asserts:

> Dr. Bajaj provides no basis for his statements that Bolle could only work in a controlled "lab" or "orchestrated production" environment and provides unsupported speculation on various scenes, usage scenarios, situations, environments, and cases. Ex. 2007, ¶¶ 25–27. He does not describe any particular scenes and usage scenarios that are not applicable. He fails to provide any facts or analysis about which heterogeneous retail environments would lead to failure and under what conditions. He also gives no details about the "numerous low-contrast cases" (*id.*, ¶ 26), including no example cases, reasoning, or citation to authoritative sources. He offers no reasoning or evidence to support that any errors made in the boundary separation would necessarily lead to incorrect object features (i.e., examples of the kind of errors and what would lead to the errors). Dr. Bajaj also failed to explain what "relative brightness/darkness" conditions lead to "large classification error and incorrect object-background separation" (*id.*, ¶ 27). He provided no examples or quantification of such error. Again, Dr. Bajaj performed no testing to substantiate any of this speculation. Ex. 1063, 120:22–121:8; 121:23–122:3.

Mot. Excl. 8–9.

Patent Owner argues, with respect to Dr. Bajaj's testimony in paragraphs 25–27 of Exhibit 2007, that Dr. Bajaj "[e]xplain[s] with detailed analysis how the relative contrast for the object with respect to the background could limit deployment of the Bolle's method and therefore it 'could only effectively be deployed . . . only in a controlled "lab" or "orchestrated production" environment.'" Paper 35, 9; *see id.* at 4–9.

Appx130

IPR2021-01304
Patent 8,478,036 B2

We disagree with Petitioner that there is no basis given for Dr. Bajaj's testimony in paragraphs 25–27, for the reasons stated by Patent Owner (Paper 35, 9), and given Dr. Bajaj's discussion of the importance of the relative contrast for an object with respect to its background to Bolle's segmentation techniques. Moreover, Dr. Bajaj's continued testimony in subsequent paragraph 28 (to which Petitioner does not object), concerning the criticality of Bolle's "threshold T for separating the object pixels from the background pixels" (Ex. 2007 ¶ 28 (citing Ex. 1006, 11:15–31)), provides further basis for Dr. Bajaj's testimony in preceding paragraphs 25–27. *See* Ex. 2007 ¶¶ 25–29; Ex. 1006, 10:59–11:31. Petitioner's complaints here that Dr. Bajaj fails to provide examples, testing results, or more support merely affect credibility of Dr. Bajaj's testimony and are not a basis for excluding that testimony. Regardless, our determination herein that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle does not rely, in any part, on Dr. Bajaj's testimony in the subject paragraphs 25–27.

### B.  *Allegation of Irrelevance*

Petitioner asserts that paragraphs 35–42 of Dr. Bajaj's Supplemental Declaration (Ex. 2007) should be excluded because they focus on symbols, e.g., barcodes, "which (i) did not form the bases of the instituted grounds, and (ii) are contrary to the district court's claim constructions adopted by the Board." Mot. Excl. 10. Petitioner explains that opinions regarding Ogasawara's symbols and barcodes "have no bearing on the prior art combinations in this IPR (which are specifically for items without symbols) or the Challenged Claims (which have not been construed to include symbols)." *Id.* at 12. According to Petitioner, an expert's testimony that has

63

IPR2021-01304
Patent 8,478,036 B2

no bearing on the issues in the case and ignores the tribunal's claim construction is irrelevant. *Id.*

The testimony regarding Ogasawara's barcodes may be misplaced but is not irrelevant to Patent Owner's theory of lack of a rational reason to combine references. Patent Owner, in its presentation, is free to emphasize the symbol or bar code aspect of Ogasawara more than it does the non-symbol aspect of Ogasawara. In any event, our determination that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle does not in any way rely on Patent Owner's emphasizing Ogasawara's symbol or barcode disclosures over Ogasawara's disclosure of recognizing visual characteristics of an object. The same is true for our determination that Petitioner does not sufficiently evidence a reasonable expectation of success in implementing a system according to the combined teachings. Petitioner is concerned that we would be confused by the discussion pertaining to Ogasawara's bar codes. We are not.

C.  *The Images*

Petitioner makes numerous contentions regarding the images reflected in paragraphs 36–39 of Exhibit 2007, and referenced in paragraphs 35–42. Mot. Excl. 12–15. Petitioner asserts that the images supposedly are representations of bar codes and data matrices printed on various surfaces. *Id.* at 12. Petitioner asserts that the images are evidence without foundation because "Patent Owner and Dr. Bajaj identified no details regarding the origin of the images or the method and circumstances under which they were produced." *Id.* at 12–13.

Petitioner also asserts that the images "appear to include markings/etchings on the objects and manipulated lighting in the images,"

64

IPR2021-01304
Patent 8,478,036 B2

and that "Dr. Bajaj provides no basis or explanation for the manipulations or annotations." Mot. Excl. 13. For that reason, Petitioner asserts the images are unreliable and should be excluded. *Id.* Petitioner further asserts that the images lack authentication and thus Patent Owner has not demonstrated that they are what they are purported to be. *Id.* at 13–14.

Petitioner further asserts that the images should be excluded because they ("including the original, copy, or any other evidence") "have not been produced to prove the content." Mot. Excl. 15 (citing Fed. R. Evid. 1001–1007). Petitioner asserts that "Patent Owner has provided no explanation as to why it did not submit supporting evidence for these images along with its Patent Owner's Response." *Id.*

All of the above-noted contentions are misplaced. The images themselves constitute the opinion of Dr. Bajaj on what some printed bar codes and data matrices on surfaces may look like under certain conditions. They are not items of evidence, separate from the opinion, submitted to prove anything, and they are not purported by Dr. Bajaj to have a specific source or origin. Even if they are assumed as evidence relied on by Dr. Bajaj, the facts or data relied on by an expert to form an opinion need not be admissible for the opinion to be admitted. Fed. R. Evid. 703.

In any event, our determination that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle and a reasonable expectation of success in doing so does not in any way rely on these images in paragraph 36–39 of Dr. Bajaj's Supplemental Declaration.

### D.   *Allegation of Hearsay*

Petitioner further asserts that paragraphs 35–42 "should be excluded as containing, referencing, and relying upon out-of-court statements, which

IPR2021-01304
Patent 8,478,036 B2

are hearsay under Fed. R. Evid. 801 and 802 and for which PO has shown no exception." Mot. Excl. 15. The assertion is too vague. Petitioner does not specifically identify any such statement and we see none.[14] Further, as discussed above in Section IV.C, the facts or data relied on by an expert to form an opinion need not be admissible for the opinion to be admitted. Fed. R. Evid. 703.

In any event, we have not relied on these images in determining that Petitioner does not sufficiently evidence a rational reason to combine Ogasawara and Bolle and a reasonable expectation of success in doing so.

### E.    Alleged Demonstratives

Petitioner asserts that the images "should be excluded to the extent that they are intended as demonstratives." Mot. Excl. 15. The assertion is without merit, because Dr. Bajaj's Supplemental Declaration (Ex. 2007), including all contents thereof, is not a demonstrative exhibit and has not been submitted by Patent Owner as a demonstrative exhibit. Patent Owner's demonstrative exhibit was submitted as Exhibit 2012. As discussed above in Section IV.C, the images are the opinion of Dr. Bajaj on what some bar codes and data matrices may look like under certain conditions.

### F.    Conclusion

Petitioner's Motion to Exclude Evidence is *denied*.

---

[14] The assertion also conflicts with the contention of Petitioner that "Patent Owner and Dr. Bajaj identified no details regarding the origin of the images or the method and circumstances under which they were produced." Mot. Excl. 12–13.

IPR2021-01304
Patent 8,478,036 B2

## V.   CONCLUSION

As set forth in the following table, Petitioner has not proven, by a preponderance of the evidence, that any of the Challenged Claims are unpatentable:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 10, 12, 13, 15 | 103 | Ogasawara, Bolle | | 1, 10, 12, 13, 15 |

## VI.   ORDER

Upon consideration of the record, it is:

ORDERED that claims 1, 10, 12, 13, and 15 of U.S. Patent No. 8,478,036 B2 have not been shown, by a preponderance of the evidence, to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence (Paper 34) is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

67

Appx135

IPR2021-01304
Patent 8,478,036 B2

FOR PETITIONER:

Dustin J. Edwards
Michael A. Tomasulo
WINSTON & STRAWN LLP
dedwares@winston.com
mtomasulo@winston.com

FOR PATENT OWNER:

James Glass
Todd Briggs
QUINN EMANUEL URQUHART & SULLIVAN, LLP
nantworksvboa@quinnemanuel.com
jimglass@quinnemanuel.com
toddbriggs@quinnemanuel.com

68

Trials@uspto.gov
571-272-7822

Paper 40
January 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BANK OF AMERICA, N.A.,
Petitioner,

v.

NANT HOLDINGS IP, LLC,
Patent Owner.

———————————

IPR2021-01332
Patent 9,324,004 B2

———————————

Before JAMESON LEE, THOMAS L. GIANNETTI, and
STEPHEN E. BELISLE, *Administrative Patent Judges.*

LEE, *Administrative Patent Judge.*

JUDGMENT

Final Written Decision
Determining All Challenged Claims Not Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude Evidence
*37 C.F.R. § 42.64(c)*

## I.  INTRODUCTION

We instituted an *inter partes* review of claims 1–3, 6, and 18 of U.S.

Patent No. 9,324,004 B2 (Ex. 1001, "the '004 patent") owned by Nant

IPR2021-01332
Patent 9,324,004 B2

Holdings IP, LLC ("Patent Owner"). Paper 9 ("Decision to Institute" or
"Inst. Dec.").

We have authority to conduct this *inter partes* review under 35 U.S.C.
§ 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a)
and 37 C.F.R. § 42.73. We determine that Bank of America, N.A.
("Petitioner") has not proved by a preponderance of the evidence that
claims 1–3, 6, and 18 of the '004 patent are unpatentable.

*A.    Background*

Petitioner filed a Petition (Paper 2 ("Pet.")) requesting *inter partes*
review of claims 1–3, 6, and 18 of the '004 patent. Patent Owner filed a
Preliminary Response.[1] Paper 6. Petitioner filed a Preliminary Reply.
Paper 7. Patent Owner filed a Preliminary Sur-Reply. Paper 8. The
Decision to Institute was entered on January 11, 2022. Paper 9. Thereafter,
Patent Owner filed a Patent Owner Response.[2] Paper 18 ("PO Resp.").
Petitioner filed a Reply. Paper 25 ("Reply"). Patent Owner filed a Sur-
Reply. Paper 33 ("Sur-Reply"). Oral hearing was consolidated with the oral
hearing in IPR2021-01081, and was held on October 12, 2022. A copy of
the consolidated hearing transcript has been entered into the record as
Paper 39 ("Tr.").

Petitioner filed a Motion to Exclude Evidence. Paper 34. Patent
Owner filed an Opposition to Petitioner's Motion to Exclude Evidence.
Paper 35. Petitioner filed a Reply and subsequently a Corrected Reply to

---

[1] The Preliminary Response was accompanied by a Declaration of
Chandrajit Bajaj, Ph.D. (Ex. 2001).
[2] The Patent Owner Response was accompanied by a Supplemental
Declaration of Dr. Bajaj (Ex. 2007).

2

IPR2021-01332
Patent 9,324,004 B2

Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence.
Papers 36, 37.

B.    *Real Parties in Interest*

Petitioner identifies Bank of America, N.A., and Bank of America
Corporation as the real parties in interest.  Pet. 63.  Patent Owner identifies
Nant Holdings IP, LLC as the real party in interest.  Paper 4, 2.

C.    *Related Matters*

The parties identify the following proceeding in the Central District of
California involving the '004 patent: *NantWorks LLC and Nant Holdings IP,
LLC v. Bank of America Corporation and Bank of America, N.A.*, No. 2:20-
cv-07872 (C.D. Cal.).  Pet. 63; Paper 4, 2.

The following *inter partes* review proceedings involve patents related
to the '004 patent:  IPR2021-01080 (Patent No. 8,463,030 B2), IPR2021-
01081 (Patent No. 7,881,529 B2), IPR2021-01304 (Patent No. 8,478,036
B2), IPR2022-01333 (Patent No. 7,899,252 B2), IPR2021-01388 (Patent
No. 8,520,897 B2), IPR2021-01389 (Patent No. 9,031,278 B2).

D.    *The '004 Patent*

The '004 patent relates to a method and process for identifying objects
from digitally captured images thereof that uses image characteristics to
identify an object from a plurality of objects in a database.  Ex. 1001, 1:27–
33.  The '004 patent describes traditional methods for linking objects to
digital information that involve applying a barcode, a radio or optical
transceiver or transmitter, or some other means of identification, to the
object, as well as modifying the image or object so as to encode detectable
information.  *Id.* at 3:42–48.  However, according to the '004 patent, there is
a need for detecting, identifying, determining the position and orientation of,

3

IPR2021-01332
Patent 9,324,004 B2

and obtaining other information about an object, without modifying or disfiguring the object, without the need for marks, symbols, codes, barcodes, or characters on the object, and without the need to touch or disturb the object. *Id.* at 1:46–57. The '004 patent states that it responds to this need by describing a system and process for identifying digitally captured images without requiring modification to the object. *Id.* at 4:33–35.

Figures 1 and 2 of the '004 patent, reproduced below, collectively illustrate an embodiment of the patent. The following description will refer to both figures:



4

IPR2021-01332
Patent 9,324,004 B2



*FIG. 2*

Figure 1 of the '004 patent is a schematic block diagram presenting a top-level algorithm flowchart. Ex. 1001, 4:50–51. Figure 1 shows the overall processing flow and steps in the algorithm. *Id.* at 5:33–35. Figure 2 of the '004 patent is an idealized view of image capture. *Id.* at 4:52.

As described in the '004 patent, user 12 uses a computer, mobile telephone, personal digital assistant, or other similar device 14 equipped with an image sensor (such as a CCD or CMOS digital camera). *Id.* at 5:36–39. User 12 aligns the sensor of image capture device 14 with object 16 of interest. *Id.* at 5:39–40. The linking process is then initiated, and device 14 captures digital image 18 of the scene at which it is pointed. *Id.* at 5:41–46. Image 18 is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. *Id.* at 5:46–49. Image 18 is subsequently transferred to image processor/server 20. *Id.* at 5:54–57.

Image type determination 26 is accomplished with a discriminator algorithm which operates on input image 18 and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters. *Id.* at 5:63–67. If such symbols are found,

5

image 18 is sent to decode symbol process 28. *Id.* at 5:53–54. In decode symbol process 28, image 18 is analyzed to determine the location, size, and nature of the symbols. *Id.* at 6:13–14. The symbols are analyzed according to their type, and their content information is extracted. *Id.* at 6:14–16.

Image 18 may also or alternatively contain an object of interest, and may therefore also or alternatively be sent to the object image branch of the process flow. *Id.* at 6:3–5. In input image decomposition process 34, a "decomposition" of a high-resolution input image into several different types of quantifiable salient parameters is performed. *Id.* at 6:17–20. According to the '004 patent, this allows for multiple independent convergent search processes of the database to occur in parallel in the database matching 36, which greatly improves image match speed and match robustness. *Id.* at 6:20–23.

Figure 4 provides an alternative explanation of the process of the '004 patent and is reproduced below:



IPR2021-01332
Patent 9,324,004 B2

Ex. 1001, 4:55–56. Terminal 102 is a computing device that has an "image" capturing device such as digital camera 103 or a video camera. *Id.* at 13:23–26. Image processing software 104 converts the digital imagery into image data 105 for transmission to and analysis by identification server 106. *Id.* at 13:33–35. An example of image data 105 is MPEG video stream created from the raw imagery from camera 103. *Id.* at 13:43–50. Identification server 106 receives image data 105 and passes it to object recognition unit 107. *Id.* at 14:2–4. The '004 patent describes:

> The object recognition [unit] 107 also detects and recognizes images of the target object 100 or portions thereof. This is accomplished by analyzing the image data 105 and comparing the results to other data, representing images of a plurality of known objects, stored in the database 108, and recognizing the target object 100 if a representation of target object 100 is stored in the database 108.

*Id.* at 14:54–60.

In addition to containing image information, database 108 also contains address information, such as Internet URL, which corresponds to target object 100. *Id.* at 20:30–35. Identification server 106 sends the stored information corresponding to the target object terminal 102, and that information can include the Internet URL. *Id.* at 20:35–41. After receiving target object information 109, terminal 102 performs an action or actions based on the target object information, and that action can be accessing a web site. *Id.* at 20:61–65. Browser 110 can be a web browser which connects to content server 111 located at the information address, which is typically an Internet URL, included in the target object information 109. *Id.* at 21:39–42. Content server then sends content information to terminal 102 and browser 110. *Id.* at 21:56–57.

7

IPR2021-01332
Patent 9,324,004 B2

"This content information usually is pertinent to the target object 100 and can be text, audio, video, graphics, or information in any form that is usable by the browser 110 and terminal 102." *Id.* at 21:56–60. The '004 patent describes:

> The user can perform ongoing interactions with the content server 111. For example, depending on the embodiment of the invention and the applications, the user can:
>
>> Listen to streaming audio samples if the target object 100 is an audio recording (e.g., compact audio disc).
>>
>> Purchase the target object 100 via on-line transaction, with the purchase amount billed to an account linked to the terminal 102, to the individual user, to a bank account, or to a credit card.

*Id.* at 22:1–9.

Claim 1 is independent and illustrative. Claims 2, 3, 6, and 18 each depend, directly or indirectly, from claim 1. Claim 1 recites:

> 1.  A method for processing a video stream, comprising:
>
> analyzing, via a mobile device, a scene represented by the video stream for at least one object;
>
> deriving at least one characteristic of the video stream;
>
> recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream;
>
> providing an indication upon recognizing the at least one object as the target object; and
>
> presenting to the user, via an address, content information associated with the target object.

Ex. 1001, 24:23–33.

IPR2021-01332
Patent 9,324,004 B2

E.    *References and Other Evidence*[3]

    The Petition relies on the following references:

    U.S. Patent No. 6,512,919 B2 (Ex. 1005, "Ogasawara").[4]

    U.S. Patent No. 5,546,475 (Ex. 1006, "Bolle").[5]

    U.S. Patent 6,947,571 B1 (Ex. 1022, "Rhoads").[6]

    Petitioner relies on a first Declaration of Jeffrey J. Rodriguez, Ph.D. (Ex. 1003) and a second Declaration of Dr. Rodriguez (Ex. 1050).  Patent Owner relies on a Declaration of Dr. Bajaj (Ex. 2001) and a Supplemental Declaration of Dr. Bajaj (Ex. 2007).

F.    *Asserted Grounds of Unpatentability*

    Petitioner asserts that the challenged claims are unpatentable on the following grounds:[7]

---

[3] The '004 patent issued from Application 14/100,431, filed Dec. 9, 2013, which claims priority to a series of non-provisional applications the earliest of which was filed on Nov. 5, 2001, and to Provisional Application 60/246,295, filed Nov. 6, 2000.  Ex. 1001, codes (21, 22, 45, 60).  Petitioner assumes November 6, 2000 is the priority date of the '004 patent.  Pet. 12.

[4] Issued Jan. 28, 2003, from Application 09/281,557, filed March 30, 1999.  Ex. 1005, codes (21, 22, 45).

[5] Issued Aug. 13, 1996.

[6] Issued Sept. 20, 2005, from Application 09/571,422, filed May 15, 2000.  Ex. 1022, codes (21, 22, 45).

[7] Patent Owner asserts that the Petition "half-heartedly argues that Ogasawara alone renders the claims unpatentable."  Counsel for Petitioner at oral hearing clarified that Petitioner does not assert that any claim would have been obvious over Ogasawara alone.  PO Resp. 24; Tr. 65:24–66:17.  In other words, according to Petitioner, the combined teachings of Ogasawara and Bolle are necessary to render obvious any challenged claim.

9

IPR2021-01332
Patent 9,324,004 B2

| Claims Challenged | 35 U.S.C. §[8] | Reference(s) |
|---|---|---|
| 1–3, 6, 18 | 103(a) | Ogasawara, Bolle |
| 1–3, 6, 18 | 103(a) | Ogasawara, Bolle, Rhoads |

Pet. 29, 48.

## II.    ANALYSIS

### A.    The Burden  of Proof on Challenged Patent Claims

Petitioner must demonstrate that the challenged patent claims are unpatentable.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  That burden never shifts to the patentee.  *Id.*

In our Institution Decision, we preliminarily found "Petitioner's cited evidence provides sufficient rational reasons for purposes of institution to combine Ogasawara and Bolle."  Inst. Dec. 39.  However, on further review of the Petition and further consideration of the parties' briefing on this issue and the relevant case law, and based on the complete record before us, we now conclude otherwise.  *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1340 (Fed. Cir. 2020) ("There is nothing inherently inconsistent about the Board instituting IPR on obviousness grounds and then ultimately finding that the petitioner did not provide preponderant evidence that the challenged claim was obvious."); *In re Magnum Oil Tools*, 829 F.3d at 1376 ("[T]he decision to institute and the final written decision are 'two very different analyses,' and each applies a 'qualitatively different standard.'" (quoting *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016))).

---

[8] Because the application from which the '004 patent issued was filed before March 16, 2013, the pre-AIA ("America Invents Act") versions of §§ 102 and 103 applies.  Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011).

10

IPR2021-01332
Patent 9,324,004 B2

In particular, we determine that Petitioner has not proven, by a preponderance of the evidence, that the ordinarily skilled artisan would have had a *rational* reason to combine the relevant teachings of Ogasawara and Bolle to render obvious the invention of independent claim 1. This issue is substantially disputed between the parties (*see* Pet. 22–28; PO Resp. 42–53; Pet. Reply 14–24; PO Sur-Reply 10–25), with Petitioner also seeking to exclude nearly all of the testimony of Patent Owner's expert, Dr. Bajaj, on this issue (Paper 34), and with Patent Owner arguing that Petitioner's Reply "improperly raises new theories for the first time" on this issue (PO Sur-Reply 4). Nonetheless, the burden of proving a rational reason (or motivation) to combine such teachings *is on Petitioner* and never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378; *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348–49 (Fed. Cir. 2021) ("[I]t was, at all times, [petitioner's] burden to show that the claims would have been obvious.").

B.     *Level of Ordinary Skill in the Art*

Petitioner contends that "[a]s of November 2000, a POSITA [person of ordinary skill in the art] . . . would have had a range of knowledge roughly equivalent to the knowledge and/or training of a person holding the degree of Bachelor of Science in Electrical Engineering, Computer Science, Computer Engineering, or equivalent, and one to two years of experience working with image processing, image recognition, or a related field." Pet. 21 (citing Ex. 1003 ¶ 53).

In the Decision to Institute, we determined that Petitioner's articulation is consistent with the prior art and patent specification and is supported by credible expert testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level

11

IPR2021-01332
Patent 9,324,004 B2

of skill).  Inst. Dec. 10–11.  Patent Owner, in its Response, states that it "does not contend that an alternative level of ordinary skill in the art should be applied."  PO Resp. 18.  Thus, we maintain our adoption of Petitioner's articulation of the level of ordinary skill in the art.

C.    *Claim Construction*

1.    *General Principles*

We use the same claim construction standard that would be used to construe a claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b) (2020).  The claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) is applicable.

Claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record.  *Phillips*, 415 F.3d at 1312–17.  Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term.  *Id.* at 1315.  The following guidance from *Phillips* is instructive:

> It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova*, 381 F.3d at 1115; *see also Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.").  That principle has been recognized

12

IPR2021-01332
Patent 9,324,004 B2

> since at least 1936, when Congress first required that the
> specification include a potion in which the inventor "shall
> particularly specify and point out the part, improvement, or
> combination, which he claims as his own invention or
> discovery." Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117, 119.
> In the following years, the Supreme Court made clear that the
> claims are "of primary importance, in the effort to ascertain
> precisely what it is that is patented." *Merrill v. Yeomans*, 94 U.S.
> 568, 570, 24 L.Ed. 235 (1876). Because the patentee is required
> to "define precisely what his invention is," the Court explained,
> it is "unjust to the public, as well as an evasion of the law, to
> construe it in a manner different from the plain import of its
> terms." *White v. Dunbar*, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed.
> 303 (1886); *see also Cont'l Paper Bag Co. v. E. Paper Bag Co.*,
> 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908) ("the
> claims measure the invention"); *McCarty v. Lehigh Valley R.R.
> Co.*, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895) ("if
> we once begin to include elements not mentioned in the claim, in
> order to limit such claim . . ., we should never know where to
> stop"); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365
> U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) ("the claims
> made in the patent are the sole measure of the grant").

*Phillips*, 415 F.3d at 1312.

In patent law, "the name of the game is the claim." *In re Hiniker Co.*,

150 F.3d 1362, 1369 (Fed. Cir. 1998). As the Federal Circuit further

explained:

> Though understanding the claim language may be aided by the
> explanations contained in the written description, it is important
> not to import into a claim limitations that are not a part of the
> claim. For example, a particular embodiment appearing in the
> written description may not be read into a claim when the claim
> language is broader than the embodiment.

13

IPR2021-01332
Patent 9,324,004 B2

*Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). *See also Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.").

It is improper to add to a claim an "extraneous" limitation appearing in the specification, and "extraneous" means a limitation read into a claim from the specification wholly apart from any need to do so. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)); *see also Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993).

The specification may reveal a special definition given to a claim term by the patentee, or the specification or prosecution history may reveal an intentional disclaimer or disavowal of claim scope by the inventor. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). The disavowal, if any, can be effectuated by language in the specification or the prosecution history. *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

It is inappropriate to construe claim terms as limited to preferred embodiments without a clear intent to redefine the term or a clear disavowal of claim scope. *See, e.g., Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In order for prosecution disclaimer to attach, the disavowal must be both "clear and unmistakable." *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013); *Lazare Kaplan Intern., Inc. v. Photoscribe Technologies, Inc.*, 628 F.3d

14

IPR2021-01332
Patent 9,324,004 B2

1359, 1370 (Fed. Cir. 2010); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003).

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011).

    2.    *"the recognize limitation"*

Petitioner asserts that the parties "have offered competing constructions for one term of the '004 patent before the district court." Pet. 28. The term is the limitation "recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream." *Id.* at 33. Hereinafter, this limitation is referred to as "the recognize limitation."

Petitioner proposes that the recognize limitation means "identifying the at least one object in the scene as a target object at least in part by matching the at least one characteristic to characteristics of objects stored in a database." *Id.* at 33–34. Petitioner asserts that in the district court "[t]he Patent Owner proposed 'no construction necessary-plain and ordinary meaning.'" *Id.* at 34. Petitioner also notes that Patent Owner's plain and ordinary meaning before the district court includes an attempt "to read this limitation for purposes of infringement in the district court to mean recognizing an object (e.g., a check) in the video stream based at least in part on the at least one characteristic of the video stream (e.g., an indication of how steady the depicted image of the check is and/or an alignment of the check within the video stream). Ex. 1010, 19–23 of 41." *Id.* In this

15

IPR2021-01332
Patent 9,324,004 B2

proceeding, however, Patent Owner has not made the argument that a steady image and/or alignment of the image within the video stream is required.

After filing of the Petition and prior to filing of the Preliminary Response, the district court in the parallel litigation in the Central District of California (*see supra*) entered a *Markman* order construing the recognize limitation, among others. *See* Ex. 2006, 15–16, 18–19.[9] For that limitation, as here, in district court Patent Owner proposed the construction of "plain and ordinary meaning." *Id.* at 15.

The district court construed the recognize limitation to mean "recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream by comparing the at least one characteristic with characteristics of objects stored in a database to find a match." *Id.* at 19. In adopting this construction, the district court remarked: "The Court agrees with Defendants that the 'recognizing' step requires querying a database." *Id.* The district court rejected parts of Petitioner's proposed construction there, finding no reason to change "recognizing" to "identifying," and also finding no reason to change "based at least in part on the at least one characteristic" to "matching the at least one characteristic." Ex. 2006, 17–19. With regard to the requirement of "finding a match," the district court explained: "The intrinsic evidence consistently emphasizes that the system compares parameters in order to match a target object with an object in a database in order to 'recognize' the target." *Id.* at 18; *see also id.* at 18–19. The district court also did not adopt Patent Owner's plain and ordinary meaning.

_____

[9] Unless otherwise specified, citations to exhibits use the page numbers assigned by the parties, not the original page numbers.

IPR2021-01332
Patent 9,324,004 B2

In its Preliminary Response, Patent Owner does not articulate its proposed construction for the recognize limitation in this proceeding. Patent Owner states: (1) "the Board should reject Petitioner's proposed construction"; and (2) "Patent Owner does not object to the Board adopting the District Court's construction of the 'recognize' limitation." Prelim. Resp. 34–35.

In the Decision to Institute, we determined that for reasons given by the district court the recognize limitation should be given the same construction as determined by the district court. We adopted the district court's construction for that term. Inst. Dec. 14; Ex. 2006, 19. Specifically, we construed the recognize limitation to mean "recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream by comparing the at least one characteristic with characteristics of objects stored in a database to find a match." Inst. Dec. 14.

Post institution of review, Patent Owner has not objected to the construction we adopted. Patent Owner states: "Patent Owner and its expert apply [the Board's construction] in their analysis in the remainder of this IPR, but do not necessarily agree it is correct." PO Resp. 19. Petitioner also has not objected to the construction we adopted.

We maintain the construction we adopted in the Decision to Institute. Inst. Dec. 14.

3.    *"a scene"*

The term "a scene" appears in independent claim 1. Patent Owner asserts:

> Claim 1 of the '004 patent specifies "analyzing, via a mobile device, **a scene** represented by the video stream for at

17

IPR2021-01332
Patent 9,324,004 B2

least one object." Ex. 1001 ('004 patent) at cl. 1 (emphasis added). A subsequent claim limitation refers to "**the scene**," the antecedent basis of which is "**a scene**" represented by the video stream. *Id.* ("recognizing the at least one object in **the scene**") (emphasis added).

"The scene" should be construed to refer to a single scene. Because "the" is a singular modifier, its usage to qualify "the scene" therefore limits that scene to being a single scene. Ex. 2007 (Supplemental Declaration of Chandrajit Bajaj, Ph. D.) ("Bajaj") ¶¶ 17–18 [other citations omitted].

PO Resp. 20.

Petitioner has not proposed a construction for "a scene" or "the scene." Petitioner states:

Ogasawara combined with Bolle teaches "analyzing . . . a scene represented by the video stream for at least one object" and "recognizing the at least one object in the scene as a target object," (Ex. 1001, 24:24–29), both under the terms' plain-and-ordinary meaning and under PO's proposed construction that the claimed "scene" refers to the "same, single scene." POR, 20–23.

Reply 3. Petitioner does not set forth specifically what it contends is the plain and ordinary meaning of "a scene" or "the scene." Petitioner does, however, explain why it believes the prior art still satisfies Patent Owner's proposed construction for "a scene" and "the scene." According to Petitioner, analyzing one scene, a single scene, does not preclude involvement in the analysis of information from a second scene. Paper 25, 4–6. Thus, in Petitioner's view, "a scene" and "the scene" are met even under Patent Owner's proposed construction.

In its Sur-Reply, Patent Owner clarifies that, under Patent Owner's proposed construction, "the analyzing and recognizing steps must occur on a *single* scene (i.e. image); the claims exclude processing that occurs across

18

IPR2021-01332
Patent 9,324,004 B2

multiple images." Paper 33, 25. This dispute between the parties requires resolution. For reasons discussed below, we disagree with Patent Owner.

Patent Owner is correct that the antecedent basis in claim 1 for "the scene" is the earlier recited "a scene." Patent Owner is incorrect, however, in characterizing "the" as a singular modifier. The definite article "the" can be used to modify something plural, e.g., "the scenes." Although in claim 1, "the" is used to modify a "scene," that does not help the Patent Owner, because nothing in the claim excludes the involvement of additional scenes while one "scene" is analyzed. Patent Owner points to nothing in claim 1 which restricts the analyzing to "only" one scene or "no more" than one scene, and we see none.

Further, claim 1 uses the non-limiting phrase "comprising," which creates a presumption that the claim is not limited to only those elements expressly recited in the claim. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). We recognize that the only embodiment described in the specification of the '004 patent analyzes only a single scene, but we are not required to construe the claim as limited to just that embodiment. *Innova/Pre Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1121–22 (Fed. Cir. 2004). Such a construction is neither encouraged nor presumed. *Id.* Additionally, Patent Owner points to no expressions of disavowal either in the prosecution history or in the specification of the '004 patent with regard to "a scene" in which the patent applicant disavows, with clarity, claim scope covering analysis of more than one scene.

For the foregoing reasons, we disagree with Patent Owner, and we determine that analyzing "a scene" as recited in claim 1 does not preclude involvement of additional scene or scenes in the analysis.

19

IPR2021-01332
Patent 9,324,004 B2

D.    *Alleged Obviousness of Claims 1–3, 6, and 18*
*over Ogasawara and Bolle*

1.    *Principles of Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention, as a whole, would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which said claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.[10] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). There must be some articulated reasoning with rational underpinning to support the legal conclusion of obviousness. *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

2.    *Overview of Ogasawara*

Ogasawara describes an electronic shopping system that facilitates purchase transactions via a wireless phone. Ex. 1005, code (57). An integral digital camera is attached to the wireless telephone to facilitate the selection of items to be purchased and is controlled to function as a bar code or product icon image capture device. *Id.* Character or pattern recognition software translates the bar or product icon image into an appropriate item identifier. *Id.* Figure 1, reproduced below, illustrates a schematic overview of the electronic shopping system. *Id.* at 4:9–10.

---

[10] Patent Owner has not presented objective evidence of nonobviousness in this proceeding.

20

## FIG. 1



Figure 1 of Ogasawara shows an electronic system comprising store server 10 in communication with a commercial telephone network 14. *Id.* at 4:66–5:2. Commercial telephone network 14 facilitates a connection of store server 10 to wireless telephone 18. *Id.* at 5:10–11. Optionally, external bar code scanner 20 communicates with the wireless telephone 18 via wire connection 19. *Id.* at 5:31–32. Alternatively, a built-in bar code scanner 25 and/or a built-in IC card reader/writer 27 are formed integrally with the wireless telephone 18. *Id.* at 5:36–38. In a store, a bar code on a purchased item 33 is scanned by bar code scanner 20 attached to a wireless telephone 18. *Id.* at 5:38–40. Catalog 21 of the items which can be

21

IPR2021-01332
Patent 9,324,004 B2

purchased contains a bar code 22 for each such item, and preferably also contains descriptive text 13 and a picture 15 of each item. *Id.* at 5:40–43.

Figure 10 of Ogasawara, reproduced below, is a block diagram depicting an electronic shopping system having a wireless videophone. *Id.* at 4:34–36.

*FIG. 10*



Figure 10 illustrates wireless videophone 218 used in combination with store or remote server 210. *Id.* at 15:55–56. Wireless videophone 218 includes, miniature digital image capture device 236, such as a CCD camera system. *Id.* at 15:63–16:1. Digital camera 236 includes processing circuitry that translates the visual image acquired by the camera's lens into digital signals suitable for processing by microprocessor 238 into a form that can be broadcast transmitted by functional electronic section 240. *Id.* at 16:7–12.

As described by Ogasawara with respect to the Figure 10 embodiment, digital camera 236 provided to the wireless videophone 218 in place of a bar code scanner, and additional character recognition and/or pattern recognition software and bar code decode software in the tailored

22

IPR2021-01332
Patent 9,324,004 B2

purchase transaction program, allow the wireless videophone to function in a manner similar to the wireless telephone and bar code scanner embodiment illustrated in Figure 1. Ex. 1005, 18:14–21.

Ogasawara also discloses that advanced pattern recognition software is able to enhance the performance of the wireless videophone by offering the capability to capture merchandise information from items that are not identified by either a bar code or an alpha-numeric label. *Id.* at 23:11–15. According to Ogasawara, advanced pattern recognition software allows a consumer to capture a videographic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software. *Id.* at 23:16–19. "This capability is useful for any merchandise item having a distinct or identifiable shape or other visually identifiable characteristic. Such pattern recognition is accomplished within the wireless videophone, by specialized downloaded software." *Id.* at 23:19–23. Ogasawara, however, does not provide a specific and detailed description of the "advanced pattern recognition software" with respect to how it works to recognize an item such as an apple without a bar code or an alpha-numeric label.

3.    *Overview of Bolle*

Bolle describes a system and apparatus that uses image processing to recognize objects within a scene. Ex. 1006, code (57). An image processing system takes a digitized image of a scene. *Id.* Using an algorithm, an object image is segmented from a background image. *Id.* The object image is then processed and compared to stored reference images. *Id.* The object is recognized when a match occurs. *Id.* Bolle discloses two embodiment, one shown in Figure 1 and another shown in Figure 4. *Id.* at 6:23–24, 6:29–31.

Figure 4 is reproduced below:

23

## FIG. 4



400

Figure 4 is a block diagram of system 400 for imaging scenes, segmenting object images 130 from their background image 311 of a physical background 312, and recognizing object(s) 131. *Id.* at 9:21–25. When using system 400, one places object 132 on support 405 above light 110 and camera 120 to provide images taken from below. *Id.* at 9:29–33. System 400 comprises opening 403 to allow object 131 to be imaged by camera 120 and illuminated by light 110. *Id.* at 9:39–43. The system further includes a segmenting algorithm for segmenting an image of object 131 from an image of the scene. *Id.* at 10:17–19. After the image is segmented, computer 140

24

IPR2021-01332
Patent 9,324,004 B2

performs a computation to determine features of the target object. *Id.* at 12:58–62. Further, computer 140, via algorithm 200, compares normalized characteristics of the target object 131 to one or more normalized referenced object characteristics. *Id.* at 13:61–63.

Bolle further describes comparison/matching of the target characterization to the reference characterizations that is performed according to one or more matching algorithms, such as a nearest neighbor classification. *Id.* at 15:50–67.

Figure 1 of Bolle is reproduced below:



Figure 1 shows an alternative embodiment of Bolle's system. *Id.* at 6:23–24, 6:29–31. In the Figure 1 embodiment, objects are placed below camera 120 and light source 110, and images are taken from above. *Id.* at Fig. 1.

25

IPR2021-01332
Patent 9,324,004 B2

    *4.    Independent Claim 1*

Petitioner provides an element-by-element analysis of claim 1 in relation to Ogasawara and Bolle.  Pet. 29–44.  The analysis in the Petition relies on the testimony of Dr. Rodriguez (Ex. 1003 ¶¶ 116–139).

Claim 1 recites, *inter alia*, the following limitations:

> *"analyzing, via a mobile device, a scene represented by the video stream for at least one object"*

> *"deriving at least one characteristic of the video stream"*

> *"recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream" [previously defined as "the recognize limitation"]*

Ex. 1001, 24:24–29.

Petitioner contends the combined teachings of Ogasawara and Bolle satisfy each of the above-identified limitations of claim 1, i.e., the analyzing step, the deriving step, and the recognizing step.  Pet. 31–33, 39–40.  For the analyzing step, Petitioner explains:

> Ogasawara explains that a shopper in a grocery store can use wireless videophone 218 "to capture a videographic image of an apple, . . . and to have the apple be recognized as such by advanced pattern recognition software" using an object's "distinct or identifiable shape or other visually identifiable characteristic."  Ex. 1005, 23:16–20.  A POSITA would have known that object recognition based on shape, for example, involves analyzing the shape of the object in the scene (processing, e.g., using techniques such as edge detection, boundary analysis, eccentricity analysis, etc.).  Ex. 1003, ¶¶ 57, 119; *see also* Ex. 1005, 126:1–4, 22:41–51, 20:62–67.  The purchase transaction program running on the wireless videophone 218 analyzes the video stream and performs this pattern recognition.  *Id.*, 19:46–51 ("videographic image data is received by the system's digital camera 236 and provided to the system's microprocessor 238 where the received videographic information is processed by . . . loaded program 306"), [*Id.* at] 20:30–45.

26

Pet. 31–32 (footnote omitted). Petitioner further asserts that "[a] POSITA would also know that the combined system of Ogasawara and Bolle, as discussed above in §III.E, would analyze the shape of the object in the scene *using segmentation*." *Id.* at 31 n.2 (emphasis added). Thus, for the analyzing step, Petitioner proposes to use and relies on using Bolle's segmentation method as Ogasawara's advanced pattern recognition software, to identify an object and separate it from the background scene by segmentation.

For the deriving step, Petitioner states that "Ogasawara in combination with Bolle expressly discloses deriving at least one characteristic of the video stream." Pet. 33. Petitioner explains:

> Bolle analyzes a video input image to "separate the target object 131 from the background so that the system 100 can compute characteristics of separated object 131 image pixels independently of the background of the scene." Ex. 1006, 7:18–26, 8:12–20, 10:47. More specifically, Bolle analyzes the segmented image "to determine features of the target object," which include, for example, "color, shape, texture, density." *Id.*, 12:60–13:4. As explained above (§III.E), a POSITA would have been motivated to combine Ogasawara and Bolle.

*Id.* Thus, for the deriving step, Petitioner similarly proposes to and relies on using Bolle's segmentation method as Ogasawara's advanced pattern recognition software to identify an object and separate it from the background scene by segmentation.

For the recognizing step, or the recognize limitation, Petitioner explains:

> Ogasawara in combination with Bolle expressly discloses this limitation under Petitioner's construction. Ex. 1003, ¶ 127. For example, Bolle discloses identifying the at least one object (e.g., the apple) in the scene as a target object at least in part by matching the at least one derived characteristic (e.g., color,

27

IPR2021-01332
Patent 9,324,004 B2

> shape, texture, or density) to characteristics of objects stored in a
> database (e.g., memory storage/database 270). *Id.* As explained
> above (§III.C,3), the derived characteristic is "compared to
> stored reference images" and "[t]he object is recognized when a
> match occurs." Ex. 1006, 6:3–6. Specifically, the count-
> normalized characterization of the target object is compared with
> the count-normalized characterizations of reference objects,
> which are stored in memory storage 270" to determine a match.
> *Id.*, 8:12–38, 14:1–2, 13:55 (referring to the memory storage 270
> as a "database 270"). As explained above (§III.E), a POSITA
> would have been motivated to combine Ogasawara and Bolle.

Pet. 40. Thus, for the recognizing step, Petitioner similarly proposes to and

relies on using Bolle's segmentation method as Ogasawara's advanced

pattern recognition software to identify an object and separate it from the

background scene by segmentation.

Patent Owner makes two primary arguments: (1) Petitioner has not

articulated a sufficient motivation to combine teachings of Ogasawara and

Bolle, and (2) Petitioner has not shown a reasonable expectation of success

in combining the teachings of Ogasawara and Bolle. PO Resp. 42–55. We

address those two issues in Sections II.D.5 and II.D.6 below.

Here, in the remainder of Section II.D.4, we address several other

arguments of Patent Owner and a belated argument of Petitioner first set

forth in its Reply.

Petitioner argues in its Reply that Bolle discloses segmenting an

object in a scene without comparing corresponding pixels of the object in

two scenes. Reply 8–9. Specifically, Petitioner asserts:

> Figure 14 [of Bolle] (below) discloses segmenting a "first object
> region" (e.g., leaves 1410) from a "second object region" (e.g.,
> grapes 1420).

28

Appx164

IPR2021-01332
Patent 9,324,004 B2



[the graphic illustration is a partial reproduction of Bolle's
Figure 14 which illustrates an already segmented objected
having two distinct regions that can be further segmented
relative to each other. Ex. 1006, 6:54–57]

Ex. 1006, 19:16–27 ("The object image 130 [sic 1430] is
segmented along its first object region 1410 and its second 1420
object region . . . by using a segmentation algorithm. A preferred
algorithm is the use of an area normalized Hue histogram for
detecting if there are two or more distinct peaks."). *This
algorithm would separate a scene into separate object and
background images just as it separates object regions.* Ex. 1050,
¶¶ 38–46.

*Id.* at 9 (emphasis added). In that connection, Petitioner asserts that Bolle's

claim 32 recites "segmenting [a] target object image from the background

image of the scene" without requiring comparing two images. *Id.* at 9–10.

According to Petitioner, claim 32 of Bolle confirms that Bolle's

segmentation embodiments are not limited to comparing two scenes. *Id.*

at 9.

Petitioner's reliance on Bolle's claim 32 is misplaced. That the scope

of claim 32 is broad and covers segmentation of an object from the

29

IPR2021-01332
Patent 9,324,004 B2

background by analyzing only one scene is not disclosure of any algorithm
to segment an object from the background by analyzing only one scene.

A petition must identify "with particularity" "the evidence that
supports the grounds for the challenge to each claim." 35 U.S.C.
§ 312(a)(3). With regard to Bolle's Figure 14, Petitioner did not, in the
Petition, identify or refer to Figure 14 as an algorithm to segment an object
from the background in a scene. Petitioner also identified no disclosure in
Bolle which describes the algorithm associated with Figure 14 as
segmenting an object from the background in a scene. It is belated for
Petitioner to raise this new contention, for the first time in its Reply, that
Bolle discloses a Figure 14 embodiment which segments an object from the
background in a scene. The argument is not entitled to consideration. If
Petitioner wanted to make that argument, Petitioner should have presented
the argument in the Petition to provide Patent Owner reasonable notice of
the argument. *See* 37 C.F.R. §42.104(b)(4) ("The petition must specify
where each element of the claim is found in the prior art patents or printed
publications relied upon."); 37 C.F.R. § 42.23(b) ("A reply may only
respond to arguments raised in the corresponding opposition, patent owner
preliminary response, or patent owner response."); *Henny Penny Corp. v.
Frymaster LLC*, 938 F.3d 1324, 1330–31 (Fed. Cir. 2019); *Intelligent Bio-
Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir.
2016).

In any event, even if we do consider the belated argument, we agree
with Patent Owner (Sur-Reply 20) that Bolle's Figure 14 does not show
segmenting an object from the background in a scene but only further
segmenting an object already previously segmented from the background in
a scene into two sub-portions. Bolle clearly states: "segmented object

30

Appx166

IPR2021-01332
Patent 9,324,004 B2

image 130 has two distinct regions, i.e., the leaves 1410 and the grapes
1420." Ex. 1006, 19:18–20. Bolle also states: "object image 130 is
segmented 220 from the background 311." *Id.* at 17:1–2. Petitioner's
expert, Dr. Rodriguez, acknowledges that object image 130 is already
segmented from the background. Ex. 1050 ¶ 39 ("Figure 14 shows an image
1405 where segmented object image 130 has two distinct regions, i.e., the
leaves 1410 and the grapes 1420."); *id.* ¶ 41 ("The grapes and the leaves are
part of a 'segmented object image 130' that was previously (prior to Figure
14) segmented from the original background." (citing Ex. 1006, 19:18–20)).

We recognize that Dr. Rodriguez also testifies that "This type of
segmentation algorithm [separating the leaves and the grapes] would
separate a scene into separate object and background images just as it
separates object regions." *Id.* ¶ 40. In its Reply, Petitioner asserts the same.
Reply 9. To the extent Petitioner is asserting that it would have been
obvious to one with ordinary skill in the art to adapt Bolle's algorithm of
Figure 14 for use in segmenting an object form the background image in a
scene, that is a new argument first presented in the Reply and is not entitled
to consideration.

Patent Owner asserts that Petitioner's stated combination of
Ogasawara and Bolle does not meet the requirements of "analyzing, via a
mobile device, a scene represented by the video stream for at least one
object" because the image segmentation methods of Bolle requires the
imaging of two scenes and subsequent comparison of the two scenes to
achieve segmentation of an object from the background. PO Resp. 55–56.

Patent Owner asserts: "Bolle's system always requires taking two still
photographs of a target object, under very specific conditions. In Bolle's
system, the target object must be segmented (i.e., isolated) from the

31

IPR2021-01332
Patent 9,324,004 B2

background before it can be recognized. *Id.* at 2:3–7 . . . ." PO Resp. 34. Patent Owner further asserts that there are only two disclosed ways for the segmentation process in Bolle's system to be performed, and that each way requires two different still photographs of a candidate object to be taken and therefore an analysis of two scenes. *Id.* at 36.

For the first way, illustrated in Figure 3a of Bolle (hereinafter "Figure 3a embodiment"), Patent Owner explains:

> The first disclosed segmentation method in Bolle is for a first still photograph to be taken of the background without the candidate object present, and then a second still photograph taken of the full scene (*i.e.*, the background plus the candidate object). The difference between the two still images allows the target object to be isolated. Ex. 1006 (Bolle) at 8:53–66 ("Fig. 3a shows two scenes. The first images scene 31, showing an image of a background 311 without any other objects present in the field of view of camera 120. The second imaged scene 320 includes both an image of the scene background 311 and an image 130 of one or more objects 131 . . . . A comparison of the scenes 310 and 320, preferably on a pixel by pixel basis, allows the object image 130 to be segmented (separated out) from the background image 311 of the scene.").

*Id.* at 37.

For the second way, illustrated in Figure 3b of Bolle (hereinafter "Figure 3b embodiment"), Patent Owner explains:

> The second disclosed segmentation method in Bolle is for a first still photograph to be taken under normal illumination conditions, and then for a second still photograph to be taken with an additional light source illuminating the candidate object. Ex. 1006 (Bolle) at 10:20–26 ("In step 510, an image (a first image) of the scene is produced with the light 110 switched on, or at a higher intensity, so as to illuminate object 132 properly. . . .  In step 520, a second image of the scene is produced with the light 110 switched off or set to a level below the level in step 510."); 11:32–42 ("In a preferred embodiment,

32

IPR2021-01332
Patent 9,324,004 B2

> the steps 530 and 540 are performed on a pixel by pixel basis for each pixel location in the scene image. The result is that the pixels corresponding to the object 131 are collected in a segmented object image 130. Specifically, in the segmented object image, all pixels from the first image that are substantially brighter than their corresponding pixel in the second image are collected in segmented object image at the position they were in the first image. Therefore the segmented object image corresponds to the desired image of the object removed from the background 312.").

*Id.* at 38–39.

Patent Owner's argument regarding the applied prior art not analyzing only one scene is unavailing because it is based on its incorrect claim construction. As discussed above in Section II.C.3., we do not read analyzing a scene as precluding involvement of an additional scene within the analysis.

Patent Owner further asserts that Ogasawara and Bolle "does not render obvious the "video stream" limitation of claim 1. PO Resp. 56. Patent Owner states: "Although the references mention video-capable hardware, neither reference describes using that hardware to take and analyze a 'video stream' in the claimed manner, as opposed to still photographs." *Id.* The argument is unavailing and does not undermine Petitioner's accounting for the recited "video stream."

> Specifically, Patent Owner explains:

> Petitioner identifies 16:55–60 of Ogasawara as disclosing MPEG video encoding and the capture of a video stream. Petition at 30. But Ogasawara never discloses any such video stream being used to identify an Object. Bajaj ¶ 55. To the contrary, any such video stream is only used as a viewfinder, and object recognition is performed on a distinct still image that is manually taken by the shopping customer. Ex. 1005 (Ogasawara) at 20:42–47 ("[A] purchaser may use the wireless videophone, in particular the

33

IPR2021-01332
Patent 9,324,004 B2

> digital camera, to select various items which the customer desires
> to purchase. Such selection is made by capturing an image of an
> item's UPC bar code data, or the like, within the image field of
> the digital camera."). This is not "analyzing" or "deriving at least
> one characteristic" of a video stream, but is instead, at most, an
> operation on a single still image. Consistent with this,
> Ogasawara discusses how the cell phone display shows the single
> still image . . . that was captured. *Id.* at 20:48–55.

*Id.* at 56–57.

As the Petition notes, Ogasawara describes that a shopper in a grocery store uses a wireless videophone "to capture a video-graphic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software." Pet. 31 (citing Ex. 1005, 23:16–20). Although Ogasawara describes that the camera "is most practically implemented as a black-and-white, or color capable, digital still camera system," Ogasawara further describes that the camera and its associated electronics "could be implemented as a reduced-frame-rate, motion capable, video camera." Ex. 1005, 16:47–60. This portion of Ogasawara describing the video camera implementation is cited on pages 3, 14, and 31 of the Petition. Patent Owner's expert, Dr. Bajaj, testifies that "all video cameras capture videos on a frame-by-frame basis," that "[a] frame is a 2D image," and that the images in a video stream are "interrelated in time because of the time sequence." Ex. 1063, 125:25–126:25.

In light of the foregoing, it is a reasonable inference that the image analyzed in Ogasawara in the alternative video camera embodiment is one of the multiple frames in the video stream captured by the video camera. That need not be expressly stated by Ogasawara. The teachings of a prior art reference may be inferred by one with ordinary skill in the art. *AstraZeneca*

34

Appx170

IPR2021-01332
Patent 9,324,004 B2

*LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991).

Patent Owner further asserts that the combination of Ogasawara and Bolle do not render obvious "a mobile device," because Bolle's image segmentation technique requires a stationary mechanism while Ogasawara's system is a hand-held, portable unit. PO Resp. 58–59. Patent Owner asserts that even if the teachings of Ogasawara and Bolle are combined, the resulting device would have been stationary, rather than mobile. *Id.* at 59. These arguments are misplaced, because they are actually directed to whether there would have been a motivation to combine teachings and whether there would have been a reasonable expectation of success. Ogasawara itself already discloses a mobile device and requires no modification to yield a mobile device. The combination Patent Owner challenges is therefore not the combination proposed by Petitioner.

> 5.  *Motivation to Combine Ogasawara and Bolle and Reasonable Expectation of Success*

>> a)  *Petitioner's Assertions in the Petition*

Regarding advanced pattern recognition, Ogasawara states:

> Advanced pattern recognition software is able to enhance the performance of the wireless videophone, in accord with the invention, by offering the capability to capture merchandise information from items that are not identified by either a bar code or an alpha-numeric label. Advanced pattern recognition software allows a consumer to capture a video-graphic image of an apple, for example, and to have the apple be recognized as such by the pattern recognition software. This capability is useful for any merchandise item having a distinct or identifiable shape or other visually identifiable characteristic. Such pattern recognition is accomplished within the wireless videophone, by specially downloaded software.

Ex. 1005, 23:11–19 (cited at Pet. 22).

IPR2021-01332
Patent 9,324,004 B2

Petitioner explains that although Ogasawara describes a shopping system which uses pattern recognition software to identify objects by their visual appearance,

> Ogasawara recognizes, however, that its system benefits from the object in the image "having a distinct or identifiable shape or other visually identifiable characteristic." *Id.*, 23:20–22. In other words, there may be an object in an image that Ogasawara cannot identify because it cannot detect characteristics of that object that are distinct from other objects in the image or the background. Ex. 1003, ¶ 105. *An object's shape or other visual characteristic may not be distinct or identifiable due to the distractions from the rest of the image. Id.* For example, parts of an image corresponding to the background may significantly perturb extracted object characteristics, causing pattern recognition to fail. Ex. 1006, 4:34–38. For these situations, Ogasawara's system would need to modify the product with a "bar code or an alphanumeric label" to definitively identify the product. Ex. 1005, 23:12–16.

*Id.* at 22–23.

Petitioner also explains (1) that "Bolle solves these issues by segmenting an object from its background in a captured video and matching image characteristics of the segmented object to image characteristics of objects stored in a database," *id.* at 23 (citing Ex. 1003 ¶ 106); (2) that "Bolle uses image segmentation technology in conjunction with object recognition techniques and a database that stores reference characteristics of target objects to match characteristics of the object in the captured image with characteristics of a target object," *id.* (citing Ex. 1006, 4:27–34, 4:39–44, 5:14–18, 5:45–47, 6:1–6, 8:12–38, 16:40–45); and (3) that in Bolle a segmented processed image that can be used to characterize features of the object is then compared to stored reference images and the object is recognized when a match occurs. *Id.* (citing Ex. 1006, 6:1–6).

36

IPR2021-01332
Patent 9,324,004 B2

Petitioner further explains that "[o]nce the object is segmented, Bolle derives visual characteristics—e.g., color, shape, and texture—that are then characterized with histograms." *Id.* at 24 (citing Ex. 1006, 13:1–14, 16:64–19:38). Petitioner asserts:

> Bolle's ability to use these diverse visual characteristics would have expanded the object recognition capability and accuracy of Ogasawara's system for products without barcodes or symbols. Ex. 1003, ¶ 107. A POSITA would have recognized that these attributes of Bolle allow the object characteristics, e.g., shape, to be more clearly delineated in the image and thus more precisely determined and matched to the stored reference characteristics to identify the object more accurately. *Id.*, ¶ 108. A POSITA would have thus recognized that Bolle would predictably enhance the performance of the Ogasawara system. *Id.*

*Id.* Petitioner states: "A POSITA would have thus recognized that combining Ogasawara with Bolle would yield predictable benefits and results because the combined image processing system could more accurately identify objects for purchase during shopping, especially those objects without a barcode or label." *Id.* at 25 (citing Ex. 1003 ¶ 109).

Additionally, Petitioner asserts (1) that both Ogasawara and Bolle are "in the same field and address the same issue in the same context—using image processing systems to identify products, e.g., produce like an apple, for purchase during shopping," (2) that "Bolle expressly describes the benefits of using its techniques with a system like Ogasawara that does not segment the object from the background and thus cannot perceive the object's distinct or identifiable shape or other visually identifiable characteristic [citing Ex. 1003 ¶ 109, Ex. 1006, 4:27–45]," and (3) that Bolle expressly states that its segmentation technology in conjunction with its matching techniques further improves the ability to identify objects in a

37

Appx173

IPR2021-01332
Patent 9,324,004 B2

captured image [citing Ex. 1003 ¶ 109, Ex. 1006, 5:45–51, 6:1–6].” Pet. 24–25.

Finally, regarding a motivation to combine teachings, Petitioner asserts:

> Additionally, Bolle explains that it improves image recognition through learning (i.e., referred to as being “trainable,” *see* Ex. 1006, 1:8–10) by adding new reference images to its database to be able to match a greater array of objects. *Id*., Abstract, 5:8–13, 6:7–12, 8:37–44, 13:32–48, 16:33–51. A POSITA would have been motivated to combine Bolle’s training techniques with Ogasawara’s system to further enhance the capability of the wireless videophone of Ogasawara to recognize a broader array of objects with increased accuracy. Ex. 1003, ¶ 110.

*Id.* at 25.

Based on the foregoing, Petitioner asserts:

> A POSITA would have been motivated to combine Ogasawara and Bolle to achieve a system that could more accurately discern the shape or other visual characteristics of an object in an image to be able to identify that object. *Id.*, ¶¶ 103–115. Combining Ogasawara and Bolle would yield a system that could achieve this by segmenting an object from its background in a captured image and matching the segmented object to images of target objects stored in a database. *Id.*

Pet. 22.

Regarding a reasonable expectation of success, Petitioner asserts that “[a] POSITA would have had a reasonable expectation of success combining Bolle’s image segmentation and matching techniques with Ogasawara’s system. *Id.* (citing Ex. 1003 ¶ 111). Petitioner explains:

> A POSITA could have combined Bolle’s image segmentation and matching techniques with Ogasawara’s system using the hardware and techniques already described in each reference, and each system would perform the same in the combined system. *Id.* A POSITA would have recognized that using

38

Bolle's image segmentation and matching techniques with Ogasawara's system would be nothing more than combining prior art elements according to known methods to yield predictable results or the application of known techniques to improve a known device to yield predictable results. *Id.*

*Id.* at 25–26 (citing Ex. 1003 ¶ 111).

      *b)*    *Patent Owner's Assertions in the Response*

Patent Owner sets forth numerous reasons why, in its view, Petitioner has not sufficiently established a reasonable motivation to combine the teachings of Ogasawara and Bolle, i.e., to use Bolle's image segmentation method on Ogasawara's mobile videophone. PO Resp. 43–52. Patent Owner also sets forth reasons why, in its view, Petitioner has not sufficiently established a reasonable expectation of success from the viewpoint of one with ordinary skill in the art who attempts to use Bolle's segmentation method on Ogasawara's mobile videophone. *Id.* at 53–55.

First, Patent Owner asserts:

[A] retail customer [in Ogasawara's environment] would not be able to take the necessary photographs to segment an object from the background using Bolle's techniques. Bajaj ¶¶ 23–25. Bolle requires precise pixel-to-pixel correspondence between the two spatially-aligned images in a non-mobile environment, which would be hard—if not impossible—for retail customer to do. Ex. 1006 (Bolle) at 10:31–35; 10:53–55.

*Id.* at 43. In that regard, Bolle states:

        Further, the object 131, the background 312, and the image input device 120 should be at the same position in both step 510 and 520 to assure that the first and second images are in special registration. Suppose each pixel is numbered starting in the upper left corner of the image then proceeding across the first line then down to the second line in the manner of reading a book. Registration means that each numbered pixel in the first image corresponds to the same area of the scene (object(s) and

IPR2021-01332
Patent 9,324,004 B2

> background 312) as the identically numbered pixel in the second
> image.

Ex. 1006, 10:31–40.

Second, Patent Owner asserts that Bolle's second segmentation
approach, i.e., the Figure 3b embodiment, which utilizes different
illumination to segment a target object from its background, is uniquely
unsuited for use in a retail environment, or anywhere else where
Ogasawara's base system is applicable, because it requires particular
reflective properties for the foreground object and background that are
highly unlikely to be found in a retail environment.  PO Resp. 44.

Third, Patent Owner asserts that the hardware used by Ogasawara and
by Bolle "is significantly different."  *Id.*  Patent Owner states:  "Bolle
contemplates that the image processing would be performed at the point of
sale by a cashier, while Ogasawara contemplates that the image processing
would be performed by a customer using their cell phone."  *Id.*  Patent
Owner asserts:  "Ogasawara never describes a cell phone as containing a
flash or any other light source, which would have prevented using Bolle's
second, illumination-based segmentation approach."  *Id.* at 45.  Patent
Owner also asserts that "Petitioner never explains how a POSITA would
expect Bolle's algorithm, which requires specialized hardware like a digital
signal processor, to work on Ogasawara's wireless videophone."  *Id.*

Fourth, Patent Owner asserts that "Bolle's dual-photograph, stationary
system disclosure fundamentally teaches away from Ogasawara's single-
photograph, mobile videophone."  *Id.*

Fifth, Patent Owner asserts that using Bolle's image segmentation and
database matching techniques in the system of Ogasawara would have

IPR2021-01332
Patent 9,324,004 B2

defeated a basic objective of Ogasawara of enabling easy and

straightforward shopping. *Id.* at 46. Patent Owner explains:

> Requiring the shopper to take an additional photograph would
> increase the time and effort required by the shopper to purchase
> each object. Taking a second image would have increased the
> burden on the shopper to purchase an item. Additionally, given
> that the two photographs must be pixel-perfect, spatially-aligned
> depictions (*i.e.*, from the same distance, angle, position, etc.), it
> would be extremely difficult or impossible for the shopping
> customer to take the required photographs. Faced with the
> inevitable technical errors that would result from that approach
> and thus not being able to consummate a purchase, the customer
> would not have used the system. It would have also defeated the
> point of giving the user mobility, if the wireless videophone of
> Ogasawara was made stationary in order to take the two accurate
> segmentation images required by Bolle.

*Id.* at 46–47.

Sixth, Patent Owner asserts: "Bolle's histogram-based approach is

incompatible with Ogasawara's bar code-based approach. Histograms are

not an appropriate mechanism to identify matching bar codes for a variety of

reasons, as Dr. Bajaj discusses in depth. Bajaj [Ex. 2007] ¶¶ 36–43." *Id.*

at 47.

> Seventh, Patent Owner asserts:

> Ogasawara is a bar-code based system that does not have a
> sufficiently detailed disclosure of detecting objects without bar
> codes, as the Board already found. Paper 9 at 33. By contrast,
> Bolle is directed to a bar-code-less system that is capable of
> detecting produce based on pre-programmed non-symbolic
> information. *E.g.*, Ex. 1006 (Bolle) at 5:47–51. A POSITA
> would not have considered the two references to have sufficient
> commonality as "image processing systems" to combine to yield
> the challenged claims. Bajaj [Ex. 2007] ¶ 45.

*Id.* at 48.

41

IPR2021-01332
Patent 9,324,004 B2

Eighth, responding to Petitioner's assertion that "Bolle expressly describes the benefits of using its system with a system such as Ogasawara," Patent Owner states that "Petitioner fails to cite any disclosure in Bolle to that effect," and that "Bolle does not contain any such statement ascribed to it by Petitioner." *Id.* Patent Owner further notes that Bolle suggests implementing its system at the point of sale, to be operated by a cashier, rather than in a portable device used by a retail customer such as in Ogasawara's system. *Id.* at 48–49.

Ninth, responding to Petitioner's assertion that Ogasawara cannot always identify an object that lacks a distinct or identifiable shape or other visually identifiable characteristic and that Bolle's segmentation technique could fill this gap, Patent Owner asserts that Petitioner has not identified any deficiency in Ogasawara's system that could be corrected by Bolle and that the problematic conditions Petitioner contends are present in Ogasawara are also problematic for Bolle. *Id.* at 49.

Tenth, responding to Petitioner's assertion that the combined system of Ogasawara and Bolle could more accurately and reliably identify objects captured by image processing systems for purchase, Patent Owner asserts that "Ogasawara's bar-code based product recognition system was highly accurate, and there is no indication in Bolle that its system would be predictably superior to Ogasawara's." *Id.* at 51.

Eleventh, responding to Petitioner's assertion that Bolle's ability to use diverse visual characteristics would have expanded the object recognition capability and accuracy of Ogasawara's system for products without barcodes or symbols, Patent Owner asserts that "Petitioner has not provided any analysis of the comparative advantage of Bolle's technique versus simply adding additional bar codes to more items, as is commonly

42

IPR2021-01332
Patent 9,324,004 B2

done with fruits and vegetables, and it is far from clear that there is any such advantage." *Id.* at 51–52. Patent Owner asserts also that Petitioner has not "addressed Ogasawara's disclosure of using a catalogue of bar codes, rather than bar codes physically present on objects, for shopping." *Id.* at 52.

Twelfth, Patent Owner asserts that "[a] POSITA would not have had a reasonable expectation of success combining Bolle's segmentation techniques with Ogasawara's system because an untrained shopping customer using Ogasawara's mobile phone would not have been able to take the precise dual images required by Bolle's system." *Id.* at 54. In that regard, Patent Owner notes that "Bolle's segmentation technique requires two still photographs without any pixel variation in the background." *Id.*

Patent Owner explains:

> Considering [the] first segmentation technique where one image is of a background without the target object, and the other image is the same exact background with the target object, a shopping customer would not be able to take the two required photographs with their phone. Bajaj [Ex. 2007] ¶ 52. For example, they would not be able to reliably situate themselves to take the necessary photograph from the same perspective, distance, etc.

*Id.* Patent Owner further explains:

> A shopping customer would also not be able to take the two images required by the other segmentation technique, where one image is taken under normal illumination and another picture is taken with an additional light source. *Id.* ¶ 53. For example, Ogasawara does not disclose any additional light source that could be the source of the illumination for the second image. The mobile phone in Ogasawara is not described as having a light or a flash functionality. There is no description in Ogasawara of even taking more than one photograph per target item, much less any disclosure of how the mobile phone could be used to take the required two photographs under specific illumination conditions.

*Id.* at 54–55.

43

> c)    *Petitioner's Assertions in the Reply*

Petitioner asserts that Patent Owner provides no support for its assertion that a user cannot hold Ogasawara's videophone sufficiently stationary while capturing multiple scenes.  Reply 14.  Petitioner asserts:

> Even if a user could not do so, Bolle expressly teaches that taking the first and second scene in quick succession ensures that the camera, object, and background are in the same relative position in both scenes. Ex. 1006, 10:31–44 ("… **Proper registration can be ensured** by **either** acquiring the first and second image **in quick succession**, **or** by imaging a **stationary** object 131 against a **stationary** background. . . ."). By capturing scenes in quick succession, any relative movement is insignificant, and thus, the scenes will be sufficiently aligned for segmentation. Ex. 1050, ¶¶ 59–60.  PO acknowledges that Bolle's technique allows for **some** movement between images.  POR, 40–41.

*Id.* at 14–15.

Petitioner asserts that Patent Owner mischaracterizes the testimony of Petitioner's expert, Dr. Rodriguez, by implying that he agrees that Bolle's teachings are limited to stationary, non-mobile devices.  Reply 15 (citing PO Resp. 33).  Petitioner explains:  "Dr. Rodriguez was not characterizing Bolle's entire teachings but, instead, was commenting on the specific system shown in Figure 4 [of Bolle].  *Id.* (citing Ex. 2008, 44:14–45:16).  Petitioner asserts that Patent Owner omits Dr. Rodriguez's testimony "that Bolle does not require a stationary (mounted) camera and does not require exact alignment between the two scenes."  *Id.* (citing Ex. 2008, 97:22–99:6).

Regarding the additional burden to the shopper in time and effort for taking two pictures, as alleged by Patent Owner, Petitioner asserts that Patent Owner is wrong, and explains as follows:

> **First**, Bolle's Figure 3b embodiment would not take significantly longer to capture two scene images in "quick succession" (Ex. 1006, 10:42–44) compared to one scene image.

44

IPR2021-01332
Patent 9,324,004 B2

> Bolle explains that a camera flash or "strobe" may be
> synchronized with the camera" capturing the two scene images.
> *Id.*, 10:8–16; *see also id.*, 7:18–65, 9:59–60.    When these
> teachings are combined and incorporated into Ogasawara's
> videophone, a POSITA would have been motivated to have the
> resultant combination capture two scene images (one with the
> flash and one without) in "quick succession." Ex. 1050, ¶ 64.
>
> **Second**, any incremental "burden" on the user would have
> been offset by the advantages of using Bolle's segmentation and
> matching process, as described in detail in the Petition.  Petition,
> 22–28; *see also* Ex. 1050, ¶ 65.

*Id.* at 16.

Regarding "strict requirements (1) to (4) mentioned in Bolle at 3:64–

4:7" as referred to in the Patent Owner Response on pages 36–37, Petitioner

asserts that Patent Owner is wrong "because these strict requirements relate

to prior art systems and not Bolle's embodiments."  Reply 16 (citing

Ex. 1050 ¶¶ 66–67).  Petitioner notes that these requirements (1) to (4) are in

the "Background of the Invention" discussing the prior art.  *Id.* (citing

Ex. 1006, 1:11–4:10).

Disagreeing with Patent Owner, Petitioner asserts that Bolle's system

is not intended to be used in highly controlled environments, and that,

instead, it is intended for use in supermarkets, grocery stores, retail stores, or

hardware stores.  *Id.* at 18.  Disagreeing with Patent Owner, Petitioner

asserts that Bolle's system is not designed to be used by highly trained and

skilled professionals, and that, instead, "it is designed to prevent cashiers

from charging customers the wrong price for an item."  *Id.*  Petitioner asserts

that "even [Patent Owner] acknowledges that Bolle's segmentation

techniques may be performed by 'an automated system' rather than a

'professional.'"  *Id.* at 19.  Petitioner asserts that "[b]ecause Ogasawara's

system, like Bolle's system, is 'automated,' both can be operated by retail

shoppers." *Id.* Petitioner further asserts that "[t]o the extent any 'training' is needed, Ogasawara's videophone provides instructions on how to capture items to be purchased." *Id.*

Petitioner asserts that Bolle's and Ogasawara's systems use the same hardware, not significantly different hardware as alleged by Patent Owner. *Id.* Petitioner asserts that it is immaterial whether Ogasawara's wireless videophone has specialized hardware like a digital signal processor to process Bolle's algorithm because Ogasawara's server hardware can execute Bolle's segmentation algorithm. *Id.* at 20. Petitioner asserts that Patent Owner does not dispute that Ogasawara's server hardware is fully capable of running Bolle's algorithm. *Id.* Petitioner further asserts that Bolle itself expressly states that its algorithm does not require "specialized hardware like a digital signal processor" and can be run on general purpose computers. *Id.* at 20–21 (citing Ex. 1006, 7:49–58, Ex. 1050 ¶ 76). Petitioner also asserts that microprocessor 238 as shown in Ogasawara's Figure 10 is "specialized hardware like a digital signal processor." *Id.* at 21. In that regard, Ogasawara states: "The microprocessor 238 may be any one of a number of **conventional** microprocessor or **digital signal processor circuits** suitable for use in wireless telephone or wireless videophone applications." Ex. 1005, 16:20–23.

Petitioner disagrees with Patent Owner's expert's assertion that a wireless videophone available in the late-1990s, like Ogasawara's videophone, would have significantly less processing power than any of the hardware discussed in Bolle. Reply 21. Petitioner asserts that digital signal processors that were widely used in mobile phones before 2000 had the processing power to execute Bolle's algorithms. *Id.* (citing Ex. 1050 ¶¶ 77–88, Ex. 1051–1061, 1065).

46

IPR2021-01332
Patent 9,324,004 B2

Petitioner asserts that Ogasawara and Bolle both suggest using well known video input devices such as a CCD digital camera, and that Bolle teaches that a "**camera flash** will suffice if a lighting source is preferred." *Id.* at 22. Petitioner also asserts that Patent Owner's expert, Dr. Bajaj, "acknowledged that flash functionality in CCD cameras integrated in mobile phones was well-known at the time of the invention." *Id.* (citing Ex. 1063, 108:4–23, Ex. 1050 ¶¶ 90–91, Ex. 1062, 4:33–38 ("Parulski")). In that regard, Petitioner's expert, Dr. Rodriguez, testifies:

> I also understand that mobile phones with camera flash functionality were known by 2000. For example, U.S. Patent 6,122,526 ("Parulski"), titled "Cellular telephone and electronic camera system with programmable transmission capability" issued on September 9, 2000. Ex. 1062, cover. It describes a cellular phone that "includes a lens 50, a flip-up flash unit 52, and an antenna 54." Id., 4:33–38.

Ex. 1050 ¶ 91.

> Petitioner asserts:

> For illumination-based segmentation, Bolle further teaches synchronizing the timing of the camera flash or "strobe" to illuminate an object. Ex. 1006, 9:59–60 (CCD digital video camera includes "a **camera flash**"), 10:9–16 ("The **control** may be a part of the light 110 as a **timing device** such as in a strobe. The control may be **synchronized with the camera** . . . [and was] **well known**."). A POSITA would therefore understand, when a user presses a key on Ogasawara's videophone to inform the program that image frames of a video stream are ready for processing, a synchronized camera flash would illuminate the scene (e.g., the second, "illuminated" scene) for Bolle's segmentation. Ex. 1050, ¶¶ 94–96.

Reply 23.

Regarding Patent Owner's argument focusing on the superior bar code recognition abilities of Ogasawara, Petitioner asserts that it is "a red herring," because Petitioner proposes combining Bolle's image recognition

47

IPR2021-01332
Patent 9,324,004 B2

techniques with Ogasawara's wireless videophone with "advanced pattern recognition software" which is for "items that are not identified by either a bar code or alpha-numeric label." Reply 23–24 (citing Pet. 24).

> d)   *Patent Owner's Assertions in the Sur-Reply*

Patent Owner asserts that Petitioner's reliance on the Figure 3b embodiment of Bolle and on disclosures relating to Figure 14 of Bolle as a segmentation method are newly and belatedly presented in the Reply and should be given no weight. Sur-Reply 4–6.

Patent Owner asserts that Petitioner's argument on integrating a flash into Ogasawara's videophone, and supporting evidence therefor including Parulski, are newly and belatedly presented in the Reply and should be given no weight. *Id.* at 8–9.

Patent Owner asserts that "Petitioner argues for the first time on Reply that 'Bolle's and Ogasawara's Systems Use the Same Hardware'" and should be given no weight. *Id.* at 9 (citing Reply 19–22). Patent Owner states:

> Petitioner cites to 24 paragraphs of Dr. Rodriguez's declaration and a dozen new references that are purportedly prior art, specifically, EX1051-1061, and 1065. Reply 21–22. This new argument and evidence incorporating a specific DSP into Ogasawara and comparing it other hardware was never presented in the Petition, and should likewise be given no weight.

*Id.* Patent Owner also asserts that Petition's argument that Ogasawara and Bolle both use the same hardware is flawed. Sur-Reply 24–25.

Responding to Petitioner's assertion that Patent Owner provides no support for its claim that a user cannot hold Ogasawara's videophone sufficiently stationary while capturing multiple images, Patent Owner notes that it cited to the testimony of Dr. Bajaj to that effect. Sur-Reply 11 (citing Ex. 2007 ¶¶ 24–25). Patent Owner further states that "[t]he difficulty of an

48

IPR2021-01332
Patent 9,324,004 B2

average customer to take two pixel-perfect images using a mobile phone is also self-apparent, and that Petitioner has not met its burden of proving the feasibility of this physically difficult task." *Id.* Patent Owner asserts that "[w]ithout camera stability, the combination [of Ogasawara and Bolle] simply would not work, as the pixel-by-pixel comparison would be unable to delineate between the background and the object to be identified." *Id.* at 10.

In paragraph 24 of his testimony, Dr. Bajaj states: "Performing this pixel-perfect special registration from two independently-acquired images taken by a shopping customer on their phone is non-trivial and is prone to be erroneous." Ex. 2007 ¶ 24. In paragraph 25 of his testimony, Dr. Bajaj explains:

> The resulting segmentation errors [from lack of pixel-to-pixel alignment] in the separation of the pixels belonging to the object form the pixels belonging to the background image causes greater and cascadic error in the object recognition phase of Bolle's method of extracting and normalizing separated object histogram characteristics and comparing to one or more stored normalized reference characterizations. . . . Since errors in pixel-wise special registration cascade to larger errors in pixel-wise object image segmentation, this pixel-wise area or length causes even larger errors in the normalized characteristics leading to erroneous comparisons with reference normalized characterizations and incorrect object recognition.

*Id.* ¶ 25.

For Bolle's Figure 3a embodiment, which takes an image with object and the background and an image with background only, Patent Owner asserts that Petitioner "provides no evidence that the pixel-perfect images with and without the object could be captured in 'quick succession' using a mobile phone," and that Bolle's teaching of "quick succession" is only with respect to Bolle's Figure 3b embodiment. Sur-Reply 11–12.

49

IPR2021-01332
Patent 9,324,004 B2

Patent Owner reiterates that "Bolle's dual-photograph, stationary system disclosure fundamentally teaches away from Ogasawara's single-photograph, mobile videophone." Sur-Reply 12 (citing PO Resp. 45–46). Patent Owner clarifies that it did not argue that Ogasawara's bar code embodiments teach away from Bolle's image recognition techniques. *Id.* at 12–13. Patent Owner reiterates that Bolle's system is fundamentally different from Ogasawara's system. *Id.* at 22–23. Notwithstanding that Bolle's system may be used in a retail store, Patent Owner asserts that Bolle's system requires precise pixel-to-pixel correspondence between the two spatially-aligned images in a non-mobile environment. *Id.* at 23.

Responding to Petitioner's assertion that Bolle's system is not designed to be used by highly trained and skilled professionals, Patent Owner asserts:

> But Bolle's system requires specific images and lighting to perform segmenting. Thus, the user of Bolle's system must be trained to capture images with and without an object, or capture images with and without illumination. It would not be reasonable to require untrained customers to capture these required images. Finally, Petitioner argues that "Bolle's segmentation techniques may be performed by an automated system," but while the segmentation algorithms can be automated, capturing the strict, specific images required for segmentation cannot be automated. Reply 19.

*Id.*

For Bolle's Figure 3b embodiment, which takes an image without lighting and an image with lighting, Patent Owner asserts that Petitioner has failed to provide any explanation as to why a POSITA would have combined Ogasawara with the Figure 3b embodiment of Bolle or with the flip-up flash unit" of the new Parulski flash reference (Ex. 1062). *Id.* at 13–14. Patent Owner asserts that the use of Bolle's Figure 3b embodiment is inconsistent

50

with Petitioner's expert, who initially proposed using Bolle's Figure 3a embodiment because it does not require "carefully controlled lighting conditions." *Id.* at 14 (citing Ex. 1003 ¶ 114).

Patent Owner asserts that with respect to Parulski, Petitioner only argues that "flash functionality in CCD cameras integrated in mobile phones was well-known at the time of the invention," but that "this is not an adequate rationale to combine." *Id.* at 15.

Patent Owner explains that the "quick succession" disclosure of Bolle applies still to a stationary camera. *Id.* at 16. Patent Owner states:

> As part of the Figure 3b embodiment, Bolle explains that pictures may be taken in "quick succession" when the **object** or **background** are not stationary, and otherwise expressly states that he camera "should be at the same position." EX1006 10:31–44. As Dr. Rodriguez admitted, Bolle teaches that these pictures are taken using a stationary camera. EX1006 9:21; EX2008 44:24–45:16 ("The camera seems to be stationary."); *see also* EX2010 55:18–56:5 ("the camera is in a fixed position," such as "putting a camera on a tripod."). Thus, Bolle's teaching of capturing images in "quick succession" is a solution for a stationary or fixed-position camera.

*Id.* at 16.

Patent Owner asserts that Petitioner provides no evidence that it would have been possible to take two images in quick succession while maintaining the required special registration. *Id.* at 17. Patent Owner notes:

> Bolle expressly discloses in both its Figure 3a and 3b embodiments use of an enclosure where the desired object is placed on "a support 405" to "ensure[] the object is of fixed and repeatable distance 407 from camera 120." EX1006 9:32–34. This is because the segmentation process uses a precise pixel-by-pixel comparison of two images. EX1006 10:59–11:4. There is no reasoned analysis in the record to establish that a mobile device could maintain the required special alignment across both pictures. Petitioner has therefore failed to establish a reasonable

51

IPR2021-01332
Patent 9,324,004 B2

> expectation of success in its new combination [Ogasawara and
> Bolle's Figure 3b embodiment].

*Id.*

Patent Owner asserts further that Petitioner has not established that
Ogasawara's videophone was capable of capturing images in sufficient
quick succession. *Id.* Patent Owner explains:

> [M]obile phones in 2000 (7 years before the iPhone) were very
> unlike those of today. Very few mobile phones had cameras, and
> Petitioner has not shown phones had the processing power or
> shutter speeds to quickly take multiple photos. Such processing
> included "translat[ing] the visual image acquired by the camera's
> lens into digital signals [and] into a form which can be broadcast
> transmitted." EX1005 16:7–12. Dr. Rodriguez also identified
> many factors that affect how quickly the images needed to be
> taken, including "shutter speed," "lighting," "focal length," and
> the size and diversity of the recognition database. EX2010
> 76:21–77:3. Petitioner does not consider any of these factors,
> nor whether a POSITA would reasonably expect success in view
> of these factors.

*Id.* at 18.

Patent Owner asserts that Petitioner provides no evidence that a flip-
up flash, such as the one disclosed in Parulski, would have integrated with
Ogasawara's videophone and still meet Bolle's segmentation requirements.
*Id.* at 18–19. Patent Owner explains:

> Petitioner points to Parulski, which discloses a mobile phone that
> includes an integrated flash. Reply 22. Petitioner, however, says
> nothing more—it does not, for example, establish that Parulski's
> flash meets Bolle's requirement that lighting be "non-
> monochromatic and of a constant frequency distribution" or that
> it is "infrared" or "ultraviolet." EX1007 7:7–14. Nor does
> Petitioner provide any evidence that Parulski's flash is similar to
> the exemplary flashes described by Bolle. *Id.* 7:14–17. Thus,
> Petitioner's revised combination [Ogasawara and Figure 3b
> embodiment of Bolle] fails to establish that Bolle's system could

52

Appx188

IPR2021-01332
Patent 9,324,004 B2

be successfully combined with Ogasawara, and is thus inadequate. 844 F.3d at 1361 (Fed. Cir. 2017).

*Id.* at 19.

e)    *Discussion*

We agree with Patent Owner that Bolle's system is not mobile, and that Bolle's camera and light source are stationary. The camera is stationary for a critical reason, that Bolle's segmentation method requires spatial registration between two images taken by the camera. Ex. 1006, 10:31–34. Bolle explains:

> [T]he object 131, the background 312, and the image input device 120 should be at the same position in both step 510 and 520 to assure that the first and second images are in *spatial registration*. Suppose each pixel is numbered starting in the upper left corner of the image then proceeding across the first line then down to the second line in the manner of reading a book. *Registration means that each numbered pixel in the first image corresponds to the same area of the scene (object(s) 131 and background 312) as the identically numbered pixel in the second image.*

*Id.* at 10:31–40 (emphases added). We credit Dr. Bajaj's testimony that "[a] person of ordinary skill in the art would have recognized that Bolle contemplates that the image processing would be performed at the point of sale by a cashier, using a stationary device with a stationary camera, light source, and object platform." Ex. 2007 ¶ 33. The testimony is supported by Figures 1 and 4 of Bolle. We credit that testimony over Dr. Rodriguez's suggestion that Bolle discloses an embodiment which makes use of a mobile device for taking the images.

Dr. Rodriguez refers to this statement in Bolle: "Proper registration can be ensured by either acquiring the first and second image in quick succession, or by imaging a stationary object 131 against a stationary

53

IPR2021-01332
Patent 9,324,004 B2

background 312." Ex. 1006, 10:41–43 (cited in Ex. 2007 ¶ 31). Based on

that description, Dr. Rodriguez testifies:

> When the object and background are not stationary with respect to the camera (as may be the case when a user holds Ogasawara's videophone), Bolle explains that proper registration can be ensured by capturing the first and second scenes in quick succession. *Id.*, 10:41–44 ("Proper registration can be ensured by **either** acquiring the first and second image **in quick succession**, **or** by imaging a **stationary** object 131 against a **stationary** background 312.") (emphases added).

Ex. 2007 ¶ 31. We agree with Patent Owner (Sur-Reply 16) that the "quick

succession" solution description is not for a moving camera, but for an

object or a background that is not staying sufficiently still. We take official

notice that apples, such as those shown in Bolle's Figures 1 and 4, take some

time to settle still after being placed on a flat support. Even if the "quick

succession" description applies to Bolle's camera, that does not turn Bolle's

stationary camera to a mobile device. For various reasons, a stationary

camera may still have unintended small movements in certain

circumstances, such as when its structural support is not firm.

We find no disclosure in Bolle of a mobile camera or a camera

embodied in a mobile device, and Petitioner has identified none. On cross-

examination, Dr. Rodriguez testified that the camera in Bolle's Figure 4

"seems to be stationary." Ex. 2008, 44:24–45:16.

Because the camera disclosed in Bolle is stationary, and is stationary

for a critical reason associated with Bolle's segmentation method, i.e.,

spatial registration with pixel-to-pixel alignment between first and second

images, we determine that one with ordinary skill in the art would see

Bolle's system as fundamentally different from and not usable in

Ogasawara's videophone which is a mobile device hand-held by a retail

54

IPR2021-01332
Patent 9,324,004 B2

shopper.  We arrive at that conclusion even assuming that Bolle's segmentation method achieves better results in recognizing an object based on a visual characteristic of the object.  "It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art."  *Bausch & Lomb, Inc. v. Barnes-Hind/Hyrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986).  Here, the manner in which Bolle performs segmentation and what are required for performing that segmentation, pixel-to-pixel alignment between two images, must be considered.

The application environment and context of Ogasawara and of Bolle are fundamentally opposite to each other, stationary for an important reason versus high mobility.[11]  Petitioner has not provided a reasonable motivation for one with ordinary skill in the art to implement Bolle's segmentation method, either the Figure 3a embodiment or the Figure 3b embodiment, on Ogasawara's videophone.[12]

Aside from the issue of adequate motivation to combine teachings, Petitioner also has a burden to show a reasonable expectation of success.  *Proctor & Ganble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).  We conclude that even if an adequate motivation for one with ordinary skill in the art to combine teachings is assumed, Petitioner has not

---

[11] We make this conclusion even assuming, without determination, that Bolle's system can be operated by a retail shopper at an automatic check-out station without formal training of any kind.

[12] We need not resolve whether Petitioner's reliance in its Reply on Bolle's Figure 3b embodiment is belated and thus constitutes an improper new argument first presented in the Reply.

55

IPR2021-01332
Patent 9,324,004 B2

shown a reasonable expectation of success in implementing Bolle's
segmentation methods on Ogasawara's videophone.

Bolle's Figure 3a embodiment would have required a retail shopper to
take two pictures in succession, one with the object in the background and
one with just the background.  Petitioner has not shown how one with
ordinary skill in the art would have had a reasonable expectation of success
in having the two pictures, with pixel-to-pixel alignment, taken by a retail
shopper with Ogasawara's videophone.

Petitioner asserts that Patent Owner "provides no support for its claim
that a user cannot hold Ogasawara's videophone sufficiently stationary while
capturing multiple scenes."  Reply 14.  But significant intervening activity
performed by the shopper is unavoidable either to add an object to the scene
or to remove an object from the scene, while holding Ogasawara's
videophone in place.  Also, Dr. Bajaj does explain as follows:

> Performing this pixel-accurate spatial registration from
> two independently-acquired images taken by a shopping
> customer on their phone is non-trivial and is prone to be
> erroneous.  All spatial registration errors between the two images
> are carried over and causatively yield much greater error using
> the pixel-wise segmentation algorithm 220 of Bolle.
>
> The resulting segmentation errors in the separation of the
> pixels belonging to the object from the pixels belonging to
> background image causes greater and cascadic error in the object
> recognition phase of Bolle's method of extracting and
> normalizing separated object histogram characteristics and
> comparing to one or more stored normalized reference
> characterizations.

Ex. 2007 ¶¶ 24–25 (cited at Sur-Reply 11).  We credit the above-quoted
testimony of Dr. Bajaj.

56

IPR2021-01332
Patent 9,324,004 B2

Petitioner does not adequately explain how the user's intervening activity could have been performed without causing substantial misalignment that undermines the registration requirement of Bolle. Petitioner does refer to Bolle's description of taking the two pictures in "quick succession," *id.*, but (1) the "quick succession" description of Bolle relates to Bolle's Figure 3b embodiment which does not involve moving an object into or out of a background (Ex. 1006, 10:24–43), and (2) Petitioner does not explain how

holding Ogasawara's videophone still gets easier for the shopper if the shopper has to move an object either into or out of a scene quicker.

Bolle's Figure 3b embodiment would have required a retail shopper to take two pictures in succession, one with the camera flash on and one with the camera flash off, both with the object in the background. Petitioner has not shown how one with ordinary skill in the art would have had a reasonable expectation of success in having the two pictures, with sufficient pixel-to-pixel alignment, taken by a retail shopper with Ogasawara's videophone.

Petitioner's expert, Dr. Rodriguez, testifies that "mobile phones with camera flash functionality were known by 2000," and Dr. Rodriguez identifies Parulski (Ex. 1062) as describing such a mobile phone with an integrated flip-up flash unit. Ex. 1050 ¶ 91. There are two infirmities with respect to this testimony as applied to the issue of implementing the segmentation method of Bolle's Figure 3b embodiment in Ogasawara's videophone.

First, Petitioner's proposed combination makes use of Ogasawara's videophone. A flash usable for taking a video is not the same as a flash usable for a still image, given that substantially more pictures or frames have

57

to be taken within a short period of time to form a video. Dr. Rodriguez does not testify that videophones with camera flash functionality were known by 2000. Second, Dr. Rodriguez simply states that mobile phones with camera functionality "were known by 2000," not "well known by 2000." The difference is not insignificant, because if such a camera flash was just known, a reference showing that may be formally required as a portion of the alleged ground of unpatentability, e.g., Ogasawara, Bolle, and Parulski. But Parulski is not in the specific ground of unpatentability asserted by Petitioner. If a feature was "well known" to one with ordinary skill in the art, Parulski need not be named in the alleged ground of unpatentability and can still be relied on by Petitioner to show basic knowledge or fundamental skill that would have been possessed by one with ordinary skill in the art. Dr. Rodriguez's testimony does not persuade us that a flash functionality was so well known for videophones in 2000 that that was basic knowledge or fundamental skill to one with ordinary skill in the art without need to include a pertinent reference in the alleged ground of unpatentability. We note further that even Parulski itself does not show a videophone. On this record, Petitioner has shown no videophone with an early enough date that operates with an integrated flash for taking a video.

Further, Petitioner asserts:

> For illumination-based segmentation, Bolle further teaches synchronizing the timing of the camera flash or "strobe" to illuminate an object. Ex. 1006, 9:59–60 (CCD digital video camera includes "a **camera flash**"), 10:9–16 ("The **control** may be a part of the light 110 as a **timing device** such as in a strobe. The control may be **synchronized with the camera** . . . [and was] **well known**."). A POSITA would therefore understand, when a user presses a key on Ogasawara's videophone to inform the program that image frames of a video stream are ready for processing, a synchronized camera flash would illuminate the

> scene (e.g., the second, "illuminated" scene) for Bolle's
> segmentation. Ex. 1050, ¶¶ 94–96.

*Id.* at 23. Thus, assuming that Ogasawara's videophone is modified to include a flash functionality for taking a video, Petitioner urges that a retail shopper could have held Ogasawara's videophone sufficiently still to take two frames while the flash is automatically synchronized to turn on and off at the appropriate time.

Petitioner, however, has not shown the existence, prior to the critical date, of an integrated flash that can be programmed in this manner, even assuming that the processing circuitry of Ogasawara is sufficiently sophisticated to be so programmed. Specifically, Petitioner has not shown that Parulski's flip-up flash can be turned on and off so quickly that it can be controlled on a frame by frame basis with respect to the video taken. For the use required by Bolle's segmentation method, the light from the flash cannot take time to emit and to cease but essentially must be instantly on and off to be programmable on a per frame basis. Petitioner has not made a showing that Parulski's flip-up flash is of that type. It is possible that Parulski's flash is turned on when it is flipped up, and is turned off when it is flipped down. It is also possible that when charging is needed, Parulski's flash starts charging after it has been flipped up and the user has to wait some time before the flash can function. Such characteristics would be incompatible with the segmentation method of Bolle's Figure 3b embodiment performed with flash programmable on a per frame basis.

In summary, Petitioner has not provided a reasonable motivation for one with ordinary skill in the art to implement Bolle's segmentation method, either the Figure 3a embodiment or the Figure 3b embodiment, on Ogasawara's videophone. And we also determine that even if an adequate

IPR2021-01332
Patent 9,324,004 B2

motivation for one with ordinary skill in the art to combine teachings is assumed, Petitioner has not shown a reasonable expectation of success in implementing Bolle's segmentation methods on Ogasawara's videophone.[13]

> *f)*     *Conclusion*

Petitioner has not proved by a preponderance of the evidence that claim 1 would have been obvious over Ogasawara and Bolle.

> 6.     *Dependent Claims 2, 3, 6, 18*

Claims 2, 6, and 18 each depend from claim 1, and claim 3 depends from claim 2. Ex. 1001, 24:34–39, 24:46–48, 25:18–20. All of the deficiencies of Petitioner's assertions discussed above in the context of claim 1 equally apply to claims 2, 3, 6, and 18. Accordingly, Petitioner has not proved by a preponderance of the evidence that any of claims 2, 3, 6, and 18 would have been obvious over Ogasawara and Bolle.

E.     *Alleged Obviousness of Claims 1–3, 6, and 18*
        *Over Ogasawara, Bolle, and Rhoads*

Petitioner does not apply Rhoads in a manner that eliminates the need to combine the teachings of Ogasawara and Bolle to use Bolle's segmentation method on Ogasawara's wireless videophone. Pet. 48–56. For example, Petitioner relies on Rhoads for teaching presenting a network address (e.g., a URL) to the display of a user's phone, in case that is, hypothetically, determined to be required by the claims. *Id.* at 54. Petitioner also relies on Rhoads for teaching that a user should align an object to be imaged within a camera's view and hold the object to be imaged steady," in case, hypothetically, the claims are construed to require recognizing an object based at least on part on an indication of how steady is the depicted

---

[13] We need not resolve Patent Owner's assertion that Petitioner's reliance on the Figure 3b embodiment of Bolle is belated and should not be considered.

image of the object and/or alignment of the object within the video stream. *Id.* at 55–56.

Accordingly, the deficiencies discussed above in Section II.D for the ground of unpatentability based on Ogasawara and Bolle apply equally to the ground of unpatentability based on Ogasawara, Bolle, and Rhoads. For the same reasons discussed above in Section II.D, Petitioner has not proved by a preponderance of the evidence that any of claims 1, 2, 3, 6, and 18 would have been obvious over Ogasawara, Bolle, and Rhoads.

*F.    Petitioner's Motion to Exclude Evidence*

Petitioner seeks to exclude multiple paragraphs within the Supplemental Declaration of Patent Owner's expert, Dr. Chandrajit Bajaj (Ex. 2007), as well as certain images contained in the Supplemental Declaration. Paper 34. Specifically, Petitioner seeks to exclude paragraphs 23–28, 30–43, 45, 47–55, 57, and 59, and the images contained in paragraphs 37–40. *Id.* at 5, 8, 10–12.

*1.    Assertion of Testimony being Conclusory*

On the basis of statements being conclusory or opinions lacking supporting fact or data, Petitioner seeks to exclude all of paragraphs 26–28, 30, 34–43, 51–54, and parts of paragraphs 23, 24, 25, 31, 32, 33, 45, 47, 48, 49, 50, 55, 57, and 59 of Dr. Bajaj's Supplemental Declaration. Paper 34, 5. Petitioner does not specifically address the content of each paragraph, but discusses only what it asserts to be exemplary. *Id.* at 6–7. Specifically, Petitioner provides three examples. *Id.*

As a first example, Petitioner asserts: "Dr. Bajaj testifies in Paragraph 33 of Exhibit 2007 that 'a person of ordinary skill in the art would have known that a wireless videophone available in the late-1990s would have significantly less processing power than any of the hardware discussed in

61

IPR2021-01332
Patent 9,324,004 B2

Bolle.' Ex. 2007, ¶ 33. Dr. Bajaj, however, provides no facts or data to support this bald assertion, which calls into question his credibility." *Id.* at 5. We disagree that Dr. Bajaj has to show more. As an expert in the field, Dr. Bajaj can testify as to his opinion regarding the state of the art at a certain time period, without need of specific underlying material. The subject is not one for which Dr. Bajaj needs to run an experiment to observe the results. In the absence of supporting material, the testimony may be challenged as lacking sufficient credibility, but the testimony is not inadmissible. In any event, as discussed above, our decision assumes that Ogasawara's videophone has processing circuitry just as powerful as Bolle's computer. The testimony did not result in any detriment to Petitioner.

As a second example, Petitioner asserts: "Dr. Bajaj testifies in Paragraphs 24, 26, 30–32, 34–35, 52–54, 57 and 59 of Exhibit 2007 that two images are *required* by Bolle for segmentation. Again, this opinion is conclusory without any supporting facts or data." *Id.* at 6. We disagree that there is no support for Dr. Bajaj's testimony. Bolle's disclosure describing the Figure 3a and Figure 3b embodiments provide such support.

Petitioner further asserts:

Dr. Bajaj contradicts this opinion in his deposition. He acknowledges in his deposition that Bolle's segmentation methods (that require comparing two images) are "preferred" methods (Ex. 1063, 66:15–67:20) and admits that segmentation without comparing two-images was know at the time of the invention (*id.*, 68:15–25). He also acknowledged that motivation to combine considers a prior art reference as a whole (*id.*, 33:11–22), yet he admits that he did not consider parts of Bolle that indicate Bolle's segmentation methods are not limited to comparing two images, such as claim 32 (*id.*, 98:6–99:14, 100:2–11).

62

Appx198

IPR2021-01332
Patent 9,324,004 B2

*Id.* The arguments are misplaced. That single image segmentation methods were known at that time is an entirely separate question from what segmentation methods are disclosed by Bolle. Here, we are not persuaded that claim 32 discloses a single image segmentation method. *Supra* 29–31. Further, that claim 32 of Bolle may be read to cover segmentation methods not requiring two images does not necessarily mean Bolle discloses a segmentation method not requiring two images. Similarly, Bolle characterizing his disclosed embodiments as preferred does not mean Bolle discloses other segmentation methods. We see no contradiction. Even if there is any contradiction, that merely affects credibility of Dr. Bajaj's testimony and is not a basis for excluding that testimony.

> Petitioner further asserts:

> Similarly, Dr. Bajaj's deposition testimony contradicts his unsupported assertions that Ogasawara is a "bar-code based system." Ex. 2007, ¶¶ 45–49. He testifies in his deposition that Ogasawara discloses character and pattern recognition software. Ex. 1063, 40:10–23, 42:4–13, 43:14–44:18, 46:3–47:16. He also testifies that a POSITA would have been aware of the character and pattern recognition software routines disclosed in Ogasawara. *Id.*, 51:1–23, 61:16–62:4.

Paper 34, 6–7. We disagree that there is no support for Dr. Bajaj's testimony such that the testimony should be excluded. That there is conflicting evidence, even overwhelming conflicting evidence, does not mean the testimony is inadmissible. Further, our determination of Petitioner not having provided insufficient motivation to combine does not rely, in any part, on Dr. Bajaj's testimony that Ogasawara is a "bar-code based system."

> As the third example, Petitioner asserts:

> Dr. Bajaj provides no basis for his opinion that Bolle's system is limited to a stationary system (Ex. 2007, ¶¶ 33–35, 59), which is based on the unsupported conclusion that two images are

63

IPR2021-01332
Patent 9,324,004 B2

required for Bolle's segmentation (*id.*, ¶¶ 33–35) and the unsupported conclusion that a user could not stabilize Ogasawara's mobile videophone to take two images for Bolle's two-image segmentation methods (*id.*, ¶¶ 24–25, 35, 59). Beyond failing to consider Bolle's other segmentation methods, as discussed above, Dr. Bajaj ignores Bolle's disclosure that, as an alternative to a stationary system, special registration "can be ensured by [] acquiring the first and second image in quick succession." Ex. 1006, 10:41–43.

*Id.* at 7.

We disagree that there is no basis for Dr. Bajaj's opinion that Bolle's system is limited to a stationary system. There is support in Figures 1 and 4 of Bolle, and also in Bolle's description of spatial registration for taking a first and a second image (Ex. 1006, 10:31–44). We also disagree that Dr. Bajaj's conclusion that a user could not stabilize Ogasawara's mobile videophone to take two images for Bolle's two-image segmentation methods" is without evidentiary support. Bolle's description of spatial registration constitutes such support. That Bolle also describes taking pictures in quick succession to address the effects of some movement goes to the weight of the evidence and is not a basis to exclude Dr. Bajaj's testimony.

### 2. Assertion of Irrelevance

Petitioner asserts that paragraphs 36–43 of Dr. Bajaj's Supplemental Declaration (Ex. 2007) should be excluded because they focus on symbols, e.g., barcodes, which "(i) did not form the bases of the instituted grounds, and (ii) is contrary to district court's claim constructions adopted by the Board." *Id.* at 8–9. Petitioner explains that opinions regarding Ogasawara's symbols and barcodes "have no bearing on the prior art combinations in this IPR (which are specifically for items without symbols) or the Challenged Claims (which have not been construed to include symbols)." *Id.* at 10.

64

IPR2021-01332
Patent 9,324,004 B2

According to Petitioner, an expert's testimony that has no bearing on the issues in the case and ignores the tribunal's claim construction is irrelevant. *Id.*

The testimony regarding Ogasawara's barcodes may be misplaced but is not irrelevant to Patent Owner's theory of lack of motivation to combine. Patent Owner, in its presentation, is free to emphasize the symbol or bar code aspect of Ogasawara more than it does the non-symbol aspect of Ogasawara. In any event, our determination that Petitioner has not shown an adequate motivation to combine teachings does not in any way rely on Patent Owner's emphasizing Ogasawara's symbol or barcode disclosures over Ogasawara's disclosure on recognizing visual characteristics of an object. The same is true for our determination that Petitioner has not shown that one with ordinary skill in the art would have had a reasonable expectation of success in implementing a system according to the combined teachings. Petitioner is concerned that we would be confused by the discussion pertaining to Ogasawara's bar codes. We are not.

    *3.    The Images*

Petitioner makes numerous contentions regarding the images reflected in paragraphs 37–40 of Exhibit 2007. Paper 34, 10–12. Petitioner asserts that the images supposedly are representations of bar codes and data matrices printed on various surfaces. *Id.* at 10. Petitioner asserts that the images are evidence without foundation because "[n]either Patent Owner nor Dr. Bajaj have identified any details regarding the origin of the images or the method and circumstances under which they were produced." *Id.*

Petitioner also asserts that the images appear to be "manipulated or annotated, including markings/etchings on the objects and manipulating light," and that "Dr. Bajaj provides no basis or explanation for the

65

IPR2021-01332
Patent 9,324,004 B2

manipulations or annotations." *Id.* at 11.  For that reason, Petitioner asserts the images are unreliable and should be excluded.  *Id.*  Petitioner further asserts that the images lack authentication and thus Patent Owner has not demonstrated that they are what they are purported to be.  *Id.*

Petitioner further asserts that the images should be excluded because they ("including the original, copy, and any other evidence") "have not been produced to prove the content."  *Id.* at 12 (citing Fed. R. Evid. 1001–1007). Petitioner asserts that "Patent Owner has provided no explanation as to why it did not submit supporting evidence for these images along with its Patent Owner's Response."  *Id.*

All of the above-noted contentions are misplaced.  The images themselves constitute the opinion of Dr. Bajaj on what some printed bar codes and data matrices on surfaces may look like under certain conditions. They are not items of evidence, separate from the opinion, submitted to prove anything, and they are not purported by Dr. Bajaj to have a specific source or origin.  Even if they are assumed as evidence relied on by Dr. Bajaj, the facts or data relied on by an expert to form an opinion need not be admissible for the opinion to be admitted.  Fed. R. Evid. 703.

In any event, our determination that Petitioner has not shown an adequate motivation to combine teachings and a reasonable expectation of success in implementing a system according to the combined teachings does not in any way rely on these images in paragraph 37–40 of Dr. Bajaj's Supplemental Declaration.

### 4.    *Alleged Hearsay*

Petitioner further asserts that paragraphs 36–43 "should be excluded as containing, referencing, and relying upon out of court statements purporting to describe the sources of these images, which are hearsay under

66

IPR2021-01332
Patent 9,324,004 B2

Fed. R. Evid. 801 and 802 for which Patent Owner has shown no exception."
Paper 34, 12.  The assertion is too vague.  Petitioner does not specifically
identify any such statement and we see none.[14]  Further, as discussed above
in Section II.F.3, the facts or data relied on by an expert to form an opinion
need not be admissible for the opinion to be admitted.  Fed. R. Evid. 703.

In any event, we have not relied on these images in determining that
Petitioner failed to show adequate motivation to combine teachings.  We
also have not relied on these images in determining that Petitioner has not
shown that one with ordinary skill in the art would have had a reasonable
expectation of success in implementing a system according to the combined
teachings.

5.    *Alleged Demonstratives*

Petitioner asserts that the images "should be excluded to the extent
they are intended as demonstratives."  *Id.* at 12.  The assertion is without
merit, because Dr. Bajaj's Supplemental Declaration (Ex. 2007), including
all contents thereof, is not a demonstrative exhibit and has not been
submitted by Patent Owner as a demonstrative exhibit.  Patent Owner's
demonstrative exhibit was submitted as Exhibit 2012.  As discussed above in
Section II.F.3, the images are the opinion of Dr. Bajaj on what some bar
codes and data matrices may look like under certain conditions.

6.    *Conclusion*

Petitioner's Motion to Exclude Evidence is *denied*.

---

[14] The assertion also conflicts with the contention of Petitioner, that
"[n]either Patent Owner nor Dr. Bajaj have identified any details regarding
the origin of the images."  *Id.* at 10.

67

IPR2021-01332
Patent 9,324,004 B2

### III. CONCLUSION

Petitioner has not proved by a preponderance of the evidence that claims 1–3, 6, and 18 of the '004 patent are unpatentable.  The outcome for the challenged claims of the '004 patent is set forth in the table below.[15]  In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 1–3, 6, 18 | 103 | Ogasawara, Bolle | | 1–3, 6, 18 |
| 1–3, 6, 18 | 103 | Ogasawara, Bolle, Rhoads | | 1–3, 6, 18 |
| **Overall Outcome** | | | | 1–3, 6, 18 |

---

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

68

Appx204

IPR2021-01332
Patent 9,324,004 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not shown by a preponderance of the evidence that claims 1–3, 6, and 18 of the '004 patent are unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Appx205

IPR2021-01332
Patent 9,324,004 B2

FOR PETITIONER:

Dustin J. Edwards
Michael A. Tomasulo
WINSTON & STRAWN LLP
dedwards@winstron.com
mtomasulo@winston.com
WS-BAC-NW-IPR@winston.com


FOR PATENT OWNER:

James M. Glass
Todd M. Briggs
QUINN EMANUEL URQUHART & SULLIVAN, LLP
nantworksvboa@quinnemanuel.com
jimglass@quinnemanuel.com

70

Trials@uspto.gov                                                                   Paper 35
571-272-7822                                                    Entered: February 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

BANK OF AMERICA, N.A.,
Petitioner,

v.

NANT HOLDINGS IP, LLC,
Patent Owner.

————————————

IPR2021-01333
Patent 7,899,252 B2

————————————

Before JAMESON LEE, ROBERT J. WEINSCHENK, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

WEINSCHENK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Petitioner's Motion to Exclude
*37 C.F.R. § 42.64(c)*

IPR2021-01333
Patent 7,899,252 B2

## I.  INTRODUCTION

### A.  Background and Summary

Bank of America, N.A. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 18, 26, 27, 29, and 31 ("the challenged claims") of U.S. Patent No. 7,899,252 B2 (Ex. 1001, "the '252 patent").  Nant Holdings IP, LLC ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp.") to the Petition.  We instituted an *inter partes* review of the challenged claims on February 22, 2022.  Paper 9 ("Dec. on Inst."), 19.  After institution, Patent Owner filed a Response (Paper 15, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 19, "Pet. Reply") to the Response, and Patent Owner filed a Sur-reply (Paper 24, "PO Sur-reply") to the Reply.  We held an oral hearing on November 10, 2022, and a transcript of the hearing is included in the record.  Paper 34 ("Tr.").

For the reasons set forth below, Petitioner has not shown by a preponderance of the evidence that claims 18, 26, 27, 29, and 31 of the '252 patent are unpatentable.

### B.  Real Parties in Interest

Petitioner identifies itself and Bank of America Corporation as the real parties in interest.  Pet. 63.  Patent Owner identifies itself as the only real party in interest.  Paper 3, 2.

### C.  Related Matters

The parties indicate that the '252 patent is the subject of the following district court case:  *NantWorks, LLC v. Bank of America Corporation*, No. 2:20-cv-07872 (C.D. Cal.).  Pet. 63–64; Paper 3, 2.

IPR2021-01333
Patent 7,899,252 B2

### D. The '252 Patent

The '252 patent relates to "digital imaging." Ex. 1001, 1:26. Specifically, the '252 patent states that a portable imaging device captures an image of an object and transmits information regarding the image to a distal server. *Id.* at 4:30–35. At least one of the portable device and the server derives a search term from at least one of the image and the transmitted information. *Id.* at 4:35–38. At least one of the portable device and the server submits the search term to a search engine. *Id.* at 4:38–41. The search engine uses the search term to produce a results set and transmits at least a portion of the results set to the portable device. *Id.* at 4:41–44.

The '252 patent claims the benefit of several provisional applications, the earliest of which was filed November 6, 2000. *Id.* at code (60). Petitioner does not contest this priority date. *See* Pet. 1, 12.

### E. Illustrative Claim

Of the challenged claims, claim 18 is independent. Claim 18 is reproduced below.

> 18. A method for retrieving information from image processing, the method comprising:
>
> providing a mobile device having a camera the mobile device configured to capture an image and configured to transmit data relating to the image an image processing platform;
>
> configuring the image processing platform to receive the data relating to the image and to conduct image processing, including:
>
> > operating on the data relating to the image to determine if the image contains one or more recognizable symbols; and

2

IPR2021-01333
Patent 7,899,252 B2

> decoding the recognizable symbols to extract
> symbol information by analyzing the recognizable
> symbols according to type;

> providing access to a distal server configured to use a
> database to identify pertinent information associated with the
> recognizable symbols based on the symbol information; and

> allowing the mobile device to receive the pertinent
> information over a network.

Ex. 1001, 19:6–26.

### F. Evidence

Petitioner submits the following evidence:

| Evidence | Exhibit No. |
|---|---|
| Declaration of Jeffrey J. Rodriguez, Ph.D. ("Rodriguez Declaration") | 1003 |
| Ogasawara, US 6,512,919 B2, issued Jan. 28, 2003 ("Ogasawara") | 1005 |
| Bolle, US 5,546,475, issued Aug. 13, 1996 ("Bolle") | 1006 |
| Cusmariu, US 6,519,362 B1, issued Feb. 11, 2003 ("Cusmariu") | 1030 |
| Second Declaration of Jeffrey J. Rodriguez, Ph.D. ("Second Rodriguez Declaration") | 1050 |

Patent Owner submits the Declaration of Chandrajit Bajaj, Ph.D.

Ex. 2010 ("Bajaj Declaration").

### G. Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable on the

following grounds:

3

Appx210

IPR2021-01333
Patent 7,899,252 B2

| Claims Challenged | 35 U.S.C. §¹ | Reference(s)/Basis |
|---|---|---|
| 18, 26, 27 | 102(e)¹ | Ogasawara |
| 29 | 103(a) | Ogasawara, Cusmariu |
| 31 | 103(a) | Ogasawara, Bolle |

## II.  ANALYSIS

### A.  Legal Standards

A claim is anticipated if each limitation of the claim is disclosed in a single prior art reference arranged as in the claim.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  A claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including 1) the scope and content of the prior art; 2) any differences between the claimed subject matter and the prior art; 3) the level of ordinary skill in the art; and 4) any objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### B.  Level of Ordinary Skill in the Art

Petitioner argues that a person of ordinary skill in the art would have had a "Bachelor of Science in Electrical Engineering, Computer Science, Computer Engineering, or equivalent, and one to two years of experience

---

¹ The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102, 103.  Because the '252 patent was filed before the effective date of the relevant amendment, the pre-AIA versions of §§ 102, 103 apply.

IPR2021-01333
Patent 7,899,252 B2

working with image processing, image recognition, or a related field."
Pet. 17 (citing Ex. 1003 ¶ 43). Petitioner's description of the level of
ordinary skill in the art is supported by the testimony of Petitioner's
declarant, Dr. Jeffrey Rodriguez. Ex. 1003 ¶ 43. Patent Owner does not
propose a description of the level of ordinary skill in the art or dispute
Petitioner's description. PO Resp. 15. We adopt Petitioner's description,
which is consistent with the level of ordinary skill in the art at the time of the
invention as reflected in the asserted prior art.

### C. Claim Construction

In an *inter partes* review proceeding, a patent claim is construed using
the same standard used in federal district court in a civil action under
35 U.S.C. § 282(b), including construing the claim in accordance with the
ordinary and customary meaning of the claim as understood by one of
ordinary skill in the art and the prosecution history pertaining to the patent.
37 C.F.R. § 42.100(b) (2020). Patent Owner proposes construing the term
"the image" in all challenged claims to refer to "the same, single image."
PO Resp. 20. Based on this proposed construction, Patent Owner argues that
the combination of Ogasawara and Bolle does not teach the limitations of
claim 31. *Id.* at 59–60. As discussed below, for reasons unrelated to the
term "the image," Petitioner does not meet its burden to show that the
challenged claims are unpatentable. *See* Sections II.D–II.F. Therefore, we
determine that the term "the image" does not require an express construction
to resolve the parties' disputes regarding the asserted grounds of
unpatentability.

IPR2021-01333
Patent 7,899,252 B2

> *D. Anticipation of Claims 18, 26, and 27 by Ogasawara*

Petitioner argues that claims 18, 26, and 27 are anticipated by Ogasawara. Pet. 19–29. For the reasons discussed below, Petitioner has not shown by a preponderance of the evidence that claims 18, 26, and 27 are anticipated by Ogasawara.

> *1. Overview of Ogasawara*

Ogasawara relates to "an electronic shopping system which utilizes a program downloadable wireless video phone as a purpose-type dedicated terminal which enable a shopper to capture, recognize and decode captured images." Ex. 1005, 1:16–21. Specifically, Ogasawara describes a wireless videophone with a digital camera and a purchase transaction program. *Id.* at 18:11–22. "[A] purchaser may use the wireless videophone, in particular the digital camera, to select various items which the consumer desires to purchase . . . by capturing an image of an item's UPC bar code data, or the like, within the image field of the digital camera." *Id.* at 20:41–47. The purchaser "need only inform the system that the image is ready for processing by a pressing a pre-defined key on the system's keyboard." *Id.* at 20:51–55. The purchase transaction program "include[s] character recognition and/or pattern recognition, as well as bar code decode, software" for recognizing "various . . . codes, indicia, text, icons, and the like" in the image. *Id.* at 18:15–22, 20:55–58.

> *2. Claim 18*

Claim 18 recites configuring an image processing platform to receive data relating to an image and to conduct image processing, including 1) "operating on the data relating to the image to *determine* if the image contains one or more recognizable symbols" ("the determining limitation");

6

IPR2021-01333
Patent 7,899,252 B2

and 2) "decoding the recognizable symbols to extract symbol information by *analyzing* the recognizable symbols according to type" ("the analyzing limitation"). Ex. 1001, 19:12–20 (emphases added).

For the determining limitation, Petitioner argues that "Ogasawara teaches that the purchase transaction program and/or personal shopping application contain pattern recognition routines to recognize and decode symbols . . . where such symbols include barcodes, icons, text, and other indicia." Pet. 23–24 (citing Ex. 1005, 18:11–58, 20:41–67). Petitioner also argues that "Ogasawara's software enables a shopper to 'capture, ***recognize and decode*** captured images.'" Pet. Reply 6 (citing. Ex. 1005, 1:15–21). According to Petitioner, "Ogasawara's system detects and recognizes those symbols that are supported (i.e., recognizable) by software downloaded to its program—i.e., its system is 'governed solely by ***operation of the downloaded program*** which is ***coded to recognize*** either characters or patterns as ***appropriate to the application.***'" *Id.* (citing Ex. 1005, 21:1–5, 22:63–66; Ex. 1050 ¶¶ 34–35).

For the analyzing limitation, Petitioner argues that Ogasawara's "[c]haracter or pattern recognition software translates the bar or icon code image into an appropriate item identifier." Pet. 24 (citing Ex. 1005, code (57)). "[F]or example, '[o]nce the bar code image has been captured, the program decodes the bar code image data to its corresponding numeric bar code data, by operating on the bar code image with pattern recognition software.'" *Id.* at 24–25 (citing Ex. 1005, 21:15–20). Petitioner also argues that "Ogasawara discloses that its pattern recognition software analyzes and decodes recognizable symbols according to type of character or pattern." *Id.* at 25 (citing Ex. 1005, 20:55–58). According to Petitioner, "[c]haracter

7

Appx214

IPR2021-01333
Patent 7,899,252 B2

recognition software supports identifying a product based on a numeric or alphanumeric code, while pattern recognition software supports recognition … based on bar code data." Pet. Reply 4 (citing Ex. 1005, 22:48–51).

Patent Owner argues that "Petitioner does not cite to anything in Ogasawara that operates on the image to determine if the image contains recognizable symbols like a barcode." PO Resp. 25 (citing Pet. 22–25). Patent Owner contends that "[b]y contrast, the '252 patent discloses '*a discriminator algorithm* which operates on the input image 18 and determines whether the input image contains recognizable symbols . . . . *If such symbols are found*, the image 18 is sent to the decode symbol 28 process.'" *Id.* (citing Ex. 1001, 11:14–19). Patent Owner further argues that although "Petitioner points to several disclosures that the recognition routines *recognize* the symbol," "Ogasawara's 'recognition' refers to the decoding of the symbol to an identifier, not the act of determining the presence of the symbol in the first place." PO Sur-reply 7 (citing Pet. Reply 5–6; Ex. 1005, code (57)). In addition, Patent Owner argues that "Ogasawara expressly states that it is *the user* which informs the system whether or not the image contains recognizable symbols such as a barcode." PO Resp. 24–25 (citing Ex. 1005, 21:12–20).

The parties agree that claim 18 requires an image processing platform that determines if an image contains one or more recognizable symbols *before* analyzing the recognizable symbols to extract information. Pet. 3 ("if a recognizable barcode is found, . . . the software decodes that barcode"); *id.* at 23–24 ("[T]he image processing platform determines *if* the captured image contains one or more recognizable symbols . . . The image processing platform *then* decodes the recognizable symbols.") (emphases added); PO

8

IPR2021-01333
Patent 7,899,252 B2

Resp. 26 ("The detection/discrimination step could . . . be a useful filter to avoid performing unnecessary recognition."). The parties' interpretation is consistent with the claim language. As discussed above, claim 18 recites "operating on the data . . . to determine if the image contains one or more recognizable symbols" and "analyzing the recognizable symbols according to type." Ex. 1001, 19:15–20. Also, because it is logical to determine if an image contains any recognizable symbols before analyzing the symbols, claim 18 indicates that the determining limitation is performed *before* the analyzing limitation. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("First, we look to the claim language to determine if, as a matter of logic or grammar, [the recited steps] must be performed in the order written.").

The parties' interpretation also is supported by the written description of the '252 patent. Specifically, the '252 patent describes "a discriminator algorithm which operates on the input image 18 and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters." Ex. 1001, 11:14–18. According to the '252 patent, "*[i]f* such symbols are found, the image 18 is sent to the decode symbol 28 process." *Id.* at 11:18–19 (emphasis added). "The image can *then* be analyzed to determine the location, size, and nature of the symbols in the decode symbol 28 [process]." *Id.* at 11:30–35 (emphasis added). On the other hand, if the discriminator algorithm does not confidently find a symbol in the image, the image can "also or alternatively be sent to the Object Image branch of the process flow." *Id.* at 11:19–23, Fig. 1. Thus, the written description indicates that the discriminator algorithm determines if the image contains recognizable symbols *before* the decode symbol process analyzes

9

IPR2021-01333
Patent 7,899,252 B2

the symbols. *See Altiris*, 318 F.3d at 1370 ("[W]e next look to the rest of the specification to determine whether *it* 'directly or implicitly requires such a narrow construction.'").

Petitioner does not show persuasively that Ogasawara expressly or implicitly discloses the determining limitation of claim 18. The portions of Ogasawara cited by Petitioner indicate that Ogasawara's computing platform invokes its recognition software to analyze image data *without* first determining if the image contains a recognizable symbol. *See* Pet. 23–25 (citing Ex. 1005, 18:11–58, 20:41–67, 21:15–20). Ogasawara discloses that the user of its device verifies that an image contains an entire symbol when capturing the image and before transmitting the image data to the computing platform. Ex. 1005, 20:47–51 ("While the consumer is scanning a particular bar code with the digital camera, . . . the consumer can visually verify that the entire image has been captured."); *see also id.* at 20:41–47, 22:10–13, 22:59–63 (disclosing that a user captures an image of an item's bar code by placing it within the image field of the digital camera). As a result, when Ogasawara's computing platform receives the image data, it simply invokes recognition software to analyze the image data.[2] *Id.* at 18:32–37, 21:17–20. For example, Ogasawara discloses that "[o]nce the bar code image has been captured, the program decodes the bar code image data . . . by operating on the bar code image with pattern recognition software." *Id.* at 21:17–20; *see also id.* at 18:32–37 ("Once this information is received . . . , a character

---

[2] In fact, Petitioner appears to acknowledge that Ogasawara's device operates in this manner. Pet. 24–25 ( "[o]nce the bar code image has been captured, the program decodes the bar code image data . . . with pattern recognition software." ).

10

IPR2021-01333
Patent 7,899,252 B2

recognition and/or pattern recognition application routine can be invoked . . .
to . . . decode the bar code.").  Thus, Ogasawara supports Patent Owner's
position that Ogasawara's computing platform does *not* determine if an
image contains a recognizable symbol *before* analyzing the image.

Petitioner argues that the term "recognize" in Ogasawara discloses
determining if an image contains a recognizable symbol, whereas the term
"decode" discloses analyzing the symbol to extract information.  Pet. Reply
6 ("capture, ***recognize <u>and</u> decode*** captured images.").  We disagree.
Ogasawara uses both terms—recognize and decode—to describe analyzing
image data to extract information.  Ex. 1005, 18:32–37, 21:17–20.  For
example, Ogasawara discloses that its computing platform invokes
recognition software "to either *decode* the bar code videographic data or to
perform pattern *recognition* functions on a[n] icon-like patter[n]."  *Id.* at
18:32–37 (emphases added); *see also id.* at 21:17–20 ("the program *decodes*
the bar code image data . . . by operating on the bar code image with pattern
*recognition* software") (emphases added).  Thus, Petitioner's reliance on the
term "recognize" does *not* show that Ogasawara discloses the determining
limitation of claim 18.

For the reasons discussed above, Petitioner does not show sufficiently
that Ogasawara discloses all the limitations of claim 18.

> 3.  *Claims 26 and 27*

Claims 26 and 27 depend, directly or indirectly, from claim 18.
Ex. 1001, 20:8–12.  Petitioner's arguments and evidence for claims 26 and
27 do not compensate for the deficiencies discussed above for claim 18.  *See*
Pet. 28–29.  Thus, for the same reasons discussed above for claim 18,

11

IPR2021-01333
Patent 7,899,252 B2

Petitioner does not show sufficiently that Ogasawara discloses all the limitations of claims 26 and 27.

### 4. Summary

For the foregoing reasons, Petitioner has not shown by a preponderance of the evidence that claims 18, 26, and 27 are anticipated by Ogasawara.

### E. Obviousness of Claim 29 over Ogasawara and Cusmariu

Petitioner argues that claim 29 would have been obvious over Ogasawara and Cusmariu. Pet. 30–38. Claim 29 depends from claim 18. Ex. 1001, 20:15–17. Petitioner's arguments and evidence for claim 29 do not compensate for the deficiencies discussed above for claim 18. *See* Pet. 30–38. Thus, for the same reasons discussed above for claim 18, Petitioner has not shown by a preponderance of the evidence that claim 29 would have been obvious over Ogasawara and Cusmariu.

### F. Obviousness of Claim 31 over Ogasawara and Bolle

Petitioner argues that claim 31 would have been obvious over Ogasawara and Bolle. Pet. 38–56. Claim 31 depends from claim 18. Ex. 1001, 20:21–25. Petitioner's arguments and evidence for claim 31 do not compensate for the deficiencies discussed above for claim 18. *See* Pet. 38–56. Thus, for the same reasons discussed above for claim 18, Petitioner has not shown by a preponderance of the evidence that claim 31 would have been obvious over Ogasawara and Bolle.

### G. Petitioner's Motion to Exclude

Petitioner filed a Motion to Exclude (Paper 27, "Pet. Mot. Excl."), Patent Owner filed an Opposition (Paper 28, "PO Opp. Excl.") to the Motion, and Petitioner filed a Reply (Paper 30, "Pet. Reply Excl.") to the

12

IPR2021-01333
Patent 7,899,252 B2

Opposition.  We have considered the parties' arguments, and, for the reasons discussed below, Petitioner's Motion to Exclude is *denied*.

Petitioner argues that portions of paragraphs 38, 39, 41, 44–46, 50, 51, 55–59, 61–66, 68–81, 83, 85–88, 90–92, and 94 of the Bajaj Declaration (Ex. 2010) should be excluded under Fed. R. Evid. 702, "because they contain conclusory statements or opinions that lack sufficient supporting facts or data."  Pet. Mot. Excl. 5.  We do not rely on any of the identified paragraphs in this Decision.  Thus, because Petitioner does not suffer any prejudice by our admission of paragraphs 38, 39, 41, 44–46, 50, 51, 55–59, 61–66, 68–81, 83, 85–88, 90–92, and 94, Petitioner's Motion to Exclude is *denied* with respect to those paragraphs of Exhibit 2010.

Petitioner argues that paragraph 57 of the Bajaj Declaration (Ex. 2010) should be excluded as 1) lacking foundation; 2) lacking authentication; 3) impermissible hearsay; 4) lacking supporting evidence; and 5) improper demonstratives.  Pet. Mot. Excl. 11–15.  We do not rely on paragraph 57 in this Decision.  Thus, because Petitioner does not suffer any prejudice by our admission of paragraph 57, Petitioner's Motion to Exclude is *denied* with respect to paragraph 57 of Exhibit 2010.

Petitioner argues that paragraphs 74–81 of the Bajaj Declaration (Ex. 2010) should be excluded as 1) lacking foundation; 2) irrelevant, misleading, confusing, and not probative; 3) lacking authentication; 4) impermissible hearsay; 5) lacking supporting evidence; and 6) improper demonstratives.  Pet. Mot. Excl. 11–15.  We do not rely on paragraphs 74–81 in this Decision.  Thus, because Petitioner does not suffer any prejudice by our admission of paragraphs 74–81, Petitioner's Motion to Exclude is *denied* with respect to paragraphs 74–81 of Exhibit 2010.

13

Appx220

IPR2021-01333
Patent 7,899,252 B2

## III. CONCLUSION

Petitioner has not shown by a preponderance of the evidence that claims 18, 26, 27, 29, and 31 of the '252 patent are unpatentable.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 18, 26, 27 | 102(e) | Ogasawara | | 18, 26, 27 |
| 29 | 103(a) | Ogasawara, Cusmariu | | 29 |
| 31 | 103(a) | Ogasawara, Bolle | | 31 |
| Overall Outcome | | | | 18, 26, 27, 29, 31 |

## IV. ORDER

It is hereby

ORDERED that claims 18, 26, 27, 29, and 31 of the '252 patent are not shown unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

14

Appx221

IPR2021-01333
Patent 7,899,252 B2

PETITIONER:

Dustin J. Edwards
Michael A. Tomasulo
WINSTON & STRAWN LLP
dedwards@winston.com
mtomasulo@winston.com


PATENT OWNER:

James M. Glass
Todd M. Briggs
Eric Huang
Quincy Lu
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
toddbriggs@quinnemanuel.com
erichuang@quinnemanuel.com
quincylu@quinnemanuel.com

15



US007881529B2

(12) **United States Patent**
Boncyk et al.

(10) **Patent No.:** US 7,881,529 B2
(45) **Date of Patent:** *Feb. 1, 2011

(54) **DATA CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS**

(75) Inventors: **Wayne C Boncyk**, Fontana, CA (US); **Ronald H Cohen**, Pasadena, CA (US)

(73) Assignee: **Evryx Technologies, Inc.,** Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/505,714**

(22) Filed: **Jul. 20, 2009**

(65) **Prior Publication Data**

US 2010/0011058 A1    Jan. 14, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/342,094, filed on Jan. 26, 2006, now Pat. No. 7,565,008, which is a continuation-in-part of application No. 09/992,942, filed on Nov. 5, 2001, now Pat. No. 7,016,532.

(60) Provisional application No. 60/317,521, filed on Sep. 5, 2001, provisional application No. 60/246,295, filed on Nov. 6, 2000.

(51) Int. Cl.
*G06K 9/00*    (2006.01)

(52) U.S. Cl. .................................................... **382/165**

(58) **Field of Classification Search** ......... 382/115–118, 382/162, 165, 170, 100, 181, 305, 224, 218; 348/239, 14.1–14.16, 211.2–211.6, 207.1, 348/460, 552; 707/1–7, 104.1; 705/26–27, 705/23; 455/414.2, 456.3, 556.1, 412.1, 455/556.2, 419; 709/201–203, 217–219, 709/250
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,522,889 | B1 | 2/2003 | Aarnio |
| 6,674,993 | B1 | 1/2004 | Tarbouriech |
| 6,724,914 | B2 | 4/2004 | Brundage et al. |
| 7,016,532 | B2 * | 3/2006 | Boncyk et al. .............. 382/165 |
| 2002/0019819 | A1 | 2/2002 | Sekiguchi et al. |
| 2003/0095681 | A1 | 5/2003 | Burg et al. |
| 2005/0015370 | A1 | 1/2005 | Stavely et al. |
| 2005/0185060 | A1 | 8/2005 | Neven |
| 2008/0021953 | A1 | 1/2008 | Gil |

* cited by examiner

*Primary Examiner*—Sherali Ishrat
(74) *Attorney, Agent, or Firm*—Fish & Associates, PC

(57) **ABSTRACT**

An identification method and process for objects from digitally captured images thereof that uses data characteristics to identify an object from a plurality of objects in a database. The data is broken down into parameters such as a Shape Comparison, Grayscale Comparison, Wavelet Comparison, and Color Cube Comparison with object data in one or more databases to identify the actual object of a digital image.

**27 Claims, 4 Drawing Sheets**



Appx235



FIG. 1

BANK OF AMERICA                    IPR2021-01081                    Ex. 1001, p. 2 of 12



FIGURE 2

BANK OF AMERICA      IPR2021-01081      Ex. 1001, p. 3 of 12



FIG. 3A

Appx238



**FIG. 3B**

BANK OF AMERICA                IPR2021-01081                Ex. 1001, p. 5 of 12

Appx239

US 7,881,529 B2

1

## DATA CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS

This application is a Continuation of U.S. application Ser. No. 11/342,094 filed Jan. 26, 2006 now U.S. Pat. No. 7,565, 008, which is a CIP of U.S. application Ser. No. 09/992,942 filed Nov. 5, 2001 now U.S. Pat. No. 7,016,532, which claims priority to U.S. Provisional Application No. 60/317,521 filed Sep. 5, 2001, and U.S. Provisional Application No. 60/246, 295 filed Nov. 6, 2000. These and all other extrinsic references are incorporated herein by reference in their entirety. Where a definition or use of a term in an incorporated reference is inconsistent or contrary to the definition of that term provided herein, the definition of that term provided herein applies and the definition of that term in the reference does not apply.

This application is a continuation-in-part of U.S. application Ser. No. 09/992,942 filed Nov. 5, 2001 which claims the benefit of U.S. Provisional Application No. 60/317,521 filed on Sep. 5, 2001 and U.S. Provisional Application No. 60/246, 295 filed on Nov. 6, 2000.

### FIELD OF THE INVENTION

The invention relates an identification method and process for objects from digitally captured images thereof that uses data characteristics to identify an object from a plurality of objects in a database.

### BACKGROUND OF THE INVENTION

There is a need to identify an object that has been digitally captured from a database of images without requiring modification or disfiguring of the object. Examples include:

identifying pictures or other art in a large museum, where it is desired to provide additional information about objects in the museum by means of a mobile display so that the museum may display objects of interest in the museum and ensure that displays are not hidden or crowded out by signs or computer screens;

establishing a communications link with a machine by merely taking a visual data of the machine; and

calculating the position and orientation of an object based on the appearance of the object in a data despite shadows, reflections, partial obscuration, and variations in viewing geometry, or other obstructions to obtaining a complete image. Data capture hardware such as a portable telephones with digital cameras included are now coming on the market and it is desirable that they be useful for duties other than picture taking for transmission to a remote location. It is also desirable that any identification system uses available computing power efficiently so that the computing required for such identification can be performed locally, shared with an Internet connected computer or performed remotely, depending on the database size and the available computing power. In addition, it is desirable that any such identification system can use existing identification markings such as barcodes, special targets, or written language when such is available to speed up searches and data information retrieval.

### SUMMARY OF THE INVENTION

The present invention solves the above stated needs. Once a data is captured digitally, a search of the data determines whether symbolic content is included in the image. If so the symbol is decoded and communication is opened with the proper database, usually using the Internet, wherein the best

2

match for the symbol is returned. In some instances, a symbol may be detected, but non-ambiguous identification is not possible. In that case and when a symbolic data can not be detected, the data is decomposed through identification algorithms where unique characteristics of the data are determined. These characteristics are then used to provide the best match or matches in the data-base, the "best" determination being assisted by the partial symbolic information, if that is available.

Therefore the present invention provides technology and processes that can accommodate linking objects and images to information via a network such as the Internet, which requires no modification to the linked object. Traditional methods for linking objects to digital information, including applying a barcode, radio or optical transceiver or transmitter, or some other means of identification to the object, or modifying the data or object so as to encode detectable information in it, are not required because the data or object can be identified solely by its visual appearance. The users or devices may even interact with objects by "linking" to them. For example, a user may link to a vending machine by "pointing and clicking" on it. His device would be connected over the Internet to the company that owns the vending machine. The company would in turn establish a connection to the vending machine, and thus the user would have a communication channel established with the vending machine and could interact with it.

The decomposition algorithms of the present invention allow fast and reliable detection and recognition of images and/or objects based on their visual appearance in an image, no matter whether shadows, reflections, partial obscuration, and variations in viewing geometry are present. As stated above, the present invention also can detect, decode, and identify images and objects based on traditional symbols which may appear on the object, such as alphanumeric characters, barcodes, or 2-dimensional matrix codes.

When a particular object is identified, the position and orientation of an object with respect to the user at the time the data was captured can be determined based on the appearance of the object in an image. This can be the location and/or identity of people scanned by multiple cameras in a security system, a passive locator system more accurate than GPS or usable in areas where GPS signals cannot be received, the location of specific vehicles without requiring a transmission from the vehicle, and many other uses.

When the present invention is incorporated into a mobile device, such as a portable telephone, the user of the device can link to images and objects in his or her environment by pointing the device at the object of interest, then "pointing and clicking" to capture an image. Thereafter, the device transmits the data to another computer ("Server"), wherein the data is analyzed and the object or data of interest is detected and recognized. Then the network address of information corresponding to that object is transmitted from the ("Server") back to the mobile device, allowing the mobile device to access information using the network address so that only a portion of the information concerning the object needs to be stored in the systems database.

Some or all of the data processing, including image/object detection and/or decoding of symbols detected in the data, may be distributed arbitrarily between the data (Client) device and the Server. In other words, some processing may be performed in the Client device and some in the Server. Additionally the processing may be performed without specification of which particular processing is performed in each. However all processing may be performed on one platform or the other, or the platforms may be combined so that there is

Appx240

US 7,881,529 B2

**3**

only one platform. The data processing can be implemented in a parallel computing manner, thus facilitating scaling of the system with respect to database size and input traffic loading.

Therefore, it is an object of the present invention to provide a system and process for identifying digitally captured images without requiring modification to the object.

Another object is to use digital capture devices in ways never contemplated by their manufacturer.

Another object is to allow identification of objects from partial views of the object.

Another object is to provide communication means with operative devices without requiring a public connection therewith.

Another object is to allow the telephony device to transmit information and data derived from the captured data to the server.

Still another object of the invention is to provide a telephony device that may transmit motion imagery to the server.

Another object is to provide a communication means wherein the telephony device may transmit information/data derived from data to the server, as opposed to transmitting the data itself.

Yet another object of the present invention is to allow the telephony device to transmit either motion imagery and/or still images to the server.

Another object of the present invention is to allow the server to send an item of information to another distal device.

Yet another object of the present invention is to allow the system to perform data processing, data contrast enhancement, noise removal and de-blurring thereof.

Yet another object of the present invention is to allow the system to perform data processing prior to the recognition and/or search process.

Still another object of the present invention is to allow the system to perform data processing even if the data recognition and/or search process fails.

Another object of the present invention is to allow the system to perform data processing after a prior data recognition and/or search process fails.

These and other objects and advantages of the present invention will become apparent to those skilled in the art after considering the following detailed specification, together with the accompanying drawings wherein:

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic block diagram top-level algorithm flowchart;

FIG. **2** is an idealized view of data capture;

FIGS. **3**A and **3**B are a schematic block diagram of process details of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention includes a novel process whereby information such as Internet content is presented to a users based solely on a remotely acquired data of a physical object. Although coded information can be included in the remotely acquired image, it is not required since no additional information about a physical object, other than its image, needs to be encoded in the linked object. There is no need for any additional code or device, radio, optical or otherwise, to be embedded in or affixed to the object. Image-linked objects can be located and identified within user-acquired imagery solely by means of digital data processing, with the address of pertinent information being returned to the device used to

**4**

acquire the data and perform the link. This process is robust against digital data noise and corruption (as can result from lossy data compression/decompression), perspective error, rotation, translation, scale differences, illumination variations caused by different lighting sources, and partial obscuration of the target that results from shadowing, reflection or blockage.

Many different variations on machine vision "target location and identification" exist in the current art. However, they all tend to provide optimal solutions for an arbitrarily restricted search space. At the heart of the present invention is a high-speed data matching engine that returns unambiguous matches to target objects contained in a wide variety of potential input images. This unique approach to data matching takes advantage of the fact that at least some portion of the target object will be found in the user-acquired image. Additionally, another unique approach is to allow for data processing by either the capturing device or the server prior to identification and transmission. The parallel data comparison processes embodied in the present search technique are, when taken together, unique to the process. Further, additional refinement of the process, with the inclusion of more and/or different decomposition-parameterization functions, utilized within the overall structure of the search loops is not restricted. The detailed process is described in the following FIG. **1** showing the overall processing flow and steps. These steps are described in further detail in the following sections.

For data capture **10**, the User **12** (FIG. **2**) utilizes a computer, mobile telephone, personal digital assistant, or other similar device **14** equipped with a data sensor (such as a CCD or CMOS digital camera). The User **12** aligns the sensor of the data capture device **14** with the object **16** of interest. The linking process is then initiated by suitable means including: the User **12** pressing a button on the device **14** or sensor; by the software in the device **14** automatically recognizing that a data is to be acquired; by User voice command; or by any other appropriate means. The device **14** captures a digital data **18** of the scene at which it is pointed. This data **18** is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. For the purposes of standardizing the analytical processes in this embodiment, if the device **14** supplies a data in other than RGB format, a transformation to RGB is accomplished. These analyses could be carried out in any standard color format, should the need arise.

If the Data/Server **20** is physically separate from the device **14**, then user acquired images are transmitted from the device **14** to the Data/Server **20** using a conventional digital network or wireless network means. However, prior to transmitting the data to the data/server **20**, the device **14** used to capture the data may first conduct data processing, such as contrast enhancement, noise removal, de-blurring and the like. This procedure of data processing may be done prior to transmission of the data to the data/server **20**, or after search results have been returned to the device **14**.

If the data **18** has been compressed (e.g. via lossy JPEG DCT) in a manner that introduces compression artifacts into the reconstructed data **18**, these artifacts may be partially removed by, for example, applying a conventional despeckle filter to the reconstructed data prior to additional processing. Additionally, the device **14** may transmit motion imagery, such as, for example, video transmissions. The motion imagery may be transferred to the server instead of; or in conjunction with one or more still images.

The Data Type Determination **26** is accomplished with a discriminator algorithm which operates on the input data **18** and determines whether the input data contains recognizable

**BANK OF AMERICA**          IPR2021-01081          **Ex. 1001, p. 7 of 12**

US 7,881,529 B2

**5**

symbols, such as barcodes, matrix codes, or alphanumeric characters. If such symbols are found, the data **18** is sent to the Decode Symbol **28** process. Depending on the confidence level with which the discriminator algorithm finds the symbols, the data **18** also may or alternatively contain an object of interest and may therefore also or alternatively be sent to the Object Data branch of the process flow. For example, if an input data **18** contains both a barcode and an object, depending on the clarity with which the barcode is detected, the data may be analyzed by both the Object Data and Symbolic Data branches, and that branch which has the highest success in identification will be used to identify and link from the object.

The data may be analyzed to determine the location, size, and nature of the symbols in the Decode Symbol **28**. The symbols are analyzed according to their type, and their content information is extracted. For example, barcodes and alphanumeric characters will result in numerical and/or text information.

For object images, the present invention performs a "decomposition", in the Input Data Decomposition **34**, of a high-resolution input data into several different types of quantifiable salient parameters. This allows for multiple independent convergent search processes of the database to occur in parallel, which greatly improves data match speed and match robustness in the Database Matching **36**. As illustrated above, a portion of the decomposition may be divided arbitrarily between the device **14** and the server **20**. The Best Match **38** from either the Decode Symbol **28**, or the data Database Matching **36**, or both, is then determined. If a specific URL (or other online address) is associated with the image, then an URL Lookup **40** is performed and the Internet address is returned by the URL Return **42**. Additionally, during processing, the server may send an item of information to another distal device (not shown). For example, if an data of a TV listing in a magazine is transmitted to the server **20**, the server may recognize the data as a TV listing wherein the server **20** may send a command to a Internet-connected television to change to the channel in the listing.

The overall flow of the Input Data Decomposition process is as follows:

Radiometric Correction
Segmentation
Segment Group Generation
FOR each segment group
Bounding Box Generation
Geometric Normalization
Wavelet Decomposition
Color Cube Decomposition
Shape Decomposition
Low-Resolution Grayscale Image Generation
FOR END

Each of the above steps is explained in further detail below. For Radiometric Correction, the input image typically is transformed to an 8-bit per color plane, RGB representation. The RGB image is radiometrically normalized in all three channels. This normalization is accomplished by linear gain and offset transformations that result in the pixel values within each color channel spanning a full 8-bit dynamic range (256 possible discrete values). An 8-bit dynamic range is adequate but, of course, as optical capture devices produce higher resolution images and computers get faster and memory gets cheaper, higher bit dynamic ranges, such as 16-bit, 32-bit or more may be used.

For Segmentation, the radiometrically normalized RGB image is analyzed for "segments," or regions of similar color, i.e. near equal pixel values for red, green, and blue. These segments are defined by their boundaries, which consist of

**6**

sets of (x, y) point pairs. A map of segment boundaries is produced, which is maintained separately from the KGB input image and is formatted as an x, y binary image map of the same aspect ratio as the RGB image.

For Segment Group Generation, the segments are grouped into all possible combinations. These groups are known as "segment groups" and represent all possible potential images or objects of interest in the input image. The segment groups are sorted based on the order in which they will be evaluated. Various evaluation order schemes are possible. The particular embodiment explained herein utilizes the following "center-out" scheme: The first segment group comprises only the segment that includes the center of the image. The next segment group comprises the previous segment plus the segment which is the largest (in number of pixels) and which is adjacent to (touching) the previous segment group. Additional segments are added using the segment criteria above until no segments remain. Each step, in which a new segment is added, creates a new and unique segment group.

For Bounding Box Generation, the elliptical major axis of the segment group under consideration (the major axis of an ellipse just large enough to contain the entire segment group) is computed. Then a rectangle is constructed within the image coordinate system, with long sides parallel to the elliptical major axis, of a size just large enough to completely contain every pixel in the segment group.

For Geometric Normalization, a copy of the input image is modified such that all pixels not included in the segment group under consideration are set to mid-level gray. The result is then resampled and mapped into a "standard aspect" output test image space such that the corners of the bounding box are mapped into the corners of the output test image. The standard aspect is the same size and aspect ratio as the Reference images used to create the database.

For Wavelet Decomposition, a grayscale representation of the full-color image is produced from the geometrically normalized image that resulted from the Geometric Normalization step. The following procedure is used to derive the grayscale representation. Reduce the three color planes into one grayscale image by proportionately adding each R, G, and B pixel of the standard corrected color image using the following formula:

$$L.sub.x,y = 0.34*R.sub.x,y + 0.55*G.sub.x,y + 0.11*B.sub.x,y$$

then round to nearest integer value. Truncate at 0 and 255, if necessary. The resulting matrix L is a standard grayscale image. This grayscale representation is at the same spatial resolution as the full color image, with an 8-bit dynamic range. A multi-resolution Wavelet Decomposition of the grayscale image is performed, yielding wavelet coefficients for several scale factors. The Wavelet coefficients at various scales are ranked according to their weight within the image.

For Color Cube Decomposition, an image segmentation is performed (see "Segmentation" above), on the RGB image that results from Geometric Normalization. Then the RGB image is transformed to a normalized Intensity, In-phase and Quadrature-phase color image (YIQ). The segment map is used to identify the principal color regions of the image, since each segment boundary encloses pixels of similar color. The average Y, I, and Q values of each segment, and their individual component standard deviations, are computed. The following set of parameters is stored, representing the colors, color variation, and size for each segment:

Y.sub.avg=Average Intensity
I.sub.avg=Average In-phase
Q.sub.avg=Average Quadrature

Appx242

US 7,881,529 B2

7

Y.sub.sigma=Intensity standard deviation

I.sub.sigma=In-phase standard deviation

Q.sub.sigma=Quadrature standard deviation

N.sub.pixels=number of pixels in the segment

The parameters comprise a representation of the color intensity and variation in each segment. When taken together for all segments in a segment group, these parameters comprise points (or more accurately, regions, if the standard deviations are taken into account) in a three-dimensional color space and describe the intensity and variation of color in the segment group.

For Shape Decomposition, the map resulting from the segmentation performed in the Color Cube Generation step is used and the segment group is evaluated to extract the group outer edge boundary, the total area enclosed by the boundary, and its area centroid. Additionally, the net ellipticity (semi-major axis divided by semi-minor axis of the closest fit ellipse to the group) is determined.

For Low-Resolution Grayscale Image Generation, the full-resolution grayscale representation of the image that was derived in the Wavelet Generation step is now subsampled by a factor in both x and y directions. For the example of this embodiment, a 3:1 subsampling is assumed. The subsampled image is produced by weighted averaging of pixels within each 3.times.3 cell. The result is contrast binned, by reducing the number of discrete values assignable to each pixel based upon substituting a "binned average" value for all pixels that fall within a discrete (TBD) number of brightness bins.

The above discussion of the particular decomposition methods incorporated into this embodiment are not intended to indicate that more, or alternate, decomposition methods may not also be employed within the context of this invention.

In other words:

FOR each input image segment group FOR each database object FOR each view of this object FOR each segment group in this view of this database object Shape Comparison Grayscale Comparison Wavelet Comparison Color Cube Comparison Calculate Combined Match Score END FOR END FOR END FOR END FOR

Each of the above steps is explained in further detail below.

FOR Each Input Image Segment Group

This loop considers each combination of segment groups in the input image, in the order in which they were sorted in the "Segment Group Generation" step. Each segment group, as it is considered, is a candidate for the object of interest in the image, and it is compared against database objects using various tests.

One favored implementation, of many possible, for the order in which the segment groups are considered within this loop is the "center-out" approach mentioned previously in the "Segment Group Generation" section. This scheme considers segment groups in a sequence that represents the addition of adjacent segments to the group, starting at the center of the image. In this scheme, each new group that is considered comprises the previous group plus one additional adjacent image segment. The new group is compared against the database. If the new group results in a higher database matching score than the previous group, then new group is retained. If the new group has a lower matching score then the previous group, then it is discarded and the loop starts again. If a particular segment group results in a match score which is extremely high, then this is considered to be an exact match and no further searching is warranted; in this case the current group and matching database group are selected as the match and this loop is exited.

8

FOR Each Database Object

This loop considers each object in the database for comparison against the current input segment group.

FOR Each View Of This Object

This loop considers each view of the current database object for comparison against the current input segment group. The database contains, for each object, multiple views from different viewing angles.

FOR Each Segment Group In This View Of This Database Object

This loop considers each combination of segment groups in the current view of the database object. These segment groups were created in the same manner as the input image segment groups.

Shape Comparison

Inputs

For the input image and all database images:

I. Segment group outline

I. Segment group area

III. Segment group centroid location

IV. Segment group bounding ellipse ellipticity

Algorithm

V. Identify those database segment groups with an area approximately equal to that of the input segment group, within TBD limits, and calculate an area matching score for each of these "matches."

VI. Within the set of matches identified in the previous step, identify those database segment groups with an ellipticity approximately equal to that of the input segment group, within TBD limits, and calculate an ellipticity position matching score for each of these "matches."

VII. Within the set of matches identified in the previous step, identify those database segment groups with a centroid position approximately equal to that of the input segment group, within TBD limits, and calculate a centroid position matching score for each of these "matches."

VIII. Within the set of matches identified in the previous step, identify those database segment groups with an outline shape approximately equal to that of the input segment group, within TBD limits, and calculate an outline matching score for each of these "matches." This is done by comparing the two outlines and analytically determining the extent to which they match.

Note: this algorithm need not necessarily be performed in the order of Steps 1 to 4. It could alternatively proceed as follows:

2 FOR each database segment group IF the group passes Step 1 IF the group passes Step 2 IF the group passes Step 3 IF the group passes Step 4 Successful comparison, save result END IF END IF END IF END IF END FOR

Grayscale Comparison

Inputs

For the input image and all database images:

IX. Low-resolution, normalized, contrast-binned, grayscale image of pixels within segment group bounding box, with pixels outside of the segment group set to a standard background color.

Algorithm

Given a series of concentric rectangular "tiers" of pixels within the low-resolution images, compare the input image pixel values to those of all database images, calculate a matching score for each comparison and identify those database images with matching scores within TBD limits, as follows:

FOR each database image

FOR each tier, starting with the innermost and progressing to the outermost

Compare the pixel values between the input and database image

**BANK OF AMERICA**          **IPR2021-01081**          **Ex. 1001, p. 9 of 12**

Appx243

US 7,881,529 B2

9 | 10

Calculate an aggregate matching score IF matching score is greater than some TBD limit (i.e., close match)

3 Successful comparison, save result END IF END FOR END FOR

Wavelet Comparison

Inputs

For the input image and all database images:

X. Wavelet coefficients from high-resolution grayscale image within segment group bounding box.

Algorithm

Successively compare the wavelet coefficients of the input segment group image and each database segment group image, starting with the lowest-order coefficients and progressing to the highest order coefficients. For each comparison, compute a matching score. For each new coefficient, only consider those database groups that had matching scores, at the previous (next lower order) coefficient within TBD limits.

4 FOR each database image IF input image $C_{sub.0}$ equals database image $C_{sub.0}$ within TBD limit IF input image $C_{sub.1}$ equals database image $C_{sub.1}$ within TBD limit . . . IF input image $C_{sub.N}$ equals database image $C_{sub.N}$ within TBD limit Close match, save result and match score END IF . . . END IF END IF END FOR Notes: I. "$C_{sub.1}$" are the wavelet coefficients, with $C_{sub.0}$ being the lowest order coefficient and $C_{sub.N}$ being the highest. II. When the coefficients are compared, they are actually compared on a statistical (e.g. Gaussian) basis, rather than an arithmetic difference. III. Data indexing techniques are used to allow direct fast access to database images according to their $C_{sub.i}$ values. This allows the algorithm to successively narrow the portions of the database of interest as it proceeds from the lowest order terms to the highest.

Color Cube Comparison

Inputs

[$Y_{sub.avg}$, $I_{sub.avg}$, $Q_{sub.avg}$, $Y_{sigma}$, $I_{sub.sigma}$, $Q_{sub.sigma}$, Npixels] data sets ("Color Cube Points") for each segment in:

I. The input segment group image

II. Each database segment group image

Algorithm

5 FOR each database image FOR each segment group in the database image FOR each Color Cube Point in database segment group, in order of descending N pixels value IF Gaussian match between input (Y,I,Q) and database (Y,I,Q) I. Calculate match score for this segment II. Accumulate segment match score into aggregate match score for segment group III. IF aggregate matching score is greater than some TBD limit (i.e., close match) Successful comparison, save result END IF END FOR END FOR END FOR Notes: I. The size of the Gaussian envelope about any Y, I, Q point is determined by RSS of standard deviations of Y, I, and Q for that point.

Calculate Combined Match Score

The four Object Image comparisons (Shape Comparison, Grayscale Comparison, Wavelet Comparison, Color Cube Comparison) each return a normalized matching score. These are independent assessments of the match of salient features of the input image to database images. To minimize the effect of uncertainties in any single comparison process, and to thus minimize the likelihood of returning a false match, the following root sum of squares relationship is used to combine the results of the individual comparisons into a combined match score for an image:

CurrentMatch=SQRT(W.sub.OCM.sub.OC.sup.2+W.sub. CC    CM.sub.CCC.sup.2+W.sub.W-CM.sub.WC.sup.2+W. sub.SGCM.sub.SGC.sup.2), where Ws are TBD parameter

weighting coefficients and Ms are the individual match scores of the four different comparisons.

The unique database search methodology and subsequent object match scoring criteria are novel aspects of the present invention that deserve special attention. Each decomposition of the Reference image and Input image regions represent an independent characterization of salient characteristics of the image. The Wavelet Decomposition, Color Cube Decomposition, Shape Decomposition, and evaluation of a subsampled low-resolution Grayscale representation of an input image all produce sets of parameters that describe the image in independent ways. Once all four of these processes are completed on the image to be tested, the parameters provided by each characterization are compared to the results of identical characterizations of the Reference images, which have been previously calculated and stored in the database. These comparisons, or searches, are carried out in parallel. The result of each search is a numerical score that is a weighted measure of the number of salient characteristics that "match" (i.e. that are statistically equivalent). Near equivalencies are also noted, and are counted in the cumulative score, but at a significantly reduced weighting.

One novel aspect of the database search methodology in the present invention is that not only are these independent searches carried out in parallel, but also, all but the low-resolution grayscale compares are "convergent." By convergent, it is meant that input image parameters are searched sequentially over increasingly smaller subsets of the entire database. The parameter carrying greatest weight from the input image is compared first to find statistical matches and near-matches in all database records. A normalized interim score (e.g., scaled value from zero to one, where one is perfect match and zero is no match) is computed based on the results of this comparison. The next heaviest weighted parameter from the input image characterization is then searched on only those database records having initial interim scores above a minimum acceptable threshold value. This results in an incremental score that is incorporated into the interim score in a cumulative fashion. Then, subsequent comparisons of increasingly lesser-weighted parameters are assessed only on those database records that have cumulative interim scores above the same minimum acceptable threshold value in the previous accumulated set of tests.

This search technique results in quick completion of robust matches, establishes limits on the domain of database elements that will be compared in a subsequent combined match calculation and therefore speeds up the process. The convergent nature of the search in these comparisons yields a ranked subset of the entire database.

The result of each of these database comparisons is a ranking of the match quality of each image, as a function of decomposition search technique. Only those images with final cumulative scores above the acceptable match threshold will be assessed in the next step, a Combined Match Score evaluation.

Four database comparison processes, Shape Comparison, Grayscale Comparison, Wavelet Comparison, and Color Cube Comparison, are performed. These processes may occur sequentially, but generally are preferably performed in parallel on a parallel computing platform. Each comparison technique searches the entire image database and returns those images that provide the best matches for the particular algorithm, along with the matching scores for these images. These comparison algorithms are performed on segment groups, with each input image segment group being compared to each segment group for each database image.

Appx244

US 7,881,529 B2

11                                              12

FIGS. **3**A and **3**B show the process flow within the Database Matching operation. The algorithm is presented here as containing four nested loops with four parallel processes inside the innermost loop. This structure is for presentation and explanation only. The actual implementation, although performing the same operations at the innermost layer, can have a different structure in order to achieve the maximum benefit from processing speed enhancement techniques such as parallel computing and data indexing techniques. It is also important to note that the loop structures can be implemented independently for each inner comparison, rather than the shared approach shown in the FIGS. **3**A and **3**B.

Preferably, parallel processing is used to divide tasks between multiple CPUs (Central Processing Units), the telephony device **14** and/or computers. The overall algorithm may be divided in several ways, such as:

6 Sharing the In this technique, all CPUs run the entire Outer Loop: algorithm, including the outer loop, but one CPU runs the loop for the first N cycles, another CPU for the second N cycles, all simultaneously. Sharing the In this technique, one CPU performs the Comparisons: loop functions. When the comparisons are performed, they are each passed to a separate CPU to be performed in parallel. Sharing the This technique entails splitting database Database: searches between CPUs, so that each CPU is responsible for searching one section of the database, and the sections are searched in parallel by multiple CPUs. This is, in essence, a form of the "Sharing the Outer Loop" technique described above.

Actual implementations can be some combination of the above techniques that optimizes the process on the available hardware.

Another technique employed to maximize speed is data indexing. This technique involves using a prior knowledge of where data resides to only search in those parts of the database that contain potential matches. Various forms of indexing may be used, such as hash tables, data compartmentalization (i.e., data within certain value ranges are stored in certain locations), data sorting, and database table indexing. An example of such techniques is in the Shape Comparison algorithm (see below). If a database is to be searched for an entry with an Area with a value of A, the algorithm would know which database entries or data areas have this approximate value and would not need to search the entire database.

Thus there has been shown novel identification methods and processes for objects from digitally captured images thereof that uses image characteristics to identify an object from a plurality of objects in a database apparatus and which fulfill all of the objects and advantages sought therefor. Many changes, alterations, modifications and other uses and applications of the subject invention will become apparent to those skilled in the art after considering the specification together with the accompanying drawings. All such changes, alterations and modifications which do not depart from the spirit and scope of the invention are deemed to be covered by the invention which is limited only by the claims that follow.

What is claimed:

**1**. A system comprising:

a camera that captures an image;

a network-enabled device that conducts a data processing operation on at least a portion of the image to produce data, and sends the data to a service;

the service programmed to receive the data; identify an object within the image;

distinguish an object present in the image from others using a database that stores data characteristics of target objects; associate the object with information; and

return the information to the network-enabled device; and

the network-enabled device further programmed to present the information related to the object to a user.

**2**. The system of claim **1**, wherein the network-enabled device comprises a mobile phone.

**3**. The system of claim **1**, wherein the service conducts a second data processing operation on at least a portion of the image.

**4**. The system of claim **1**, wherein the service is further programmed to identify the object by applying multiple algorithms to at least a portion of the image or of the data, and identify the object as a function of a confidence levels associated with results of the multiple algorithms.

**5**. The system of claim **1**, wherein the object is not encoded with any data.

**6**. The system of claim **1**, further comprising identifying a bar code or other symbol contained within the image.

**7**. The system of claim **1**, wherein the service is hosted on a computer remote to the network-enabled device.

**8**. The system of claim **1**, wherein the service is further programmed to select the information from among a plurality of information that provides content in a format suitable for display on the network-enabled device.

**9**. The system of claim **1**, wherein the information comprises data that can be utilized to conduct a commercial transaction related to the object.

**10**. The system of claim **1**, wherein the network-enabled device is further programmed to use an address within the information to conduct a commercial transaction related to the object.

**11**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and the information to initiate a software process on a remote computer.

**12**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and the information to initiate a telephone call.

**13**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and of information to initiate a radio communication.

**14**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and the information to send data received from the service to a web site.

**15**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and the information to display graphics.

**16**. The system of claim **10**, wherein the network-enabled device is further programmed to use at least one of an address and the information to produce an audible sound.

**17**. The system of claim **10**, wherein the distal server is farther programmed to initiate a telephone call from at least one of an address and the information.

**18**. The system of claim **1**, wherein at least one of (a) processing of the data and (b) recognizing objects in the data are divided between the device and the server.

**19**. The system of claim **1** wherein the image include motion imagery.

**20**. The system of claim **1** wherein the data processing operation is selected from the group consisting of contrast enhancement, noise removal, and de-blurring.

US 7,881,529 B2

13

21. The system of claim 1 wherein the data processing operation is applied to the image prior to identifying the object.

22. The system of claim 1, wherein the object comprises a bar code.

23. The system of claim 1, wherein the at least one of the device and the server are further configured to discriminate among recognizable symbols.

24. The system of claim 23, wherein the at least one of the device and the server are further configured to decode a recognizable symbol.

14

25. The system of claim 24, wherein the recognizable symbol comprises at least one of the following a barcode, a matrix code, an alphanumeric character.

26. The system of claim 1, wherein the image comprises an image of a magazine.

27. The system of claim 1, wherein the at least one of the device and the server are further configured to produce a grayscale representation of the image.

*  *  *  *  *



US008478036B2

(12) **United States Patent**
Boncyk et al.

(10) Patent No.: **US 8,478,036 B2**
(45) Date of Patent: **\*Jul. 2, 2013**

(54) **IMAGE CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS**

(75) Inventors: **Wayne C. Boncyk**, Evergreen, CA (US); **Ronald H. Cohen**, Pasadena, CA (US)

(73) Assignee: **Nant Holdings IP, LLC**, Culver City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/410,577**

(22) Filed: **Mar. 2, 2012**

(65) **Prior Publication Data**

US 2012/0163722 A1    Jun. 28, 2012

**Related U.S. Application Data**

(60) Division of application No. 13/037,317, filed on Feb. 28, 2011, now Pat. No. 8,224,078, which is a division of application No. 12/333,630, filed on Dec. 12, 2008, now Pat. No. 7,899,243, which is a division of application No. 10/492,243, filed as application No. PCT/US02/35407 on Nov. 5, 2002, now Pat. No. 7,477,780, which is a continuation of application No. 09/992,942, filed on Nov. 5, 2001, now Pat. No. 7,016,532.

(60) Provisional application No. 60/317,521, filed on Sep. 5, 2001, provisional application No. 60/246,295, filed on Nov. 6, 2000.

(51) **Int. Cl.**
*G06K 9/00*    (2006.01)

(52) **U.S. Cl.**
USPC ........................................ **382/165**

(58) **Field of Classification Search**
USPC ................ 382/100, 162, 165, 181, 224, 305, 382/115–118; 348/239, 211.2–211.6, 207.1, 348/460, 522; 705/26.1–27.2, 23; 455/414.1–414.2, 412.1, 411, 456.5, 456.6; 709/201–203, 217–219, 250
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,579,471 A | 11/1996 | Barber et al. |
| 5,615,324 A | 3/1997 | Kuboyama |
| 5,625,765 A | 4/1997 | Ellenby et al. |
| 5,682,332 A | 10/1997 | Ellenby et al. |
| 5,724,579 A | 3/1998 | Suzuki |
| 5,742,521 A | 4/1998 | Ellenby et al. |
| 5,751,286 A | 5/1998 | Barber et al. |
| 5,768,633 A | 6/1998 | Allen et al. |
| 5,815,411 A | 9/1998 | Ellenby et al. |
| 5,926,116 A | 7/1999 | Kitano et al. |
| 5,933,823 A | 8/1999 | Cullen et al. |
| 5,933,829 A | 8/1999 | Durst et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0920179 | 6/1999 |
| EP | 1012725 A1 | 6/2000 |

(Continued)

*Primary Examiner* — Ishrat I Sherali
(74) *Attorney, Agent, or Firm* — Fish & Associates, PC

(57) **ABSTRACT**

A digital image of the object is captured and the object is recognized from plurality of objects in a database. An information address corresponding to the object is then used to access information and initiate communication pertinent to the object.

**19 Claims, 7 Drawing Sheets**



**BANK OF AMERICA**          **IPR2021-01304**          **Ex. 1001, p. 1 of 21**

**US 8,478,036 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,978,773 A | 11/1999 | Hudetz et al. | |
| 5,991,827 A | 11/1999 | Ellenby et al. | |
| 6,031,545 A | 2/2000 | Ellenby et al. | |
| 6,037,936 A | 3/2000 | Ellenby et al. | |
| 6,055,536 A | 4/2000 | Shimakawa et al. | |
| 6,064,398 A | 5/2000 | Ellenby et al. | |
| 6,081,612 A | 6/2000 | Gutkowicz-Krusin et al. | |
| 6,098,118 A | 8/2000 | Ellenby et al. | |
| 6,108,656 A | 8/2000 | Durst et al. | |
| 6,144,848 A | 11/2000 | Walsh et al. | |
| 6,173,239 B1 | 1/2001 | Ellenby | |
| 6,181,817 B1 | 1/2001 | Zabih et al. | |
| 6,182,090 B1 | 1/2001 | Peairs | |
| 6,199,048 B1 | 3/2001 | Hudetz et al. | |
| 6,208,749 B1 | 3/2001 | Gutkowicz-Krusin et al. | |
| 6,256,409 B1 | 7/2001 | Wang | |
| 6,278,461 B1 | 8/2001 | Ellenby et al. | |
| 6,286,036 B1 | 9/2001 | Rhoads | |
| 6,307,556 B1 | 10/2001 | Ellenby et al. | |
| 6,307,957 B1 | 10/2001 | Gutkowicz-Krusin et al. | |
| 6,393,147 B2 | 5/2002 | Danneels et al. | |
| 6,396,475 B1 | 5/2002 | Ellenby et al. | |
| 6,396,537 B1 | 5/2002 | Squilla et al. | |
| 6,411,725 B1 | 6/2002 | Rhoads | |
| 6,414,696 B1 | 7/2002 | Ellenby et al. | |
| 6,430,554 B1 | 8/2002 | Rothschild | |
| 6,434,561 B1 | 8/2002 | Durst, Jr. et al. | |
| 6,453,361 B1 | 9/2002 | Morris | |
| 6,522,292 B1 | 2/2003 | Ellenby et al. | |
| 6,522,889 B1 * | 2/2003 | Aarnio ..................... | 455/456.5 |
| 6,532,298 B1 | 3/2003 | Cambier et al. | |
| 6,535,210 B1 | 3/2003 | Ellenby et al. | |
| 6,542,933 B1 | 4/2003 | Durst, Jr. et al. | |
| 6,567,122 B1 | 5/2003 | Anderson et al. | |
| 6,651,053 B1 | 11/2003 | Rothschild | |
| 6,674,923 B1 | 1/2004 | Shih et al. | |
| 6,674,993 B1 | 1/2004 | Tarbouriech | |
| 6,675,165 B1 | 1/2004 | Rothschild | |
| 6,690,370 B2 | 2/2004 | Ellenby et al. | |
| 6,691,914 B2 | 2/2004 | Ritz et al. | |
| 6,714,969 B1 | 3/2004 | Klein et al. | |
| 6,724,914 B2 | 4/2004 | Brundage et al. | |
| 6,738,630 B2 | 5/2004 | Ashmore | |
| 6,766,363 B1 | 7/2004 | Rothschild | |
| 6,804,726 B1 | 10/2004 | Ellenby et al. | |
| 6,842,181 B2 | 1/2005 | Acharya | |
| 6,865,608 B2 | 3/2005 | Hunter | |
| 6,885,771 B2 | 4/2005 | Takahashi | |
| 6,993,573 B2 | 1/2006 | Hunter | |
| 7,016,532 B2 * | 3/2006 | Boncyk et al. .................. | 382/165 |
| 7,031,536 B2 | 4/2006 | Kajiwara | |
| 7,031,875 B2 | 4/2006 | Ellenby et al. | |
| 7,127,094 B1 | 10/2006 | Elbaum et al. | |
| 7,245,273 B2 | 7/2007 | Eberl et al. | |
| 7,362,922 B2 | 4/2008 | Nishiyama et al. | |
| 7,383,209 B2 | 6/2008 | Hudetz et al. | |
| 7,430,588 B2 | 9/2008 | Hunter | |
| 7,641,342 B2 | 1/2010 | Eberl et al. | |
| 7,696,905 B2 | 4/2010 | Ellenby et al. | |
| 7,765,126 B2 | 7/2010 | Hudetz et al. | |
| 7,768,534 B2 | 8/2010 | Pentenrieder et al. | |
| 7,872,669 B2 * | 1/2011 | Darrell et al. .............. | 348/207.1 |
| 7,889,193 B2 | 2/2011 | Platonov et al. | |
| 7,916,138 B2 | 3/2011 | John et al. | |
| 2001/0011276 A1 | 8/2001 | Durst JR. et al. | |
| 2001/0032252 A1 | 10/2001 | Durst et al. | |
| 2001/0044824 A1 | 11/2001 | Hunter et al. | |
| 2001/0047426 A1 | 11/2001 | Hunter | |
| 2002/0019819 A1 | 2/2002 | Sekiguchi et al. | |
| 2002/0055957 A1 | 5/2002 | Ohsawa | |
| 2002/0089524 A1 | 7/2002 | Ikeda | |
| 2002/0090132 A1 | 7/2002 | Boncyk et al. | |
| 2002/0102966 A1 | 8/2002 | Lev et al. | |
| 2002/0103813 A1 | 8/2002 | Frigon | |
| 2002/0140988 A1 | 10/2002 | Cheatle et al. | |
| 2002/0156866 A1 | 10/2002 | Schneider | |
| 2002/0163521 A1 | 11/2002 | Ellenby et al. | |
| 2003/0095681 A1 | 5/2003 | Burg et al. | |
| 2004/0208372 A1 | 10/2004 | Boncyk et al. | |
| 2005/0015370 A1 | 1/2005 | Stavely et al. | |
| 2005/0024501 A1 | 2/2005 | Ellenby et al. | |
| 2005/0162523 A1 | 7/2005 | Darrell et al. | |
| 2005/0185060 A1 | 8/2005 | Neven, Sr. | |
| 2006/0161379 A1 | 7/2006 | Ellenby et al. | |
| 2006/0190812 A1 | 8/2006 | Ellenby et al. | |
| 2007/0109619 A1 | 5/2007 | Eberl et al. | |
| 2007/0146391 A1 | 6/2007 | Pentenrieder et al. | |
| 2007/0182739 A1 | 8/2007 | Platonov et al. | |
| 2008/0021953 A1 | 1/2008 | Gil | |
| 2008/0157946 A1 | 7/2008 | Eberl et al. | |
| 2010/0045933 A1 | 2/2010 | Eberl et al. | |
| 2010/0188638 A1 | 7/2010 | Eberl et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1354260 A2 | 10/2003 | |
| EP | 1355258 | 10/2003 | |
| EP | 2264669 | 12/2010 | |
| GB | 2407230 | 4/2005 | |
| JP | 1091634 | 4/1998 | |
| JP | 10289243 | 10/1998 | |
| JP | 2001101191 | 4/2001 | |
| JP | 2001282825 | 10/2001 | |
| WO | 97/49060 | 12/1997 | |
| WO | 98/37811 | 9/1998 | |
| WO | 9916024 | 4/1999 | |
| WO | 9942946 A2 | 8/1999 | |
| WO | 9942947 A2 | 8/1999 | |
| WO | 99/44010 | 9/1999 | |
| WO | 0124050 | 4/2001 | |
| WO | 0149056 | 7/2001 | |
| WO | 0163487 A1 | 8/2001 | |
| WO | 0171282 A1 | 9/2001 | |
| WO | 0173603 | 10/2001 | |
| WO | 02/01143 | 1/2002 | |
| WO | 02059716 A2 | 8/2002 | |
| WO | 02073818 A1 | 9/2002 | |
| WO | 02082799 | 10/2002 | |

* cited by examiner



FIG. 1

BANK OF AMERICA                    IPR2021-01304                    Ex. 1001, p. 3 of 21



FIG. 2

Appx250



**FIG. 3A**

BANK OF AMERICA                    IPR2021-01304                    Ex. 1001, p. 5 of 21

Appx251



FIG. 3B

Appx252



FIG. 4

BANK OF AMERICA                    IPR2021-01304                    Ex. 1001, p. 7 of 21



FIG. 5

Appx254



FIG. 6

BANK OF AMERICA          IPR2021-01304          Ex. 1001, p. 9 of 21

Appx255

US 8,478,036 B2

1

## IMAGE CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS

This application is a divisional of Ser. No. 13/037,317 filed Feb. 28, 2011 which is a divisional of Ser. No. 12/333,630 filed Dec. 12, 2008 which is a divisional of Ser. No. 10/492, 243 filed Apr. 9, 2004 which is a National Phase of PCT/US02/35407 filed Nov. 5, 2002 which is an International Patent application of Ser. No. 09/992,942 filed Nov. 5, 2001 which claims priority to provisional application No. 60/317, 521 filed Sep. 5, 2001 and provisional application No. 60/246, 295 filed Nov. 6, 2000. These and all other referenced patents and applications are incorporated herein by reference in their entirety. Where a definition or use of a term in a reference that is incorporated by reference is inconsistent or contrary to the definition of that term provided herein, the definition of that term provided herein is deemed to be controlling.

TECHNICAL FIELD

The invention relates an identification method and process for objects from digitally captured images thereof that uses image characteristics to identify an object from a plurality of objects in a database.

BACKGROUND ART

There is a need to provide hyperlink functionality in known objects without modification to the objects, through reliably detecting and identifying the objects based only on the appearance of the object, and then locating and supplying information pertinent to the object or initiating communications pertinent to the object by supplying an information address, such as a Uniform Resource Locator (URL), pertinent to the object.

There is a need to determine the position and orientation of known objects based only on imagery of the objects.

The detection, identification, determination of position and orientation, and subsequent information provision and communication must occur without modification or disfigurement of the object, without the need for any marks, symbols, codes, barcodes, or characters on the object, without the need to touch or disturb the object, without the need for special lighting other than that required for normal human vision, without the need for any communication device (radio frequency, infrared, etc.) to be attached to or nearby the object, and without human assistance in the identification process. The objects to be detected and identified may be 3-dimensional objects, 2-dimensional images (e.g., on paper), or 2-dimensional images of 3-dimensional objects, or human beings.

There is a need to provide such identification and hyperlink services to persons using mobile computing devices, such as Personal Digital Assistants (PDAs) and cellular telephones.

There is a need to provide such identification and hyperlink services to machines, such as factory robots and spacecraft.

Examples include:

identifying pictures or other art in a museum, where it is desired to provide additional information about such art objects to museum visitors via mobile wireless devices;

provision of content (information, text, graphics, music, video, etc.), communications, and transaction mechanisms between companies and individuals, via networks (wireless or otherwise) initiated by the individuals "pointing and clicking" with camera-equipped mobile devices on magazine advertisements, posters, billboards, consumer products, music or video disks or tapes, buildings, vehicles, etc.;

2

establishment of a communications link with a machine, such a vending machine or information kiosk, by "pointing and clicking" on the machine with a camera-equipped mobile wireless device and then execution of communications or transactions between the mobile wireless device and the machine;

identification of objects or parts in a factory, such as on an assembly line, by capturing an image of the objects or parts, and then providing information pertinent to the identified objects or parts;

identification of a part of a machine, such as an aircraft part, by a technician "pointing and clicking" on the part with a camera-equipped mobile wireless device, and then supplying pertinent content to the technician, such maintenance instructions or history for the identified part;

identification or screening of individual(s) by a security officer "pointing and clicking" a camera-equipped mobile wireless device at the individual(s) and then receiving identification information pertinent to the individuals after the individuals have been identified by face recognition software;

identification, screening, or validation of documents, such as passports, by a security officer "pointing and clicking" a camera-equipped device at the document and receiving a response from a remote computer;

determination of the position and orientation of an object in space by a spacecraft nearby the object, based on imagery of the object, so that the spacecraft can maneuver relative to the object or execute a rendezvous with the object;

identification of objects from aircraft or spacecraft by capturing imagery of the objects and then identifying the objects via image recognition performed on a local or remote computer;

watching movie previews streamed to a camera-equipped wireless device by "pointing and clicking" with such a device on a movie theatre sign or poster, or on a digital video disc box or videotape box;

listening to audio recording samples streamed to a camera-equipped wireless device by "pointing and clicking" with such a device on a compact disk (CD) box, videotape box, or print media advertisement;

purchasing movie, concert, or sporting event tickets by "pointing and clicking" on a theater, advertisement, or other object with a camera-equipped wireless device;

purchasing an item by "pointing and clicking" on the object with a camera-equipped wireless device and thus initiating a transaction;

interacting with television programming by "pointing and clicking" at the television screen with a camera-equipped device, thus capturing an image of the screen content and having that image sent to a remote computer and identified, thus initiating interaction based on the screen content received (an example is purchasing an item on the television screen by "pointing and clicking" at the screen when the item is on the screen);

interacting with a computer-system based game and with other players of the game by "pointing and clicking" on objects in the physical environment that are considered to be part of the game;

paying a bus fare by "pointing and clicking" with a mobile wireless camera-equipped device, on a fare machine in a bus, and thus establishing a communications link between the device and the fare machine and enabling the fare payment transaction;

establishment of a communication between a mobile wireless camera-equipped device and a computer with an Internet connection by "pointing and clicking" with the device on the computer and thus providing to the mobile device an Internet

**BANK OF AMERICA**              **IPR2021-01304**                       **Ex. 1001, p. 10 of 21**

US 8,478,036 B2

**3**

address at which it can communicate with the computer, thus establishing communications with the computer despite the absence of a local network or any direct communication between the device and the computer;

use of a mobile wireless camera-equipped device as a point-of-sale terminal by, for example, "pointing and clicking" on an item to be purchased, thus identifying the item and initiating a transaction.

## DISCLOSURE OF INVENTION

The present invention solves the above stated needs. Once an image is captured digitally, a search of the image determines whether symbolic content is included in the image. If so the symbol is decoded and communication is opened with the proper database, usually using the Internet, wherein the best match for the symbol is returned. In some instances, a symbol may be detected, but non-ambiguous identification is not possible. In that case and when a symbolic image can not be detected, the image is decomposed through identification algorithms where unique characteristics of the image are determined. These characteristics are then used to provide the best match or matches in the data base, the "best" determination being assisted by the partial symbolic information, if that is available.

Therefore the present invention provides technology and processes that can accommodate linking objects and images to information via a network such as the Internet, which requires no modification to the linked object. Traditional methods for linking objects to digital information, including applying a barcode, radio or optical transceiver or transmitter, or some other means of identification to the object, or modifying the image or object so as to encode detectable information in it, are not required because the image or object can be identified solely by its visual appearance. The users or devices may even interact with objects by "linking" to them. For example, a user may link to a vending machine by "pointing and clicking" on it. His device would be connected over the Internet to the company that owns the vending machine. The company would in turn establish a connection to the vending machine, and thus the user would have a communication channel established with the vending machine and could interact with it.

The decomposition algorithms of the present invention allow fast and reliable detection and recognition of images and/or objects based on their visual appearance in an image, no matter whether shadows, reflections, partial obscuration, and variations in viewing geometry are present. As stated above, the present invention also can detect, decode, and identify images and objects based on traditional symbols which may appear on the object, such as alphanumeric characters, barcodes, or 2-dimensional matrix codes.

When a particular object is identified, the position and orientation of an object with respect to the user at the time the image was captured can be determined based on the appearance of the object in an image. This can be the location and/or identity of people scanned by multiple cameras in a security system, a passive locator system more accurate than GPS or usable in areas where GPS signals cannot be received, the location of specific vehicles without requiring a transmission from the vehicle, and many other uses.

When the present invention is incorporated into a mobile device, such as a portable telephone, the user of the device can link to images and objects in his or her environment by pointing the device at the object of interest, then "pointing and clicking" to capture an image. Thereafter, the device transmits the image to another computer ("Server"), wherein the

**4**

image is analyzed and the object or image of interest is detected and recognized. Then the network address of information corresponding to that object is transmitted from the ("Server") back to the mobile device, allowing the mobile device to access information using the network address so that only a portion of the information concerning the object need be stored in the systems database.

Some or all of the image processing, including image/object detection and/or decoding of symbols detected in the image may be distributed arbitrarily between the mobile (Client) device and the Server. In other words, some processing may be performed in the Client device and some in the Server, without specification of which particular processing is performed in each, or all processing may be performed on one platform or the other, or the platforms may be combined so that there is only one platform. The image processing can be implemented in a parallel computing manner, thus facilitating scaling of the system with respect to database size and input traffic loading.

Therefore, it is an object of the present invention to provide a system and process for identifying digitally captured images without requiring modification to the object.

Another object is to use digital capture devices in ways never contemplated by their manufacturer.

Another object is to allow identification of objects from partial views of the object.

Another object is to provide communication means with operative devices without requiring a public connection therewith.

These and other objects and advantages of the present invention will become apparent to those skilled in the art after considering the following detailed specification, together with the accompanying drawings wherein:

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic block diagram top-level algorithm flowchart;

FIG. **2** is an idealized view of image capture;

FIGS. **3**A and **3**B are a schematic block diagram of process details of the present invention;

FIG. **4** is a schematic block diagram of a different explanation of invention;

FIG. **5** is a schematic block diagram similar to FIG. **4** for cellular telephone and personal data assistant (PDA) applications; and

FIG. **6** is a schematic block diagram for spacecraft applications.

## BEST MODES FOR CARRYING OUT THE INVENTION

The present invention includes a novel process whereby information such as Internet content is presented to a user, based solely on a remotely acquired image of a physical object. Although coded information can be included in the remotely acquired image, it is not required since no additional information about a physical object, other than its image, needs to be encoded in the linked object. There is no need for any additional code or device, radio, optical or otherwise, to be embedded in or affixed to the object. Image-linked objects can be located and identified within user-acquired imagery solely by means of digital image processing, with the address of pertinent information being returned to the device used to acquire the image and perform the link. This process is robust against digital image noise and corruption (as can result from lossy image compression/decompression), perspective error,

**BANK OF AMERICA**          IPR2021-01304          **Ex. 1001, p. 11 of 21**

US 8,478,036 B2

5                                                                                6

rotation, translation, scale differences, illumination variations caused by different lighting sources, and partial obscuration of the target that results from shadowing, reflection or blockage.

Many different variations on machine vision "target location and identification" exist in the current art. However, they all tend to provide optimal solutions for an arbitrarily restricted search space. At the heart of the present invention is a high-speed image matching engine that returns unambiguous matches to target objects contained in a wide variety of potential input images. This unique approach to image matching takes advantage of the fact that at least some portion of the target object will be found in the user-acquired image. The parallel image comparison processes embodied in the present search technique are, when taken together, unique to the process. Further, additional refinement of the process, with the inclusion of more and/or different decomposition-parameterization functions, utilized within the overall structure of the search loops is not restricted. The detailed process is described in the following. FIG. 1 shows the overall processing flow and steps. These steps are described in further detail in the following sections.

For image capture 10, the User 12 (FIG. 2) utilizes a computer, mobile telephone, personal digital assistant, or other similar device 14 equipped with an image sensor (such as a CCD or CMOS digital camera). The User 12 aligns the sensor of the image capture device 14 with the object 16 of interest. The linking process is then initiated by suitable means including: the User 12 pressing a button on the device 14 or sensor; by the software in the device 14 automatically recognizing that an image is to be acquired; by User voice command; or by any other appropriate means. The device 14 captures a digital image 18 of the scene at which it is pointed. This image 18 is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. For the purposes of standardizing the analytical processes in this embodiment, if the device 14 supplies an image in other than RGB format, a transformation to RGB is accomplished. These analyses could be carried out in any standard color format, should the need arise.

If the server 20 is physically separate from the device 14, then user acquired images are transmitted from the device 14 to the Image Processor/Server 20 using a conventional digital network or wireless network means. If the image 18 has been compressed (via via lossy JPEG DCT) in a manner that introduces compression artifacts into the reconstructed image 18, these artifacts may be partially removed by, for example, applying a conventional despeckle filter to the reconstructed image prior to additional processing.

The Image Type Determination 26 is accomplished with a discriminator algorithm which operates on the input image 18 and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters. If such symbols are found, the image 18 is sent to the Decode Symbol 28 process. Depending on the confidence level with which the discriminator algorithm finds the symbols, the image 18 also may or alternatively contain an object of interest and may therefore also or alternatively be sent to the Object Image branch of the process flow. For example, if an input image 18 contains both a barcode and an object, depending on the clarity with which the barcode is detected, the image may be analyzed by both the Object Image and Symbolic Image branches, and that branch which has the highest success in identification will be used to identify and link from the object.

The image is analyzed to determine the location, size, and nature of the symbols in the Decode Symbol 28. The symbols are analyzed according to their type, and their content information is extracted. For example, barcodes and alphanumeric characters will result in numerical and/or text information.

For object images, the present invention performs a "decomposition", in the Input Image Decomposition 34, of a high-resolution input image into several different types of quantifiable salient parameters. This allows for multiple independent convergent search processes of the database to occur in parallel, which greatly improves image match speed and match robustness in the Database Matching 36. The Best Match 38 from either the Decode Symbol 28, or the image Database Matching 36, or both, is then determined. If a specific URL (or other online address) is associated with the image, then an URL Lookup 40 is performed and the Internet address is returned by the URL Return 42.

The overall flow of the Input Image Decomposition process is as follows:

---

Radiometric Correction
Segmentation
Segment Group Generation
FOR each segment group
    Bounding Box Generation
    Geometric Normalization
    Wavelet Decomposition
    Color Cube Decomposition
    Shape Decomposition
    Low-Resolution Grayscale Image Generation
FOR END

---

Each of the above steps is explained in further detail below. For Radiometric Correction, the input image typically is transformed to an 8-bit per color plane, RGB representation. The RGB image is radiometrically normalized in all three channels. This normalization is accomplished by linear gain and offset transformations that result in the pixel values within each color channel spanning a full 8-bit dynamic range (256 possible discrete values). An 8-bit dynamic range is adequate but, of course, as optical capture devices produce higher resolution images and computers get faster and memory gets cheaper, higher bit dynamic ranges, such as 16-bit, 32-bit or more may be used.

For Segmentation, the radiometrically normalized RGB image is analyzed for "segments," or regions of similar color, i.e. near equal pixel values for red, green, and blue. These segments are defined by their boundaries, which consist of sets of (x, y) point pairs. A map of segment boundaries is produced, which is maintained separately from the RGB input image and is formatted as an x, y binary image map of the same aspect ratio as the RGB image.

For Segment Group Generation, the segments are grouped into all possible combinations. These groups are known as "segment groups" and represent all possible potential images or objects of interest in the input image. The segment groups are sorted based on the order in which they will be evaluated. Various evaluation order schemes are possible. The particular embodiment explained herein utilizes the following "center-out" scheme: The first segment group comprises only the segment that includes the center of the image. The next segment group comprises the previous segment plus the segment which is the largest (in number of pixels) and which is adjacent to (touching) the previous segment group. Additional segments are added using the segment criteria above until no segments remain. Each step, in which a new segment is added, creates a new and unique segment group.

For Bounding Box Generation, the elliptical major axis of the segment group under consideration (the major axis of an

BANK OF AMERICA                    IPR2021-01304                    Ex. 1001, p. 12 of 21

US 8,478,036 B2

**7**

ellipse just large enough to contain the entire segment group) is computed. Then a rectangle is constructed within the image coordinate system, with long sides parallel to the elliptical major axis, of a size just large enough to completely contain every pixel in the segment group.

For Geometric Normalization, a copy of the input image is modified such that all pixels not included in the segment group under consideration are set to mid-level gray. The result is then resampled and mapped into a "standard aspect" output test image space such that the corners of the bounding box are mapped into the corners of the output test image. The standard aspect is the same size and aspect ratio as the Reference images used to create the database.

For Wavelet Decomposition, a grayscale representation of the full-color image is produced from the geometrically normalized image that resulted from the Geometric Normalization step. The following procedure is used to derive the grayscale representation. Reduce the three color planes into one grayscale image by proportionally adding each R, G, and B pixel of the standard corrected color image using the following formula:

$$L_{xy}=0.34*R_{xy}+0.55*G_{xy}+0.44*B_{xy}$$

then round to nearest integer value. Truncate at 0 and 255, if necessary. The resulting matrix L is a standard grayscale image. This grayscale representation is at the same spatial resolution as the full color image, with an 8-bit dynamic range. A multi-resolution Wavelet Decomposition of the grayscale image is performed, yielding wavelet coefficients for several scale factors. The Wavelet coefficients at various scales are ranked according to their weight within the image.

For Color Cube Decomposition, an image segmentation is performed (see "Segmentation" above), on the RGB image that results from Geometric Normalization. Then the RGB image is transformed to a normalized Intensity, In-phase and Quadrature-phase color image (YIQ). The segment map is used to identify the principal color regions of the image, since each segment boundary encloses pixels of similar color. The average Y, I, and Q values of each segment, and their individual component standard deviations, are computed. The following set of parameters result, representing the colors, color variation, and size for each segment:

$Y_{avg}$=Average Intensity
$I_{avg}$=Average In-phase
$Q_{avg}$=Average Quadrature
$Y_{sigma}$=Intensity standard deviation
$I_{sigma}$=In-phase standard deviation
$Q_{sigma}$=Quadrature standard deviation
$N_{pixels}$=number of pixels in the segment

The parameters comprise a representation of the color intensity and variation in each segment. When taken together for all segments in a segment group, these parameters comprise points (or more accurately, regions, if the standard deviations are taken into account) in a three-dimensional color space and describe the intensity and variation of color in the segment group.

For Shape Decomposition, the map resulting from the segmentation performed in the Color Cube Generation step is used and the segment group is evaluated to extract the group outer edge boundary, the total area enclosed by the boundary, and its area centroid. Additionally, the net ellipticity (semi-major axis divided by semi-minor axis of the closest fit ellipse to the group) is determined.

For Low-Resolution Grayscale Image Generation, the full-resolution grayscale representation of the image that was derived in the Wavelet Generation step is now subsampled by a factor in both x and y directions. For the example of this

**8**

embodiment, a 3:1 subsampling is assumed. The subsampled image is produced by weighted averaging of pixels within each 3x3 cell. The result is contrast binned, by reducing the number of discrete values assignable to each pixel based upon substituting a "binned average" value for all pixels that fall within a discrete (TBD) number of brightness bins.

The above discussion of the particular decomposition methods incorporated into this embodiment are not intended to indicate that more, or alternate, decomposition methods may not also be employed within the context of this invention.

In other words:

```
FOR each input image segment group
  FOR each database object
    FOR each view of this object
      FOR each segment group in this view of this database
      object
        Shape Comparison
        Grayscale Comparison
        Wavelet Comparison
        Color Cube Comparison
        Calculate Combined Match Score
      END FOR
    END FOR
  END FOR
END FOR
```

Each of the above steps is explained in further detail below.

FOR Each Input Image Segment Group

This loop considers each combination of segment groups in the input image, in the order in which they were sorted in the "Segment Group Generation" step. Each segment group, as it is considered, is a candidate for the object of interest in the image, and it is compared against database objects using various tests.

One favored implementation, of many possible, for the order in which the segment groups are considered within this loop is the "center-out" approach mentioned previously in the "Segment Group Generation" section. This scheme considers segment groups in a sequence that represents the addition of adjacent segments to the group, starting at the center of the image. In this scheme, each new group that is considered comprises the previous group plus one additional adjacent image segment. The new group is compared against the database. If the new group results in a higher database matching score than the previous group, then new group is retained. If the new group has a lower matching score then the previous group, then it is discarded and the loop starts again. If a particular segment group results in a match score which is extremely high, then this is considered to be an exact match and no further searching is warranted; in this case the current group and matching database group are selected as the match and this loop is exited.

FOR Each Database Object

This loop considers each object in the database for comparison against the current input segment group.

FOR Each View of this Object This loop considers each view of the current database object, for comparison against the current input segment group. The database contains, for each object, multiple views from different viewing angles.

FOR Each Segment Group in this View of this Database Object

This loop considers each combination of segment groups in the current view of the database object. These segment groups were created in the same manner as the input image segment groups.

**BANK OF AMERICA**          **IPR2021-01304**                    **Ex. 1001, p. 13 of 21**

Appx259

US 8,478,036 B2

9                                                                                      10

### Shape Comparison

Inputs:

For the input image and all database images:

I. Segment group outline

II. Segment group area

III. Segment group centroid location

IV. Segment group bounding ellipse ellipticity

Algorithm:

V. Identify those database segment groups with an area approximately equal to that of the input segment group, within TBD limits, and calculate an area matching score for each of these "matches."

VI. Within the set of matches identified in the previous step, identify those database segment groups with an ellipticity approximately equal to that of the input segment group, within TBD limits, and calculate an ellipticity position matching score for each of these "matches."

Within the set of matches identified in the previous step, identify those database segment groups with a centroid position approximately equal to that of the input segment group, within TBD limits, and calculate a centroid position matching score for each of these "matches."

VIII. Within the set of matches identified in the previous step, identify those database segment groups with an outline shape approximately equal to that of the input segment group, within TBD limits, and calculate an outline matching score for each of these "matches." This is done by comparing the two outlines and analytically determining the extent to which they match.

Note: this algorithm need not necessarily be performed in the order of Steps 1 to 4. It could alternatively proceed as follows:

```
FOR each database segment group
    IF the group passes Step 1
        IF the group passes Step 2
            IF the group passes Step 3
                IF the group passes Step 4
                    Successful comparison, save result
                END IF
            END IF
        END IF
    END IF
END FOR
```

### Grayscale Comparison

Inputs:

For the input image and all database images:

IX. Low-resolution, normalized, contrast-binned, grayscale image of pixels within segment group bounding box, with pixels outside of the segment group set to a standard background color.

Algorithm:

Given a series of concentric rectangular "tiers" of pixels within the low-resolution images, compare the input image pixel values to those of all database images. Calculate a matching score for each comparison and identify those database images with matching scores within TBD limits, as follows:

```
FOR each database image
    FOR each tier, starting with the innermost and progressing to the
    outermost
        Compare the pixel values between the input and database image
        Calculate an aggregate matching score
```

-continued

```
            IF matching score is greater than some TBD limit (i.e., close match)
                Successful comparison, save result
            END IF
    END FOR
END FOR
```

### Wavelet Comparison

Inputs:

For the input image and all database images:

X. Wavelet coefficients from high-resolution grayscale image within segment group bounding box.

Algorithm:

Successively compare the wavelet coefficients of the input segment group image and each database segment group image, starting with the lowest-order coefficients and progressing to the highest order coefficients. For each comparison, compute a matching score. For each new coefficient, only consider those database groups that had matching scores, at the previous (next lower order) coefficient within TBD limits.

```
FOR each database image
    IF input image C_0 equals database image C_0 within TBD limit
        IF input image C_1 equals database image C_1 within TBD limit
            IF input image C_N equals database image C_N within TBD
            limit
                Close match, save result and match score
            END IF
        END IF
    END IF
END FOR
```

Notes:

I. "$C_i$" are the wavelet coefficients, with $C_0$ being the lowest order coefficient and $C_N$ being the highest.

II. When the coefficients are compared, they are actually compared on a statistical (e.g. Gaussian) basis, rather than an arithmetic difference.

III. Data indexing techniques are used to allow direct fast access to those database images according to their $C_i$ values. This allows the algorithm to successively narrow the portions of the database of interest as it proceeds from the lowest order terms to the highest.

### Color Cube Comparison

Inputs:

$[Y_{avg}, I_{avg}, Q_{avg}, Y_{sigma}, Q_{sigma}, N_{pixels}]$ data sets ("Color Cube Points") for each segment in:

I. The input segment group image

II. Each database segment group image

Algorithm:

```
FOR each database image
    FOR each segment group in the database image
        FOR each Color Cube Point in database segment group, in order of
        descending N_pixels value
            IF Gaussian match between input (Y,I,Q) and database segment group
            (Y,I,Q)
                I. Calculate match score for this segment
                II. Accumulate segment match score into aggregate match
                score for segment group
                III. IF aggregate matching score is greater than some TBD
                limit (i.e., close match)
                    Successful comparison, save result
                END IF
            END IF
        END FOR
    END FOR
END FOR
```

Notes:

I. The size of the Gaussian envelope about any Y, I, Q point is determined by RSS of standard deviations of Y, I, and Q for that point.

### Calculate Combined Match Score

The four Object Image comparisons (Shape Comparison, Grayscale Comparison, Wavelet Comparison, Color Cube

**BANK OF AMERICA**                    IPR2021-01304                    **Ex. 1001, p. 14 of 21**

Appx260

US 8,478,036 B2

11

Comparison) each return a normalized matching score. These are independent assessments of the match of salient features of the input image to database images. To minimize the effect of uncertainties in any single comparison process, and to thus minimize the likelihood of returning a false match, the following root sum of squares relationship is used to combine the results of the individual comparisons into a combined match score for an image:

$$CurrentMatch=SQRT(W_{OC}M_{OC}^{2}+W_{CCC}M_{CCC}^{2}+W_{WC}M_{WC}^{2}+W_{SGC}M_{SGC}^{2})$$

where Ws are TBD parameter weighting coefficients and Ms are the individual match scores of the four different comparisons.

The unique database search methodology and subsequent object match scoring criteria are novel aspects of the present invention that deserve special attention. Each decomposition of the Reference image and Input image regions represent an independent characterization of salient characteristics of the image. The Wavelet Decomposition, Color Cube Decomposition, Shape Decomposition, and evaluation of a subsampled low-resolution Grayscale representation of an input image all produce sets of parameters that describe the image in independent ways. Once all four of these processes are completed on the image to be tested, the parameters provided by each characterization are compared to the results of identical characterizations of the Reference images, which have been previously calculated and stored in the database. These comparisons, or searches, are carried out in parallel. The result of each search is a numerical score that is a weighted measure of the number of salient characteristics that "match" (i.e. that are statistically equivalent). Near equivalencies are also noted, and are counted in the cumulative score, but at a significantly reduced weighting.

One novel aspect of the database search methodology in the present invention is that not only are these independent searches carried out in parallel, but also, all but the low-resolution grayscale compares are "convergent." By convergent, it is meant that input image parameters are searched sequentially over increasingly smaller subsets of the entire database. The parameter carrying greatest weight from the input image is compared first to find statistical matches and near-matches in all database records. A normalized interim score (e.g., scaled value from zero to one, where one is perfect match and zero is no match) is computed, based on the results of this comparison. The next heaviest weighted parameter from the input image characterization is then searched on only those database records having initial interim scores above a minimum acceptable threshold value. This results in an incremental score that is incorporated into the interim score in a cumulative fashion. Then, subsequent compares of increasingly lesser-weighted parameters are assessed only on those database records that have cumulative interim scores above the same minimum acceptable threshold value in the previous accumulated set of tests.

This search technique results in quick completion of robust matches, and establishes limits on the domain of database elements that will be compared in a subsequent combined match calculation and therefore speeds up the process. The convergent nature of the search in these comparisons yields a ranked subset of the entire database.

The result of each of these database comparisons is a ranking of the match quality of each image, as a function of decomposition search technique. Only those images with final cumulative scores above the acceptable match threshold will be assessed in the next step, a Combined Match Score evaluation.

12

Four database comparison processes, Shape Comparison, Grayscale Comparison, Wavelet Comparison, and Color Cube Comparison, are performed. These processes may occur sequentially, but generally are preferably performed in parallel on a parallel computing platform. Each comparison technique searches the entire image database and returns those images that provide the best matches, for the particular algorithm, along with the matching scores for these images. These comparison algorithms are performed on segment groups, with each input image segment group being compared to each segment group for each database image.

FIGS. **3**A and **3**B show the process flow within the Database Matching operation. The algorithm is presented here as containing four nested loops with four parallel processes inside the innermost loop. This structure is for presentation and explanation only. The actual implementation, although performing the same operations at the innermost layer, can have a different structure in order to achieve the maximum benefit from processing speed enhancement techniques such as parallel computing and data indexing techniques. It is also important to note that the loop structures can be implemented independently for each inner comparison, rather than the shared approach shown in the FIGS. **3**A and **3**B.

Preferably, parallel processing is used to divide tasks between multiple CPUs (Central Processing Units) and/or computers. The overall algorithm may be divided in several ways, such as:

| | |
|---|---|
| Sharing the Outer Loop: | In this technique, all CPUs run the entire algorithm, including the outer loop, but one CPU runs the loop for the first N cycles, another CPU for the second N cycles, all simultaneously. |
| Sharing the Comparisons: | In this technique, one CPU performs the loop functions. When the comparisons are performed, they are each passed to a separate CPU to be performed in parallel. |
| Sharing the Database: | This technique entails splitting database searches between CPUs, so that each CPU is responsible for searching one section of the database, and the sections are searched in parallel by multiple CPUs. This is, in essence, a form of "Sharing the Outer Loop" technique described above. |

Actual implementations can be some combination of the above techniques that optimize the process on the available hardware.

Another technique employed to maximize speed is data indexing. This technique involves using a priori knowledge of where data resides to only search in those parts of the database that contain potential matches. Various forms of indexing may be used, such as hash tables, data compartmentalization (i.e., data within certain value ranges are stored in certain locations), data sorting, and database table indexing. An example of such techniques is, in the Shape Comparison algorithm (see below), if a database is to be searched for an entry with an Area with a value of A, the algorithm would know which database entries or data areas have this approximate value and would not need to search the entire database.

Another technique employed is as follows. FIG. **4** shows a simplified configuration of the invention. Boxes with solid lines represent processes, software, physical objects, or devices. Boxes with dashed lines represent information. The process begins with an object of interest: the target object **100**. In the case of consumer applications, the target object **100** could be, for example, beverage can, a music CD box, a DVD video box, a magazine advertisement, a poster, a theatre, a store, a building, a car, or any other object that user is inter-

Appx261

US 8,478,036 B2

13

ested in or wishes to interact with. In security applications the target object **100** could be, for example, a person, passport, or driver's license, etc. In industrial applications the target object **100** could be, for example, a part in a machine, a part on an assembly line, a box in a warehouse, or a spacecraft in orbit, etc.

The terminal **102** is a computing device that has an "image" capture device such as digital camera **103**, a video camera, or any other device that an convert a physical object into a digital representation of the object. The imagery can be a single image, a series of images, or a continuous video stream. For simplicity of explanation this document describes the digital imagery generally in terms of a single image, however the invention and this system can use all of the imagery types described above.

After the camera **103** captures the digital imagery of the target object **100**, image preprocessing **104** software converts the digital imagery into image data **105** for transmission to and analysis by an identification server **106**. Typically a network connection is provided capable of providing communications with the identification server **106**. Image data **105** is data extracted or converted from the original imagery of the target object **100** and has information content appropriate for identification of the target object **100** by the object recognition **107**, which may be software or hardware. Image data **105** can take many forms, depending on the particular embodiment of the invention. Examples of image data **105** are:

Compressed (e.g., JPEG2000) form of the raw imagery from camera **103**;

Key image information, such as spectral and/or spatial frequency components (e.g. wavelet components) of the raw imagery from camera **103**; and

MPEG video stream created from the raw imagery from camera **103**.

The particular form of the image data **105** and the particular operations performed in image preprocessing **104** depend on:

Algorithm and software used in object recognition **107**
Processing power of terminal **102**;

Network connection speed between terminal **102** and identification server **106**;

Application of the System; and

Required system response time.

In general, there is a tradeoff between the network connection speed (between terminal **102** and identification server **106**) and the processing power of terminal **102**. The results all of the above tradeoffs will define the nature of image preprocessing **104** and image data **105** for a specific embodiment. For example, image preprocessing **104** could be image compression and image data **105** compressed imagery, or image preprocessing **104** could be wavelet analysis and image data **105** could be wavelet coefficients.

The image data **105** is sent from the terminal **102** to the identification server **106**. The identification server **106** receives the image data **105** and passes it to the object recognition **107**.

The identification server **106** is a set of functions that usually will exist on computing platform separate from the terminal **102**, but could exist on the same computing platform. If the identification server **106** exists on a separate computing device, such as a computer in a data center, then transmission of the image components **105** to the identification server **106** is accomplished via a network or combination of networks, such a cellular telephone network, wireless Internet, Internet, and wire line network. If the identification server **106** exists on the same computing device

14

as the terminal **102** then the transmission consists simply of a transfer of data from one software component or process to another.

Placing the identification server **106** on a computing platform separate from the terminal **102** enables the use of powerful computing resources for the object recognition **107** and database **108** functions, thus providing the power of these computing resources to the terminal **102** via network connection. For example, an embodiment that identifies objects out of a database of millions of known objects would be facilitated by the large storage, memory capacity, and processing power available in a data center; it may not be feasible to have such computing power and storage in a mobile device. Whether the terminal **102** and the identification server **106** are on the same computing platform or separate ones is an architectural decision that depends on system response time, number of database records, image recognition algorithm computing power and storage available in terminal **102**, etc., and this decision must be made for each embodiment of the invention. Based on current technology, in most embodiments these functions will be on separate computing platforms.

The overall function of the identification server **106** is to determine and provide the target object information **109** corresponding to the target object **100**, based on the image data **105**.

The object recognition **107** and the database **108** function together to:

1. Detect, recognize, and decode symbols, such as barcodes or text, in the image.

2. Recognize the object (the target object **100**) in the image.

3. Provide the target object information **109** that corresponds to the target object **100**. The target object information **109** usually (depending on the embodiment) includes an information address corresponding to the target object **100**.

The object recognition **107** detects and decodes symbols, such as barcodes or text, in the input image. This is accomplished via algorithms, software, and/or hardware components suited for this task. Such components are commercially available (The HALCON software package from MVTec is an example). The object recognition **107** also detects and recognizes images of the target object **100** or portions thereof. This is accomplished by analyzing the image data **105** and comparing the results to other data, representing images of a plurality of known objects, stored in the database **108**, and recognizing the target object **100** if a representation of target object **100** is stored in the database **108**.

In some embodiments the terminal **102** includes software, such as a web browser (the browser **110**), that receives an information address, connects to that information address via a network or networks, such as the Internet, and exchanges information with another computing device at that information address. In consumer applications the terminal **102** may be a portable cellular telephone or Personal Digital Assistant equipped with a camera **103** and wireless Internet connection. In security and industrial applications the terminal **102** may be a similar portable hand-held device or may be fixed in location and/or orientation, and may have either a wireless or wire line network connection.

Other object recognition techniques also exist and include methods that store 3-dimensional models (rather than 2-dimensional images) of objects in a database and correlate input images with these models of the target object is performed by an object recognition technique of which many are available commercially and in the prior art. Such object recognition techniques usually consist of comparing a new input image to a plurality of known images and detecting correspondences between the new input image and one of more of the known

**BANK OF AMERICA**                    IPR2021-01304                    Ex. 1001, p. 16 of 21

Appx262

US 8,478,036 B2

15

images. The known images are views of known objects from a plurality of viewing angles and thus allow recognition of 2-dimensional and 3-dimensional objects in arbitrary orientations relative to the camera 103.

FIG. 4 shows the object recognition 107 and the database 108 as separate functions for simplicity. However, in many embodiments the object recognition 107 and the database 108 are so closely interdependent that they may be considered a single process.

There are various options for the object recognition technique and the particular processes performed within the object recognition 107 and the database 108 depend on this choice. The choice depends on the nature, requirements, and architecture of the particular embodiment of the invention. However, most embodiments will usually share most of the following desired attributes of the image recognition technique:

Capable of recognizing both 2-dimensional (i.e., flat) and 3-dimensional objects;

Capable of discriminating the target object 100 from any foreground or background objects or image information, i.e., be robust with respect to changes in background;

Fast;

Autonomous (no human assistance required in the recognition process);

Scalable; able to identify objects from a large database of known objects with short response time; and

Robust with respect to:

Affine transformations (rotation, translation, scaling);

Non-affine transformations (stretching, bending, breaking);

Occlusions (of the target object 100);

Shadows (on the target object 100);

Reflections (on the target object 100);

Variations in light color temperature;

Image noise;

Capable of determining position and orientation of the target object 100 in the original imagery; and

Capable of recognizing individual human faces from a database containing data representing a large plurality of human faces.

All of these attributes do not apply to all embodiments. For example, consumer linking embodiments generally do not require determination of position and orientation of the target object 100, while a spacecraft target position and orientation determination system generally would not be required to identify human faces or a large number of different objects.

It is usually desirable that the database 108 be scalable to enable identification of the target object 100 from a very large plurality (for example, millions) of known objects in the database 108. The algorithms, software, and computing hardware must be designed to function together to quickly perform such a search. An example software technique for performing such searching quickly is to use a metric distance comparison technique for comparing the image data 105 to data stored in the database 108, along with database clustering and multiresolution distance comparisons. This technique is described in "Fast Exhaustive Multi-Resolution Search Algorithm Based on Clustering for Efficient Image Retrieval," by Song, Kim, and Ra, 2000.

In addition to such software techniques, a parallel processing computing architecture may be employed to achieve fast searching of large databases. Parallel processing is particularly important in cases where a non-metric distance is used in object recognition 107, because techniques such database clustering and multiresolution search may not be possible and

16

thus the complete database must be searched by partitioning the database across multiple CPUs.

As described above, the object recognition 107 can also detect identifying marks on the target object 100. For example, the target object 100 may include an identifying number or a barcode. This information can be decoded and used to identify or help identify the target object 100 in the database 108. This information also can be passed on as part of the target object information 109. If the information is included as part of the target object information 109 then it can be used by the terminal 102 or content server 111 to identify the specific target object 100, out of many such objects that have similar appearance and differ only in the identifying marks. This technique is useful, for example, in cases where the target object 100 is an active device with a network connection (such as a vending machine) and the content server establishes communication with the target object 100. A combination with a Global Positioning System can also be used to identify like objects by their location.

The object recognition 107 may be implemented in hardware, software, or a combination of both. Examples of each category are presented below.

Hardware object recognition implementations include optical correlators, optimized computing platforms, and custom hardware.

Optical correlators detect objects in images very rapidly by, in effect, performing image correlation calculations with light. Examples of optical correlators are:

Litton Miniaturized Ruggedized Optical Correlator, from Northrop Grumman Corp;

Hybrid Digital/Optical Correlator, from the School of Engineering and Information Technology, University of Sussex, UK; and

OC-VGA3000 and OC-VGA6000 Optical Correlators from INO, Quebec, Canada.

Optimized computing platforms are hardware computing systems, usually on a single board, that are optimized to perform image processing and recognition algorithms very quickly. These platforms must be programmed with the object recognition algorithm of choice. Examples of optimized computing platforms are:

VIP/Balboa™ Image Processing Board, from Irvine Sensors Corp.; and

3DANN™-R Processing System, from Irvine Sensors Corp.

Image recognition calculations can also be implemented directly in custom hardware in forms such as Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), and Digital Signal Processors (DSPs).

There are many object and image recognition software applications available commercially and many algorithms published in the literature. Examples of commercially available image/object recognition software packages include:

Object recognition system, from Sandia National Laboratories;

Object recognition perception modules, from Evolution Robotics;

ImageFinder, from Attrasoft;

ImageWare, from Roz Software Systems; and

ID-2000, from Imagis Technologies.

Some of the above recognition systems include 3-dimensional object recognition capability while others perform 2-dimensional image recognition. The latter type are used to perform 3-dimensional object recognition by comparing input images to a plurality of 2-dimensional views of objects from a plurality of viewing angles.

BANK OF AMERICA

US 8,478,036 B2

17

Examples of object recognition algorithms in the literature and intended for implementation in software are:

Distortion Invariant Object Recognition in the Dynamic Link Architecture, Lades et al, 1993;

SEEMORE: Combining Color, Shape, and Texture Histogramming in a Neurally Inspired Approach to Visual Object Recognition, Mel, 1996;

Probabilistic Affine Invariants for Recognition, Leung et al, 1998;

Software Library for Appearance Matching (SLAM), Nene et al, 1994;

Probabilistic Models of Appearance for 3-D Object Recognition, Pope & Lowe, 2000;

Matching 3D Models with Shape Distributions, Osada et al, 2001;

Finding Pictures of Objects in Large Collections of Images, Forsyth et al, 1996;

The Earth Mover's Distance under Transformation Sets, Cohen & Guibas, 1999;

Object Recognition from Local Scale-Invariant Features, Lowe, 1999; and

Fast Object Recognition in Noisy Images Using Simulated Annealing, Betke & Makris, 1994.

Part of the current invention is the following object recognition algorithm specifically designed to be used as the object recognition 107 and, to some extent, the database 108. This algorithm is robust with respect to occlusions, reflections, shadows, background/foreground clutter, object deformation and breaking, and is scalable to large databases. The task of the algorithm is to find an object or portion thereof in an input image, given a database of multiple objects with multiple views (from different angles) of each object.

This algorithm uses the concept of a Local Image Descriptor (LID) to summarize the information in a local region of an image. A LID is a circular subset, or "cutout," of a portion of an image. There are various formulations for LIDs; two examples are:

LID Formulation 1

The area within the LID is divided into range and angle bins. The average color in each [range,angle] bin is calculated from the pixel values therein.

LID Formulation 2

The area within the LID is divided into range bins. The color histogram values within each range bin are calculated from the pixel values therein. For each range bin, a measure of the variation of color with angle is calculated as, for example, the sum of the changes in average color between adjacent small angular slices of a range bin.

A LID in the input image is compared to a LID in a database image by a comparison technique such the L1 Distance, L2 Distance, Unfolded Distance, Earth Mover Distance, or cross-correlation. Small distances indicate a good match between the portions of the images underlying the LIDS. By iteratively changing the position and size of the LIDs in the input and database images the algorithm converges on the best match between circular regions in the 2 images.

Limiting the comparisons to subsets (circular LIDs) of the images enables the algorithm to discriminate an object from the background. Only LIDs that fall on the object, as opposed to the background, yield good matches with database images. This technique also enable matching of partially occluded objects; a LID that falls on the visible part of an occluded object will match to a LID in the corresponding location in the database image of the object.

The iteration technique used to find the best match is simulated annealing, although genetic search, steepest descent, or other similar techniques appropriate for multivariable opti-

18

mization can also be used individually or in combination with simulated annealing. Simulated annealing is modeled after the concept of a molten substance cooling and solidifying into a solid. The algorithm starts at a given temperature and then the temperature is gradually reduced with time. At each time step, the values of the search variables are perturbed from the their previous values to a create a new "child" generation of LIDs. The perturbations are calculated statistically and their magnitudes are functions of the temperature. As the temperature decreases the perturbations decrease in size. The child LIDs, in the input and database images, are then compared. If the match is better than that obtained with the previous "parent" generation, then a statistical decision is made regarding to whether to accept or reject the child LIDs as the current best match. This is a statistical decision that is a function of both the match distance and the temperature. The probability of child acceptance increases with temperature and decreases with match distance. Thus, good matches (small match distance) are more likely to be accepted but poor matches can also be accepted occasionally. The latter case is more likely to occur early in the process when the temperature is high. Statistical acceptance of poor matches is included to allow the algorithm to "jump" out of local minima.

When LID Formulation 1 is used, the rotation angle of the LID need not necessarily be a simulated annealing search parameter. Faster convergence can be obtained by performing a simple step-wise search on rotation to find the best orientation (within the tolerance of the step size) within each simulated annealing time step.

The search variables, in both the input and database images, are:

LID x-position;

LID y-position;

LID radius;

LID x-stretch;

LID y-stretch; and

LID orientation angle (only for LID Formulation 1).

LID x-stretch and LID y-stretch are measures of "stretch" distortion applied to the LID circle, and measure the distortion of the circle into an oval. This is included to provide robustness to differences in orientation and curvature between the input and database images.

The use of multiple simultaneous LIDs provides additional robustness to occlusions, shadows, reflections, rotations, deformations, and object breaking. The best matches for multiple input image LIDS are sought throughout the database images. The input image LIDS are restricted to remain at certain minimum separation distances from each other. The minimum distance between any 2 LIDs centers is a function of the LID radii. The input image LIDS converge and settle on the regions of the input image having the best correspondence to any regions of any database images. Thus the LIDs behave in the manner of marbles rolling towards the lowest spot on a surface, e.g., the bottom of a bowl, but being held apart by their radius (although LIDS generally have minimum separation distances that are less than their radii).

In cases where the object in the input image appears deformed or curved relative to the known configuration in which it appears in the database, multiple input image LIDS will match to different database images. Each input image LID will match to that database image which shows the underlying portion of the object as it most closely resembles the input image. If the input image object is bent, e.g., a curved poster, then one part will match to one database orientation and another part will match to a different orientation.

In the case where the input image object appears to be broken into multiple pieces, either due to occlusion or to

BANK OF AMERICA    IPR2021-01304

Appx264

US 8,478,036 B2

19

physical breakage, use of multiple LIDs again provides robust matching: individual LIDs "settle" on portions of the input image object as they match to corresponding portions of the object in various views in the database.

Robustness with respect to shadows and reflections is provided by LIDs simply not detecting good matches on these input image regions. They are in effect accommodated in the same manner as occlusions.

Robustness with respect to curvature and bending is accommodated by multiple techniques. First, use of multiple LIDs provides such robustness as described above. Secondly, curvature and bending robustness is inherently provided to some extent within each LID by use of LID range bin sizes that increase with distance from the LID center (e.g., logarithmic spacing). Given matching points in an input image and database image, deformation of the input image object away from the plane tangent at the matching point increases with distance from the matching point. The larger bin sizes of the outer bins (in both range and angle) reduce this sensitivity because they are less sensitive to image shifts.

Robustness with respect to lighting color temperature variations is provided by normalization of each color channel within each LID.

Fast performance, particular with large databases, can be obtained through several techniques, as follows:

1. Use of LID Formulation 2 can reduce the amount of search by virtue of being rotationally invariant, although this comes at the cost of some robustness due to loss of image information.

2. If a metric distance (e.g., L1, L2, or Unfolded) is used for LID comparison, then database clustering, based on the triangle inequality, can be used to rule out large portions of the database from searching. Since database LIDs are created during the execution of the algorithm, the run-time database LIDs are not clustered. Rather, during preparation of the database, sample LIDs are created from the database images by sampling the search parameters throughout their valid ranges. From this data, bounding clusters can be created for each image and for portions of images. With this information the search algorithm can rule out portions of the search parameter space.

3. If a metric distance is used, then progressive multiresolution search can be used. This technique saves time by comparing data first at low resolution and only proceeds with successive higher-resolution comparison on candidates with correlations better than the current best match. A discussion of this technique, along with database clustering, can be found in "Fast Exhaustive Multi-Resolution Search Algorithm Based on Clustering for Efficient Image Retrieval," by Song et al, 2000.

4. The parameter search space and number of LIDs can be limited. Bounds can be placed, for example, on the sizes of LIDs depending on the expected sizes of input image objects relative to those in the database. A small number of LIDs, even 1, can be used, at the expense of some robustness.

5. LIDs can be fixed in the database images. This eliminates iterative searching on database LID parameters, at the expense of some robustness.

6. The "x-stretch" and "y-stretch" search parameters can be eliminated, although there is a trade-off between these search parameters and the number of database images. These parameters increase the ability to match between images of the same object in different orientations. Elimination of these parameters may require more database images with closer angular spacing, depending on the particular embodiment.

20

7. Parallel processing can be utilized to increase computing power.

This technique is similar to that described by Betke & Makris in "Fast Object Recognition in Noisy Images Using Simulated Annealing," 1994, with the following important distinctions:

The current algorithm is robust with respect to occlusion. This is made possible by varying size and position of LIDs in database images, during the search process, in order to match non-occluded portions of database images.

The current algorithm can identify 3-dimensional objects by containing views of objects from many orientations in the database.

The current algorithm uses database clustering to enable rapid searching of large databases.

The current algorithm uses circular LIDs.

In addition to containing image information, the database 108 also contains address information. After the target object 100 has been identified, the database 108 is searched to find information corresponding to the target object 100. This information can be an information address, such as an Internet URL. The identification server 106 then sends this information, in the form of the target object information 109, to the terminal 102. Depending on the particular embodiment of the invention, the target object information 109 may include, but not be limited to, one or more of the following items of information pertaining to the target object 100:

Information address (e.g., Internet URL);

Identity (e.g., object name, number, classification, etc.);

Position;

Orientation;

Size;

Color;

Status;

Information decoded from and/or referenced by symbols (e.g. information coded in a barcode or a URL referenced by such a barcode); and

Other data (e.g. alphanumerical text).

Thus, the identification server determines the identity and/or various attributes of the target object 100 from the image data 105.

The target object information 109 is sent to the terminal 102. This information usually flows via the same communication path used to send the image data 105 from the terminal 102 to the identification server 106, but this is not necessarily the case. This method of this flow information depends on the particular embodiment of the invention.

The terminal 102 receives the target object information 109. The terminal 102 then performs some action or actions based on the target object information 109. This action or actions may include, but not be limited to:

Accessing a web site.

Accessing or initiating a software process on the terminal 102.

Accessing or initiating a software process on another computer via a network or networks such as the Internet.

Accessing a web service (a software service accessed via the Internet).

Initiating a telephone call (if the terminal 102 includes such capability) to a telephone number that may be included in or determined by the target object Information, may be stored in the terminal 102, or may be entered by the user.

Initiating a radio communication (if the terminal 102 includes such capability) using a radio frequency that may be included in or determined by the target object Information, may be stored in the terminal 102, or may be entered by the user.

BANK OF AMERICA

Appx265

US 8,478,036 B2

21

Sending information that is included in the target object information 109 to a web site, a software process (on another computer or on the terminal 102), or a hardware component.

Displaying information, via the screen or other visual indication, such as text, graphics, animations, video, or indicator lights.

Producing an audio signal or sound, including playing music.

In many embodiments, the terminal 102 sends the target object information 109 to the browser 110. The browser 110 may or may not exist in the terminal 102, depending on the particular embodiment of the invention. The browser 110 is a software component, hardware component, or both, that is capable of communicating with and accessing information from a computer at an information address contained in target object information 109.

In most embodiments the browser 110 will be a web browser, embedded in the terminal 102, capable of accessing and communicating with web sites via a network or networks such as the Internet. In some embodiments, however, such as those that only involve displaying the identity, position, orientation, or status of the target object 100, the browser 110 may be a software component or application that displays or provides the target object information 109 to a human user or to another software component or application.

In embodiments wherein the browser 110 is a web browser, the browser 110 connects to the content server 111 located at the information address (typically an Internet URL) included in the target object information 109. This connection is effected by the terminal 102 and the browser 110 acting in concert. The content server 111 is an information server and computing system. The connection and information exchanged between the terminal 102 and the content server 111 generally is accomplished via standard Internet and wireless network software, protocols (e.g. HTTP, WAP, etc.), and networks, although any information exchange technique can be used. The physical network connection depends on the system architecture of the particular embodiment but in most embodiments will involve a wireless network and the Internet. This physical network will most likely be the same network used to connect the terminal 102 and the identification server 106.

The content server 111 sends content information to the terminal 102 and browser 110. This content information usually is pertinent to the target object 100 and can be text, audio, video, graphics, or information in any form that is usable by the browser 110 and terminal 102. The terminal 102 and browser 110 send, in some embodiments, additional information to the content server 111. This additional information can be information such as the identity of the user of the terminal 102 or the location of the user of the terminal 102 (as determined from a GPS system or a radio-frequency ranging system). In some embodiments such information is provided to the content server by the wireless network carrier.

The user can perform ongoing interactions with the content server 111. For example, depending on the embodiment of the invention and the applications, the user can:

Listen to streaming audio samples if the target object 100 is an audio recording (e.g., compact audio disc).

Purchase the target object 100 via on-line transaction, with the purchase amount billed to an account linked to the terminal 102, to the individual user, to a bank account, or to a credit card.

In some embodiments the content server 111 may reside within the terminal 102. In such embodiments, the communication between the terminal 102 and the content server 111 does not occur via a network but rather occurs within the terminal 102.

In embodiments wherein the target object 100 includes or is a device capable of communicating with other devices or

22

computers via a network or networks such as the Internet, and wherein the target object information 109 includes adequate identification (such as a sign, number, or barcode) of the specific target object 100, the content server 111 connects to and exchanges information with the target object 100 via a network or networks such as the Internet. In this type of embodiment, the terminal 102 is connected to the content server 111 and the content server 111 is connected to the target object 100. Thus, the terminal 102 and target object 100 can communicate via the content server 111. This enables the user to interact with the target object 100 despite the lack of a direct connection between the target object 100 and the terminal 102.

The following are examples of embodiments of the invention.

FIG. 5 shows a preferred embodiment of the invention that uses a cellular telephone, PDA, or such mobile device equipped with computational capability, a digital camera, and a wireless network connection, as the terminal 202 corresponding to the terminal 102 in FIG. 4. In this embodiment, the terminal 202 communicates with the identification server 206 and the content server 211 via networks such as a cellular telephone network and the Internet.

This embodiment can be used for applications such as the following ("User" refers to the person operating the terminal 202, and the terminal 202 is a cellular telephone, PDA, or similar device, and "point and click" refers to the operation of the User capturing imagery of the target object 200 and initiating the transfer of the image data 205 to the identification server 206).

The User "points and clicks" the terminal 202 at a compact disc (CD) containing recorded music or a digital video disc (DVD) containing recorded video. The terminal 202 browser connects to the URL corresponding to the CD or DVD and displays a menu of options from which the user can select. From this menu, the user can listen to streaming audio samples of the CD or streaming video samples of the DVD, or can purchase the CD or DVD.

The User "points and clicks" the terminal 202 at a print media advertisement, poster, or billboard advertising a movie, music recording, video, or other entertainment. The browser 210 connects to the URL corresponding to the advertised item and the user can listen to streaming audio samples, purchase streaming video samples, obtain show times, or purchase the item or tickets.

The User "points and clicks" the terminal 202 at a television screen to interact with television programming in real-time. For example, the programming could consist of a product promotion involving a reduced price during a limited time. Users that "point and click" on this television programming during the promotion are linked to a web site at which they can purchase the product at the promotional price. Another example is a interactive television programming in which users "point and click" on the television screen at specific times, based on the on-screen content, to register votes, indicate actions, or connect to a web site through which they perform real time interactions with the on-screen program.

The User "points and clicks" on an object such as a consumer product, an advertisement for a product, a poster, etc., the terminal 202 makes a telephone call to the company selling the product, and the consumer has a direct discussion with a company representative during the course of a company's product or service. In this case the company telephone number is included in the target object information 209. If the target object information 209 also includes the company URL then the User can interact with the company via both voice and Internet (via browser 210) simultaneously.

The User "points and clicks" on a vending machine (target object 200) that is equipped with a connection to a network

**BANK OF AMERICA**          IPR2021-01304          Ex. 1001, p. 20 of 21

US 8,478,036 B2

23

such as the Internet and that has a unique identifying mark, such as a number. The terminal **202** connects to the content server **211** of the company that operates the vending machine. The identification server identifies the particular vending machine by identifying and decoding the unique identifying mark. The identity of the particular machine is included in the target object information **209** and is sent from the terminal **202** to the content server **211**. The content server **211**, having the identification of the particular vending machine (target object **200**), initiates communication with the vending machine. The User performs a transaction with the vending machine, such as purchasing a product, using his terminal **202** that communicates with the vending machine via the content server **211**.

The User "points and clicks" on part of a machine, such as an aircraft part. The terminal **202** then displays information pertinent to the part, such as maintenance instructions or repair history.

The User "points and clicks" on a magazine or newspaper article and link to streaming audio or video content, further information, etc.

The User "points and clicks" on an automobile. The location of the terminal **206** is determined by a Global Position System receiver in the terminal **206**, by cellular network radio ranging, or by another technique. The position of the terminal **202** is sent to the content server **211**. The content server provides the User with information regarding the automobile, such as price and features, and furthermore, based on the position information, provides the User with the location of a nearby automobile dealer that sells the car. This same technique can be used to direct Users to nearby retail stores selling items appearing in magazine advertisements that Users "point and click" on.

For visually impaired people:

Click on any item in a store and the device speaks the name of the item and price to you (the items must be in the database).

Click on a newspaper or magazine article and the device reads the article to you.

Click on a sign (building, streetsign, etc.) and the device reads the sign to you and provides any addition pertinent information (the signs must be in the database).

FIG. **6** shows an embodiment of the invention for spacecraft applications. In this embodiment, all components of the system (except the target object **300**) are onboard a Spacecraft. The target object **300** is another spacecraft or object. This embodiment is used to determine the position and orientation of the target object **300** relative to the Spacecraft so that this information can be used in navigating, guiding, and maneuvering the spacecraft relative to the target object **300**. An example use of this embodiment would be in autonomous spacecraft rendezvous and docking.

This embodiment determines the position and orientation of the target object **300**, relative to the Spacecraft, as determined by the position, orientation, and size of the target object **300** in the imagery captured by the camera **303**, by comparing the imagery with views of the target object **300** from different orientations that are stored in the database **308**. The relative position and orientation of the target object **300** are output in the target object information, so that the spacecraft data system **310** can use this information in planning trajectories and maneuvers.

INDUSTRIAL APPLICABILITY

The industrial applicability is anywhere that objects are to be identified by a digital optical representation of the object.

24

What is claimed is:

1. A content provisioning system comprising:
   a target database storing known targets of different types and recognition parameters associated with the known targets;
   an identification platform coupled with the target database, and that:
      communicates with a mobile device capable of acquiring a digital representation of a scene containing at least a portion of a target;
      receives the digital representation from the mobile device; and
      recognizes the target as a known target from the target database based on comparing parameters derived from the digital representation to recognition parameters associated with the known targets; and
   a content service coupled with the identification platform, and that:
      obtains content information related to the known target; and
      sends the content information to at least one of the identification platform and the mobile device.

2. The system of claim **1**, wherein the content information comprises at least one of the following types of data: video data, audio data, image data, and text data.

3. The system of claim **1**, wherein the derived parameters comprise a position of the target in the scene.

4. The system of claim **1**, wherein the derived parameters comprise an orientation of the target in the scene.

5. The system of claim **1**, wherein the derived parameters comprise a location.

6. The system of claim **1**, wherein the derived parameters comprises a time the digital representation was captured.

7. The system of claim **1**, wherein the known target comprises a face.

8. The system of claim **1**, wherein the known target comprises a building.

9. The system of claim **1**, wherein the known target comprises a vehicle.

10. The system of claim **1**, wherein the known target comprises printed media.

11. The system of claim **1**, wherein the known target comprises a machine.

12. The system of claim **1**, wherein the content information enables the mobile device to have an interaction related to the known target.

13. The system of claim **12**, wherein the interaction comprises a transaction with an account.

14. The system of claim **12**, wherein the interaction comprises accessing a software process.

15. The system of claim **12**, wherein the interaction comprises sending information related to the known target to a remote computer.

16. The system of claim **12**, wherein the interaction comprises initiating a telephone call.

17. The system of claim **1**, wherein the mobile device comprises the identification platform.

18. The system of claim **1**, wherein the mobile device comprises the content service.

19. The system of claim **1**, wherein the mobile device comprises at least one of the following devices: a vehicle, a phone, a personal digital assistant, a point-of-sales terminal, a digital camera, and a security device.

\*  \*  \*  \*  \*

Appx267



US009324004B2

## (12) United States Patent
### Boncyk et al.

(10) Patent No.: **US 9,324,004 B2**
(45) Date of Patent: **\*Apr. 26, 2016**

(54) **IMAGE CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS**

(71) Applicant: **Nant Holdings IP, LLC**, Culver City, CA (US)

(72) Inventors: **Wayne C. Boncyk**, Evergreen, CO (US); **Ronald H. Cohen**, Pasadena, CA (US)

(73) Assignee: **Nant Holdings IP, LLC**, Culver City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/100,431**

(22) Filed: **Dec. 9, 2013**

(65) **Prior Publication Data**

US 2014/0098993 A1    Apr. 10, 2014

**Related U.S. Application Data**

(60) Division of application No. 13/907,780, filed on May 31, 2013, which is a division of application No. 13/693,983, filed on Dec. 4, 2012, now Pat. No. 8,712,193, which is a continuation of application No.

(Continued)

(51) **Int. Cl.**
*G06K 9/46* (2006.01)
*G06F 17/30* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ... *G06K 9/46* (2013.01); *A61F 9/08* (2013.01); *A63F 13/00* (2013.01); *A63F 13/12* (2013.01); *G06F 3/0482* (2013.01); *G06F 17/2235* (2013.01); *G06F 17/30014* (2013.01); *G06F*

*17/3025* (2013.01); *G06F 17/3028* (2013.01); *G06F 17/30241* (2013.01); *G06F 17/30244* (2013.01); *G06F 17/30247* (2013.01); *G06F 17/30253* (2013.01); *G06F 17/30256* (2013.01); *G06F 17/30259* (2013.01); *G06F 17/30268* (2013.01); *G06F 17/30386* (2013.01); *G06F 17/30879* (2013.01); *G06F 17/30882* (2013.01);

(Continued)

(58) **Field of Classification Search**
USPC ................. 382/100, 103, 165, 181, 305, 224; 705/26.1–27.2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,800,082 A    3/1974    Fish
4,947,321 A    8/1990    Spence et al.

(Continued)

FOREIGN PATENT DOCUMENTS

DE    10050486 A1    4/2002
EP    0614559 B1    1/1999

(Continued)

OTHER PUBLICATIONS

European Search Report for Application No. EP06018047, mailed on Oct. 30, 2008, 2 pages.

(Continued)

*Primary Examiner* — Ishrat I Sherali
(74) *Attorney, Agent, or Firm* — Fish & Tsang LLP

(57) **ABSTRACT**

A digital image of the object is captured and the object is recognized from plurality of objects in a database. An information address corresponding to the object is then used to access information and initiate communication pertinent to the object.

**54 Claims, 7 Drawing Sheets**



Appx268

**US 9,324,004 B2**

Page 2

### Related U.S. Application Data

13/069,112, filed on Mar. 22, 2011, now Pat. No. 8,326,031, which is a division of application No. 13/037,317, filed on Feb. 28, 2011, now Pat. No. 8,224, 078, which is a division of application No. 12/333,630, filed on Dec. 12, 2008, now Pat. No. 7,899,243, which is a division of application No. 10/492,243, filed as application No. PCT/US02/35407 on Nov. 5, 2002, now Pat. No. 7,477,780, which is a continuation of application No. 09/992,942, filed on Nov. 5, 2001, now Pat. No. 7,016,532.

(60) Provisional application No. 60/317,521, filed on Sep. 5, 2001, provisional application No. 60/246,295, filed on Nov. 6, 2000.

(51) **Int. Cl.**

| | |
|---|---|
| *G06K 9/22* | (2006.01) |
| *G06K 9/62* | (2006.01) |
| *G06Q 30/02* | (2012.01) |
| *G06Q 30/06* | (2012.01) |
| *G06Q 40/00* | (2012.01) |
| *G06K 9/78* | (2006.01) |
| *G06K 9/00* | (2006.01) |
| *H04N 5/225* | (2006.01) |
| *G06Q 20/40* | (2012.01) |
| *A61F 9/08* | (2006.01) |
| *H04N 7/18* | (2006.01) |
| *A63F 13/00* | (2014.01) |
| *H04N 21/81* | (2011.01) |
| *G06K 9/32* | (2006.01) |
| *A63F 13/30* | (2014.01) |
| *H04N 21/254* | (2011.01) |
| *H04N 21/442* | (2011.01) |
| *G06Q 10/02* | (2012.01) |
| *H04N 5/232* | (2006.01) |
| *G06Q 20/24* | (2012.01) |
| *G06Q 20/34* | (2012.01) |
| *G06F 3/0482* | (2013.01) |
| *H04N 1/00* | (2006.01) |
| *H04N 5/91* | (2006.01) |
| *G06Q 90/00* | (2006.01) |
| *G06K 9/64* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *H04N 21/231* | (2011.01) |
| *H04N 21/234* | (2011.01) |
| *H04N 21/414* | (2011.01) |
| *H04N 21/4223* | (2011.01) |
| *H04N 21/4722* | (2011.01) |
| *H04N 21/4782* | (2011.01) |
| *H04N 21/658* | (2011.01) |
| *G06K 9/18* | (2006.01) |
| *G06T 7/00* | (2006.01) |
| *G06F 17/22* | (2006.01) |
| *G06Q 20/20* | (2012.01) |
| *G06Q 20/32* | (2012.01) |

(52) **U.S. Cl.**

CPC .......... *G06K 9/0063* (2013.01); *G06K 9/00536* (2013.01); *G06K 9/00664* (2013.01); *G06K 9/18* (2013.01); *G06K 9/228* (2013.01); *G06K 9/3241* (2013.01); *G06K 9/4652* (2013.01); *G06K 9/4671* (2013.01); *G06K 9/6201* (2013.01); *G06K 9/6202* (2013.01); *G06K 9/6203* (2013.01); *G06K 9/6212* (2013.01); *G06K 9/6215* (2013.01); *G06K 9/64* (2013.01); *G06K 9/78* (2013.01); *G06Q 10/02* (2013.01); *G06Q 20/202* (2013.01); *G06Q 20/208* (2013.01); *G06Q 20/24* (2013.01); *G06Q 20/327* (2013.01); *G06Q 20/3567* (2013.01); *G06Q 20/40145* (2013.01); *G06Q 30/0217* (2013.01); *G06Q 30/0241* (2013.01); *G06Q 30/0253* (2013.01); *G06Q 30/0257* (2013.01); *G06Q 30/0267* (2013.01); *G06Q 30/0268* (2013.01); *G06Q 30/0269* (2013.01); *G06Q 30/0277* (2013.01); *G06Q 30/0601* (2013.01); *G06Q 30/0623* (2013.01); *G06Q 30/0643* (2013.01); *G06Q 40/00* (2013.01); *G06Q 90/00* (2013.01); *G06T 7/0079* (2013.01); *H04L 67/02* (2013.01); *H04L 67/10* (2013.01); *H04N 1/00244* (2013.01); *H04N 5/225* (2013.01); *H04N 5/23206* (2013.01); *H04N 5/23222* (2013.01); *H04N 5/23229* (2013.01); *H04N 5/91* (2013.01); *H04N 7/183* (2013.01); *H04N 21/23109* (2013.01); *H04N 21/23418* (2013.01); *H04N 21/254* (2013.01); *H04N 21/41407* (2013.01); *H04N 21/4223* (2013.01); *H04N 21/44222* (2013.01); *H04N 21/4722* (2013.01); *H04N 21/4782* (2013.01); *H04N 21/6582* (2013.01); *H04N 21/812* (2013.01); *H04N 21/8126* (2013.01); *H04N 21/8173* (2013.01); *G06T 2207/20144* (2013.01); *H04N 2201/3253* (2013.01); *H04N 2201/3254* (2013.01); *H04N 2201/3274* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,991,008 | A | 2/1991 | Nama |
| 5,034,812 | A | 7/1991 | Rawlings |
| 5,241,671 | A | 8/1993 | Reed et al. |
| 5,259,037 | A | 11/1993 | Plunk |
| 5,497,314 | A | 3/1996 | Novak |
| 5,576,950 | A | 11/1996 | Tonomura et al. |
| 5,579,471 | A | 11/1996 | Barber et al. |
| 5,594,806 | A | 1/1997 | Colbert |
| 5,615,324 | A | 3/1997 | Kuboyama |
| 5,625,765 | A | 4/1997 | Ellenby et al. |
| 5,682,332 | A | 10/1997 | Ellenby et al. |
| 5,724,579 | A | 3/1998 | Suzuki |
| 5,742,521 | A | 4/1998 | Ellenby et al. |
| 5,742,815 | A | 4/1998 | Stern |
| 5,751,286 | A | 5/1998 | Barber et al. |
| 5,768,633 | A | 6/1998 | Allen et al. |
| 5,768,663 | A | 6/1998 | Lin |
| 5,771,307 | A | 6/1998 | Lu et al. |
| 5,787,186 | A | 7/1998 | Schroeder |
| 5,815,411 | A | 9/1998 | Ellenby et al. |
| 5,832,464 | A | 11/1998 | Houvener et al. |
| 5,893,095 | A | 4/1999 | Jain et al. |
| 5,894,323 | A | 4/1999 | Kain et al. |
| 5,897,625 | A | 4/1999 | Gustin et al. |
| 5,911,827 | A | 6/1999 | Heller |
| 5,915,038 | A | 6/1999 | Abdel-Mottaleb et al. |
| 5,917,930 | A | 6/1999 | Kayani et al. |
| 5,926,116 | A | 7/1999 | Kitano et al. |
| 5,933,823 | A | 8/1999 | Cullen et al. |
| 5,933,829 | A | 8/1999 | Durst et al. |
| 5,933,923 | A | 8/1999 | Catlos et al. |
| 5,937,079 | A | 8/1999 | Franke |
| 5,945,982 | A | 8/1999 | Higashio et al. |
| 5,971,277 | A | 10/1999 | Cragun et al. |
| 5,978,773 | A | 11/1999 | Hudetz et al. |
| 5,982,912 | A | 11/1999 | Fukui et al. |
| 5,991,827 | A | 11/1999 | Ellenby et al. |
| 5,992,752 | A | 11/1999 | Wilz, Sr. et al. |
| 6,009,204 | A | 12/1999 | Ahmad |
| 6,031,545 | A | 2/2000 | Ellenby et al. |

Appx269

**US 9,324,004 B2**

Page 3

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,037,936 | A | 3/2000 | Ellenby et al. |
| 6,037,963 | A | 3/2000 | Denton et al. |
| 6,038,295 | A | 3/2000 | Mattes |
| 6,038,333 | A | 3/2000 | Wang |
| 6,045,039 | A | 4/2000 | Stinson et al. |
| 6,055,536 | A | 4/2000 | Shimakawa et al. |
| 6,061,478 | A | 5/2000 | Kanoh et al. |
| 6,064,398 | A | 5/2000 | Ellenby et al. |
| 6,072,904 | A | 6/2000 | Desai et al. |
| 6,081,612 | A | 6/2000 | Gutkowicz-Krusin et al. |
| 6,098,118 | A | 8/2000 | Ellenby et al. |
| 6,108,656 | A | 8/2000 | Durst et al. |
| 6,134,548 | A | 10/2000 | Gottsman et al. |
| 6,144,848 | A | 11/2000 | Walsh et al. |
| 6,173,239 | B1 | 1/2001 | Ellenby |
| 6,181,817 | B1 | 1/2001 | Zabih et al. |
| 6,182,090 | B1 | 1/2001 | Peairs |
| 6,199,048 | B1 | 3/2001 | Hudetz et al. |
| 6,202,055 | B1 | 3/2001 | Houvener et al. |
| 6,208,353 | B1 | 3/2001 | Ayer et al. |
| 6,208,749 | B1 | 3/2001 | Gutkowicz-Krusin et al. |
| 6,208,933 | B1 | 3/2001 | Lazar |
| 6,256,409 | B1 | 7/2001 | Wang |
| 6,278,461 | B1 | 8/2001 | Ellenby et al. |
| 6,286,036 | B1 | 9/2001 | Rhoads |
| 6,307,556 | B1 | 10/2001 | Ellenby et al. |
| 6,307,957 | B1 | 10/2001 | Gutkowicz-Krusin et al. |
| 6,317,718 | B1 | 11/2001 | Fano |
| 6,393,147 | B2 | 5/2002 | Danneels et al. |
| 6,396,475 | B1 | 5/2002 | Ellenby et al. |
| 6,396,537 | B1 | 5/2002 | Squilla et al. |
| 6,396,963 | B2 | 5/2002 | Shaffer et al. |
| 6,404,975 | B1 | 6/2002 | Bopardikar et al. |
| 6,405,975 | B1 | 6/2002 | Sankrithi et al. |
| 6,411,725 | B1 | 6/2002 | Rhoads |
| 6,411,953 | B1 | 6/2002 | Ganapathy et al. |
| 6,414,696 | B1 | 7/2002 | Ellenby et al. |
| 6,430,554 | B1 | 8/2002 | Rothschild |
| 6,434,561 | B1 | 8/2002 | Durst, Jr et al. |
| 6,445,834 | B1 | 9/2002 | Rising, III |
| 6,446,076 | B1 | 9/2002 | Burkey et al. |
| 6,453,361 | B1 | 9/2002 | Morris |
| 6,490,443 | B1 | 12/2002 | Freeny, Jr. |
| 6,501,854 | B1 | 12/2002 | Konishi et al. |
| 6,502,756 | B1 | 1/2003 | Faahraeus |
| 6,510,238 | B2 | 1/2003 | Haycock |
| 6,522,292 | B1 | 2/2003 | Ellenby et al. |
| 6,522,772 | B1 | 2/2003 | Morrison et al. |
| 6,522,889 | B1 | 2/2003 | Aarnio |
| 6,526,158 | B1 | 2/2003 | Goldberg |
| 6,532,298 | B1 | 3/2003 | Cambier et al. |
| 6,533,392 | B1 | 3/2003 | Koitabashi |
| 6,535,210 | B1 | 3/2003 | Ellenby et al. |
| 6,542,933 | B1 | 4/2003 | Durst, Jr. et al. |
| 6,563,959 | B1 | 5/2003 | Troyanker |
| 6,567,122 | B1 | 5/2003 | Anderson et al. |
| 6,578,017 | B1 | 6/2003 | Ebersole et al. |
| 6,580,385 | B1 | 6/2003 | Winner et al. |
| 6,597,818 | B2 | 7/2003 | Kumar et al. |
| 6,601,026 | B2 | 7/2003 | Appelt et al. |
| 6,609,103 | B1 | 8/2003 | Kolls |
| 6,650,794 | B1 | 11/2003 | Aoki |
| 6,651,053 | B1 | 11/2003 | Rothschild |
| 6,658,389 | B1 | 12/2003 | Alpdemir |
| 6,674,923 | B1 | 1/2004 | Shih et al. |
| 6,674,993 | B1 | 1/2004 | Tarbouriech |
| 6,675,165 | B1 | 1/2004 | Rothschild |
| 6,689,966 | B2 | 2/2004 | Wiebe |
| 6,690,370 | B2 | 2/2004 | Ellenby et al. |
| 6,691,914 | B2 | 2/2004 | Isherwood et al. |
| 6,711,278 | B1 | 3/2004 | Gu et al. |
| 6,714,969 | B1 | 3/2004 | Klein et al. |
| 6,724,914 | B2 | 4/2004 | Brundage et al. |
| 6,738,630 | B2 | 5/2004 | Ashmore |
| 6,744,935 | B2 | 6/2004 | Choi et al. |

| | | | | |
|---|---|---|---|---|
| 6,748,122 | B1 | 6/2004 | Ihara et al. | |
| 6,765,569 | B2 | 7/2004 | Neumann et al. | |
| 6,766,363 | B1 | 7/2004 | Rothschild | |
| 6,771,294 | B1 | 8/2004 | Pulli et al. | |
| 6,788,800 | B1 | 9/2004 | Carr et al. | |
| 6,801,657 | B1 | 10/2004 | Cieplinski | |
| 6,804,726 | B1 | 10/2004 | Ellenby et al. | |
| 6,842,181 | B2 | 1/2005 | Acharya | |
| 6,853,750 | B2 | 2/2005 | Aoki | |
| 6,856,965 | B1 | 2/2005 | Stinson et al. | |
| 6,865,608 | B2 | 3/2005 | Hunter | |
| 6,866,196 | B1 | 3/2005 | Rathus et al. | |
| 6,868,415 | B2 | 3/2005 | Kageyama et al. | |
| 6,882,756 | B1 | 4/2005 | Bober | |
| 6,885,771 | B2 | 4/2005 | Takahashi | |
| 6,912,464 | B1 | 6/2005 | Parker | |
| 6,925,196 | B2 | 8/2005 | Kass et al. | |
| 6,950,800 | B1 | 9/2005 | McIntyre et al. | |
| 6,956,593 | B1 | 10/2005 | Gupta et al. | |
| 6,963,656 | B1 | 11/2005 | Persaud et al. | |
| 6,968,453 | B2 | 11/2005 | Doyle et al. | |
| 6,974,078 | B1 | 12/2005 | Simon | |
| 6,985,240 | B2 | 1/2006 | Benke et al. | |
| 6,990,235 | B2 * | 1/2006 | Katsuyama | G06T 7/0081 |
| | | | | 382/165 |
| 6,993,573 | B2 | 1/2006 | Hunter | |
| 6,996,251 | B2 | 2/2006 | Malone et al. | |
| 7,002,551 | B2 | 2/2006 | Azuma et al. | |
| 7,016,532 | B2 * | 3/2006 | Boncyk et al. | 382/165 |
| 7,016,889 | B2 | 3/2006 | Bazoon | |
| 7,016,899 | B1 | 3/2006 | Stern et al. | |
| 7,027,652 | B1 | 4/2006 | I'anson | |
| 7,031,496 | B2 | 4/2006 | Shimano et al. | |
| 7,031,536 | B2 | 4/2006 | Kajiwara | |
| 7,031,875 | B2 * | 4/2006 | Ellenby | G01C 21/20 |
| | | | | 702/150 |
| 7,050,653 | B2 | 5/2006 | Edso et al. | |
| 7,053,916 | B2 | 5/2006 | Kobayashi et al. | |
| 7,062,454 | B1 | 6/2006 | Giannini et al. | |
| 7,072,669 | B1 * | 7/2006 | Duckworth | G01S 5/0215 |
| | | | | 455/404.2 |
| 7,103,772 | B2 | 9/2006 | Jorgensen et al. | |
| 7,104,444 | B2 * | 9/2006 | Suzuki | 235/380 |
| 7,113,867 | B1 | 9/2006 | Stein | |
| 7,119,831 | B2 | 10/2006 | Ohto et al. | |
| 7,121,469 | B2 | 10/2006 | Dorai et al. | |
| 7,127,094 | B1 | 10/2006 | Elbaum et al. | |
| 7,143,949 | B1 | 12/2006 | Hannigan | |
| 7,167,164 | B2 | 1/2007 | Ericson et al. | |
| 7,175,095 | B2 | 2/2007 | Pettersson et al. | |
| 7,190,833 | B2 | 3/2007 | Kagehiro et al. | |
| 7,224,995 | B2 | 5/2007 | Rhoads | |
| 7,245,273 | B2 | 7/2007 | Eberl et al. | |
| 7,254,548 | B1 | 8/2007 | Tannenbaum | |
| 7,266,545 | B2 | 9/2007 | Bergman et al. | |
| 7,295,718 | B2 | 11/2007 | Park et al. | |
| 7,296,747 | B2 | 11/2007 | Rohs | |
| 7,301,536 | B2 | 11/2007 | Ellenby et al. | |
| 7,305,354 | B2 | 12/2007 | Rodriguez et al. | |
| 7,309,015 | B2 | 12/2007 | Frantz et al. | |
| 7,333,947 | B2 | 2/2008 | Wiebe et al. | |
| 7,334,728 | B2 * | 2/2008 | Williams | 235/383 |
| 7,345,673 | B2 | 3/2008 | Ericson et al. | |
| 7,353,182 | B1 | 4/2008 | Missinhoun et al. | |
| 7,353,184 | B2 | 4/2008 | Kirshenbaum et al. | |
| 7,353,990 | B2 | 4/2008 | Elliot et al. | |
| 7,356,705 | B2 | 4/2008 | Ting | |
| 7,362,922 | B2 | 4/2008 | Nishiyama et al. | |
| 7,376,645 | B2 | 5/2008 | Bernard | |
| 7,383,209 | B2 | 6/2008 | Hudetz et al. | |
| 7,410,099 | B2 | 8/2008 | Fukasawa et al. | |
| 7,427,980 | B1 | 9/2008 | Partridge et al. | |
| 7,430,588 | B2 | 9/2008 | Hunter | |
| 7,477,909 | B2 | 1/2009 | Roth et al. | |
| 7,526,440 | B2 | 4/2009 | Walker et al. | |
| 7,548,915 | B2 | 6/2009 | Ramer et al. | |
| 7,558,595 | B2 | 7/2009 | Angelhag | |
| 7,564,469 | B2 | 7/2009 | Cohen | |

Appx270

**US 9,324,004 B2**

Page 4

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,580,061 | B2 | 8/2009 | Toyoda |
| 7,595,816 | B1 | 9/2009 | Enright et al. |
| 7,599,847 | B2 | 10/2009 | Block et al. |
| 7,631,336 | B2 | 12/2009 | Perez et al. |
| 7,641,342 | B2 | 1/2010 | Eberl et al. |
| 7,680,324 | B2 | 3/2010 | Boncyk et al. |
| 7,696,905 | B2 | 4/2010 | Ellenby et al. |
| 7,707,218 | B2 | 4/2010 | Gocht et al. |
| 7,711,598 | B2 | 5/2010 | Perkowski |
| 7,720,436 | B2 | 5/2010 | Hamynen et al. |
| 7,734,507 | B2 | 6/2010 | Ritter |
| 7,737,965 | B2 | 6/2010 | Alter et al. |
| 7,751,805 | B2 * | 7/2010 | Neven et al. ............ 455/414.3 |
| 7,756,755 | B2 | 7/2010 | Ghosh et al. |
| 7,764,808 | B2 | 7/2010 | Zhu et al. |
| 7,765,126 | B2 | 7/2010 | Hudetz et al. |
| 7,768,534 | B2 | 8/2010 | Pentenrieder et al. |
| 7,769,228 | B2 | 8/2010 | Bahlmann et al. |
| 7,774,283 | B2 | 8/2010 | Das et al. |
| 7,775,437 | B2 | 8/2010 | Cohen |
| 7,797,204 | B2 | 9/2010 | Balent |
| 7,830,417 | B2 * | 11/2010 | Liu ................... G06F 3/0346 |
| | | | 348/211.99 |
| 7,843,488 | B2 | 11/2010 | Stapleton |
| 7,845,558 | B2 | 12/2010 | Beemer et al. |
| 7,872,669 | B2 | 1/2011 | Darrell et al. |
| 7,889,193 | B2 | 2/2011 | Platonov et al. |
| 7,896,235 | B2 | 3/2011 | Ramachandran |
| 7,916,138 | B2 | 3/2011 | John et al. |
| 8,090,616 | B2 | 1/2012 | Proctor, Jr. et al. |
| 8,090,657 | B2 | 1/2012 | Mitchell et al. |
| 8,099,332 | B2 | 1/2012 | Lemay et al. |
| 8,121,944 | B2 | 2/2012 | Norman et al. |
| 8,130,242 | B2 | 3/2012 | Cohen |
| 8,131,118 | B1 | 3/2012 | Jing et al. |
| 8,131,595 | B2 | 3/2012 | Lee et al. |
| 8,187,045 | B2 | 5/2012 | Thibodaux |
| 8,189,964 | B2 | 5/2012 | Flynn et al. |
| 8,190,645 | B1 | 5/2012 | Bashaw |
| 8,218,874 | B2 | 7/2012 | Boncyk et al. |
| 8,219,146 | B2 | 7/2012 | Connors et al. |
| 8,255,291 | B1 | 8/2012 | Nair |
| 8,312,168 | B2 | 11/2012 | Rhoads et al. |
| 8,320,615 | B2 | 11/2012 | Hamza et al. |
| 8,326,031 | B2 | 12/2012 | Boncyk et al. |
| 8,335,351 | B2 | 12/2012 | Boncyk et al. |
| 8,386,918 | B2 | 2/2013 | Do et al. |
| 8,442,500 | B2 | 5/2013 | Gupta et al. |
| 8,447,066 | B2 | 5/2013 | King et al. |
| 8,477,202 | B2 | 7/2013 | Asano |
| 8,483,715 | B2 | 7/2013 | Chen |
| 8,494,274 | B2 | 7/2013 | Badharudeen et al. |
| 8,497,939 | B2 | 7/2013 | Cuttner |
| 8,523,075 | B2 * | 9/2013 | van der Merwe ..... G06K 7/1447 |
| | | | 235/435 |
| 8,542,906 | B1 | 9/2013 | Persson et al. |
| 8,550,903 | B2 | 10/2013 | Lyons et al. |
| 8,559,671 | B2 | 10/2013 | Milanfar et al. |
| 8,577,810 | B1 | 11/2013 | Dalit et al. |
| 8,588,527 | B2 | 11/2013 | Boncyk et al. |
| 8,605,141 | B2 * | 12/2013 | Dialameh ........ G06F 17/30247 |
| | | | 348/157 |
| 8,626,602 | B2 | 1/2014 | George |
| 8,751,316 | B1 | 6/2014 | Fletchall et al. |
| 8,756,659 | B2 * | 6/2014 | Ruckart ............................ 726/4 |
| 8,824,738 | B2 | 9/2014 | Boncyk et al. |
| 8,831,279 | B2 | 9/2014 | Rodriguez et al. |
| 8,831,677 | B2 | 9/2014 | Villa-Real |
| 8,838,477 | B2 | 9/2014 | Moshfeghi |
| 8,903,430 | B2 | 12/2014 | Sands et al. |
| 8,990,235 | B2 | 3/2015 | King et al. |
| 2001/0011276 | A1 | 8/2001 | Durst, Jr et al. |
| 2001/0032212 | A1 | 10/2001 | Durst et al. |
| 2001/0044824 | A1 | 11/2001 | Hunter et al. |
| 2001/0047426 | A1 | 11/2001 | Hunter |

| | | | |
|---|---|---|---|
| 2001/0053252 | A1 | 12/2001 | Creque |
| 2002/0001398 | A1 | 1/2002 | Shimano et al. |
| 2002/0006602 | A1 | 1/2002 | Masters |
| 2002/0019819 | A1 | 2/2002 | Sekiguchi et al. |
| 2002/0048403 | A1 | 4/2002 | Guerreri |
| 2002/0055957 | A1 | 5/2002 | Ohsawa |
| 2002/0084328 | A1 | 7/2002 | Kim |
| 2002/0089524 | A1 | 7/2002 | Ikeda |
| 2002/0090132 | A1 | 7/2002 | Boncyk et al. |
| 2002/0102966 | A1 | 8/2002 | Lev et al. |
| 2002/0103813 | A1 | 8/2002 | Frigon |
| 2002/0124188 | A1 | 9/2002 | Sherman et al. |
| 2002/0140988 | A1 | 10/2002 | Cheatle et al. |
| 2002/0150298 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0156866 | A1 | 10/2002 | Schneider |
| 2002/0163521 | A1 | 11/2002 | Ellenby et al. |
| 2002/0167536 | A1 | 11/2002 | Valdes et al. |
| 2003/0064705 | A1 | 4/2003 | Desiderio |
| 2003/0095681 | A1 | 5/2003 | Burg et al. |
| 2003/0116478 | A1 | 6/2003 | Laskowski |
| 2003/0132974 | A1 | 7/2003 | Bodin |
| 2003/0164819 | A1 | 9/2003 | Waibel |
| 2004/0208372 | A1 | 10/2004 | Boncyk et al. |
| 2005/0015370 | A1 | 1/2005 | Stavely et al. |
| 2005/0024501 | A1 | 2/2005 | Williams |
| 2005/0055281 | A1 | 3/2005 | Williams |
| 2005/0102233 | A1 | 5/2005 | Park et al. |
| 2005/0162523 | A1 | 7/2005 | Darrell et al. |
| 2005/0162532 | A1 | 7/2005 | Toyoda |
| 2005/0185060 | A1 | 8/2005 | Neven, Sr. et al. |
| 2005/0206654 | A1 | 9/2005 | Vaha-Sipila |
| 2005/0252966 | A1 | 11/2005 | Kulas |
| 2006/0008124 | A1 | 1/2006 | Ewe et al. |
| 2006/0038833 | A1 | 2/2006 | Mallinson et al. |
| 2006/0161379 | A1 | 7/2006 | Ellenby et al. |
| 2006/0190812 | A1 | 8/2006 | Ellenby et al. |
| 2006/0223635 | A1 | 10/2006 | Rosenberg |
| 2007/0109619 | A1 | 5/2007 | Eberl et al. |
| 2007/0146391 | A1 | 6/2007 | Pentenrieder et al. |
| 2007/0182739 | A1 | 8/2007 | Platonov et al. |
| 2008/0021953 | A1 | 1/2008 | Gil |
| 2008/0133555 | A1 | 6/2008 | Rhoads et al. |
| 2008/0157946 | A1 | 7/2008 | Eberl et al. |
| 2008/0189185 | A1 | 8/2008 | Matsuo et al. |
| 2008/0207296 | A1 | 8/2008 | Lutnick et al. |
| 2008/0243721 | A1 | 10/2008 | Joao |
| 2008/0279481 | A1 | 11/2008 | Ando |
| 2009/0027337 | A1 | 1/2009 | Hildreth |
| 2009/0030900 | A1 | 1/2009 | Iwasaki |
| 2010/0045933 | A1 | 2/2010 | Eberl et al. |
| 2010/0106720 | A1 | 4/2010 | Chao et al. |
| 2010/0188638 | A1 | 7/2010 | Eberl et al. |
| 2011/0131241 | A1 | 6/2011 | Petrou et al. |
| 2011/0173100 | A1 | 7/2011 | Boncyk et al. |
| 2011/0282785 | A1 | 11/2011 | Chin |
| 2012/0002872 | A1 | 1/2012 | Boncyk et al. |
| 2012/0011119 | A1 | 1/2012 | Baheti et al. |
| 2012/0011112 | A1 | 1/2012 | Baheti et al. |
| 2012/0027290 | A1 | 2/2012 | Baheti et al. |
| 2012/0072353 | A1 | 3/2012 | Boone et al. |
| 2012/0095857 | A1 | 4/2012 | McKelvey et al. |
| 2012/0231887 | A1 | 9/2012 | Lee et al. |
| 2012/0263388 | A1 | 10/2012 | Vaddadi et al. |
| 2013/0013414 | A1 | 1/2013 | Haff |
| 2013/0046602 | A1 | 2/2013 | Grigg et al. |
| 2013/0265450 | A1 * | 10/2013 | Barnes, Jr. ............... 348/207.1 |
| 2013/0304609 | A1 | 11/2013 | Keonorasak |
| 2014/0006165 | A1 | 1/2014 | Grigg et al. |
| 2014/0007012 | A1 | 1/2014 | Govande et al. |
| 2014/0010148 | A1 | 4/2014 | Gardiner et al. |
| 2014/0129942 | A1 * | 5/2014 | Rathod .................... 715/720 |
| 2014/0162598 | A1 | 6/2014 | Villa-Real |
| 2015/0026785 | A1 | 1/2015 | Soon-Shiong |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0920179 | A2 | 6/1999 |
| EP | 0967574 | A2 | 12/1999 |
| EP | 1012725 | A1 | 6/2000 |

US 9,324,004 B2

Page 5

(56)         **References Cited**

FOREIGN PATENT DOCUMENTS

| EP | 0920179 | A3 | 9/2000 |
|----|---------|----|--------|
| EP | 1354260 | A2 | 10/2003 |
| EP | 1355258 | A2 | 10/2003 |
| EP | 2264669 | A2 | 12/2010 |
| GB | 2407230 | A | 4/2005 |
| JP | S6314297 | A | 1/1988 |
| JP | H09231244 | A | 9/1997 |
| JP | H1091634 | A | 4/1998 |
| JP | H10289243 | A | 10/1998 |
| JP | H11265591 | A | 9/1999 |
| JP | 2001101191 | A | 4/2001 |
| JP | 2001160057 | A | 6/2001 |
| JP | 2001256500 | A | 9/2001 |
| JP | 2001265970 | A | 9/2001 |
| JP | 2001282825 | A | 10/2001 |
| JP | 2002197103 | A | 7/2002 |
| JP | 2002297648 | A | 10/2002 |
| JP | 2003178067 | A | 6/2003 |
| JP | 2003323440 | A | 11/2003 |
| JP | 2004005314 | A | 1/2004 |
| JP | 2004030377 | A | 1/2004 |
| JP | 2004118384 | A | 4/2004 |
| JP | 2005011180 | A | 1/2005 |
| JP | 2005038421 | A | 2/2005 |
| JP | 2005049920 | A | 2/2005 |
| JP | 2005509219 | A | 4/2005 |
| JP | 2007509392 | A | 4/2007 |
| WO | 9744737 | A1 | 11/1997 |
| WO | 9749060 | A1 | 12/1997 |
| WO | 9837811 | A1 | 9/1998 |
| WO | 9846323 | A1 | 10/1998 |
| WO | 9916024 | A1 | 4/1999 |
| WO | 9942946 | A2 | 8/1999 |
| WO | 9942947 | A2 | 8/1999 |
| WO | 9944010 | A1 | 9/1999 |
| WO | 9942946 | A3 | 10/1999 |
| WO | 9942947 | A3 | 12/1999 |
| WO | 9967695 | A2 | 12/1999 |
| WO | 0124050 | A1 | 4/2001 |
| WO | 0149056 | A1 | 7/2001 |
| WO | 0163487 | A1 | 8/2001 |
| WO | 0171282 | A1 | 9/2001 |
| WO | 0173603 | A1 | 10/2001 |
| WO | 0201143 | A2 | 1/2002 |
| WO | 02059716 | A2 | 8/2002 |
| WO | 02073818 | A1 | 9/2002 |
| WO | 02082799 | A2 | 10/2002 |
| WO | 03041000 | A1 | 5/2003 |

OTHER PUBLICATIONS

International Search Report and Written Opinion for Application No. PCT/US2007/02010, mailed on Nov. 16, 2007, 5 pages.

Arai T., et al., "PaperLink: A Technique for Hyperlinking from Real Paper to Electronic Content," CHI 97 Electronic Publications: Papers, Conference on Human Factors in Computer Systems, Atlanta, Georgia, Mar. 22-27, 1997, pp. 327-334.

Bulman J., et al., "Mixed Reality Applications in Urban Environments," BT Technology Journal, 2004, vol. 22 (3), pp. 84-94.

Carswell J.D., et al., "An Environment for Mobile Context-Based Hypermedia Retrieval," IEEE: Proceedings of the 13th International Workshop on Database and Expert Systems Applications, 1529-4188/02, 2002, 5 pages.

Chang S.F., et al., "Visual Information Retrieval from Large Distributed Online Repositories," Communication of Association for Computing Machinery, ISSN:0001-0782, 1997, vol. 40 (12), pp. 64-71.

Chang W., et al., "Efficient Resource Selection in Distributed Visual Information Systems," ACM Multimedia, 1997, pp. 203-213.

Diverdi S., et al., "ARWin—A Desktop Augmented Reality Window Manager," UCSB Tech Report 2003-12, University of California Santa Barbara, May 2003, 7 pages.

Diverdi S., et al., "Level of Detail Interfaces," Proc. ISMAR 2004, IEEE/ACM IIIyf Symp on Mixed and Augmented Reality, Arlington, Virginia, 2004, 2 pages.

Feiner S., et al., "A Touring Machine: Prototyping 3D Mobile Augmented Reality Systems for Exploring the Urban Environment," Personal Technologies, 1997, vol. 1 (4), pp. 208-217.

Fernandez F., "Responsive Environments: Digital Objects in the Landscape," Thesis submitted to Department of Landscape Architecture, University of Manitoba, Winnipeg, Manitoba, Mar. 2004, 124 pages.

Geiger C., et al., "Mobile AR4ALL," Proceedings of the IEEE and ACM Intl Symposium on Augmented Reality (ISAR'01), Oct. 29-30, 2001, Columbia University, New York, 2 pages.

Gevers T., et al., "PicToSeek: Combining Color and Shape Invariant Features for Image Retrieval," IEEE Transactions on Image Processing, 2000, vol. 9 (1), pp. 102-119.

Haritaoglu I., "InfoScope: Link from Real World to Digital Information Space," IBM Almaden Research, UbiComp, Lecture Notes in Computer Science, 2001, vol. 2201, pp. 247-255.

Hollerer T., et al., "Chapter Nine: Mobile Augmented Reality," in: Telegeoinformatics: Location Based Computing and Services, Karimi H., eds., Taylor & Francis Books, Ltd., 2004, Chapter 9, 39 pages.

Iwamoto T., et al., "Digital Safari Guidebook With Image Retrieval," International Conference on Advances in Mathematical Computations and Statistical Computing, 1999, vol. 2, pp. 1011-1012.

Iwamoto T., et al., "u-Photo: A Design and Implementation of a Snapshot Based Method for Capturing Contextual Information," The Second International Conference on Pervasive Computing Pervasive, 2004, Advances in Pervasive Computing, LinzNienna, Austria, 6 pages.

Jebara T., et al., "Stochasticks: Augmenting the Billiards Experience With Probabilistic Vision and Wearable Computers," International Symposium on Wearable Computers, 1997, IEEE Computer Society, pp. 138-145.

Kangas K., et al., "Using Code Mobility to Create Ubiquitous and Active Augmented Reality in Mobile Computing," Mobicom, 1999, Seattle, Washington, pp. 48-58.

Kato H., et al., "Marker Tracking and HMD Calibration for a Video-Based Augmented Reality Conferencing System," Proceedings of the 2nd IEEE and ACM Intl Workshop on Augmented Reality, San Francisco, California, 1999, pp. 85-94.

Klinker G., "Augmented Maintenance of Powerplants: A Prototyping Case Study of a Mobile AR System," International Symposium on Augmented Reality, 2001, IEEE Computer Society, pp. 124-136.

Levine J.M., "Real-Time Target and Pose Recognition for 3-D Graphical Overlay," Master's thesis, 1997, 48 pages.

Ljungstrand P., et al., "WebStickers: Using Physical Tokens to Access, Manage and Share Bookmarks on the Web," Proceedings of the 2000 ACM Conference on Designing Augmented Reality Environments (DARE 2000), 2000, pp. 23-31.

Rekimoto J., et al., "Augment-able Reality: Situated Communication Through Physical and Digital Spaces," Wearable Computers, Second International Symposium, 1998, pp. 68-75.

Rekimoto J., et al., "CyberCode: Designing Augmented Reality Environments With Visual Tags," Proceedings of the 2000 ACM Conference on Designing Augmented Reality Environments, 2000, pp. 1-10.

Rekimoto J., et al., "The World Through the Computer: Computer Augmented Interaction With Real World Environments," ACM Symposium on User Interface Software and Technology, 1995, pp. 29-36.

Rekimoto J., "NaviCam: A Palmtop Device Approach to Augmented Reality," Fundamentals of Wearable Computers and Augmented Reality, 2001, Barfield and Caudell, Eds., pp. 353-377.

Rohs M., et al., "A Conceptual Framework for Camera Phone-Based Interaction Techniques," Pervasive Computing. Lecture Notes in Computer Science, 2005, vol. 3468, pp. 171-189.

Siltanen S., et al., "Implementing a Natural User Interface for Camera Phones Using Visual Tags," Proceedings of the 7th Australasian User interface conference, 2006, vol. 50, pp. 113-116.

Smailagic A., et al., "Metronaut: A Wearable Computer With Sensing and Global Communication Capabilities," First International Symposium on Wearable Computers, Oct. 13-14, 1997, Cambridge, Massachusetts; Digest of Papers, pp. 116-122.

Appx272

US 9,324,004 B2

Page 6

(56)            **References Cited**

OTHER PUBLICATIONS

Smith J.R., et al., "VisualSEEK: A Fully Automated Content-Based Image Query System," Proceedings of the fourth ACM international conference on Multimedia, ACM New York, 1996, pp. 87-98.

Starner T., et al., "Augmented Reality Through Wearable Computing," Presence: Teleoper. Virtual Environ. 6, 4, Massachusetts Institute of Technology, 1997, 24 pages.

Supplementary European Search Report for Application No. EP02778730, mailed on May 14, 2007, 3 pages.

Supplementary European Search Report for Application No. EP06801326, mailed on Aug. 12, 2008, 8 pages.

Suzuki G., et al., "u-Photo: Interacting with Pervasive Services Using Digital Still Images," Pervasive Computing. Lecture Notes in Computer Science, vol. 3468, 2005, pp. 190-207.

Toye E., et al., "Interacting with Mobile Services: An Evaluation of Camera-Phones and Visual Tags," in: Personal and Ubiquitous Computing, vol. 11 (2), Springer-Verlag, London Limited, 2007, pp. 97-106.

Wagner D., et al., "First Steps Towards Handheld Augmented Reality," Vienna University of Technology, Proceedings of Seventh IEEE International Symposium on Wearable Computers, Oct. 18-21, 2003, 9 pages.

Yang J., et al., "Smart Sight: A Tourist Assistant System," Digest of Papers, Third International Symposium on Wearable Computers, Oct. 18-19, 1999, San Francisco, California, pp. 73-78.

Yeh T., et al., "Searching the Web with Mobile Images for location Recognition," IEEE: Proceedings of the 2004 IEEE Computer Society Conference on Computer Vision and Pattern Recognition (CVPR'04), 1063-6919/04, 2004, 6 pages.

Zhang X., et al., "Taking AR Into Large Scale Industrial Environments: Navigation and Information Access With Mobile Computers," Proceedings of the IEEE and ACM Intl Symposium on Augmented Reality, 2001, pp. 179-180.

* cited by examiner

**BANK OF AMERICA**              **IPR2021-01332**              **Ex. 1001, p. 6 of 27**



FIG. 1

Appx274



FIG. 2

BANK OF AMERICA    IPR2021-01332    Ex. 1001, p. 8 of 27



FIG. 3A

BANK OF AMERICA                    IPR2021-01332                    Ex. 1001, p. 9 of 27



FIG. 3B

**BANK OF AMERICA**    IPR2021-01332    Ex. 1001, p. 10 of 27



FIG. 4

BANK OF AMERICA          IPR2021-01332          Ex. 1001, p. 11 of 27



Appx279



FIG. 6

BANK OF AMERICA    IPR2021-01332    Ex. 1001, p. 13 of 27

Appx280

US 9,324,004 B2

1

## IMAGE CAPTURE AND IDENTIFICATION SYSTEM AND PROCESS

This application is a divisional Ser. No. 13/907,780, filed May 31, 2013, which is a divisional of of Ser. No. 13/693,983, filed Dec. 4, 2012, which is a continuation of Ser. No. 13/069, 112, filed Mar. 22, 2011 and issued Dec. 4, 2012 as U.S. Pat. No. 8,326,031, which is a divisional of Ser. No. 13/037,317 filed Feb. 28, 2011 and issued Jul. 17, 2012 as U.S. Pat. No. 8,224,078, which is a divisional of Ser. No. 12/333,630 filed Dec. 12, 2008 and issued Mar. 1, 2011 as U.S. Pat. No. 7,899,243, which is a divisional of Ser. No. 10/492,243 filed May 20, 2004 and issued Jan. 13, 2009 as U.S. Pat. No. 7,477,780, which is a National Phase of PCT/US02/35407 filed Nov. 5, 2002, which is a continuation-in-part of Ser. No. 09/992,942 filed Nov. 5, 2001 and issued Mar. 21, 2006 as U.S. Pat. No. 7,016,532, which claims priority to provisional application No. 60/317,521 filed Sep. 5, 2001 and provisional application No. 60/246,295 filed Nov. 6, 2000. These and all other referenced patents and applications are incorporated herein by reference in their entirety. Where a definition or use of a term in a reference that is incorporated by reference is inconsistent or contrary to the definition of that term provided herein, the definition of that term provided herein is deemed to be controlling.

### TECHNICAL FIELD

The invention relates an identification method and process for objects from digitally captured images thereof that uses image characteristics to identify an object from a plurality of objects in a database.

### BACKGROUND ART

There is a need to provide hyperlink functionality in known objects without modification to the objects, through reliably detecting and identifying the objects based only on the appearance of the object, and then locating and supplying information pertinent to the object or initiating communications pertinent to the object by supplying an information address, such as a Uniform Resource Locator (URL), pertinent to the object.

There is a need to determine the position and orientation of known objects based only on imagery of the objects.

The detection, identification, determination of position and orientation, and subsequent information provision and communication must occur without modification or disfigurement of the object, without the need for any marks, symbols, codes, barcodes, or characters on the object, without the need to touch or disturb the object, without the need for special lighting other than that required for normal human vision, without the need for any communication device (radio frequency, infrared, etc.) to be attached to or nearby the object, and without human assistance in the identification process. The objects to be detected and identified may be 3-dimensional objects, 2-dimensional images (e.g., on paper), or 2-dimensional images of 3-dimensional objects, or human beings.

There is a need to provide such identification and hyperlink services to persons using mobile computing devices, such as Personal Digital Assistants (PDAs) and cellular telephones.

There is a need to provide such identification and hyperlink services to machines, such as factory robots and spacecraft.

2

Examples include:

identifying pictures or other art in a museum, where it is desired to provide additional information about such art objects to museum visitors via mobile wireless devices;

provision of content (information, text, graphics, music, video, etc.), communications, and transaction mechanisms between companies and individuals, via networks (wireless or otherwise) initiated by the individuals "pointing and clicking" with camera-equipped mobile devices on magazine advertisements, posters, billboards, consumer products, music or video disks or tapes, buildings, vehicles, etc.;

establishment of a communications link with a machine, such a vending machine or information kiosk, by "pointing and clicking" on the machine with a camera-equipped mobile wireless device and then execution of communications or transactions between the mobile wireless device and the machine;

identification of objects or parts in a factory, such as on an assembly line, by capturing an image of the objects or parts, and then providing information pertinent to the identified objects or parts;

identification of a part of a machine, such as an aircraft part, by a technician "pointing and clicking" on the part with a camera-equipped mobile wireless device, and then supplying pertinent content to the technician, such maintenance instructions or history for the identified part;

identification or screening of individual(s) by a security officer "pointing and clicking" a camera-equipped mobile wireless device at the individual(s) and then receiving identification information pertinent to the individuals after the individuals have been identified by face recognition software;

identification, screening, or validation of documents, such as passports, by a security officer "pointing and clicking" a camera-equipped device at the document and receiving a response from a remote computer;

determination of the position and orientation of an object in space by a spacecraft nearby the object, based on imagery of the object, so that the spacecraft can maneuver relative to the object or execute a rendezvous with the object;

identification of objects from aircraft or spacecraft by capturing imagery of the objects and then identifying the objects via image recognition performed on a local or remote computer;

watching movie previews streamed to a camera-equipped wireless device by "pointing and clicking" with such a device on a movie theatre sign or poster, or on a digital video disc box or videotape box;

listening to audio recording samples streamed to a camera-equipped wireless device by "pointing and clicking" with such a device on a compact disk (CD) box, videotape box, or print media advertisement;

purchasing movie, concert, or sporting event tickets by "pointing and clicking" on a theater, advertisement, or other object with a camera-equipped wireless device;

purchasing an item by "pointing and clicking" on the object with a camera-equipped wireless device and thus initiating a transaction;

interacting with television programming by "pointing and clicking" at the television screen with a camera-equipped device, thus capturing an image of the screen content and having that image sent to a remote computer and identified, thus initiating interaction based on the screen content received (an example is purchasing an item on the television screen by "pointing and clicking" at the screen when the item is on the screen);

BANK OF AMERICA          IPR2021-01332          Ex. 1001, p. 14 of 27

US 9,324,004 B2

**3**

interacting with a computer-system based game and with other players of the game by "pointing and clicking" on objects in the physical environment that are considered to be part of the game;

paying a bus fare by "pointing and clicking" with a mobile wireless camera-equipped device, on a fare machine in a bus, and thus establishing a communications link between the device and the fare machine and enabling the fare payment transaction;

establishment of a communication between a mobile wireless camera-equipped device and a computer with an Internet connection by "pointing and clicking" with the device on the computer and thus providing to the mobile device an Internet address at which it can communicate with the computer, thus establishing communications with the computer despite the absence of a local network or any direct communication between the device and the computer;

use of a mobile wireless camera-equipped device as a point-of-sale terminal by, for example, "pointing and clicking" on an item to be purchased, thus identifying the item and initiating a transaction.

DISCLOSURE OF INVENTION

The present invention solves the above stated needs. Once an image is captured digitally, a search of the image determines whether symbolic content is included in the image. If so the symbol is decoded and communication is opened with the proper database, usually using the Internet, wherein the best match for the symbol is returned. In some instances, a symbol may be detected, but non-ambiguous identification is not possible. In that case and when a symbolic image can not be detected, the image is decomposed through identification algorithms where unique characteristics of the image are determined. These characteristics are then used to provide the best match or matches in the data base, the "best" determination being assisted by the partial symbolic information, if that is available.

Therefore the present invention provides technology and processes that can accommodate linking objects and images to information via a network such as the Internet, which requires no modification to the linked object. Traditional methods for linking objects to digital information, including applying a barcode, radio or optical transceiver or transmitter, or some other means of identification to the object, or modifying the image or object so as to encode detectable information in it, are not required because the image or object can be identified solely by its visual appearance. The users or devices may even interact with objects by "linking" to them. For example, a user may link to a vending machine by "pointing and clicking" on it. His device would be connected over the Internet to the company that owns the vending machine. The company would in turn establish a connection to the vending machine, and thus the user would have a communication channel established with the vending machine and could interact with it.

The decomposition algorithms of the present invention allow fast and reliable detection and recognition of images and/or objects based on their visual appearance in an image, no matter whether shadows, reflections, partial obscuration, and variations in viewing geometry are present. As stated above, the present invention also can detect, decode, and identify images and objects based on traditional symbols which may appear on the object, such as alphanumeric characters, barcodes, or 2-dimensional matrix codes.

When a particular object is identified, the position and orientation of an object with respect to the user at the time the

**4**

image was captured can be determined based on the appearance of the object in an image. This can be the location and/or identity of people scanned by multiple cameras in a security system, a passive locator system more accurate than GPS or usable in areas where GPS signals cannot be received, the location of specific vehicles without requiring a transmission from the vehicle, and many other uses.

When the present invention is incorporated into a mobile device, such as a portable telephone, the user of the device can link to images and objects in his or her environment by pointing the device at the object of interest, then "pointing and clicking" to capture an image. Thereafter, the device transmits the image to another computer ("Server"), wherein the image is analyzed and the object or image of interest is detected and recognized. Then the network address of information corresponding to that object is transmitted from the ("Server") back to the mobile device, allowing the mobile device to access information using the network address so that only a portion of the information concerning the object need be stored in the systems database.

Some or all of the image processing, including image/object detection and/or decoding of symbols detected in the image may be performed in the Client device and some in the Server. In other words, some processing may be performed in the Client device and some in the Server, without specification of which particular processing is performed in each, or all processing may be performed on one platform or the other, or the platforms may be combined so that there is only one platform. The image processing can be implemented in a parallel computing manner, thus facilitating scaling of the system with respect to database size and input traffic loading.

Therefore, it is an object of the present invention to provide a system and process for identifying digitally captured images without requiring modification to the object.

Another object is to use digital capture devices in ways never contemplated by their manufacturer.

Another object is to allow identification of objects from partial views of the object.

Another object is to provide communication means with operative devices without requiring a public connection therewith.

These and other objects and advantages of the present invention will become apparent to those skilled in the art after considering the following detailed specification, together with the accompanying drawings wherein:

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic block diagram top-level algorithm flowchart;

FIG. **2** is an idealized view of image capture;

FIGS. **3**A and **3**B are a schematic block diagram of process details of the present invention;

FIG. **4** is a schematic block diagram of a different explanation of invention;

FIG. **5** is a schematic block diagram similar to FIG. **4** for cellular telephone and personal data assistant (PDA) applications; and

FIG. **6** is a schematic block diagram for spacecraft applications.

BEST MODES FOR CARRYING OUT THE INVENTION

The present invention includes a novel process whereby information such as Internet content is presented to a user,

Appx282

US 9,324,004 B2

5

based solely on a remotely acquired image of a physical object. Although coded information can be included in the remotely acquired image, it is not required since no additional information about a physical object, other than its image, needs to be encoded in the linked object. There is no need for any additional code or device, radio, optical or otherwise, to be embedded in or affixed to the object. Image-linked objects can be located and identified within user-acquired imagery solely by means of digital image processing, with the address of pertinent information being returned to the device used to acquire the image and perform the link. This process is robust against digital image noise and corruption (as can result from lossy image compression/decompression), perspective error, rotation, translation, scale differences, illumination variations caused by different lighting sources, and partial obscuration of the target that results from shadowing, reflection or blockage.

Many different variations on machine vision "target location and identification" exist in the current art. However, they all tend to provide optimal solutions for an arbitrarily restricted search space. At the heart of the present invention is a high-speed image matching engine that returns unambiguous matches to target objects contained in a wide variety of potential input images. This unique approach to image matching takes advantage of the fact that at least some portion of the target object will be found in the user-acquired image. The parallel image comparison processes embodied in the present search technique are, when taken together, unique to the process. Further, additional refinement of the process, with the inclusion of more and/or different decomposition-parameterization functions, utilized within the overall structure of the search loops is not restricted. The detailed process is described in the following. FIG. 1 shows the overall processing flow and steps. These steps are described in further detail in the following sections.

For image capture 10, the User 12 (FIG. 2) utilizes a computer, mobile telephone, personal digital assistant, or other similar device 14 equipped with an image sensor (such as a CCD or CMOS digital camera). The User 12 aligns the sensor of the image capture device 14 with the object 16 of interest. The linking process is then initiated by suitable means including: the User 12 pressing a button on the device 14 or sensor; by the software in the device 14 automatically recognizing that an image is to be acquired; by User voice command; or by any other appropriate means. The device 14 captures a digital image 18 of the scene at which it is pointed. This image 18 is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. For the purposes of standardizing the analytical processes in this embodiment, if the device 14 supplies an image in other than RGB format, a transformation to RGB is accomplished. These analyses could be carried out in any standard color format, should the need arise.

If the server 20 is physically separate from the device 14, then user acquired images are transmitted from the device 14 to the Image Processor/Server 20 using a conventional digital network or wireless network. If the image 18 has been compressed (e.g. via lossy JPEG DCT) in a manner that introduces compression artifacts into the reconstructed image 18, these artifacts may be partially removed by, for example, applying a conventional despeckle filter to the reconstructed image prior to additional processing.

The Image Type Determination 26 is accomplished with a discriminator algorithm which operates on the input image 18 and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters. If such symbols are found, the image 18 is

6

sent to the Decode Symbol 28 process. Depending on the confidence level with which the discriminator algorithm finds the symbols, the image 18 also may or alternatively contain an object of interest and may therefore also or alternatively be sent to the Object Image branch of the process flow. For example, if an input image 18 contains both a barcode and an object, depending on the clarity with which the barcode is detected, the image may be analyzed by both the Object Image and Symbolic Image branches, and that branch which has the highest success in identification will be used to identify and link from the object.

The image is analyzed to determine the location, size, and nature of the symbols in the Decode Symbol 28. The symbols are analyzed according to their type, and their content information is extracted. For example, barcodes and alphanumeric characters will result in numerical and/or text information.

For object images, the present invention performs a "decomposition", in the Input Image Decomposition 34, of a high-resolution input image into several different types of quantifiable salient parameters. This allows for multiple independent convergent search processes of the database to occur in parallel, which greatly improves image match speed and match robustness in the Database Matching 36. The Best Match 38 from either the Decode Symbol 28, or the Image Database Matching 36, or both, is then determined. If a specific URL (or other online address) is associated with the image, then an URL Lookup 40 is performed and the Internet address is returned by the URL Return 42.

The overall flow of the Input Image Decomposition process is as follows:

```
Radiometric Correction
Segmentation
Segment Group Generation
FOR each segment group
    Bounding Box Generation
    Geometric Normalization
    Wavelet Decomposition
    Color Cube Decomposition
    Shape Decomposition
    Low-Resolution Grayscale Image Generation
FOR END
```

Each of the above steps is explained in further detail below. For Radiometric Correction, the input image typically is transformed to an 8-bit per color plane, RGB representation. The RGB image is radiometrically normalized in all three channels. This normalization is accomplished by linear gain and offset transformations that result in the pixel values within each color channel spanning a full 8-bit dynamic range (256 possible discrete values). An 8-bit dynamic range is adequate but, of course, as optical capture devices produce higher resolution images and computers get faster and memory gets cheaper, higher bit dynamic ranges, such as 16-bit, 32-bit or more may be used.

For Segmentation, the radiometrically normalized RGB image is analyzed for "segments," or regions of similar color, i.e. near equal pixel values for red, green, and blue. These segments are defined by their boundaries, which consist of sets of (x, y) point pairs. A map of segment boundaries is produced, which is maintained separately from the RGB input image and is formatted as an x, y binary image map of the same aspect ratio as the RGB image.

For Segment Group Generation, the segments are grouped into all possible combinations. These groups are known as "segment groups" and represent all possible potential images or objects of interest in the input image. The segment groups

Appx283

US 9,324,004 B2

7

are sorted based on the order in which they will be evaluated. Various evaluation order schemes are possible. The particular embodiment explained herein utilizes the following "center-out" scheme: The first segment group comprises only the segment that includes the center of the image. The next segment group comprises the previous segment plus the segment which is the largest (in number of pixels) and which is adjacent to (touching) the previous segment group. Additional segments are added using the segment criteria above until no segments remain. Each step, in which a new segment is added, creates a new and unique segment group.

For Bounding Box Generation, the elliptical major axis of the segment group under consideration (the major axis of an ellipse just large enough to contain the entire segment group) is computed. Then a rectangle is constructed within the image coordinate system, with long sides parallel to the elliptical major axis, of a size just large enough to completely contain every pixel in the segment group.

For Geometric Normalization, a copy of the input image is modified such that all pixels not included in the segment group under consideration are set to mid-level gray. The result is then resampled and mapped into a "standard aspect" output test image space such that the corners of the bounding box are mapped into the corners of the output test image. The standard aspect is the same size and aspect ratio as the Reference images used to create the database.

For Wavelet Decomposition, a grayscale representation of the full-color image is produced from the geometrically normalized image that resulted from the Geometric Normalization step. The following procedure is used to derive the grayscale representation. Reduce the three color planes into one grayscale image by proportionately adding each R, G, and B pixel of the standard corrected color image using the following formula:

$$L_{x,y} = 0.34 * R_{x,y} + 0.55 * G_{x,y} + 0.44 * B_{x,y}$$

then round to nearest integer value. Truncate at 0 and 255, if necessary. The resulting matrix L is a standard grayscale image. This grayscale representation is at the same spatial resolution as the full color image, with an 8-bit dynamic range. A multi-resolution Wavelet Decomposition of the grayscale image is performed, yielding wavelet coefficients for several scale factors. The Wavelet coefficients at various scales are ranked according to their weight within the image.

For Color Cube Decomposition, an image segmentation is performed (see "Segmentation" above), on the RGB image that results from Geometric Normalization. Then the RGB image is transformed to a normalized Intensity, In-phase and Quadrature-phase color image (YIQ). The segment map is used to identify the principal color regions of the image, since each segment boundary encloses pixels of similar color. The average Y, I, and Q values of each segment, and their individual component standard deviations, are computed. The following set of parameters result, representing the colors, color variation, and size for each segment:

$Y_{avg}$=Average Intensity
$I_{avg}$=Average In-phase
$Q_{avg}$=Average Quadrature
$Y_{sigma}$=intensity standard deviation
$I_{sigma}$=in-phase standard deviation
$Q_{sigma}$=Quadrature standard deviation
$N_{pixels}$=number of pixels in the segment

The parameters comprise a representation of the color intensity and variation in each segment. When taken together for all segments in a segment group, these parameters comprise points (or more accurately, regions, if the standard

8

deviations are taken into account) in a three-dimensional color space and describe the intensity and variation of color in the segment group.

For Shape Decomposition, the map resulting from the segmentation performed in the Color Cube Generation step is used and the segment group is evaluated to extract the group outer edge boundary, the total area enclosed by the boundary, and its area centroid. Additionally, the net ellipticity (semi-major axis divided by semi-minor axis of the closest fit ellipse to the group) is determined.

For Low-Resolution Grayscale Image Generation, the full-resolution grayscale representation of the image that was derived in the Wavelet Generation step is now subsampled by a factor in both x and y directions. For the example of this embodiment, a 3:1 subsampling is assumed. The subsampled image is produced by weighted averaging of pixels within each 3×3 cell. The result is contrast binned, by reducing the number of discrete values assignable to each pixel based upon substituting a "binned average" value for all pixels that fall within a discrete (TBD) number of brightness bins.

The above discussion of the particular decomposition methods incorporated into this embodiment are not intended to indicate that more, or alternate, decomposition methods may not also be employed within the context of this invention.

In other words:

```
FOR each input image segment group
  FOR each database object
    FOR each view of this object
      FOR each segment group in this view of this
      database object
        Shape Comparison
        Grayscale Comparison
        Wavelet Comparison
        Color Cube Comparison
        Calculate Combined Match Score
      END FOR
    END FOR
  END FOR
END FOR
```

Each of the above steps is explained in further detail below.
FOR Each Input Image Segment Group

This loop considers each combination of segment groups in the input image, in the order in which they were sorted in the "Segment Group Generation" step. Each segment group, as it is considered, is a candidate for the object of interest in the image, and it is compared against database objects using various tests.

One favored implementation, of many possible, for the order in which the segment groups are considered within this loop is the "center-out" approach mentioned previously in the "Segment Group Generation" section. This scheme considers segment groups in a sequence that represents the addition of adjacent segments to the group, starting at the center of the image. In this scheme, each new group that is considered comprises the previous group plus one additional adjacent image segment. The new group is compared against the database. If the new group results in a higher database matching score than the previous group, then new group is retained. If the new group has a lower matching score then the previous group, then it is discarded and the loop starts again. If a particular segment group results in a match score which is extremely high, then this is considered to be an exact match and no further searching is warranted; in this case the current group and matching database group are selected as the match and this loop is exited.

BANK OF AMERICA          IPR2021-01332          Ex. 1001, p. 17 of 27

Appx284

US 9,324,004 B2

**9**

FOR Each Database Object

This loop considers each object in the database for comparison against the current input segment group.

FOR Each View of this Object

This loop considers each view of the current database object, for comparison against the current input segment group. The database contains, for each object, multiple views from various viewing angles.

FOR Each Segment Group in this View of this Database Object

This loop considers each combination of segment groups in the current view of the database object. These segment groups were created in the same manner as the input image segment groups.

Shape Comparison

Inputs:

For the input image and all database images:

I. Segment group outline

II. Segment group area

III. Segment group centroid location

IV. Segment group bounding ellipse ellipticity

Algorithm:

V. Identify those database segment groups with an area approximately equal to that of the input segment group, within TBD limits, and calculate an area matching score for each of these "matches."

VI. Within the set of matches identified in the previous step, identify those database segment groups with an ellipticity approximately equal to that of the input segment group, within TBD limits, and calculate an ellipticity position matching score for each of these "matches."

Within the set of matches identified in the previous step, identify those database segment groups with a centroid position approximately equal to that of the input segment group, within TBD limits, and calculate a centroid position matching score for each of these "matches."

VIII. Within the set of matches identified in the previous step, identify those database segment groups with an outline shape approximately equal to that of the input segment group, within TBD limits, and calculate an outline matching score for each of these "matches." This is done by comparing the two outlines and analytically determining the extent to which they match.

Note: this algorithm need not necessarily be performed in the order of Steps 1 to 4. It could alternatively proceed as follows:

```
FOR each database segment group
    IF the group passes Step 1
        IF the group passes Step 2
            IF the group passes Step 3
                IF the group passes Step 4
                    Successful comparison, save result
                END IF
            END IF
        END IF
    END IF
END FOR
```

Grayscale Comparison

Inputs:

For the input image and all database images:

IX. Low-resolution, normalized, contrast-binned, grayscale image of pixels within segment group bounding box, with pixels outside of the segment group set to a standard background color.

**10**

Algorithm:

Given a series of concentric rectangular "tiers" of pixels within the low-resolution images, compare the input image pixel values to those of all database images. Calculate a matching score for each comparison and identify those database images with matching scores within TBD limits, as follows:

```
FOR each database image
    FOR each tier, starting with the innermost and progressing to the
    outermost
        Compare the pixel values between the input and database
        image
        Calculate an aggregate matching score
        IF matching score is greater than some TBD limit
        (i.e., close match)
            Successful comparison, save result
        END IF
    END FOR
END FOR
```

Wavelet Comparison

Inputs:

For the input image and all database images:

X. Wavelet coefficients from high-resolution grayscale image within segment group bounding box.

Algorithm:

Successively compare the wavelet coefficients of the input segment group image and each database segment group image, starting with the lowest-order coefficients and progressing to the highest order coefficients. For each comparison, compute a matching score. For each new coefficient, only consider those database groups that had matching scores, at the previous (next lower order) coefficient within TBD limits.

```
FOR each database image
    IF input image C_0 equals database image C_0 within TBD limit
        IF input image C_1 equals database image C_1 within TBD
        limit
            IF input image C_N equals database image C_N within
            TBD limit
                Close match, save result and match score
            END IF
        END IF
    END IF
END FOR
```

Notes:

I. "$C_i$" are the wavelet coefficients, with $C_0$ being the lowest order coefficient and $C_N$ being the highest.

II. When the coefficients are compared, they are actually compared on a statistical (e.g. Gaussian) basis, rather than an arithmetic difference.

III. Data indexing techniques are used to allow direct fast access to database images according to their $C_i$ values. This allows the algorithm to successively narrow the portions of the database of interest as it proceeds from the lowest order terms to the highest.

Color Cube Comparison

Inputs:

$[Y_{avg}, I_{avg}, Q_{avg}, Y_{Sigma}, I_{sigma}, Q_{sigma}, N_{pixels}]$ data sets ("Color Cube Points") for each segment in:

I. The input segment group image

II. Each database segment group image

Algorithm:

```
FOR each database image
    FOR each segment group in the database
        FOR each Color Cube Point in database segment group, in
        order of descending N_pixels value
            IF Gaussian match between input (Y,I,Q) and
            database (Y,I,Q)
```

US 9,324,004 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

-continued

```
            I. Calculate match score for this segment
            II. Accumulate segment match score into aggregate
            match score for segment group
            III. IF aggregate matching score is greater than some
            TBD limit (i.e., close match)
                Successful comparison, save result
            END IF
        END FOR
    END FOR
END FOR
```

Notes:
I. The size of the Gaussian envelope about any Y, I, Q point is determined by RSS of standard deviations of Y, I, and Q for that point.

Calculate Combined Match Score

The four Object Image comparisons (Shape Comparison, Grayscale Comparison, Wavelet Comparison, Color Cube Comparison) each return a normalized matching score. These are independent assessments of the match of salient features of the input image to database images. To minimize the effect of uncertainties in any single comparison process, and to thus minimize the likelihood of returning a false match, the following root sum of squares relationship is used to combine the results of the individual comparisons into a combined match score for an image:

$$\text{CurrentMatch} = \text{SQRT}(W_{OC}M_{OC}^2 + W_{CCC}M_{CCC}^2 + W_{WC}M_{WC}^2 + W_{SGC}M_{SGC}^2)$$

where Ws are TBD parameter weighting coefficients and Ms are the individual match scores of the four different comparisons.

The unique database search methodology and subsequent object match scoring criteria are novel aspects of the present invention that deserve special attention. Each decomposition of the Reference image and Input image regions represent an independent assessment of salient characteristics of the image. The Wavelet Decomposition, Color Cube Decomposition, Shape Decomposition, and evaluation of a subsampled low-resolution Grayscale representation of an input image all produce sets of parameters that describe the image in independent ways. Once all four of these processes are completed on the image to be tested, the parameters provided by each characterization are compared to the results of identical characterizations of the Reference images, which have been previously calculated and stored in the database. These comparisons, or searches, are carried out in parallel. The result of each search is a numerical score that is a weighted measure of the number of salient characteristics that "match" (i.e. that are statistically equivalent). Near equivalences are also noted, and are counted in the cumulative score, but at a significantly reduced weighting.

One novel aspect of the database search methodology in the present invention is that not only are these independent searches carried out in parallel, but also, all but the lowresolution grayscale compares are "convergent." By convergent, it is meant that input image parameters are searched sequentially over increasingly smaller subsets of the entire database. The parameter carrying greatest weight from the input image is compared first to find statistical matches and near-matches in all database records. A normalized interim score (e.g., scaled value from zero to one, where one is perfect match and zero is no match) is computed, based on the results of this comparison. The next heaviest weighted parameter from the input image characterization is then searched on only those database records having initial interim scores above a minimum acceptable threshold value. This results in an incremental score that is incorporated into the interim score in a cumulative fashion. Then, subsequent compares of increasingly lesser-weighted parameters are assessed only on those database records that have cumulative interim scores above the same minimum acceptable threshold value in the previous accumulated set of tests.

This search technique results in quick completion of robust matches, and establishes limits on the domain of database elements that will be compared in a subsequent combined match calculation and therefore speeds up the process. The convergent nature of the search in these comparisons yields a ranked subset of the entire database.

The result of each of these database comparisons is a ranking of the match quality of each image, as a function of decomposition search technique. Only those images with final cumulative scores above the acceptable threshold will be assessed in the next step, a Combined Match Score evaluation.

Four database comparison processes, Shape Comparison, Grayscale Comparison, Wavelet Comparison, and Color Cube Comparison, are performed. These processes may occur sequentially, but generally are preferably performed in parallel on a parallel computing platform. Each comparison technique searches the entire image database and returns those images that provide the best matches, for the particular algorithm, along with the matching scores for these images. These comparison algorithms are performed on segment groups, with each input image segment group being compared to each segment group for each database image.

FIGS. 3A and 3B show the process flow within the Database Matching operation. The algorithm is presented here as containing four nested loops with four parallel processes inside the innermost loop. This structure is for presentation and explanation only. The actual implementation, although performing the same operations at the innermost layer, can have a different structure in order to achieve the maximum benefit from processing speed enhancement techniques such as parallel computing and data indexing techniques. It is also important to note that the loop structures can be implemented independently for each inner comparison, rather than the shared approach shown in the FIGS. 3A and 3B.

Preferably, parallel processing is used to divide tasks between multiple CPUs (Central Processing Units) and/or computers. The overall algorithm may be divided in several ways, such as:

| | |
|---|---|
| Sharing the Outer Loop: | In this technique, all CPUs run the entire algorithm, including the outer loop, but one CPU runs the loop for the first N cycles, another CPU for the second N cycles, all simultaneously. |
| Sharing the Comparisons: | In this technique, one CPU performs the loop functions. When the comparisons are performed, they are each passed to a separate CPU to be performed in parallel. |
| Sharing the Database: | This technique entails splitting database searches between CPUs, so that each CPU is responsible for searching one section of the database, and the sections are searched in parallel by multiple CPUs. This is, in essence, a form of the "Sharing the Outer Loop" technique described above. |

Actual implementations can be some combination of the above techniques that optimizes the process on the available hardware.

Another technique employed to maximize speed is data indexing. This technique involves using a priori knowledge of where data resides to only search in those parts of the database that contain potential matches. Various forms of indexing may be used, such as hash tables, data compartmentalization (i.e., data within certain value ranges are stored in certain

BANK OF AMERICA          IPR2021-01332          Ex. 1001, p. 19 of 27

Appx286

US 9,324,004 B2

13

locations), data sorting, and database table indexing. An example of such techniques is, in the Shape Comparison algorithm (see below), if a database is to be searched for an entry with an Area with a value of A, the algorithm would know which database entries or data areas have this approximate value and would not need to search the entire database.

Another technique employed is as follows. FIG. 4 shows a simplified configuration of the invention. Boxes with solid lines represent processes, software, physical objects, or devices. Boxes with dashed lines represent information. The process begins with an object of interest: the target object 100. In the case of consumer applications, the target object 100 could be, for example, beverage can, a music CD box, a DVD video box, a magazine advertisement, a poster, a theatre, a store, a building, a car, or any other object that user is interested in or wishes to interact with. In security applications the target object 100 could be, for example, a person, passport, or driver's license, etc. In industrial applications the target object 100 could be, for example, a part in a machine, a part on an assembly line, a box in a warehouse, or a spacecraft in orbit, etc.

The terminal 102 is a computing device that has an "image" capture device such as digital camera 103, a video camera, or any other device that can convert a physical object into a digital representation of the object. The imagery can be a single image, a series of images, or a continuous video stream. For simplicity of explanation this document describes the digital imagery generally in terms of a single image, however the invention and this system can use all of the imagery types described above.

After the camera 103 captures the digital imagery of the target object 100, image preprocessing 104 software converts the digital imagery into image data 105 for transmission to and analysis by an identification server 106. Typically a network connection is provided capable of providing communications with the identification server 106. Image data 105 is data extracted or converted from the original imagery of the target object 100 and has information content appropriate for identification of the target object 100 by the object recognition 107, which may be software or hardware. Image data 105 can take many forms, depending on the particular embodiment of the invention. Examples of image data 105 are:

Compressed (e.g., JPEG2000) form of the raw imagery from camera 103;

Key image information, such as spectral and/or spatial frequency components (e.g. wavelet components) of the raw imagery from camera 103; and

MPEG video stream created from the raw imagery from camera 103.

The particular form of the image data 105 and the particular operations performed in image preprocessing 104 depend on:

Algorithm and software used in object recognition 107

Processing power of terminal 102;

Network connection speed between terminal 102 and identification server 106;

Application of the System; and

Required system response time.

In general, there is a tradeoff between the network connection speed (between terminal 102 and identification server 106) and the processing power of terminal 102. The results all of the above tradeoffs will define the nature of image preprocessing 104 and image data 105 for a specific embodiment. For example, image preprocessing 104 could be image compression and image data 105 compressed imagery, or image preprocessing 104 could be wavelet analysis and image data 105 could be wavelet coefficients.

14

The image data 105 is sent from the terminal 102 to the identification server 106. The identification server 106 receives the image data 105 and passes it to the object recognition 107.

The identification server 106 is a set of functions that usually will exist on computing platform separate from the terminal 102, but could exist on the same computing platform. If the identification server 106 exists on a separate computing device, such as a computer in a data center, then the transmission of the image components 105 to the identification server 106 is accomplished via a network or combination of networks, such a cellular telephone network, wireless Internet, Internet, and wire line network. If the identification server 106 exists on the same computing device as the terminal 102 then the transmission consists simply of a transfer of data from one software component or process to another.

Placing the identification server 106 on a computing platform separate from the terminal 102 enables the use of powerful computing resources for the object recognition 107 and database 108 functions, thus providing the power of these computing resources to the terminal 102 via network connection. For example, an embodiment that identifies objects out of a database of millions of known objects would be facilitated by the large storage, memory capacity, and processing power available in a data center; it may not be feasible to have such computing power and storage in a mobile device. Whether the terminal 102 and the identification server 106 are on the same computing platform or separate ones is an architectural decision that depends on system response time, number of database records, image recognition algorithm computing power and storage available in terminal 102, etc., and this decision must be made for each embodiment of the invention. Based on current technology, in most embodiments these functions will be on separate computing platforms.

The overall function of the identification server 106 is to determine and provide the target object information 109 corresponding to the target object 100, based on the image data 105.

The object recognition 107 and the database 108 function together to:

1. Detect, recognize, and decode symbols, such as barcodes or text, in the image.

2. Recognize the object (the target object 100) in the image.

3. Provide the target object information 109 that corresponds to the target object 100. The target object information 109 usually (depending on the embodiment) includes an information address corresponding to the target object 100.

The object recognition 107 detects and decodes symbols, such as barcodes or text, in the input image. This is accomplished via algorithms, software, and/or hardware components suited for this task. Such components are commercially available (The HALCON software package from MVTec is an example). The object recognition 107 also detects and recognizes images of the target object 100 or portions thereof. This is accomplished by analyzing the image data 105 and comparing the results to other data, representing images of a plurality of known objects, stored in the database 108, and recognizing the target object 100 if a representation of target object 100 is stored in the database 108.

In some embodiments the terminal 102 includes software, such as a web browser (the browser 110), that receives an information address, connects to that information address via a network or networks, such as the Internet, and exchanges information with another computing device at that information address. In consumer applications the terminal 102 may be a portable cellular telephone or Personal Digital Assistant

BANK OF AMERICA                IPR2021-01332                Ex. 1001, p. 20 of 27

US 9,324,004 B2

15                                                                                  16

equipped with a camera **103** and wireless Internet connection. In security and industrial applications the terminal **102** may be a similar portable hand-held device or may be fixed in location and/or orientation, and may have either a wireless or wire line network connection.

Other object recognition techniques also exist and include methods that store 3-dimensional models (rather than 2-dimensional images) of objects in a database and correlate input images with these models of the target object is performed by an object recognition technique of which many are available commercially and in the prior art. Such object recognition techniques usually consist of comparing a new input image to a plurality of known images and detecting correspondences between the new input image and one of more of the known images. The known images are views of known objects from a plurality of viewing angles and thus allow recognition of 2-dimensional and 3-dimensional objects in arbitrary orientations relative to the camera **103**.

FIG. **4** shows the object recognition **107** and the database **108** as separate functions for simplicity. However, in many embodiments the object recognition **107** and the database **108** are so closely interdependent that they may be considered a single function.

There are various options for the object recognition technique and the particular processes performed within the object recognition **107** and the database **108** depend on this choice. The choice depends on the nature, requirements, and architecture of the particular embodiment of the invention. However, most embodiments will usually share most of the following desired attributes of the image recognition technique:

Capable of recognizing both 2-dimensional (i.e., flat) and 3-dimensional objects;

Capable of discriminating the target object **100** from any foreground or background objects or image information, i.e., be robust with respect to changes in background;

Fast;

Autonomous (no human assistance required in the recognition process);

Scalable; able to identify objects from a large database of known objects with short response time; and

Robust with respect to:

Affine transformations (rotation, translation, scaling);

Non-affine transformations (stretching, bending, breaking);

Occlusions (of the target object **100**);

Shadows (on the target object **100**);

Reflections (on the target object **100**);

Variations in light color temperature;

Image noise;

Capable of determining position and orientation of the target object **100** in the original imagery; and

Capable of recognizing individual human faces from a database containing data representing a large plurality of human faces.

All of these attributes do not apply to all embodiments. For example, consumer linking embodiments generally do not require determination of position and orientation of the target object **100**, while a spacecraft target position and orientation determination system generally would not be required to identify human faces or a large number of different objects.

It is usually desirable that the database **108** be scalable to enable identification of the target object **100** from a very large plurality (for example, millions) of known objects in the database **108**. The algorithms, software, and computing hardware must be designed to function together to quickly perform such a search. An example software technique for per-

forming such searching quickly is to use a metric distance comparison technique for comparing the image data **105** to data stored in the database **108**, along with database clustering and multiresolution distance comparisons. This technique is described in "Fast Exhaustive Multi-Resolution Search Algorithm Based on Clustering for Efficient Image Retrieval," by Song, Kim, and Ra, 2000.

In addition to such software techniques, a parallel processing computing architecture may be employed to achieve fast searching of large databases. Parallel processing is particularly important in cases where a non-metric distance is used in object recognition **107**, because techniques such database clustering and multiresolution search may not be possible and thus the complete database must be searched by partitioning the database across multiple CPUs.

As described above, the object recognition **107** can also detect identifying marks on the target object **100**. For example, the target object **100** may include an identifying number or a barcode. This information can be decoded and used to identify or help identify the target object **100** in the database **108**. This information also can be passed on as part of the target object information **109**. If the information is included as part of the target object information **109** then it can be used by the terminal **102** or content server **111** to identify the specific target object **100**, out of many such objects that have similar appearance and differ only in the identifying marks. This technique is useful, for example, in cases where the target object **100** is an active device with a network connection (such as a vending machine) and the content server establishes communication with the target object **100**. A combination with a Global Positioning System can also be used to identify like objects by their location.

The object recognition **107** may be implemented in hardware, software, or a combination of both. Examples of each category are presented below.

Hardware object recognition implementations include optical correlators, optimized computing platforms, and custom hardware.

Optical correlators detect objects in images very rapidly by, in effect, performing image correlation calculations with light. Examples of optical correlators are:

Litton Miniaturized Ruggedized Optical Correlator, from Northrop Grumman Corp;

Hybrid Digital/Optical Correlator, from the School of Engineering and Information Technology, University of Sussex, UK; and

OC-VGA3000 and OC-VGA6000 Optical Correlators from INO, Quebec, Canada.

Optimized computing platforms are hardware computing systems, usually on a single board, that are optimized to perform image processing and recognition algorithms very quickly. These platforms must be programmed with the object recognition algorithm of choice. Examples of optimized computing platforms are:

VIP/Balboa™ Image Processing Board, from Irvine Sensors Corp.; and

3DANN™-R Processing System, from Irvine Sensors Corp.

Image recognition calculations can also be implemented directly in custom hardware in forms such as Application Specific Integrated Circuits (ASICs), Field Programmable Gate Arrays (FPGAs), and Digital Signal Processors (DSPs).

There are many object and image recognition software applications available commercially and many algorithms published in the literature. Examples of commercially available image/object recognition software packages include:

Appx288

US 9,324,004 B2

17 18

Object recognition system, from Sandia National Laboratories;

Object recognition perception modules, from Evolution Robotics;

ImageFinder, from Attrasoft;

ImageWare, from Roz Software Systems; and

ID-2000, from Imagis Technologies.

Some of the above recognition systems include 3-dimensional object recognition capability while others perform 2-dimensional image recognition. The latter type are used to perform 3-dimensional object recognition by comparing input images to a plurality of 2-dimensional views of objects from a plurality of viewing angles.

Examples of object recognition algorithms in the literature and indeed for implementation in software are:

Distortion Invariant Object Recognition in the Dynamic Link Architecture, Lades et al, 1993;

SEEMORE: Combining Color, Shape, and Texture Histogramming in a Neurally Inspired Approach to Visual Object Recognition, Mel, 1996;

Probabilistic Affine Invariants for Recognition, Leung et al, 1998;

Software Library for Appearance Matching (SLAM), Nene at al, 1994;

Probabilistic Models of Appearance for 3-D Object Recognition, Pope & Lowe, 2000;

Matching 3D Models with Shape Distributions, Osada et al, 2001;

Finding Pictures of Objects in Large Collections of Images, Forsyth et al, 1996;

The Earth Mover's Distance under Transformation Sets, Cohen & Guibas, 1999;

Object Recognition from Local Scale-Invariant Features, Lowe, 1999; and

Fast Object Recognition in Noisy Images Using Simulated Annealing, Betke & Makris, 1994.

Part of the current invention is the following object recognition algorithm specifically designed to be used as the object recognition **107** and, to some extent, the database **108**. This algorithm is robust with respect to occlusions, reflections, shadows, background/foreground clutter, object deformation and breaking, and is scalable to large databases. The task of the algorithm is to find an object or portion thereof in an input image, given a database of multiple objects with multiple views (from different angles) of each object.

This algorithm uses the concept of a Local Image Descriptor (LID) to summarize the information in a local region of an image. A LID is a circular subset, or "cutout," of a portion of an image. There are various formulations for LIDs; two examples are:

LID Formulation 1

The area within the LID is divided into range and angle bins. The average color in each [range,angle] bin is calculated from the pixel values therein.

LID Formulation 2

The area within the LID is divided into range bins. The color histogram values within each range bin are calculated from the pixel values therein. For each range bin, a measure of the variation of color with angle is calculated as, for example, the sum of the changes in average color between adjacent small angular slices of a range bin.

A LID in the input image is compared to a LID in a database image by a comparison technique such the L1 Distance, L2 Distance, Unfolded Distance, Earth Mover Distance, or cross-correlation. Small distances indicate a good match between the portions of the images underlying the LIDS. By iteratively changing the position and size of the LIDs in the input and database images the algorithm converges on the best match between circular regions in the 2 images.

Limiting the comparisons to subsets (circular LIDs) of the images enables the algorithm to discriminate an object from the background. Only LIDs that fall on the object, as opposed to the background, yield good matches with database images. This technique also enable matching of partially occluded objects; a LID that falls on the visible part of an occluded object will match to a LID in the corresponding location in the database image of the object.

The iteration technique used to find the best match is simulated annealing, although genetic search, steepest descent, or other similar techniques appropriate for multivariable optimization can also be used individually or in combination with simulated annealing. Simulated annealing is modeled after the concept of a molten substance cooling and solidifying into a solid. The algorithm starts at a given temperature and then the temperature is gradually reduced with time. At each time step, the values of the search variables are perturbed from the their previous values to create a new "child" generation of LIDs. The perturbations are calculated statistically and their magnitudes are functions of the temperature. As the temperature decreases the perturbations decrease in size. The child LIDs, in the input and database images, are then compared. If the match is better than that obtained with the previous "parent" generation, then a statistical decision is made regarding to whether to accept or reject the child LIDs as the current best match. This is a statistical decision that is a function of both the match distance and the temperature. The probability of child acceptance increases with temperature and decreases with match distance. Thus, good matches (small match distance) are more likely to be accepted but poor matches can also be accepted occasionally. The latter case is more likely to occur early in the process when the temperature is high. Statistical acceptance of poor matches is included to allow the algorithm to "jump" out of local minima.

When LID Formulation 1 is used, the rotation angle of the LID need not necessarily be a simulated annealing search parameter. Faster convergence can be obtained by performing a simple step-wise search on rotation to find the best orientation (within the tolerance of the step size) within each simulated annealing time step.

The search variables, in both the input and database images, are:

LID x-position;

LID y-position;

LID radius;

LID x-stretch;

LID y-stretch; and

LID orientation angle (only for LID Formulation 1).

LID x-stretch and LID y-stretch are measures of "stretch" distortion applied to the LID circle, and measure the distortion of the circle into an oval. This is included to provide robustness to differences in orientation and curvature between the input and database images.

The use of multiple simultaneous LIDs provides additional robustness to occlusions, shadows, reflections, rotations, deformations, and object breaking. The best matches for multiple input image LIDS are sought throughout the database images. The input image LIDS are restricted to remain at certain minimum separation distances from each other. The minimum distance between any 2 LIDs centers is a function of the LID radii. The input image LIDS converge and settle on the regions of the input image having the best correspondence to any regions of any database images. Thus the LIDs behave in the manner of marbles rolling towards the lowest spot on a surface, e.g., the bottom of a bowl, but being held apart by

**BANK OF AMERICA**          IPR2021-01332          **Ex. 1001, p. 22 of 27**

US 9,324,004 B2

19

their radius (although LIDS generally have minimum separation distances that are less than their radii).

In cases where the object in the input image appears deformed or curved relative to the known configuration in which it appears in the database, multiple input image LIDS will match to different database images. Each input image LID will match to that database image which shows the underlying portion of the object as it most closely resembles the input image. If the input image object is bent, e.g., a curved poster, then one part will match to one database orientation and another part will match to a different orientation.

In the case where the input image object appears to be broken into multiple pieces, either due to occlusion or to physical breakage, use of multiple LIDs again provides robust matching: individual LIDs "settle" on portions of the input image object as they match to corresponding portions of the object in various views in the database.

Robustness with respect to shadows and reflections is provided by LIDs simply not detecting good matches on these input image regions. They are in effect accommodated in the same manner as occlusions.

Robustness with respect to curvature and bending is accommodated by multiple techniques. First, use of multiple LIDs provides such robustness as described above. Secondly, curvature and bending robustness is inherently provided to some extent within each LID by use of LID range bin sizes that increase with distance from the LID center (e.g., logarithmic spacing). Given matching points in an input image and database image, deformation of the input image object 30 away from the plane tangent at the matching point increases with distance from the matching point. The larger bin sizes of the outer bins (in both range and angle) reduce this sensitivity because they are less sensitive to image shifts.

Robustness with respect to lighting color temperature variations is provided by normalization of each color channel within each LID.

Fast performance, particular with large databases, can be obtained through several techniques, as follows:

1. Use of LID Formulation 2 can reduce the amount of search by virtue of being rotationally invariant, although this comes at the cost of some robustness due to loss of image information.

2. If a metric distance (e.g., L1, L2, or Unfolded) is used for LID comparison, then database clustering, based on the triangle inequality, can be used to rule out large portions of the database from searching. Since database LIDs are created during the execution of the algorithm, the run-time database LIDs are not clustered. Rather, during preparation of the database, sample LIDs are created from the database images by sampling the search parameters throughout their valid ranges. From this data, bounding clusters can be created for each image and for portions of images. With this information the search algorithm can rule out portions of the search parameter space.

3. If a metric distance is used, then progressive multiresolution search can be used. This technique saves time by comparing data first at low resolution and only proceeds with successive higher-resolution comparison on candidates with correlations better than the current best match. A discussion of this technique, along with database clustering, can be found in "Fast Exhaustive Multi-Resolution Search Algorithm Based on Clustering for Efficient Image Retrieval," by Song et al, 2000.

4. The parameter search space and number of LIDs can be limited. Bounds can be placed, for example, on the sizes of LIDs depending on the expected sizes of input image objects

20

relative to those in the database. A small number of LIDs, even 1, can be used, at the expense of some robustness.

5. LIDs can be fixed in the database images. This eliminates iterative searching on database LID parameters, at the expense of some robustness.

6. The "x-stretch" and "y-stretch" search parameters can be eliminated, although there is a trade-off between these search parameters and the number of database images. These parameters increase the ability to match between images of the same object in different orientations. Elimination of these parameters may require more database images with closer angular spacing, depending on the particular embodiment.

7. Parallel processing can be utilized to increase computing power.

This technique is similar to that described by Betke & Makris in "Fast Object Recognition in Noisy Images Using Simulated Annealing", 1994, with the following important distinctions:

The current algorithm is robust with respect to occlusion. This is made possible by varying size and position of LIDs in database images, during the search process, in order to match non-occluded portions of database images.

The current algorithm can identify 3-dimensional objects by containing views of objects from many orientations in the database.

The current algorithm uses database clustering to enable rapid searching of large databases.

The current algorithm uses circular LIDs.

In addition to containing image information, the database 108 also contains address information. After the target object 100 has been identified, the database 108 is searched to find information corresponding to the target object 100. This information can be an information address, such as an Internet URL. The identification server 106 then sends this information, in the form of the target object information 109, to the terminal 102. Depending on the particular embodiment of the invention, the target object information 109 may include, but not be limited to, one or more of the following items of information pertaining to the target object 100:

Information address (e.g., Internet URL);

Identity (e.g., object name, number, classification, etc.);

Position;

Orientation;

Size;

Color;

Status;

Information decoded from and/or referenced by symbols (e.g. information coded in a barcode or a URL referenced by such a barcode); and

Other data (e.g. alphanumerical text).

Thus, the identification server determines the identity and/or various attributes of the target object 100 from the image data 105.

The target object information 109 is sent to the terminal 102. This information usually flows via the same communication path used to send the image data 105 from the terminal 102 to the identification server 106, but this is not necessarily the case. This method of this flow information depends on the particular embodiment of the invention.

The terminal 102 receives the target object information 109. The terminal 102 then performs some action or actions based on the target object information 109. This action or actions may include, but not be limited to:

Accessing a web site.

Accessing or initiating a software process on the terminal 102.

**BANK OF AMERICA**          **IPR2021-01332**          **Ex. 1001, p. 23 of 27**

US 9,324,004 B2

21

Accessing or initiating a software process on another computer via a network or networks such as the Internet.

Accessing a web service (a software service accessed via the Internet).

Initiating a telephone call (if the terminal **102** includes such capability) to a telephone number that may be included in or determined by the target object Information, may be stored in the terminal **102**, or may be entered by the user.

Initiating a radio communication (if the terminal **102** includes such capability) using a radio frequency that may be included in or determined by the target object Information, may be stored in the terminal **102**, or may be entered by the user.

Sending information that is included in the target object information **109** to a web site, a software process (on another computer or on the terminal **102**), or a hardware component.

Displaying information, via the screen or other visual indication, such as text, graphics, animations, video, or indicator lights.

Producing an audio signal or sound, including playing music.

In many embodiments, the terminal **102** sends the target object information **109** to the browser **110**. The browser **110** may or may not exist in the terminal **102**, depending on the particular embodiment of the invention. The browser **110** is a software component, hardware component, or both, that is capable of communicating with and accessing information from a computer at an information address contained in target object information **109**.

In most embodiments the browser **110** will be a web browser, embedded in the terminal **102**, capable of accessing and communicating with web sites via a network or networks such as the Internet. In some embodiments, however, such as those that only involve displaying the identity, position, orientation, or status of the target object **100**, the browser **110** may be a software component or application that displays or provides the target object information **109** to a human user or to another software component or application.

In embodiments wherein the browser **110** is a web browser, the browser **110** connects to the content server **111** located at the information address (typically an Internet URL) included in the target object information **109**. This connection is effected by the terminal **102** and the browser **110** acting in concert. The content server **111** is an information server and computing system. The connection and information exchanged between the terminal **102** and the content server **111** generally is accomplished via standard Internet and wireless network software, protocols (e.g. HTTP, WAP, etc.), and networks, although any information exchange technique can be used. The physical network connection depends on the system architecture of the particular embodiment but in most embodiments will involve a wireless network and the Internet. This physical network will most likely be the same network used to connect the terminal **102** and the identification server **106**.

The content server **111** sends content information to the terminal **102** and browser **110**. This content information usually is pertinent to the target object **100** and can be text, audio, video, graphics, or information in any form that is usable by the browser **110** and terminal **102**. The terminal **102** and browser **110** send, in some embodiments, additional information to the content server **111**. This additional information can be information such as the identity of the user of the terminal **102** or the location of the user of the terminal **102** (as determined from a GPS system or a radio-frequency ranging system). In some embodiments such information is provided to the content server by the wireless network carrier.

22

The user can perform ongoing interactions with the content server **111**. For example, depending on the embodiment of the invention and the applications, the user can:

Listen to streaming audio samples if the target object **100** is an audio recording (e.g., compact audio disc).

Purchase the target object **100** via on-line transaction, with the purchase amount billed to an account linked to the terminal **102**, to the individual user, to a bank account, or to a credit card.

In some embodiments the content server **111** may reside within the terminal **102**. In such embodiments, the communication between the terminal **102** and the content server **111** does not occur via a network but rather occurs within the terminal **102**.

In embodiments wherein the target object **100** includes or is a device capable of communicating with other devices or computers via a network or networks such as the Internet, and wherein the target object information **109** includes adequate identification (such as a sign, number, or barcode) of the specific target object **100**, the content server **111** connects to and exchanges information with the target object **100** via a network or networks such as the Internet. In this type of embodiment, the terminal **102** is connected to the content server **111** and the content server **111** is connected to the target object **100**. Thus, the terminal **102** and target object **100** can communicate via the content server **111**. This enables the user to interact with the target object **100** despite the lack of a direct connection between the target object **100** and the terminal **102**.

The following are examples of embodiments of the invention.

FIG. **5** shows a preferred embodiment of the invention that uses a cellular telephone, PDA, or such mobile device equipped with computational capability, a digital camera, and a wireless network connection, as the terminal **202** corresponding to the terminal **102** in FIG. **4**. In this embodiment, the terminal **202** communicates with the identification server **206** and the content server **211** via networks such as a cellular telephone network and the Internet.

This embodiment can be used for applications such as the following ("User" refers to the person operating the terminal **202**, and the terminal **202** is a cellular telephone, PDA, or similar device, and "point and click" refers to the operation of the User capturing imagery of the target object **200** and initiating the transfer of the image data **205** to the identification server **206**).

The User "points and clicks" the terminal **202** at a compact disc (CD) containing recorded music or a digital video disc (DVD) containing recorded video. The terminal **202** browser connects to the URL corresponding to the CD or DVD and displays a menu of options from which the user can select. From this menu, the user can listen to streaming audio samples of the CD or streaming video samples of the DVD, or can purchase the CD or DVD.

The User "points and clicks" the terminal **202** at a print media advertisement, poster, or billboard advertising a movie, music recording, video, or other entertainment. The browser **210** connects to the URL corresponding to the advertised item and the user can listen to streaming audio samples, purchase streaming video samples, obtain show times, or purchase the item or tickets.

The User "points and clicks" the terminal **202** at a television screen to interact with television programming in real-time. For example, the programming could consist of a product promotion involving a reduced price during a limited time. Users that "point and click" on this television programming during the promotion are linked to a web site at which

**BANK OF AMERICA**          IPR2021-01332          **Ex. 1001, p. 24 of 27**

US 9,324,004 B2

23

they can purchase the product at the promotional price. Another example is a interactive television programming in which users "point and click" on the television screen at specific times, based on the on-screen content, to register votes, indicate actions, or connect to a web site through which they perform real time interactions with the on-screen program.

The User "points and clicks" on an object such as a consumer product, an advertisement for a product, a poster, etc., the terminal 202 makes a telephone call to the company selling the product, and the consumer has a direct discussion with a company representative regarding the company's product or service. In this case the company telephone number is included in the target object information 209. If the target object information 209 also includes the company URL then the User can interact with the company via both voice and Internet (via browser 210) simultaneously.

The User "points and clicks" on a vending machine (target object 200) that is equipped with a connection to a network such as the Internet and that has a unique identifying mark, such as a number. The terminal 202 connects to the content server 211 of the company that operates the vending machine. The identification server identifies the particular vending machine by identifying and decoding the unique identifying mark. The identity of the particular machine is included in the target object information 209 and is sent from the terminal 202 to the content server 211. The content server 211, having the identification of the particular vending machine (target object 200), initiates communication with the vending machine. The User performs a transaction with the vending machine, such as purchasing a product, using his terminal 202 that communicates with the vending machine via the content server 211.

The User "points and clicks" on part of a machine, such as an aircraft part. The terminal 202 then displays information pertinent to the part, such as maintenance instructions or repair history.

The User "points and clicks" on a magazine or newspaper article and link to streaming audio or video content, further information, etc.

The User "points and clicks" on an automobile. The location of the terminal 206 is determined by a Global Position System receiver in the terminal 206, by cellular network radio ranging, or by another technique. The position of the terminal 202 is sent to the content server 211. The content server provides the User with information regarding the automobile, such as price and features, and furthermore, based on the position information, provides the User with the location of a nearby automobile dealer that sells the car. This same technique can be used to direct Users to nearby retail stores selling items appearing in magazine advertisements that Users "point and click" on.

For visually impaired people:

Click on any item in a store and the device speaks the name of the item and price to you (the items must be in the database).

Click on a newspaper or magazine article and the device reads the article to you.

Click on a sign (building, streetsign, etc.) and the device reads the sign to you and provides any addition pertinent information (the signs must be in the database).

FIG. 6 shows an embodiment of the invention for spacecraft applications. In this embodiment, all components of the system (except the target object 300) are onboard a Spacecraft. The target object 300 is another spacecraft or object. This embodiment is used to determine the position and orientation of the target object 300 relative to the Spacecraft so

24

that this information can be used in navigating, guiding, and maneuvering the spacecraft relative to the target object 300. An example use of this embodiment would be in autonomous spacecraft rendezvous and docking.

This embodiment determines the position and orientation of the target object 300, relative to the Spacecraft, as determined by the position, orientation, and size of the target object 300 in the imagery captured by the camera 303, by comparing the imagery with views of the target object 300 from different orientations that are stored in the database 308. The relative position and orientation of the target object 300 are output in the target object information, so that the spacecraft data system 310 can use this information in planning trajectories and maneuvers.

INDUSTRIAL APPLICABILITY

The industrial applicability is anywhere that objects are to be identified by a digital optical representation of the object.

What is claimed is:

1. A method for processing a video stream, comprising:
analyzing, via a mobile device, a scene represented by the video stream for at least one object;
deriving at least one characteristic of the video stream;
recognizing the at least one object in the scene as a target object based at least in part on the at least one characteristic of the video stream;
providing an indication upon recognizing the at least one object as the target object; and
presenting to a user, via an address, content information associated with the target object.

2. The method of claim 1, wherein the mobile device comprises at least one of a robot, a mobile telephone and a personal digital assistant.

3. The method of claim 2, wherein the mobile device comprises a camera capable of at least one of image and video capture.

4. The method of claim 1, wherein the at least one object is recognizable by at least one tag associated with the at least one object.

5. The method of claim 1, wherein the indication is at least one of a sound and a visual indication.

6. The method of claim 1, wherein the at least one object is identified as the target object based at least in part on at least one user input.

7. The method of claim 6, wherein the at least one user input comprises at least one attribute associated with at least one of a company, a product, and a service.

8. The method of claim 6, wherein the user input comprises at least one of a voice command and image data, and is associated with at least one promotion for at least one of a product and a service.

9. The method of claim 1, wherein the content information associated with the target object is presented to the user on a display of the mobile device as graphic content information adjacent to a real-time video stream of the scene.

10. The method of claim 9, wherein the content information is interactive.

11. The method of claim 2, wherein the mobile device captures the video stream representative of the scene.

12. The method of claim 1, wherein the at least one object comprises at least one of a product and a service.

13. The method of claim 1, wherein the at least one object is at least one of a store and a building.

Appx292

US 9,324,004 B2

25 26

**14**. The method of claim **13**, wherein the at least one of the store and the building is recognized based on an association with a company providing at least one of a product and a service.

**15**. The method of claim **1**, wherein the step of providing an indication comprises at least one of providing access to a web site, initiating a software process on the same device, initiating a software process on another computer or network, initiating a phone call, initiating a radio communication, sending information, displaying information, producing a visual signal, producing an audio signal, and playing music.

**16**. The method of claim **1**, further comprising presenting the user with an opportunity to purchase at least one of a product and a service.

**17**. The method of claim **2**, further comprising communicating banking account information via a wireless connection between the mobile device and a point-of-sale terminal.

**18**. The method of claim **1**, further comprising communicating at least one of banking account information, user data and terminal specific data to a banking company.

**19**. A system for processing a video stream comprising:
a mobile device configured for:
analyzing a scene represented by a video stream, and including at least one object;
deriving at least one characteristic of the video stream;
recognizing the at least one object within the scene as a target object based at least in part on the at least one characteristic of the video stream;
initiating an action when the at least one object has been recognized as the target object; and
presenting, via an address, content information associated with the target object to a user.

**20**. The system of claim **19**, wherein the mobile device comprises at least one of a robot, a mobile telephone and a personal digital assistant.

**21**. The system of claim **20**, wherein the mobile device comprises a camera capable of at least one of image and video capture.

**22**. The system of claim **19**, wherein the at least one object is recognizable by at least one tag associated with the at least one object.

**23**. The system of claim **19**, wherein the at least one object lacks a tag.

**24**. The system of claim **19**, wherein the at least one object is recognized as the target object based at least in part on at least one user input.

**25**. The system of claim **24**, wherein the at least one user input comprises at least one attribute associated with at least one of a company, a product and a service.

**26**. The system of claim **24**, wherein the user input comprises at least one of a voice command and image data, and is associated with at least one promotion for at least one of a product and a service.

**27**. The system of claim **20**, wherein the mobile device comprises a display and wherein the content information associated with the target object is presented to the user on the display of the mobile device as graphic content information adjacent to a real-time video stream representative of the scene.

**28**. The system of claim **27**, wherein the content information is interactive.

**29**. The system of claim **20**, wherein the mobile device captures the video stream representative of the scene.

**30**. The system of claim **19**, wherein the at least one object comprises at least one of a product and a service.

**31**. The system of claim **19**, wherein the at least one object is at least one of a store and a building.

**32**. The system of claim **31**, wherein the at least one of the store and the building is recognized based on an association with a company providing at least one of a product and a service.

**33**. The system of claim **19**, wherein the mobile device is further configured for providing access to a web site, initiating a software process on the mobile device, initiating a software process on a computer or network, initiating a phone call, initiating a radio communication, sending information, displaying information, producing a visual signal, producing an audio signal, or playing music.

**34**. The system of claim **19**, wherein the mobile device is further configured for presenting the user with an opportunity to purchase at least one product or service.

**35**. The system of claim **20**, where in the mobile device is further configured for communicating banking account information via a wireless connection between the mobile device and a point-of-sale terminal.

**36**. The system of claim **19**, wherein the mobile device is further configured for communicating at least one of banking account information, user data and terminal specific data to a banking company.

**37**. A computer software product for evaluating a video stream on a mobile device, comprising a non-transitory computer-readable medium storing software instructions that configure a processor to execute the steps of:
analyzing a scene represented by the video stream, and including at least one object;
deriving at least one characteristic of the video stream;
recognizing the at least one object within the scene as a target object based at least in part on the at least one characteristic of the video stream;
providing an indication upon recognizing the at least one object as the target object; and
presenting, via and address, content information associated with the target object to a user.

**38**. The computer software product of claim **37**, wherein the mobile device comprises at least one of a robot, a mobile telephone and a personal digital assistant.

**39**. The computer software product of claim **38**, wherein the mobile device comprises a camera capable of at least one of image and video capture.

**40**. The computer software product of claim **37**, wherein the software instructions further configure a processor to execute the step of recognizing the at least one object by recognizing at least one tag associated with the at least one object.

**41**. The computer software product of claim **37**, wherein the indication is at least one of a sound and a visual indication.

**42**. The computer software product of claim **37**, wherein the software instructions further configure a processor to execute the step of recognizing the at least one object based at least in part on at least one user input.

**43**. The computer software product of claim **42**, wherein the at least one user input comprises at least one attribute associated with at least one of a company, a product and a service.

**44**. The computer software product of claim **42**, wherein the user input comprises at least one of a voice command and image data, and is associated with at least one promotion for at least one of a product or a service.

**45**. The computer program product of claim **38**, wherein the mobile device comprises a display and wherein the software instructions further configure a processor to execute the step of presenting the content information on the display of the mobile device as graphic content information adjacent to a real-time video stream representative of the scene.

Appx293

US 9,324,004 B2

27

28

**46**. The computer software product of claim **45**, wherein the content information is interactive.

**47**. The computer software product of claim **38**, wherein the mobile device captures the video stream representative of the stream.

**48**. The computer software product of claim **37**, wherein the at least one object comprises at least one of a product and a service.

**49**. The computer software product of claim **37**, wherein the at least one object is at least one of a store and a building.

**50**. The computer software product of claim **49**, wherein the software instructions further configure a processor to execute the step of recognizing the at least one of the store and the building based on an association with a company providing at least one of a product or a service.

**51**. The computer software product of claim **37**, wherein the software instructions further configure a processor to execute at least one of the following steps: providing access to a web site, initiating a software process on the mobile device, initiating a software process on a computer or network, initiating a phone call, initiating a radio communication, sending information, displaying information, producing a visual signal, producing an audio signal, and playing music.

**52**. The computer software product of claim **38**, wherein the software instructions further configure the processor to execute the step of presenting the user an opportunity to purchase at least one product or service.

**53**. The computer software product of claim **38**, wherein the software instructions further configure the processor to execute the step of communicating banking account information via a wireless connection between the mobile device and a point-of-sale terminal.

**54**. The computer software product of claim **37**, wherein the software instructions further configure the processor to execute the step of communicating banking account information or other user or terminal specific data to a banking company.

* * * * *

Appx294



US007899252B2

(12) **United States Patent**
Boncyk et al.

(10) Patent No.: **US 7,899,252 B2**
(45) Date of Patent: ***Mar. 1, 2011**

(54) **OBJECT INFORMATION DERIVED FROM OBJECT IMAGES**

(75) Inventors: **Wayne C. Boncyk**, Evergreen, CO (US);
**Ronald H. Cohen**, Pasadena, CA (US)

(73) Assignee: **Evryx Technologies, Inc.,** Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 43 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/568,130**

(22) Filed: **Sep. 28, 2009**

(65) **Prior Publication Data**

US 2010/0034468 A1    Feb. 11, 2010

**Related U.S. Application Data**

(60) Division of application No. 11/204,901, filed on Aug. 15, 2005, now Pat. No. 7,680,324, which is a continuation-in-part of application No. 09/992,942, filed on Nov. 5, 2001, now Pat. No. 7,016,532.

(60) Provisional application No. 60/317,521, filed on Sep. 5, 2001, provisional application No. 60/246,295, filed on Nov. 6, 2000, provisional application No. 60/630,524, filed on Nov. 22, 2004, provisional application No. 60/625,526, filed on Nov. 4, 2004.

(51) **Int. Cl.**
*G06K 9/00* (2006.01)
*G06K 9/54* (2006.01)

(52) **U.S. Cl.** ...................................... **382/181;** 382/305

(58) **Field of Classification Search** .......... 382/181–182, 382/100, 305–306, 224, 170, 209, 218, 233;

707/1–7, 104.1; 709/201–203, 217–219, 250; 705/26–27, 23, 64; 348/239, 460, 552, 211.2–211.6, 207.1; 340/989, 988; 455/550.1, 414.2, 456.3, 556.1, 412.1, 419, 556.2; 235/375–386, 462.09, 462.46

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,579,471 | A | 11/1996 | Barber |
| 5,615,324 | A | 3/1997 | Kuboyama |
| 5,724,579 | A | 3/1998 | Suzuki |
| 5,768,633 | A | 6/1998 | Allen et al. |
| 5,926,116 | A | 7/1999 | Kitano et al. |
| 6,055,536 | A | 4/2000 | Shimakawa |
| 6,181,817 | B1 | 1/2001 | Zabih |
| 6,286,036 | B1 | 9/2001 | Rhodes |
| 6,393,147 | B2 | 5/2002 | Danneels et al. |
| 6,522,889 | B1 | 2/2003 | Aarnio |
| 6,674,993 | B1 | 1/2004 | Tarbouriech |
| 6,993,573 | B2 * | 1/2006 | Hunter .......................... 709/218 |
| 7,305,354 | B2 * | 12/2007 | Rodriguez et al. .......... 705/26 |
| 7,309,015 | B2 * | 12/2007 | Frantz et al. .......... 235/462.46 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 920179 | 9/2000 |

(Continued)

*Primary Examiner* — Sherali Ishrat
(74) *Attorney, Agent, or Firm* — Fish & Associates, PC

(57) **ABSTRACT**

Search terms are derived automatically from images captured by a camera equipped cell phone, PDA, or other image capturing device, submitted to a search engine to obtain information of interest, and at least a portion of the resulting information is transmitted back locally to, or nearby, the device that captured the image.

**34 Claims, 8 Drawing Sheets**





Appx295

**US 7,899,252 B2**

Page 2

---

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,410,099 | B2 * | 8/2008 | Fukasawa et al. | 235/462.09 |
| 7,430,588 | B2 * | 9/2008 | Hunter | 709/218 |
| 7,558,595 | B2 * | 7/2009 | Angelhag | 455/550.1 |
| 7,774,283 | B2 * | 8/2010 | Das et al. | 705/64 |
| 7,845,558 | B2 * | 12/2010 | Beemer et al. | 235/462.01 |
| 2002/0055957 | A1 | 5/2002 | Ohsawa | |
| 2002/0089524 | A1 | 7/2002 | Ikeda | |
| 2002/0102966 | A1 | 8/2002 | Lev et al. | |
| 2002/0103813 | A1 | 8/2002 | Frigon | |
| 2002/0140988 | A1 | 10/2002 | Cheatle | |
| 2002/0156866 | A1 | 10/2002 | Schneider | |
| 2005/0162523 | A1 | 7/2005 | Darrell et al. | |
| 2008/0021953 | A1 | 1/2008 | Gil | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO02082799 | A2 | 10/2002 |

* cited by examiner

Appx296



FIG. 1

BANK OF AMERICA

Ex. 1001, p. 3 of 20



FIG. 2

BANK OF AMERICA    IPR2021-01333    Ex. 1001, p. 4 of 20

Appx298



FIG. 3A

BANK OF AMERICA          IPR2021-01333          Ex. 1001, p. 5 of 20

CALCULATE COMBINED
MATCH SCORE

NEXT SEGMENT GROUP IN
THIS DATABASE VIEW

NEXT VIEW OF THIS
DATABASE OBJECT

NEXT OBJECT IN
DATABASE

NEXT INPUT IMAGE
SEGMENT GROUP

FINISH

# FIG. 3B



FIG. 4

**BANK OF AMERICA**          IPR2021-01333          Ex. 1001, p. 7 of 20



FIG. 5

BANK OF AMERICA          IPR2021-01333          Ex. 1001, p. 8 of 20



FIG. 6

BANK OF AMERICA                IPR2021-01333                Ex. 1001, p. 9 of 20

Appx303



FIG. 7

**BANK OF AMERICA**    IPR2021-01333    Ex. 1001, p. 10 of 20

US 7,899,252 B2

1

## OBJECT INFORMATION DERIVED FROM OBJECT IMAGES

This application is a divisional of 11/204,901 filed Aug. 15, 2005 now U.S. Pat. No. 7,680,324, which is a continuation-in-part of 09/992,942 filed Nov. 5, 2001 now U.S. Pat. No. 7,061,532, which claims priority to provisional application No. 60/317,521 filed Sep. 5, 2001 and provisional application No. 60/246,295 filed Nov. 6, 2000; and also claims priority to provisional application No. 60/630,524 filed Nov. 22, 2004 and provisional application No. 60/625,526 filed Nov. 4, 2004, and utility application Ser. No. 10/492,243 filed May 20, 2004 now U.S. Pat. No. 7,477,780, which claims priority to PCT/US02/35407 filed Nov. 5, 2002, which claims priority to utility application Ser. No. 09/992,942 filed Nov. 5, 2001 now U.S. Pat. No. 7,061,532. These and all other referenced patents and applications are incorporated herein by reference in their entirety. Where a definition or use of a term in a reference that is incorporated by reference is inconsistent or contrary to the definition of that term provided herein, the definition of that term provided herein is deemed to be controlling.

### FIELD OF THE INVENTION

The field of the invention is digital imaging.

### BACKGROUND

Several years ago the present inventors pioneered the concept of using digitally captured images to identify objects within the images, and then using such identifications to retrieve information from various databases. Examples include:

Using a local device (cell phone, digital camera, PDA or other device) to capture an image of an object in an art museum, identifying the object from the image data, and then providing the user with information regarding the object (i.e., about or relating to the object);

Using a local device (cell phone, digital camera, PDA or other device) to capture an image of an automobile as it drives along a road, identifying the make and model from the image data, and then providing a user with a link to a website relating to that particular make and model;

Using a local device (cell phone, digital camera, PDA or other device) to capture an image of a bar code, logo, or other indicia in a magazine, using information contained in the indicia to identify a product, and providing a telephone number or other contact information relating to that product;

Using a local device (cell phone, digital camera, PDA or other device) to photograph a billboard of a restaurant, identifying the restaurant from a barcode, special target, written language, or other information contained in the photograph, and using that information to access a database to provide the user with restaurant's location, menu, or telephone number; and

Using a local device (cell phone, digital camera, PDA or other device) to capture an image of a sign at a sports stadium, using information extracted from the image to automatically purchase an entry ticket for the user, and providing the user with an entry code that can be used to bypass the long lines of ordinary ticket purchasers.

In such embodiments it was specifically contemplated that analysis of the images could be performed locally (i.e. on the cell phone, PDA or other device capturing the image), distally

2

at a server, or more preferably using some combination of the two. It was also contemplated that any available database could be accessed to provide the returned information, including publicly accessible databases on the Internet. It was not appreciated, however, that one could integrate these concepts with the searching capabilities of standard Search Engines.

In the 1990s Yahoo!™ introduced the idea of indexing web pages accessible on Internet, and providing a Search Engine that to access the index. Since that time dozens of other searching systems have been developed, which use all manner of various search methods, algorithms, hardware and/or software. All such systems and methods that accept user inputs of Key Information, and then utilize such Key Information to provide the user with information of interest, are referred to herein as Search Engines. The user, of course, can be a natural person, as well as a device (computing or otherwise), algorithm, system, organization, or any other entity. In searching for information, a Search Engine can utilize any suitable search domain, including for example:

A database (including for example a relational database, an object database, or an XML database).

A network of resources including for example web pages accessible within the Internet; and

A public or private collection of documents or information (e.g., documents, information, and/or messages of a company or other organization(s)) such as that maintained by LEXIS™.

In a typical search, Key Information is provided to the Search Engine in the form of key words comprising text, numbers, strings, or other machine-readable information types. The Search Engine then searches its indices of web pages for matches, and returns to the user a hyperlinked listing of Internet Uniform Resource Locators ("URLs"), as well as some brief display of context in which the key word(s) are used. The information of interest can sometimes be found in the hyperlinked listing, but is more frequently found by linking directly to the listed web pages.

Providing Key Information to Search Engines in the form of text strings has inherent difficulties. It involves strategy in the selection of the text to be entered, and even with respect to the format of the keywords (for example using wildcards). Another difficulty is that small computing and/or telephony devices (e.g. telephones, both mobile and non-mobile), have small and/or limited keyboards, thus making text entry difficult.

### SUMMARY OF THE INVENTION

The present invention provides apparatus, systems and methods in which: (a) a digital photograph, video, MPEG, AVI, or other image is captured using a camera equipped cell phone, PDA, or other image capturing device; (b) key words or other search criteria are automatically extracted or derived from image; (c) the search criteria are submitted to a Search Engine to obtain information of interest; and (d) at least a portion of the resulting information is transmitted back locally to, or nearby, the device that captured the image.

Some images so utilized will include symbolic content that is sufficient in and of itself to be relatively non-ambiguous. Such symbolic content, for example, can be a telephone number or a web-site address. In such instances the symbolic content search criteria can advantageously be utilized as a literal in the search criteria. In other instances significant additional processing can be needed. For example, an image of an automobile will likely need to be processed to determine the make and model, and that information (e.g. Mercedes™

BANK OF AMERICA          IPR2021-01333          Ex. 1001, p. 11 of 20

US 7,899,252 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

S500™) can then be transmitted to the Search Engine to be used as key words for a search. It is also contemplated that processing of some images will result in only best guesses. Thus, a side view of an automobile can not be analyzable into a particular make and model, and in that case the system can provide more generic terms such as SUV or automobile.

In general, the present invention provides technology and processes that can accommodate linking objects and images to information via a network such as the Internet, which require no modification to the linked object. Traditional methods for linking objects to digital information, including applying a barcode, radio or optical transceiver or transmitter, or some other means of identification to the object, or modifying the image or object so as to encode detectable information in it, are not required because the image or object can be identified solely by its visual appearance. The users or devices can even interact with objects by "linking" to them. For example, a user can link to a vending machine by "pointing and clicking" on it. His device would be connected over the Internet to the company that owns the vending machine. The company would in turn establish a connection to the vending machine, and thus the user would have a communication channel established with the vending machine and could interact with it.

The present invention contemplates any suitable decomposition algorithms. Clearly, faster and more accurate algorithms are preferred over slower and less accurate algorithms. It is especially preferred that algorithms are chosen such that at least some processing can take place locally to the device that captures the image. Such processing can in many instances eliminate the need to wirelessly transmit detailed images, and can eliminate reliance on a distal server that might be oversubscribed. Thus, some or all of the image processing, including image/object detection and/or decoding of symbols detected in the image can be distributed arbitrarily between the mobile (client) device and the server. In other words, some processing can be performed in the client device and some in the server, without specification of which particular processing is performed in each, or all processing can be performed on one platform or the other, or the platforms can be combined so that there is only one platform. The image processing can be implemented in a parallel computing manner, thus facilitating scaling of the system with respect to database size and input traffic loading.

It is further contemplated that some suitable algorithms will take into account the position and orientation of an object with respect to the user at the time the image was captured, which can be determined based on the appearance of the object in an image. This can be the location and/or identity of people scanned by multiple cameras in a security system, a passive locator system more accurate than GPS or usable in areas where GPS signals cannot be received, the location of specific vehicles without requiring a transmission from the vehicle, and many other uses.

Therefore, it is an object of the present invention to provide a system and process for identifying digitally captured images without requiring modification to the object.

Another object is to use digital capture devices in ways never contemplated by their manufacturer.

Another object is to allow identification of objects from partial views of the object.

Another object is to provide communication means with operative devices without requiring a public connection therewith.

Various other objects, features, aspects and advantages of the present invention will become more apparent from the following detailed description of preferred embodiments of the invention, along with the accompanying drawings in which like numerals represent like components.

BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a schematic block diagram top-level algorithm flowchart;

FIG. 2 is an idealized view of image capture;

FIGS. 3A and 3B are a schematic block diagram of process details of the present invention;

FIG. 4 is a schematic block diagram of a different explanation of invention;

FIG. 5 is a schematic block diagram similar to FIG. 4 for cellular telephone and personal data assistant (PDA) applications; and

FIG. 6 is a schematic block diagram for spacecraft applications.

FIG. 7 is a schematic of a system in which a local device captures and image, a search term is automatically derived from an image, is submitted to a search engine to produce a results set, and information from the results set is sent back to the device.

DETAILED DESCRIPTION

FIGS. 1-6 are copied from the priority PCT application, PCT/US02/35407 filed Nov. 5, 2002. Discussion of those figures is set forth later in the application.
Search Engine-Related Embodiments

In FIG. 7 a system 400 generally comprises a portable imaging device 410, a distal server 420, an electronic communications network 425, and a search engine 430.

In general, the portable device 410 captures an image 412 of an object 415; and transmits information 413 regarding the image to the server 420. At least one of the device 410 and the server 420 derives a search term 421A, 421B from at least one of the image 412 and the transmitted information 413, respectively. At least one of the device 410 and the server 420 cause the search term 421A, 421B to be submitted via a network 425 to a search engine 430 that uses an index 432 of web pages or other information. The search engine then uses the search term 421A, 421B to produce a results set 434, and causes at least a portion of the results set 434 to be transmitted back to the portable device 410. In the above discussion it should be appreciated that information regarding the image can include the entire image, one or more subsets of the image, as well as a name or other information derived from the image, but not contained within the image. It should also be appreciated that one could use a proxy server between his/her portable device and the server. In short, the present application contemplates using any complexity of circuitous communication between the mobile client and server—not necessarily a direct connection.

Device 410 can be a cell phone, PDA, laptop computer, or any other portable device that optically captures an image. By "optically captures" is meant some sort of light sensitive array, the output of which can be processed to comprise a visually perceptible image. Viewed from another perspective, device 410 can be any camera having telephony capability, and especially having cell phone capability. With current technology, device 410 would usually have a lens or other light focusing mechanism, although it is contemplated that advances in electronics can eliminate the need for any physical focusing mechanism. The term "optically captures" is not satisfied by a device that has not optical components, and is merely capable of downloading images from the Internet or other sources.

BANK OF AMERICA    IPR2021-01333    Ex. 1001, p. 12 of 20

US 7,899,252 B2

**5**

It is certainly contemplated that the cell phone or other device providing the services discussed herein would operate software permitting it to do so. That software could be resident on the device, in external memory (memory card), or paged in as needed.

Object **415** (referred to as a Thing of Interest" in one or more of the priority applications) can be any visually perceptible object, regardless of dimension. Contemplated "two dimensional objects" include objects in which the relevant information is substantially in two dimensional format, which includes advertisements and articles in magazine or other print media, as well as photographs or designs on billboards, street signs, restaurant or other business signs, user manuals, paintings at a museum, and so forth.

Contemplated three dimensional objects include substantially all physical objects in which the relevant information is derived from the shape of the object and/or the appearance of the surface of the object. Thus, an automobile is considered herein to have three dimensions of relevance where the shape or other dimensions convey information about the make and model. Similarly, a window in a building can be considered to have three dimensions of relevance where the identity of the manufacturer or distributor can be gleaned from the overall physical dimensions, detail, and so forth. As another example, a beverage container can be considered to have three dimensions; information can be obtained from the shape of the container but further information can also be obtained from the label, printing, logos, text, or other such visible markings on the container (obtaining information from visible markings on the container enables discrimination between different containers that have identical physical shape). Contemplated three dimensional objects include substantially all physical objects in which the relevant information is derived from changes over time. For example, the speed of a bird or its flight patterns, or a gesture of a person, can be captured in multiple images over a period of time, and can be relevant information, and can be reduced to search terms (referred to as Key Information in one or more of the priority documents) for submission to a search engine. Of course, many objects will be considered to have two, three or four dimensions of relevance herein. Thus, relevant information for an automobile can be provided by each of a two-dimensional logo on the side of the vehicle, the three dimensional shape of the vehicle, and its four dimensional acceleration or handling features.

It is especially contemplated that objects can include animate and inanimate objects. Among animate objects are included faces of people, and biometric information such as the fingerprint pattern on a human finger, an iris of a person, and so forth.

Image **412** is contemplated to be any array of pixels. In most cases the pixels will be regularly arranged, but that is not absolutely necessary. In most cases the pixels also will number greater than 19,200 (160×120), such as 78,800 (320×240) but they can number few than that. More preferred images have greater pixel counts, including for example, 256,000 (640×400), more preferably at least 2 million, and even more preferably at least 4 million. It is not necessary that the image be actually constructed at the portable device. Thus, a statement that "the portable device captures an image of an object" includes situations where the device receives and derives data from light emitted or reflected from the object, even if the data is never presented to a user as a visually perceptible image, and even if the data is sent to a distal server without ever being collected into an image by the device.

The information transmitted to the server can comprise any relevant information regarding the contents of the image.

**6**

Thus, information **413** could comprise the entire image, or a portion of the image. For example, where a user takes a picture of a bar code (whether 2D, 3D or any other configuration, the device **410** could process the image **412** to remove color and all background except the bar code itself, and then merely send the portion of the image containing the bar code as the transmitted information **413**. In other cases it is contemplated that the device **410** could sufficiently process the image **413** to derive one or more keywords, and then send only the keyword(s) as the transmitted information **413**. All possible combinations are also contemplated. Thus, a user might take a photograph of a Gucci™ handbag, the device **412** might derive the word "Gucci" from the image, subtract out background except for the handbag, and then transmit: (a) the word "Gucci"; and (b) the image of the handbag as the transmitted information **413**. In such instances the process can be iterative. Thus, the device might initially transmit the word "Gucci" as the first transmitted information, receive a results set from the search engine indicating clothing accessories, and then subtract out background except for the handbag, and transmit the image of the handbag as the second transmitted information. As discussed above, it is specifically contemplated that the device **410** could send the server **420** numerical/digital data that is mathematically derived from the image. Examples include image features and characteristics that the server **420** could use in the server recognition process, without transmitting the original image.

As should be apparent by now, the transmitted information need not be limited to image information. Sights, sounds, text, and all sorts of other information can be included in the transmitted information, some of which can be derived directly from the image, and some of which can be derived indirectly from the image. In addition, the device **410** can also capture non-visual information such as sounds, and that information can also be transmitted. Thus, it is contemplated that the device could capture the sounds of a frog, capture an image of a lake or forest, and send both to be used as (or further analyzed into) search terms.

Distal server **420** is distal in the sense that it has no hard-wired link to device **410**. Server **420** can be a single device, as well as any number of devices coupled together, as for example in a server farm. All manner of suitable servers are contemplated. Thus, servers can use any reasonable hardware, operate using any reasonable software, communications protocols, and so forth.

In terms of interaction with the device, the various analytical tasks discussed above can allocated in any suitable manner between server **420** and device **410**. For example, in the iterative operation discussed above with respect to the Gucci™ handbag, it is contemplated that the device **410** could analyze the image sufficiently to transmit the term "Gucci" as an initial search term to the search engine **430**, and the server **420** could then undertake the tasks of subtracting out background of the image except for the handbag, and transmitting the image of the handbag as a second search term.

In another example, the server **420** could determine that the original image provided insufficient information, and send a message to the user through the device **410**, directing the user to take another image (such as from another angle, closer, or with greater detail.). Indeed, the server **420** could direct the user to take an image of another object entirely, in order to help determine identity of the first object. Thus, the user could take a first image of a payment display at a ball game, provide that image to the server for identification, and then instruct the user to take an image of a credit card against which the user wants to be billed for entrance into the ball game. The server could then process the payment against that credit card, and

**BANK OF AMERICA**          **IPR2021-01333**          **Ex. 1001, p. 13 of 20**

US 7,899,252 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

provide an entry code that the user could type to pass through an electronically controlled gate.

In still another example, a user could use his cell phone to capture an image of a screwdriver set at a hardware store, and the cell phone could transmit the information derived from the image to Google™ or some other search engine to find comparison prices. The server **420** could then instruct the user to turn over the packaging and take another image of the set, this time from the back side of the packaging. In this way there is iterative interaction among the user's device, the server, and the search engine.

It should also be appreciated that there are embodiments in which the search engine never communicates with the portable device. For example, the server might do the search query, get results, and provide them to the portable device, or even to a television or other device besides the portable device.

The phase "search engine" is contemplated herein to include any system dedicated to the indexing, searching and retrieval of information. The most familiar search engines such as Google™, Yahoo!™, MSN™, and Alta Vista™ focus mostly or entirely on indexing web pages from the World Wide Web portion of the Internet. Other search engines, such as Lexis/Nexis™ focus on indexing proprietary collections of data, which can include links to Internet Web pages. The phase "search term" is contemplated herein to include any keys or other information used by the search engines to access their indexing system. In the case of most web based search engines, the keys are currently text. In such instances a user typically enters one or more key words, where the term "key word" is used in an extremely broad sense to include: (a) words that would likely be found in a dictionary; (b) proper names, number strings and other terms that are not found in any dictionary; as well as (c) characters that are interpreted as wild cards, truncations and so forth. Such search engines are already starting to experiment with use of non-text keys, including for example images and/or sounds. All such possible keys fall within the scope of contemplated search terms.

Thus, contemplated search terms include key words, a portion of an image, as well as a logo, bar code or other symbol. It is specifically contemplated that in some instances an image will contain a literal of a search terms (e.g. the name of a movie on a movie poster), in some instances an image will not contain such a literal (e.g. a picture of a tree or other plant, where the search term is the name of the plant). In either case the device and/or the server in any combination can perform one or more of the tasks of deriving the search term and submitting it to one or more search engines.

Network **425** can be any workable electronic network, including public and private access networks, and combinations of the two. Preferred networks include the Internet, the upcoming Internet II, cell phone networks, and so forth. Although not expressly shown, the communication lines in FIG. **7** are all contemplated to be one- or two-way communications as appropriate. Moreover, it is contemplated that multiple networks will usually be involved. Thus, for example, communications between device **410** and server **420** will very likely take place over some combination of cell phone (not shown) and Internet networks (e.g. **425**), while communications between server and search engine will very likely take place over some combination of Internet and local server farm networks.

The results set **434** can be of any size and composition, but most likely will be tailored to accommodate the device **410**. It does very little good, for example, to transmit dozens of web pages to a cell phone, which has insufficient display area to properly view them. Thus, it is contemplated that the results set **434** can be whittled down or otherwise processed by the server (which of course is indicated generically by numeral **420** and need not be the very same box as utilized earlier in the transmission of the transmitted information **413**) before being sent to the device **410**. Thus, the server **420** or some other processor can process results before providing them to the device **410**, such as where the search terms are submitted to the search engine by the server **420** rather than by the device **410**. But the device **410** can also access the search engine directly using search information provided by the server. Four contemplated search modes include the following:

1. The server **420** composes a search URL (consisting of search engine address and key words) and sends it to the portable device **410**. The portable device then executes the search engine query by sending the search URL to the search engine, and the search engine sends one or more web pages back to the portable device.

2. The server **420** sends keywords, and optionally also a search engine address, to portable device **410**. The portable device composes a search URL, sends the search query to the search engine, and receives one or more web pages in response.

3. The server **420** sends the search query to the search engine, and receives a response. The server optionally processes the search response (which could be in any form) and provides some result to portable device. The result could, for example, comprise a file sent to the portable device, or a web page on some server, with URL of that web page sent to the portable device.

4. In any of the above modes, or in "direct linking" mode, the result might not be a search results page, but instead some other type of information or action. For example, a server could identify an object, and thereupon send a code to another server, which causes an action to occur. An example of this is clicking on a vending machine with a cell phone to buy something from the machine. Another example is clicking on a TV listing in a newspaper, causing the server to change the channel of the television in front of the user.

Thus, a statement that "the search engine causes at least a portion of the results set **434** to be transmitted back to the portable device **410**" should be interpreted herein to mean that at least some information relating to the results set, which information can or can not be included verbatim in the results set, is transmitted back to the device, whether directly or indirectly by the search engine. It is particularly contemplated that a results set could include at least one hyperlinked address.

It is specifically contemplated that results sets can include the following types of information: Uniform Resource Locator (URL); Uniform Resource Identifier (URI); Internet Protocol (IP) address; telephone number; radio frequency or channel; television frequency or channel; and physical location or address. The result(s) displayed to the user can be interactive. In such a case, the user can take further action by interacting directly with the object, by linking to a referenced web page, or some combination of the two. Or, as discussed above, the results could cause another server/computer or machine to perform some action, such as dispensing a product or changing a channel.

From a method perspective, methods of using a search engine to obtain information are contemplated comprising: using a cell phone enabled portable device to take an image of an object; running computer software that automatically derives a first search term from at least a portion the image; submitting the first search term to the search engine; and transmitting the information to the device. Some preferred methods further comprise using the device to take a second

Appx308

US 7,899,252 B2

**9**

image of the object; running the computer software to derive a second search term from at least a portion of the second object; and submitting the second search term along with the first search term to the search engine. Other preferred methods include the step of submitting the first search term can advantageously comprise: sending at least the portion of the image to a distal server; running the software on the server; and the server sending the search term to the search engine. Still other preferred methods include a distal server providing the search term(s) to the device, with the device submitting the search term(s) to the search engine.

Analysis of data (whether visual or otherwise) to produce search terms can be accomplished in any suitable manner. Useful techniques include. for example, signal analysis, Fourier analysis, pattern matching, pattern recognition, image recognition, object recognition, wavelet analysis, component analysis, etc.

EXAMPLES

Search terms can be advantageously derived from attribute (s) including name, type, size, color, position, and location, with the derivation performed by algorithm, table/database look-up, hardware device, or other suitable means. For example, consider an example wherein the object being imaged is a poster for the color version of a movie named "Modern Times," starring Charlie Chaplin. The device **410** and/or the server **420** can identify as attributes the text "Modern Times Movie Poster" and "Color Version", and can from that determine search terms such as "Modern Times", "Colorized", "Charlie Chaplin", and "Classic movies". The attributes and search terms in this case could be determined by a human user, a machine algorithm, or some combination of the two.

In another example, a user takes an image of a notebook computer. An algorithm detects the notebook computer in the image and identifies it as being a Model 5, made by ZZZ Corporation. The algorithm then determines the attribute "ZZZ Model 5" and the corresponding search terms, "online shopping", "ZZZ", "notebook", and "5".

An embodiment of particular interest comprises a search using image and/or video input. The device captures one or more of single images, multiple images, motion imagery, and/or video (each and all of these information types are known henceforth as "imagery"). Indeed, the imagery can be captured by more than one electronic imaging device, such as a digital camera, a camera-equipped mobile telephone, or a security camera, or multiple such devices. An object or objects are identified in the imagery via image/object recognition techniques (software and/or hardware). The identity of the object(s) is used to look up, in a table/database, a set of text keywords search terms, which are then provided to a search engine. The search engine returns information addresses (e.g., in the form of a web page with hyperlinks) that are pertinent to the objects identified in the imagery. The user then accesses information and/or computing resources based upon at least one of the information addresses.

Another contemplated embodiment comprises a search using sign language input. Imagery is captured of a person gesturing in sign language. Image/motion recognition techniques are used to translate the sign language into text or other machine-understandable data, such as text. The machine-understandable data is either sent directly to a search engine or is used to determine search terms that in turn are sent to a search engine. The search engine returns information addresses pertinent to the meaning of the sign language or portions thereof.

**10**

Still another embodiment comprises search using speech input. There, human speech is captured by a sound capture and/or recording device. Speech recognition processing is then used to recognize the speech and translate it into machine-understandable data (such as text). The machine-understandable data is either sent directly to a search engine or is used to determine search terms that are in turn sent to a search engine. The search engine returns information addresses pertinent to the meaning of the human speech or portions thereof.

An especially preferred embodiment of this invention comprises a search using camera-equipped portable device. There, imagery is captured by a portable device with a network connection (for example, a cellular telephone). Image recognition processing is then used to recognize at least one object in the imagery. The recognition process can be performed in the portable device, in a distant server, or distributed and/or otherwise shared and performed partly in each. Based on the identity of the object(s), text keywords corresponding to the object(s) are retrieved from a database. As with the image recognition, it is preferred that this process occur on a distant server, although it can be performed on the portable device or on a combination of the portable device and the server. The text keywords are then sent to a search engine. This is accomplished by sending the keywords to an Internet search engine web site as an HTTP transaction, with the search keywords embedded in the URL that is sent to the search engine web site. It is preferred that the HTTP transaction be initiated from the portable device, so that the search results are returned directly to the portable device. In this case, the search keywords would generally first be made available on the portable device; if they were determined on the distant server then they are first sent from the server to the portable device. The search engine results are returned to the portable device as a web page which can then be displayed in the web browser of the portable device. If the HTTP transaction was initiated by the server, then the results web page is made available for viewing on the portable device by one or more various means (the address of the results web page can be sent to the portable device, or the entire web page can be sent to the portable device, or the web page can be stored or converted into another form on the server after which the portable device is directed to the address of the stored or converted page, etc.)

Image Analysis

Preferred image analysis techniques are described in the following, in which FIG. **1** shows the overall processing flow and steps. These steps are described in further detail in the following sections.

In FIG. **2**, for image capture **10**, the user **12** utilizes a computer, mobile telephone, personal digital assistant, or other similar device **14** equipped with an image sensor (such as a CCD or CMOS digital camera). The user **12** aligns the sensor of the image capture device **14** with the object **16** of interest. The linking process is then initiated by suitable means including: the user **12** pressing a button on the device **14** or sensor; by the software in the device **14** automatically recognizing that an image is to be acquired; by user voice command; or by any other appropriate means. The device **14** captures a digital image **18** of the scene at which it is pointed. This image **18** is represented as three separate 2-D matrices of pixels, corresponding to the raw RGB (Red, Green, Blue) representation of the input image. For the purposes of standardizing the analytical processes in this embodiment, if the device **14** supplies an image in other than RGB format, a

**BANK OF AMERICA** IPR2021-01333 **Ex. 1001, p. 15 of 20**

US 7,899,252 B2

11

transformation to RGB is accomplished. These analyses could be carried out in any standard color format, should the need arise.

If the server **20** is physically separate from the device **14**, then user acquired images are transmitted from the device **14** to the Image Processor/server **20** using a conventional digital network or wireless network means. If the image **18** has been compressed (e.g. via lossy JPEG DCT) in a manner that introduces compression artifacts into the reconstructed image **18**, these artifacts can be partially removed by, for example, applying a conventional despeckle filter to the reconstructed image prior to additional processing.

Image type determination **26** can be accomplished with a discriminator algorithm which operates on the input image **18** and determines whether the input image contains recognizable symbols, such as barcodes, matrix codes, or alphanumeric characters. If such symbols are found, the image **18** is sent to the decode symbol **28** process. Depending on the confidence level with which the discriminator algorithm finds the symbols, the image **18** also can or alternatively contain an object of interest and can therefore also or alternatively be sent to the Object Image branch of the process flow. For example, if an input image **18** contains both a barcode and an object, depending on the clarity with which the barcode is detected, the image can be analyzed by both the Object Image and Symbolic Image branches, and that branch which has the highest success in identification will be used to identify and link from the object.

The image can then be analyzed to determine the location, size, and nature of the symbols in the decode symbol **28**. The symbols are preferably analyzed according to their type, and their content information is extracted. For example, barcodes and alphanumeric characters will result in numerical and/or text information.

For object images, one can advantageously perform a "decomposition", in the input image decomposition step **34**, of a high-resolution input image into several different types of quantifiable salient parameters. This allows for multiple independent convergent search processes of the database to occur in parallel, which greatly improves image match speed and match robustness in the database matching **36**. The best match **38** from either the decode symbol **28**, or the image database matching **36**, or both, is then determined. If a specific URL (or other online address) is associated with the image, then an URL Lookup **40** is performed and the Internet address is returned by the URL Return **42**. Code examples are set forth in the priority documents, as well as further detail, including segmentation, segment group generation, bounding box generation, geometric normalization, wavelet decomposition, color cube decomposition, shape decomposition, low-resolution grayscale image generation, grayscale comparison, wavelet comparison, color cube comparison, and calculation of combined match score.

FIGS. **3A** and **3B** show a preferred process flow that can occur within a database matching operation. The algorithm is presented here as containing four nested loops with four parallel processes inside the innermost loop. This structure is for presentation and explanation only. Any actual implementation, although most likely performing the same operations at the innermost layer, can have a different structure in order to achieve the maximum benefit from processing speed enhancement techniques such as parallel computing and data indexing techniques. It is also important to note that the loop structures can be implemented independently for each inner comparison, rather than the shared approach shown in the FIGS. **3A** and **3B**.

12

Preferably, parallel processing is used to divide tasks between multiple CPUs (central processing units) and/or computers. The overall algorithm may be divided in several ways, such as:

| Sharing the Outer Loop | In this technique, all CPUs run the entire algorithm, including the outer loop, but one CPU runs the loop for the first N cycles, another CPU for the second N cycles, all simultaneously. |
|---|---|
| Sharing the Comparison | In this technique, one CPU performs the loop functions. When the comparisons are performed, they are each passed to a separate CPU to be performed in parallel. |
| Sharing the database | This technique entails splitting database searches between CPUs, so that each CPU is responsible for searching one section of the database, and the sections are searched in parallel by multiple CPUs. This is, in essence, a form of the "Sharing the Outer Loop" technique described above. |

Actual implementations can be some combination of the above techniques that optimizes the process on the available hardware.

Another technique employed to maximize speed is data indexing. This technique involves using a priori knowledge of where data resides to only search in those parts of the database that contain potential matches. Various forms of indexing may be used, such as hash tables, data compartmentalization (i.e., data within certain value ranges are stored in certain locations), data sorting, and database table indexing. An example of such techniques is, in the shape comparison algorithm, if a database is to be searched for an entry with an area with a value of A, the algorithm would know which database entries or data areas have this approximate value and would not need to search the entire database.

FIG. **4** shows a simplified configuration of an alternative analytical technique. Boxes with solid lines represent processes, software, physical objects, or devices. Boxes with dashed lines represent information. The process begins with an object of interest: the target object **100**. In the case of consumer applications, the target object **100** could be, for example, beverage can, a music CD box, a DVD video box, a magazine advertisement, a poster, a theatre, a store, a building, a car, or any other object that user is interested in or wishes to interact with. In security applications the target object **100** could be, for example, a person, passport, or driver's license, etc. In industrial applications the target object **100** could be, for example, a part in a machine, a part on an assembly line, a box in a warehouse, or a spacecraft in orbit, etc.

The terminal **102** is a computing device that has an "image" capture device such as digital camera **103**, a video camera, or any other device that an convert a physical object into a digital representation of the object. The imagery can be a single image, a series of images, or a continuous video stream. For simplicity of explanation this document describes the digital imagery generally in terms of a single image, however the invention and this system can use all of the imagery types described above.

After the camera **103** captures the digital imagery of the target object **100**, image preprocessing **104** software converts the digital imagery into image data **105** for transmission to and analysis by an identification server **106**. Typically a network connection is provided capable of providing communications with the identification server **106**. Image data **105** is data extracted or converted from the original imagery of the

**BANK OF AMERICA**

Appx310

US 7,899,252 B2

13

target object **100** and has information content appropriate for identification of the target object **100** by the object recognition **107**, which can be software or hardware. Image data **105** can take many forms, depending on the particular embodiment of the invention. Specific examples are given in the priority documents.

The image data **105** is sent from the terminal **102** to the identification server **106**. The identification server **106** receives the image data **105** and passes it to the object recognition **107**.

The identification server **106** is a set of functions that usually will exist on computing platform separate from the terminal **102**, but could exist on the same computing platform. If the identification server **106** exists on a separate computing device, such as a computer in a data center, then the transmission of the image components **105** to the identification server **106** is accomplished via a network or combination of networks, a cellular telephone network, wireless Internet, Internet, and wire line network. If the identification server **106** exists on the same computing device as the terminal **102** then the transmission consists simply of a transfer of data from one software component or process to another.

Placing the identification server **106** on a computing platform separate from the terminal **102** enables the use of powerful computing resources for the object recognition **107** and database **108** functions, thus providing the power of these computing resources to the terminal **102** via network connection. For example, an embodiment that identifies objects out of a database of millions of known objects would be facilitated by the large storage, memory capacity, and processing power available in a data center; it is very difficult to have such computing power and storage in a portable device. Whether the terminal **102** and the identification server **106** are on the same computing platform or separate ones is an architectural decision that depends on system response time, number of database records, image recognition algorithm computing power and storage available in terminal **102**, etc., and this decision must be made for each embodiment of the invention. Based on current technology, in most embodiments these functions will be on separate computing platforms.

The overall function of the identification server **106** is to determine and provide the target object information **109** corresponding to the target object **100**, based on the image data **105**.

The object recognition **107** and the database **108** function together to:

1. Detect, recognize, and decode symbols, such as barcodes or text, in the image.
2. Recognize the object (the target object **100**) in the image.
3. Provide the target object information **109** that corresponds to the target object **100**. The target object information **109** usually (depending on the embodiment) includes an information address corresponding to the target object **100**.

The object recognition **107** detects and decodes symbols, such as barcodes or text, in the input image. This is accomplished via algorithms, software, and/or hardware components suited for this task. Such components are commercially available (The HALCON software package from MVTec is an example). The object recognition **107** also detects and recognizes images of the target object **100** or portions thereof. This is accomplished by analyzing the image data **105** and comparing the results to other data, representing images of a plurality of known objects, stored in the database **108**, and recognizing the target object **100** if a representation of target object **100** is stored in the database **108**.

14

In some embodiments the terminal **102** includes software, such as a web browser (the browser **110**), that receives an information address, connects to that information address via a network or networks, such as the Internet, and exchanges information with another computing device at that information address. In consumer applications the terminal **102** can be a portable cellular telephone or Personal Digital Assistant equipped with a camera **103** and wireless Internet connection. In security and industrial applications the terminal **102** can be a similar portable hand-held device or can be fixed in location and/or orientation, and can have either a wireless or wire line network connection.

Other object recognition techniques also exist and include methods that store 3-dimensional models (rather than 2-dimensional images) of objects in a database and correlate input images with these models of the target object is performed by an object recognition technique of which many are available commercially and in the prior art. Such object recognition techniques usually consist of comparing a new input image to a plurality of known images and detecting correspondences between the new input image and one of more of the known images. The known images are views of known objects from a plurality of viewing angles and thus allow recognition of 2-dimensional and 3-dimensional objects in arbitrary orientations relative to the camera **103**.

FIG. 4 shows the object recognition **107** and the database **108** as separate functions for simplicity. However, in many embodiments the object recognition **107** and the database **108** are so closely interdependent that they can be considered a single process.

It is usually desirable that the database **108** be scalable to enable identification of the target object **100** from a very large plurality (for example, millions) of known objects in the database **108**. The algorithms, software, and computing hardware must be designed to function together to quickly perform such a search. An example software technique for performing such searching quickly is to use a metric distance comparison technique for comparing the image data **105** to data stored in the database **108**, along with database clustering and multi-resolution distance comparisons. This technique is described in "Fast Exhaustive Multi-Resolution Search Algorithm Based on Clustering for Efficient Image Retrieval," by Song, Kim, and Ra, 2000.

In addition to such software techniques, a parallel processing computing architecture can be employed to achieve fast searching of large databases. Parallel processing is particularly important in cases where a non-metric distance is used in object recognition **107**, because techniques such database clustering and multi-resolution search can not be possible and thus the complete database must be searched by partitioning the database across multiple CPUs.

As described above, the object recognition **107** can also detect identifying marks on the target object **100**. For example, the target object **100** can include an identifying number or a barcode. This information can be decoded and used to identify or help identify the target object **100** in the database **108**. This information also can be passed on as part of the target object information **109**. If the information is included as part of the target object information **109** then it can be used by the terminal **102** or content server **111** to identify the specific target object **100**, out of many such objects that have similar appearance and differ only in the identifying marks. This technique is useful, for example, in cases where the target object **100** is an active device with a network connection (such as a vending machine) and the content server establishes communication with the target

**BANK OF AMERICA**          IPR2021-01333          **Ex. 1001, p. 17 of 20**

US 7,899,252 B2

15

object 100. A combination with a Global Positioning System can also be used to identify like objects by their location.

The object recognition 107 can be implemented in hardware, software, or a combination of both. Examples of each category and additional details are set forth in one or more of the priority documents.

In most embodiments the browser 110 will be a web browser, embedded in the terminal 102, capable of accessing and communicating with web sites via a network or networks such as the Internet. In some embodiments, however, such as those that only involve displaying the identity, position, orientation, or status of the target object 100, the browser 110 can be a software component or application that displays or provides the target object information 109 to a human user or to another software component or application.

In embodiments wherein the browser 110 is a web browser, the browser 110 connects to the content server 111 located at the information address (typically an Internet URL) included in the target object information 109. This connection is effected by the terminal 102 and the browser 110 acting in concert. The content server 111 is an information server and computing system. The connection and information exchanged between the terminal 102 and the content server 111 generally is accomplished via standard Internet and wireless network software, protocols (e.g. HTTP, WAP, etc.), and networks, although any information exchange technique can be used. The physical network connection depends on the system architecture of the particular embodiment but in most embodiments will involve a wireless network and the Internet. This physical network will most likely be the same network used to connect the terminal 102 and the identification server 106.

The content server 111 sends content information to the terminal 102 and browser 110. This content information usually is pertinent to the target object 100 and can be text, audio, video, graphics, or information in any form that is usable by the browser 110 and terminal 102. The terminal 102 and browser 110 send, in some embodiments, additional information to the content server 111. This additional information can be information such as the identity of the user of the terminal 102 or the location of the user of the terminal 102 (as determined from a GPS system or a radio-frequency ranging system). In some embodiments such information is provided to the content server by the wireless network carrier.

The user can perform ongoing interactions with the content server 111. For example, depending on the embodiment of the invention and the applications, the user can:

Listen to streaming audio samples if the target object 100 is an audio recording (e.g., compact audio disc).

Purchase the target object 100 via on-line transaction, with the purchase amount billed to an account linked to the terminal 102, to the individual user, to a bank account, or to a credit card.

In some embodiments the content server 111 can reside within the terminal 102. In such embodiments, the communication between the terminal 102 and the content server 111 does not occur via a network but rather occurs within the terminal 102.

In embodiments wherein the target object 100 includes or is a device capable of communicating with other devices or computers via a network or networks such as the Internet, and wherein the target object information 109 includes adequate identification (such as a sign, number, or barcode) of the specific target object 100, the content server 111 connects to and exchanges information with the target object 100 via a network or networks such as the Internet. In this type of embodiment, the terminal 102 is connected to the content

16

server 111 and the content server 111 is connected to the target object 100. Thus, the terminal 102 and target object 100 can communicate via the content server 111. This enables the user to interact with the target object 100 despite the lack of a direct connection between the target object 100 and the terminal 102.

FIG. 5 shows an embodiment that uses a cellular telephone, PDA, or such portable device equipped with computational capability, a digital camera, and a wireless network connection, as the terminal 202 corresponding to the terminal 102 in FIG. 4. In this embodiment, the terminal 202 communicates with the identification server 206 and the content server 211 via networks such as a cellular telephone network and the Internet.

This embodiment can be used for applications such as the following ("user" refers to the person operating the terminal 202, and the terminal 202 is a cellular telephone, PDA, or similar device, and "point and click" refers to the operation of the user capturing imagery of the target object 200 and initiating the transfer of the image data 205 to the identification server 206):

The user "points and clicks" the terminal 202 at a compact disc (CD) containing recorded music or a digital video disc (DVD) containing recorded video. The terminal 202 browser connects to the URL corresponding to the CD or DVD and displays a menu of options from which the user can select. From this menu, the user can listen to streaming audio samples of the CD or streaming video samples of the DVD, or can purchase the CD or DVD.

The user "points and clicks" the terminal 202 at a print media advertisement, poster, or billboard advertising a movie, music recording, video, or other entertainment. The browser 210 connects to the URL corresponding to the advertised item and the user can listen to streaming audio samples, purchase streaming video samples, obtain show times, or purchase the item or tickets.

The user "points and clicks" the terminal 202 at a television screen to interact with television programming in real-time. For example, the programming could consist of a product promotion involving a reduced price during a limited time. users that "point and click" on this television programming during the promotion are linked to a web site at which they can purchase the product at the promotional price. Another example is a interactive television programming in which users "point and click" on the television screen at specific times, based on the on-screen content, to register votes, indicate actions, or connect to a web site through which they perform real time interactions with the on-screen program.

The user "points and clicks" on an object such as a consumer product, an advertisement for a product, a poster, etc., the terminal 202 makes a telephone call to the company selling the product, and the consumer has a direct discussion with a company representative regarding the company's product or service. In this case the company telephone number is included in the target object information 209. If the target object information 209 also includes the company URL then the user can interact with the company via both voice and Internet (via browser 210) simultaneously.

The user "points and clicks" on a vending machine (target object 200) that is equipped with a connection to a network such as the Internet and that has a unique identifying mark, such as a number. The terminal 202 connects to the content server 211 of the company that operates the vending machine. The identification server identifies the particular vending machine by identifying and decoding the unique identifying mark. The identity of the particular machine is included in the target object information 209 and is sent from the terminal

BANK OF AMERICA          IPR2021-01333          Ex. 1001, p. 18 of 20

US 7,899,252 B2

17

**202** to the content server **211**. The content server **211**, having the identification of the particular vending machine (target object **200**), initiates communication with the vending machine. The user performs a transaction with the vending machine, such as purchasing a product, using his terminal **202** that communicates with the vending machine via the content server **211**.

The user "points and clicks" on part of a machine, such as an aircraft part. The terminal **202** then displays information pertinent to the part, such as maintenance instructions or repair history.

The user "points and clicks" on a magazine or newspaper article and link to streaming audio or video content, further information, etc.

The user "points and clicks" on an automobile. The location of the terminal **206** is determined by a Global Position System receiver in the terminal **206**, by cellular network radio ranging, or by another technique. The position of the terminal **202** is sent to the content server **211**. The content server provides the user with information regarding the automobile, such as price and features, and furthermore, based on the position information, provides the user with the location of a nearby automobile dealer that sells the car. This same technique can be used to direct users to nearby retail stores selling items appearing in magazine advertisements that users "point and click" on.

For visually impaired people:

Click on any item in a store and the device speaks the name of the item and price to you (the items must be in the database).

Click on a newspaper or magazine article and the device reads the article to you.

Click on a sign (building, street sign, etc.) and the device reads the sign to you and provides any addition pertinent information (the signs must be in the database).

FIG. **6** shows an embodiment of the invention for spacecraft applications. In this embodiment, all components of the system (except the target object **300**) are onboard a Spacecraft. The target object **300** is another spacecraft or object. This embodiment is used to determine the position and orientation of the target object **300** relative to the Spacecraft so that this information can be used in navigating, guiding, and maneuvering the spacecraft relative to the target object **300**. An example use of this embodiment would be in autonomous spacecraft rendezvous and docking.

This embodiment determines the position and orientation of the target object **300**, relative to the Spacecraft, as determined by the position, orientation, and size of the target object **300** in the imagery captured by the camera **303**, by comparing the imagery with views of the target object **300** from different orientations that are stored in the database **308**. The relative position and orientation of the target object **300** are output in the target object information, so that the spacecraft data system **310** can use this information in planning trajectories and maneuvers.

Thus, specific embodiments and applications of using image-derived information as search criteria for Internet and other search engines have been disclosed. It should be apparent, however, to those skilled in the art that many more modifications besides those already described are possible without departing from the inventive concepts herein. The inventive subject matter, therefore, is not to be restricted except in the spirit of the appended claims. Moreover, in interpreting both the specification and the claims, all terms should be interpreted in the broadest possible manner consistent with the context. In particular, the terms "comprises" and "comprising" should be interpreted as referring to elements, compo-

18

nents, or steps in a non-exclusive manner, indicating that the referenced elements, components, or steps can be present, or utilized, or combined with other elements, components, or steps that are not expressly referenced. Where the specification claims refers to at least one of something selected from the group consisting of A, B, C . . . and N, the text should be interpreted as requiring only one element from the group, not A plus N, or B plus N, etc.

What is claimed is:

**1**. An image processing and information retrieval system comprising:

a mobile device having a camera, the mobile device configured to capture an image, and configured to transmit data relating to the image to an image processing platform;

the image processing platform configured to receive the data relating to the image and to conduct image processing including:

operating on the data relating to the image to determine if the image contains one or more recognizable symbols; and

decoding the recognizable symbols to extract symbol information by analyzing the recognizable symbols according to type;

a distal server configured to access a database to identify pertinent information associated with the recognizable symbols based on the symbol information; and

the mobile device further configured to receive the pertinent information over a network.

**2**. The system of claim **1**, wherein the pertinent information comprises data that can be utilized to conduct a commercial transaction.

**3**. The system of claim **2**, wherein the mobile device is further programmed to allow a user to automatically make a purchase relating to an object in the image.

**4**. The system of claim **1**, wherein the pertinent information comprises contact information relating to an object in the image.

**5**. The system of claim **3**, wherein the contact information comprises a phone number.

**6**. The system of claim **1**, wherein the recognizable symbols include a bar code.

**7**. The system of claim **6**, wherein the bar code comprises a 2D bar code.

**8**. The system of claim **1**, wherein the pertinent information comprises one of the following types of data: audio, image, video, and text.

**9**. The system of claim **1**, wherein the pertinent information comprises a network address.

**10**. The system of claim **1**, wherein the data relating to the image comprises the image.

**11**. The system of claim **10**, wherein the data relating to the image includes a compressed version of the image.

**12**. The system of claim **11**, wherein the compressed version of the image comprises compression artifacts.

**13**. The system of claim **1**, wherein image processing further includes converting at least a portion of the data relating to the image into grayscale.

**14**. The system of claim **1**, wherein image processing further includes discriminating between the recognizable symbols and other types of objects in the image.

**15**. The system of claim **1**, wherein the distal server is further configured to use the database to identify the pertinent information based on image characteristics derived by the image processing platform based on the data relating to the image.

US 7,899,252 B2

19 20

**16.** The system of claim **1**, wherein the mobile device comprises at least part of the image processing platform.

**17.** The system of claim **16**, wherein the image processing platform is distributed between the mobile device and the distal server.

**18.** A method for retrieving information from image processing, the method comprising:

providing a mobile device having a camera the mobile device configured to capture an image and configured to transmit data relating to the image an image processing platform;

configuring the image processing platform to receive the data relating to the image and to conduct image processing, including:

operating on the data relating to the image to determine if the image contains one or more recognizable symbols; and

decoding the recognizable symbols to extract symbol information by analyzing the recognizable symbols according to type;

providing access to a distal server configured to use a database to identify pertinent information associated with the recognizable symbols based on the symbol information; and

allowing the mobile device to receive the pertinent information over a network.

**19.** The method of claim **18**, further comprising using the pertinent information to conduct a commercial transaction.

**20.** The method of claim **19**, further comprising allowing the mobile device to automatically make a purchase relating to an object in the image.

**21.** The method of claim **18**, wherein the pertinent information comprises contact information relating to an object in the image.

**22.** The method of claim **21**, wherein the contact information comprises a phone number.

**23.** The method of claim **18**, wherein image processing further includes identifying the recognizable symbols as comprising a bar code.

**24.** The method of claim **23**, wherein the bar code comprises a 2D bar code.

**25.** The method of claim **18**, wherein the pertinent information comprises a network address.

**26.** The method of claim **18**, wherein the data relating to the image comprises the image.

**27.** The method of claim **26**, wherein image processing further comprises compressing the image to form the data relating to the image.

**28.** The method of claim **27**, wherein a compressed version of the image comprises compression artifacts.

**29.** The method of claim **18**, wherein image processing further includes converting at least a portion of the data relating to the image into a grayscale image.

**30.** The method of claim **18**, wherein the image processing further includes discriminating between the recognizable symbols and other types of objects in the image.

**31.** The method of claim **18**, further comprising the distal server using database to identify the pertinent information based on image characteristics of the image derived by the image processing platform based on the data relating to the image.

**32.** The method of claim **18**, further comprising providing the image processing platform by distributing image processing of the image between the mobile device and distal server.

**33.** The method of claim **18**, wherein the distal service comprises the image processing platform.

**34.** The method of claim **18**, further comprising returning to the pertinent information to the mobile device as of the following types of data: audio, image, video, and text.

* * * * *

# CERTIFICATE OF SERVICE

I certify that on July 5, 2023, the foregoing brief was filed with the Clerk of Court and caused to be served on all parties through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ George C. Lombardi
GEORGE C. LOMBARDI
*Counsel for Appellant*

July 5, 2023

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,347 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.


/s/ George C. Lombardi
GEORGE C. LOMBARDI
*Counsel for Appellant*

July 5, 2023